1                UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF FLORIDA
2
            CASE NO.: 00-6111-CIV-(DIMITROULEAS/Johnson)
3

4    TURNBERRY CHARTERS, INC.,                    FILED by _____ D.C.

5            Plaintiff,                           DEC - 8 2000

6    vs.                                          CLARENCE MADDOX
                                                  CLERK U.S. DIST. CT.
7    INTERNATIONAL PAPER COMPANY,                 S.D. OF FLA. FT. LAUD.

8            Defendant.
     _____/
9

10

11

12                 DEPOSITION OF DENNIS LAINEY

13

14

15

16          Taken before WAYNE McDANIEL, Professional Reporter,

17   Notary Public in and for the State of Florida at Large,

18   pursuant to Notice of Taking Deposition filed by the

19   Defendant in the above cause.

20
                        ORIGINAL TRANSCRIPT
21

22
     Wednesday, November 15, 2000
23   3801 Hollywood Blvd.
     Hollywood, Florida
24   1:00 - 6:05

25

              KNIPES-COHEN/SPHERION COURT REPORTING
                       (561) 478-0401



```
 1    Appearances:

 2

 3         On Behalf Of The Plaintiff:

 4
               REIMER & ROSENTHAL, LLP
 5             3801 Hollywood Boulevard, Suite 350
               Hollywood, Florida 33021
 6             PHONE:  (954) 893-9800
               BY:  DAVID H. REIMER, ESQUIRE
 7

 8         On Behalf Of The Defendant:

 9
               HOLLAND & KNIGHT, LLP
10             One East Broward Boulevard, Suite 1300
               Fort Lauderdale, Florida  33301
11             PHONE:  (954) 525-1000
               BY:  RICHARD C. HUTCHISON, ESQUIRE
12

13

14    WITNESS:           DIRECT    CROSS

15    Dennis Lainey        3

16    BY MR. HUTCHISON

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2

 3                         -   -   -

 4    Thereupon,

 5                         DENNIS LAINEY

 6    being by the undersigned Notary Public first duly sworn,

 7    was examined and testified as follows:

 8              THE WITNESS:  I do.

 9                    DIRECT EXAMINATION

10    BY MR. HUTCHISON:

11        Q    Mr. Lainey will you please state your full legal

12    name?

13        A    My name is Dennis Raymond Lainey.

14        Q    L-A-I-N-E-Y?

15        A    That's correct.

16        Q    Ever use any other name?

17        A    No.

18        Q    What is your current address?

19        A    2800 Overseas Highway, Number 35-152 Marathon,

20    Florida.

21        Q    That is a house address in the Keys?

22        A    No, that is a mailbox where we get our mail.

23        Q    What is your home address?

24        A    We're, right now we're presently staying on our

25    boat.
```

| | | |
|---|---|---|
| 1 | Q | What marina? |
| 2 | A | At the Driftwood Marina. |
| 3 | Q | That is in the Keys? |
| 4 | A | That is in the Keys. |
| 5 | Q | Whereabouts just -- |
| 6 | A | It's Marathon. |
| 7 | Q | In Marathon? |
| 8 | A | Yes. |
| 9 | Q | What mile marker, do you know? |
| 10 | A | 54, 55 something like that. |
| 11 | Q | What is the name of your boat? |
| 12 | A | Dennel.  D-E-N-N-E-L. |
| 13 | Q | What is the name, what was it named after? |
| 14 | A | It was a combination of my name and my wife's, |

15  Dennis and Nellie.

| | | |
|---|---|---|
| 16 | Q | What is your date of birth? |
| 17 | A | 5/8/50. |
| 18 | Q | And you have a business address different than |

19  your personal residence?

| | | |
|---|---|---|
| 20 | A | No. |
| 21 | Q | You don't have a residence, you are living on |

22  your boat full time?

| | | |
|---|---|---|
| 23 | A | That's right. |
| 24 | Q | Have you ever been deposed before? |
| 25 | A | Yes. |

1       Q       Just briefly, you understand that you're under

2    oath today, correct?

3       A       Yes.

4       Q       The court reporter can only record one of us at

5    a time.  I will try my best to let you finish your answer,

6    I only ask that you let me finish my question, is that

7    fair?

8       A       That is fair.

9       Q       And this is not to test you or to trick you, or

10   I don't want to put words in your mouth.  If there is some

11   reason you don't understand my question, will you let me

12   know that?

13      A       I will.

14      Q       Any reason why we shouldn't go forward with this

15   deposition this morning?

16      A       Not that I'm aware of.

17      Q       At any time during the course of this deposition

18   if you want to change an answer that you gave me earlier

19   in the deposition or modify the answer or add to it or you

20   think of facts that are responsive to a previous question

21   will you let me know so we can go back to that previous

22   question?

23      A       Yes, I will.

24      Q       Similarly if, during the course of this

25   deposition you think of any questions, I'm sorry,

1    documents that are responsive to any previous question or

2    will help you answer any previous question will you let me

3    know that?

4         A    I will.

5         Q    Do you have a personal file dealing with this

6    case?

7         A    No.   The file was given to our attorneys.

8         Q    Mr. Reimer?

9         A    Yes.

10        Q    Do you have any documents pertaining to this

11   case in your possession?

12        A    Not any longer, no.

13        Q    When did you give them to the attorneys?

14        A    When the deal was completed.

15        Q    When the deal was completed, what deal are you

16   referring to?

17        A    The Challenger 600.

18        Q    When Turnberry purchased it from Aero Toy Store?

19        A    Yes.

20        Q    So, then you haven't had any documents in your

21   possession regarding the Challenger 600?

22        A    Other than some requests by Turnberry's office

23   that I supplied, but they have all the information.

24        Q    Well, let me ask you a question, you said you

25   supplied something pursuant to Turnberry's request, what

```
 1   did you supply?

 2        A    All the documents with reference to the aircraft

 3   deal.

 4        Q    You don't have any copies in your possession?

 5        A    No.

 6        Q    Everything has been turned over to Turnberry

 7   well over six or eight months ago?

 8        A    Yes.

 9        Q    And today the documents that you turned --

10             MR. REIMER:  Let me clarify, you asked him

11        whether he has any documents relative to the deal.

12        He turned over all the documents relative to the

13        deal.  Mr. Lainey does have in his possession,

14        because you did not give those to me, you have them,

15        a couple of documents that we felt may be responsive

16        to your subpoena, but are not directly relative to

17        the deal.  For example, his phone records.  So, I

18        don't want you guys to keep going on the wrong track.

19        He does have a couple of documents in his possession

20        that are not directly relative to the deal, but might

21        be responsive to your subpoena.

22             MR. HUTCHISON:  Okay, in whose possession are

23        they in yours or his.

24             MR. REIMER:  Those documents you didn't give

25        them to me, did you?
```

KNIPES-COHEN/SPHERION COURT REPORTING
(561) 478-0401

1        THE WITNESS:  I thought I did, David.

2        MR. REIMER:  No, I thought, I think you took

3     them back.

4        THE WITNESS:  There they are right there.

5        MR. REIMER:  With the exception of a few

6     documents that we have and Mr. Lainey has that we can

7     show you separately, everything else he has turned

8     over to us and we have turned over to you in prior

9     discovery.

10    BY MR. HUTCHISON:

11    Q    Okay, so the only documents that you have, Mr.

12    Lainey, that may be relevant to this case are the

13    documents that are a quarter inch stack of documents

14    Mr. Reimer has in his hand?

15    A    As far as I am aware, yes.

16    Q    You mentioned earlier that you had been deposed

17    before, how many times?

18    A    Dozen times possibly.

19    Q    When was the last time?

20    A    In 1997.

21    Q    What was that regarding generally?

22    A    An IRS matter.

23    Q    Whose IRS matter?

24    A    It was the IRS versus myself, my company.

25    Q    What was the name of the company?

1    A    Jetways.

2    Q    J-E-T-W-A-Y-S?

3    A    Yes.

4    Q    Inc.

5    A    Yes.

6    Q    Is Jetways, Inc. still -- Was this a Florida

7    corporation?

8    A    It was.

9    Q    Now administratively dissolved?

10   A    Yes, it is.

11   Q    What happened in that litigation?

12   A    It was a lawsuit where I was suing the IRS for

13   an IRS audit.

14   Q    Alleging what?

15   A    The suit.

16   Q    Yes.

17   A    That their findings were incorrect.

18   Q    And was the case resolved?

19   A    Yes, it was.

20   Q    Settled?

21   A    Yes.

22   Q    To your satisfaction?

23   A    Yes.

24   Q    What was the case before that?

25   A    There was a case on a aircraft that I was

KNIPES-COHEN/SPHERION COURT REPORTING
(561) 478-0401

1    managing with reference to some damage that was done to

2    the aircraft.

3        Q    Were you the plaintiff or the defendant, were

4    you being sued?

5        A    I was never -- I was just called as a witness.

6    I was deposed for a witness.

7        Q    Have you ever been an expert witness?

8        A    No, I have not.

9        Q    Whether at deposition or trial you have never

10    testified as an expert witness?

11        A    No, I haven't.

12        Q    Have you ever been retained as an expert

13    witness?

14        A    No.

15        Q    In that case you were just testifying regarding

16    the care of the aircraft or the housing of the aircraft?

17        A    Care of the aircraft and how the incident

18    occurred.

19        Q    How about before that?

20        A    I don't recall.

21        Q    Do you recall any of your other ten depositions?

22        A    No.  No, I just --

23        Q    In any of those other ten depositions were you a

24    party to the lawsuit, as opposed to a witness?

25        A    Not that I recall.

```
 1        Q    In those other ten depositions were you
 2   testifying in a corporate capacity as a representative of
 3   a company or in your individual capacity such as something
 4   that you did individually, like a car accident or
 5   something to that effect?
 6        A    It would have been both.
 7        Q    Have you ever testified for Turnberry before?  I
 8   think Turnberry Company, you understand there are
 9   different ones?
10        A    No, not for them.
11        Q    None of the Turnberrys?
12        A    None of the Turnberrys.
13        Q    How about any corporation owned by the Soffers?
14        A    Not that I recall.
15        Q    Now I may have asked you this before, did you
16   ever testify in court before?
17        A    Yes.
18        Q    Regarding what?
19        A    Regarding the aircraft accident that I referred
20   to earlier.
21        Q    That is the one where you were deposed and you
22   also testified in court?
23        A    That's right.
24        Q    Was that in front of a judge or jury?
25        A    It was a judge.
```

```
 1    Q    Where?

 2    A    Pennsylvania.

 3    Q    City, town, county?

 4    A    I think it was Allegheny.

 5    Q    Allegheny County?

 6    A    Yes.

 7    Q    Any other testimony in court?

 8    A    Not that I recall.

 9    Q    Just that one time?

10    A    Uh huh.

11    Q    Is that correct?

12    A    That's correct.

13    Q    You got to say a, yes or no, you can't shake

14  your head or say uh huh because the court reporter needs

15  to get a verbal response, is that okay?

16    A    Okay.

17    Q    Are you currently employed?

18    A    Yes.

19    Q    By who?

20    A    By Turnberry Aviation?

21    Q    Now, I understand Turnberry Aviation and

22  Turnberry Charters are different companies, is that

23  correct?

24    A    That is correct.

25    Q    What is Turnberry Aviation?
```

```
 1      A     Turnberry Aviation is an aviation company doing

 2   business for charter and aircraft sales.

 3      Q     Who owns Turnberry Aviation?

 4      A     I believe it's Jeff Soffer and Jackie Soffer.

 5      Q     Is that S-O-F-E-R?

 6      A     S-O-F-F-E-R.

 7      Q     Who is your direct report at Turnberry Aviation?

 8      A     Jeff Soffer.

 9      Q     How long have you been employed by Turnberry

10   Aviation?

11      A     Approximately five months.

12      Q     So, today is November 15, so since roughly June

13   15?

14      A     Yes.

15      Q     Where is your office located?

16      A     The office of Turnberry Aviation is located at

17   the Opa Locka Airport.

18      Q     Address?

19      A     15001 Northwest 42nd Avenue, Suite 117, Miami,

20   Florida, 33054.

21      Q     Do you have any other offices?

22      A     No.

23      Q     Were you aware that someone was trying to serve

24   you with a subpoena in this case?

25      A     Yes.
```

```
 1        Q    Who told you that?

 2        A    A service agent in Marathon, Florida.

 3        Q    Someone, a service agent, meaning someone who is

 4   a process server, someone who was trying to serve you with

 5   a subpoena?

 6        A    Yes.

 7        Q    Did he call you or see you?

 8        A    She called.

 9        Q    She called you?

10        A    Yes.

11        Q    What happened?

12        A    I returned the call.

13        Q    Did you make yourself available for service?

14        A    No.

15        Q    Why not?

16        A    I wasn't available.

17        Q    You weren't available to pick up a subpoena?

18        A    I wasn't available.

19        Q    Why weren't you available?

20        A    I was busy.

21        Q    What have you been doing with Turnberry Aviation

22   since June 15, 2000?

23        A    Say that again?

24        Q    What have you been doing for Turnberry Aviation

25   since June 15, 2000?  What are your duties,
```

1    responsibilities?

2        A    I was employed by the Turnberry Aviation for the

3    purpose of selling and buying aircraft.

4        Q    Now, are you an independent contractor, or are

5    you on their payroll?

6        A    I am an independent contractor.

7        Q    Do you have any other job other than working for

8    Turnberry?

9        A    No.

10        Q    So, basically your full-time employment for the

11    last five months has been Turnberry?

12        A    Yes.

13        Q    How do you invoice them weekly, monthly,

14    quarterly?

15        A    I invoice them at the end of a deal.

16        Q    What aircraft were you employed for in order to

17    buy or sell?

18        A    For the sell portion is one Canadair Challenger

19    600 aircraft and an Astrojet.

20        Q    You're going to sell both of those?

21        A    I was.

22        Q    Are they sold yet?

23        A    No.

24        Q    The Canadair Challenger 600 is the subject

25    aircraft of this lawsuit, correct?

```
 1     A     That's correct.

 2     Q     And the Astrojet was also for sale?

 3     A     That is correct.

 4     Q     Are there any sales pending on either of those

 5   planes?

 6     A     Sales pending, no.

 7     Q     Does Turnberry Aviation still own both of those

 8   planes?

 9     A     Turnberry Aviation owns the Challenger 600.

10     Q     So, the Astrojet has been sold?

11     A     The Astrojet is owned by a holding company VSC

12   Aviation.

13     Q     VSC Aviation?

14     A     Yes.

15     Q     Who employed you to sell these two aircraft?

16     A     Turnberry Aviation.

17     Q     And neither one has been sold if I understand

18   you correctly?

19     A     That is correct.

20     Q     Are the two still going to be sold, or are they

21   off the block so-to-speak?

22     A     The Astro is off the block and the Canadair

23   Challenger is still for sale?

24     Q     Are you negotiating with any party right now

25   currently as we speak?
```

```
 1      A     Yes.

 2      Q     Any expected date of selling for that plane?

 3      A     Possibly December 15th.

 4      Q     What is the asking price?

 5      A     The asking price for the aircraft, at this time,

 6   is $8,150,000.

 7      Q     Has any work been done to it since it was

 8   purchased from Aero Toy?

 9      A     Yes.

10      Q     What work?

11      A     I would not have a list of all the work that was

12   done to the aircraft.  You would have to get that from

13   flight operations.

14      Q     Larry Aikens would have that?

15      A     Sure.

16      Q     Do you know how much money was put into making

17   the additional renovations or repairs or modifications the

18   aircraft since it was purchased from Aero Toy?

19      A     I wouldn't be involved with those.

20      Q     You don't have any idea what the dollar figure

21   is?

22      A     I wouldn't.

23      Q     You started to tell me what the sell portion of

24   your current employment is, what is the buy portion, is

25   there a buy portion as well?
```

18

```
1      A     To replace the Canadair Challenger.
2      Q     Once the deal is done, whenever it's done
3    December 15, tentatively I know, but whenever it's done,
4    then you will search to find a replacement?
5      A     Or simultaneously.
6      Q     Do you have, are you in the process of
7    negotiations for a purchase as well, now?
8      A     Yes.
9      Q     Are there any other companies with Turnberry
10   other than Turnberry Charters and Turnberry Aviation?
11           MR. REIMER:   Object to form?
12   BY MR. HUTCHISON:
13     Q     You can answer.
14     A     I wouldn't be privy to all their companies.   I
15   know the Turnberry Aviation and ASC Aviation.
16     Q     Well, Turnberry Charters?
17     A     Turnberry Charters.
18     Q     Are you aware of any other Turnberry company
19   other than those?
20     A     Of course Turnberry Associates.
21     Q     Do you do any work with Turnberry Associates?
22     A     Not directly.
23     Q     What do you do for them indirectly?
24     A     They're owned by the same people.
25     Q     Okay, but do you do anything specifically for
```

1    them, do you receive any payments from them?

2        A    No.

3        Q    Do you do anything for Turnberry Charters, any

4    work for Turnberry Charters?

5        A    I have in te past, yes.

6        Q    What specific work?

7        A    Buying and selling aircraft.

8        Q    When is the last time?

9        A    Was the acquisition of the Canadair Challenger.

10       Q    The one that is the subject of this lawsuits?

11       A    That's correct.

12       Q    Anything after that?

13       A    No.

14       Q    Do you have an employment contract or an

15   agreement for your current employment?

16       A    Yes.

17       Q    Who is that with?

18       A    With Turnberry Charters, Inc.

19       Q    Do you have a copy of that with you?

20       A    You have a copy don't you.

21       Q    Did you have an employment agreement or

22   employment contract regarding the acquisition of the

23   Challenger 600, the subject aircraft of this litigation?

24       A    Yes, that is the contract that you have.

25       Q    That one is for the Challenger?  Do you have one

KNIPES-COHEN/SPHERION COURT REPORTING
(561) 478-0401

20

```
 1   currently, for your current term?

 2        A     No, that is the same contract.

 3        Q     It's the same contract?

 4        A     Yes.

 5        Q     This one seems to be for the purchase of a, well

 6   actually for the sale of a Gulfstream GIIB and a Cessna

 7   Citation SII?

 8        A     Yes.

 9        Q     That is what this contract appears to be for?

10        A     And the replacement aircraft.

11        Q     So, the replacement aircraft was the Challenger?

12        A     That is correct.

13        Q     So, then it says this employment agreement shall

14   be in effect from this date until completion of the sale

15   of the two aircraft that we referenced earlier and the

16   purchase of the replacement aircraft, the Challenger 600,

17   which is the subject of this lawsuit?

18        A     Yes.

19        Q     As well as any other aircraft the employer may

20   designate in the future or until terminated by either

21   party by written notice to the other party.  So this has

22   never been terminated, this contract?

23        A     That's right.

24              MR. HUTCHISON:  Can I mark this one as an

25        exhibit or you want to make a copy.
```

```
 1              MR. REIMER:  Go ahead.
 2              MR. HUTCHISON:  I'm going to make this agreement
 3         that you handed to me as exhibit 20.
 4    BY MR. HUTCHISON:
 5         Q    Exhibit 20, that is the contract that we have
 6    been referring to?
 7         A    Yes.
 8         Q    That is the employment agreement or contract
 9    that you understand is in effect today?
10         A    Yes.
11         Q    Has there been any modification, amendment,
12    addendum, additions to that contract, oral or written?
13         A    Yes.
14         Q    Okay, which, oral or written?
15         A    Oral.
16         Q    What are those changes?
17         A    To do business under Turnberry Aviation, LLC and
18    business under ASC Aviation, LLC.
19         Q    Other than that?
20         A    No.
21         Q    What is the second one?
22         A    Turnberry Aviation and --  Turnberry Aviation,
23    LLC and ASC Aviation, LLC.
24         Q    That is what I missed.  Any other changes other
25    than that?
```

1     A     No.

2           MR. HUTCHISON:  David, my question to you is, in

3     the middle of Mr. Aikens' deposition literally in the

4     middle of John Aikens deposition you talked about how

5     you would have to rely on another individual for the

6     corporate rep.  Is he here for the corporate rep

7     portion pursuant to notice as well?

8           MR. REIMER:  No.  Larry Aikens was here.

9           MR. HUTCHISON:  Larry had no knowledge of three

10    quarters of the information, so my question is, is he

11    your corporate rep or not?

12          MR. REIMER:  I haven't --  At the time I

13    designated Larry Aikens, I hadn't designated him as a

14    corporate rep.  He is an employee of Turnberry

15    Aviation, was an employee of Turnberry Charters, as

16    you know, at different times.  That has been the case

17    during this case, during this litigation.

18          MR. HUTCHISON:  For the present time I want to

19    know, I don't want to get into that at this juncture,

20    I just need to know if this gentleman is here in a

21    corporate representative capacity pursuant to the

22    rules of civil procedure?  Yes, or no, is all I need

23    to know.

24          MR. REIMER:  He is here pursuant to the current

25    subpoena for Dennis Lainey, and he is an employee of,

              KNIPES-COHEN/SPHERION COURT REPORTING
                        (561) 478-0401

23

```
 1          he is currently an employee of Turnberry Aviation.
 2              MR. HUTCHISON:  He is not the corporate
 3          representative of the Plaintiff in this case is all I
 4          want to know.
 5              MR. REIMER:  No.
 6              MR. HUTCHISON:  That is correct?
 7              MR. REIMER:  Right.
 8  BY MR. HUTCHISON:
 9      Q    I'm going to tell you where I am going so you
10  can help me through this.  Up until June of 2000, I want
11  to know what you did, but I don't want to work backwards.
12  I like going chronological.  You have a college education?
13      A    Yes.
14      Q    Okay, in what?
15      A    In what program.
16      Q    Do you have a degree?
17      A    No.
18      Q    Where did you go to college?
19      A    Worcester Junior College.
20      Q    How do you spell that?
21      A    W-O-R-C-E-S-T-E-R, in Worcester, Massachusetts.
22      Q    That is, you say, a junior college?
23      A    Yes.
24      Q    What did you study at Worcester?
25      A    Mechanical Engineering.
```

```
 1      Q     And how long did you attend Worcester?

 2      A     Three years.

 3      Q     Did you obtain a degree from Worcester?

 4      A     No.

 5      Q     After you left Worcester, which would be

 6    approximately what, 70, 72, 71?

 7      A     74.

 8      Q     What did you do?

 9      A     I was a pilot.

10      Q     For who?

11      A     For Northeast Airlines.

12      Q     That would have been 74 to what?

13      A     74 for approximately seven months.

14      Q     Okay, now what license or rating do you have, or

15    did you have in 74, let's start there?

16      A     In 74.

17      Q     Do you remember?

18      A     Let's see, I had a private pilot's license,

19    airplane, single multi-engine land commercial pilot's

20    license, single multi-engine land airline transport

21    pilot's license, flight instructor airplane.

22      Q     That's all in 74, you had all these?

23      A     Yes.

24      Q     Were you in the military?

25      A     Yes.
```

```
 1        Q      What branch?

 2        A      In the Army.

 3        Q      Is that where you obtained your ratings?

 4        A      No.

 5        Q      What did do you in the Army?

 6        A      I was a pilot.

 7        Q      When did you first obtain a rating or license,

 8   what year?

 9        A      1965.

10        Q      What years were you in the Army?

11        A      1968 to 1973.

12        Q      Specifically what was your rank?

13        A      I was a Warrant Officer.

14        Q      Honorable discharge?

15        A      Yes.

16        Q      Were you in Nam?

17        A      No.

18        Q      Let's go back, why did you leave Northeast

19   Airlines?

20        A      The company merged with another airline and shut

21   down the training program.

22        Q      So you were in training during those seven

23   months?

24        A      That's correct.

25        Q      After you left Northeast, where did you go?
```

| | | |
|---|---|---|
| 1 | A | To Portland, Maine. |
| 2 | Q | Did you find employment? |
| 3 | A | Yes. |
| 4 | Q | What did you do? |
| 5 | A | I was a pilot. |
| 6 | Q | For who? |
| 7 | A | For Priority Air. |
| 8 | Q | How long? |
| 9 | A | A little over a year. |
| 10 | Q | Why did you leave Priority Air? |
| 11 | A | For other employment. |
| 12 | Q | Where did you go? |
| 13 | A | To Corporate Air. |
| 14 | Q | What did you do -- Where is Corporate Air based |
| 15 | | out of? |
| 16 | A | Out of Hartford, Connecticut. |
| 17 | Q | I assume you flew for them? |
| 18 | A | Yes. |
| 19 | Q | What did you fly at Corporate Air? |
| 20 | A | Say that again. |
| 21 | Q | Corporate Air, what kind of planes did you fly? |
| 22 | A | We had twin engine turbo props, small jets, |
| 23 | | various aircraft we used for cargo planes. |
| 24 | Q | How long were you with Corporate Air? |
| 25 | A | Up through 1979. |

KNIPES-COHEN/SPHERION COURT REPORTING
(561) 478-0401

```
 1    Q   Why did you leave?

 2    A   For other employment.

 3    Q   Where did you go in 1979?

 4    A   To Miami, Florida.

 5    Q   Who did you work for?

 6    A   For Aventura Country Club.

 7    Q   What did you do for Aventura Country Club?

 8    A   I was a pilot.

 9    Q   Who did you report to at Aventura Country Club?

10    A   Don Soffer.

11    Q   How long were you employed with Aventura Country

12  Club?

13    A   1982.

14    Q   Pilot the whole time?

15    A   Yes.

16    Q   Why did you leave Aventura?

17    A   Shut down the aviation department.

18    Q   Where did you go after Aventura?

19    A   I started a company called Jetways.

20    Q   What did Jetways, Inc., do?

21    A   Jetways was an aviation management group.

22    Q   Tell me what an aviation management group does?

23    A   It manages corporate aircraft.

24    Q   Manage their charters or the corporation owns

25  them and you go in and you manage them?
```

```
 1      A    We go in and manage, we charter the aircraft, we

 2   buy and sell the aircraft.

 3      Q    Were you the sole owner of Jetways, Inc.

 4      A    Yes.

 5      Q    How long was Jetways, Inc., in business?

 6      A    Until 1996.  I believe it was shut done the year

 7   end.

 8      Q    Did it file bankruptcy?

 9      A    No.

10      Q    Just closed it down?

11      A    Dissolved the company.

12      Q    Why?

13      A    Left for family medical reasons.

14      Q    Were you or are you ill today?

15      A    I was.  I was at that time.

16      Q    What was the matter?

17      A    I had hypertension and a minor stroke.

18      Q    Any problems since then?

19      A    It's continuing blood pressure and problems,

20   sure.

21      Q    Any other strokes?

22      A    No.

23      Q    Bob Cassidy, do you know that name?

24      A    Yes.

25      Q    How?
```

```
 1     A     He's the manager for Midcoast Aviation in St.

 2   Louis.

 3     Q     Bob Cassidy, is that what you --

 4     A     No, I'm sorry, no, sir, Bob Cassidy is with

 5   International Paper.

 6     Q     Did you ever meet Bob Cassidy in person?

 7     A     No.

 8     Q     Never met him in person?

 9     A     No.

10     Q     Have you ever spoken with him?

11     A     No.

12     Q     Never had a telephone conversation with Bob

13   Cassidy?

14     A     No, not that I recall.

15     Q     I see you're referring to something, did you

16   take some notes or chronology of events?

17     A     These are notes that I just prepared for this

18   deposition.

19     Q     Did you look at any documents to prepare your

20   notes?

21     A     Just the documents that we have here.

22     Q     Those notes help you organize your thoughts for

23   today, to refresh your recollection?

24     A     Yes.

25     Q     Other than Mr. Cassidy, are you aware of any
```

```
 1    other employees from International Paper that were

 2    involved in the subject transaction?

 3         A    No.

 4         Q    Did you ever speak with a Mr. Carter?

 5         A    I'm not sure.

 6         Q    Did you ever speak with anyone from

 7    International Paper Company?

 8         A    Yes, I did.

 9         Q    When?

10         A    It was the first contact that I had with

11    International Paper, it was on or about June 18, 1999.

12         Q    Tell me how this first contact with

13    International Paper came about?

14         A    Its was soliciting all of the Challenger 600

15    owners to check and see if their aircraft was available to

16    sell.

17         Q    When you say you were soliciting all the

18    Challenger 600 owners, you got a list of them from

19    somewhere or you saw their ads?

20         A    We had, we got a list.

21         Q    Of all registered owners?

22         A    Yes.

23         Q    So, you didn't see an ad regarding the sale, you

24    just stumbled upon International Paper, is that your

25    testimony?
```

```
 1        A     You don't stumble upon it, I mean, you go
 2   through all the owners in looking for an aircraft to sell.
 3        Q     When I say, stumble upon, what I'm talking, you
 4   didn't know they were selling the jet, you were calling up
 5   and asking if they were selling the jet?
 6        A     Yes.
 7        Q     Not like you saw an ad for that.  Okay, I'm
 8   going to call them up.  You were just going down the list
 9   hoping to find one for sale?
10        A     Yes.
11        Q     That is what I mean by stumbling on it?
12        A     Yes.
13        Q     So, how did you come up -- So, you have a list,
14   International Paper -- What do you do -- Did you then
15   get a phone number and person to speak with?
16        A     Yes, we have --  That information is readily
17   available from the different agencies, the registration
18   agencies throughout the world, and that is my job, that is
19   what I do.
20        Q     What registration agencies did you use to find
21   out?
22        A     There would be a list of aircraft owners from
23   the FAA.
24        Q     Okay, and do you remember whose name was listed
25   as far as an International Paper representative?
```

KNIPES-COHEN/SPHERION COURT REPORTING
(561) 478-0401

```
 1    A    It would be a Bob Cassidy or a John Dillon.

 2    Q    Did you call one of those two individuals?

 3    A    I called the number, but I don't believe I

 4  talked to either one of those individuals.  I see in here

 5  that Bob Cassidy is chief pilot.  I was talking to the

 6  mechanic.

 7    Q    So, I just want to make sure I got the players

 8  right.  The first person you called then was a mechanic?

 9    A    Yes.

10    Q    Is that correct?

11    A    I believe so, yes.

12    Q    What does the mechanic tell you?

13    A    Told me that the aircraft was for sale and it

14  was being handled by Ed Dahlberg of Emerald Aviation.

15    Q    So the person you spoke with was a mechanic?

16    A    I believe so.

17    Q    Do you remember any other details about that

18  initial conversation with an International Paper employee,

19  in this case the mechanic?

20    A    It was very short.

21    Q    You obtained Mr. Dahlberg's name, and then what

22  did you do?

23    A    I called Mr. Dahlberg.

24    Q    After that initial contact did you have any

25  future contact directly with any employee of International
```

1   Paper Company?

2        A    No.

3        Q    So, when I asked you if you heard of a

4   Mr. Carter, you're only saying that if that was the

5   mechanic's name?

6        A    Yes.

7        Q    Is that correct?

8        A    That is correct.

9             MR. HUTCHISON:  This is off the record.

10            (A discussion was held off the record.)

11   BY MR. HUTCHISON:

12        Q    All right, ready.  I may have asked you this and

13   if I did I apologize.  We had a little distraction off the

14   record.  Let me ask you again, if I did I apologize.

15   Other than this initial contact that you just told us

16   about with an individual who you thought was a mechanic,

17   did you ever have any other direct contact with an

18   employee of International Paper Company throughout this

19   transaction and lawsuit?

20        A    No.

21        Q    To this day, as you sit here today, have you

22   ever spoken with any other employee of International Paper

23   Company to your knowledge?

24        A    Not that I am aware of.

25        Q    We will go back to your initial phone

                  KNIPES-COHEN/SPHERION COURT REPORTING
                            (561) 478-0401

```
 1    conversation.  You don't recall any other details, other
 2    than basically you got Emerald Aviation and Mr. Dahlberg's
 3    name?
 4        A    Yes.
 5        Q    I assume you got a number?
 6        A    Yes, a telephone number.
 7        Q    You then do what?
 8        A    I'm sorry?
 9        Q    You then do what?  Did you call Mr. Dahlberg
10    that day?
11        A    I'm not sure if it was the same day of the
12    contact with International Paper, it could have been the
13    next day or, you know, in that area.
14        Q    You gave me a date on or about earlier of June
15    18, 99, how do you know it was that date?
16        A    I know June 18 was my first contact with Ed
17    Dahlberg.
18        Q    Okay, so the conversation with the person you
19    thought was a mechanic was a day or two before that?
20        A    Would be several weeks of research going through
21    all these aircraft.
22        Q    Sometime during that course?
23        A    Yes.
24        Q    You then call Mr. Dahlberg on June 18, how do
25    you remember that date?
```

1     A     I remember that date because it was on a Friday.

2     It was an easy day to remember.

3     Q     June 18, 1999 was Friday?

4     A     Yes.

5     Q     You called Mr. Dahlberg and tell us about that

6     conversation?

7     A     It was an inquiry on the aircraft.

8     Q     I don't know, you call him up, you say I

9     understand there is an aircraft for sale, you tell me what

10    happened, I mean, the contents of the conversation?

11    A     He told me about the airplane, and we exchanged

12    information back and forth.  And see if we can get

13    together and do some kind of a deal.

14    Q     Okay, what other details of that first

15    conversation do you recall?

16    A     The total specifications of the aircraft.

17    Q     During the first conversation on June 18, 1999

18    when Mr. Dahlberg,  Mr. Dahlberg would have told you the

19    specifications of the aircraft?

20    A     Wait a second.  Let's me go back to my note

21    here.  I would like to change that statement.  On June 18,

22    my first contact was with Ed Dahlberg, I left a message

23    for him.  And Ed Dahlberg returned the call to me on June

24    18, we had the conversation from the return call.

25    Q     And you're reading off your notes, again?

                KNIPES-COHEN/SPHERION COURT REPORTING
                          (561) 478-0401

```
 1        A     That is correct.

 2        Q     All right, I just want to mark your notes as an

 3   exhibit, exhibit 21 in the bottom right-hand corner.  What

 4   is that, six pages?

 5        A     Yes.

 6        Q     Okay, now, he called back on the 18th, or

 7   returned your, the message that you had left him, and tell

 8   me about that conversation?  Mr. Dahlberg would have gave

 9   you the specifications of the aircraft, which were

10   generally what, it was a Canadair Challenger 600?

11        A     On the 19th he returned the call and gave me his

12   telephone number at home and his office number.  And it

13   wasn't until the 19th, Saturday that we had the

14   conversation on the particulars on the aircraft.

15        Q     And you're again reading from your notes?

16        A     That's right.

17        Q     So, you left a message for him on the 19th, he

18   returned your message and left a message, then you

19   actually had a conversation on the 19th?

20        A     That's right.

21        Q     All right, I'm with you.  Now tell me about that

22   conversation on June 19?

23        A     It was a Saturday, the 19th, we had a

24   conversation reference the airplane, the specifications of

25   the airplane, and generally the maintenance on the
```

1    airplane, the condition of it.

2              And we were able to get together and strike up a

3    deal on the airplane.

4         Q    Okay, he tells you about the specifications,

5    gives you a maintenance history, does he tell you what the

6    asking price was?

7         A    Yes.

8         Q    What was the asking price?

9         A    It was $7,250,000.

10        Q    And this is, again, during that first

11   conversation on June 19?

12        A    Yes.

13        Q    He tells you the specs, the maintenance history,

14   gives you an asking price, any other details regarding the

15   plane?

16        A    I'm sure there were numerous details that we --

17        Q    What do you have down in your notes?

18        A    My notes say that we made a deal of $7,000,000.

19   He wanted a written executed offer.  He wanted $250,000

20   deposit put in escrow.

21             And he was concerned about payments on

22   Turnberry's part of Midcoast Aviation for any review of

23   the aircraft.

24        Q    What was his concern about payment?

25        A    That work would be done to the aircraft and

KNIPES-COHEN/SPHERION COURT REPORTING
(561) 478-0401

```
 1    Turnberry wouldn't be paying for the work.

 2        Q    He was concerned that they would not be paid?

 3        A    That is right.

 4        Q    What did you -- How did you respond to his

 5    concerns?

 6        A    Well, we struck up an arrangement to set up a

 7    deposit, and was going to be $100,000 deposit in escrow,

 8    and a $50,000 deposit to Midcoast Aviation.

 9        Q    So, that any work done by Midcoast then would

10    have been taken out of the $50,000?

11        A    That was going to be the original arrangement,

12    yes.

13        Q    What else during this initial conversation on

14    June 19?

15        A    We went through the terms of the initial

16    arrangement and contract.

17        Q    Okay, you and Mr. Dahlberg?

18        A    Yes, that's right.

19        Q    On the phone?

20        A    Yes.

21        Q    What were those terms?  I see you're reading

22    through exhibit 21 still are those terms in exhibit 21 as

23    well?

24        A    No, we have the, we have the offer, the contract

25    for that.
```

39

```
 1              MR. REIMER:  Well, just tell Mr. Hutchison what
 2        document you would need to look at in order to answer
 3        his question and then we will take it from there.
 4              THE WITNESS:  Okay, I need the document that
 5        shows the original contract.
 6    BY MR. HUTCHISON:
 7        Q    Fair enough.  You're talking about the June 19
 8    letter that you signed on behalf of Turnberry?
 9        A    Yea.
10        Q    Before I get there let me show you what was
11    previously marked as exhibit 18, I'm sorry, strike that,
12    exhibit 19, do you recall ever seeing that?
13        A    Yes.
14        Q    When did you first see that?
15        A    I don't recall.
16        Q    Do you know if that was when it was for sale by
17    International Paper or when it was for sale by
18    International Paper's predecessor, the previous owner of
19    the plane?
20              MR. REIMER:  Object to the form.
21              THE WITNESS:  I don't recall.
22    BY MR. HUTCHISON:
23        Q    Do you know where you would have seen exhibit
24    19?
25        A    This, I believe is in a publication called
```

1    Business Air Today.

2        Q    You would have saw it in that publication?

3        A    These are publications that I would look at?

4        Q    To find planes?

5        A    Yes.

6        Q    I'm asking that because 19 was produced to me by

7    your attorney, so I would assume it was in your file?

8        A    Yes.

9        Q    You would have copied it out of the Business Air

10   Today Magazine?

11       A    Sure, sure.

12       Q    Take a look at what was previously marked as

13   exhibits 18, tell me if that is what you're referring to?

14       A    Yes.

15       Q    Let me see exhibit 21 for a second, please?   Now

16   let's talk about exhibit 18, which is a June 19, 1999

17   letter, did you draft that letter?

18       A    Yes.

19       Q    When you drafted that letter, what did you do

20   with it?

21       A    Yes, after drafting this letter, I faxed it, I

22   faxed it Sunday, June 20, to Ed Dahlberg's office.

23       Q    When you drafted this letter, did you have

24   anybody review it other than yourself?

25       A    Yes.

1    Q    Who?

2    A    The terms of the contract were gone over by

3    Mr. Soffer.

4    Q    Which Mr. Soffer, I understand there is more

5    than one Mr. Soffer?

6    A    There is Don and Jeff Soffer.

7    Q    So, both Don and Jeffrey Soffer would have

8    reviewed exhibit 19?

9    A    Over the phone.

10    Q    Did you fax them a copy or did your read it to

11    them on the phone?

12    A    I read it to them on the phone.

13    Q    To both individuals?

14    A    Yes, I believe so.

15    Q    Both of the Mr. Soffers approved the letter?

16    A    Yes.

17    Q    You then faxed it to Mr. Dahlberg?

18    A    Yes.

19    Q    Did Mr. Dahlberg have any comments or --  This

20    is your offer, so, I guess, Dahlberg doesn't have the

21    right to edit or delete anything from it, correct?

22    A    No, that is not correct.

23    Q    Tell me about that?

24    A    These are the terms of the agreement that was

25    made between Turnberry and Ed Dahlberg representing

```
 1    International Paper.

 2         Q    Exhibit 18, it's your testimony that these terms

 3    were agreed upon on the phone and you just wrote them

 4    down?

 5         A    That's correct.

 6         Q    You then drafted exhibit 18, which is the

 7    June 19, 1999 letter and sent it to Mr. Dahlberg?

 8         A    That's correct.

 9         Q    What date did you send it to Mr. Dahlberg?

10         A    June 20, Sunday.

11         Q    So, then you're reading from your exhibit 21,

12    correct?

13         A    That's correct.

14         Q    When Mr. Dahlberg, did he call you when he

15    received this letter, or like did you call him and say I'm

16    faxing it now or I will be faxing it this afternoon, or

17    I'll fax it tomorrow, any conversation regarding

18    Mr. Dahlberg's receipt of exhibit 18?

19         A    I don't recall.

20         Q    When is the next time you heard from Mr.

21    Dahlberg after your faxing him the June 19 letter, which

22    is exhibit 18?

23         A    On June 21 I received a fax return

24    counter-signed by International Paper on the contract.

25         Q    I want to go chronological, Mr. Lainey,
```

1    chronologically Mr. Lainey, help me.  The exhibit 18 that

2    is drafted after your first telephone conference or

3    conversation with Mr. Dahlberg on June 19, is that

4    correct?

5        A    That's correct.

6        Q    You draft exhibit 18, have the Soffers review it

7    over the telephone, and the next day, which is June 20,

8    1999, you fax exhibit 18 to Mr. Dahlberg, is that correct?

9        A    That's correct.

10       Q    In between the first conversation with

11   Mr. Dahlberg and the time you faxed exhibit 18, to Mr.

12   Dahlberg on June 20, 1999, did you have any additional

13   conversations with Mr. Dahlberg?

14       A    I don't recall.  I could have.  I don't recall.

15   The largest conversation we had was the first conversation

16   when we agreed on the deal.

17       Q    When you -- Okay, well, let me ask you this, so

18   you don't recall any conversations between that first

19   telephone conversation with Mr. Dahlberg and the time you

20   faxed exhibit 18 to Mr. Dahlberg, is that correct?

21       A    That's correct.

22       Q    And then from the time you faxed exhibit 18 to

23   Mr. Dahlberg until June 21st, when exhibit 18 comes back

24   to you via facsimile, signed by International Paper

25   Company, did you have any conversations with Mr. Dahlberg?

KNIPES-COHEN/SPHERION COURT REPORTING
(561) 478-0401

1          A      I don't recall.

2          Q      Exhibit 21 is kind of your diary or your notes

3     in this case, do you have any other written reports, day

4     timers, diaries, journals of any kind that would --

5          A      Exhibit 21 is not a diary, there is, these are

6     notes that I comprised for purposes of this deposition.

7     This was not taken at the time that the event happened.

8          Q      Well, when did you create exhibit 21?

9          A      Within the past 24 hours.

10         Q      That is my point, prior to your creation of

11    exhibit 21, did you have any written diaries, journals,

12    day timers, entries, notes, reports, documents of any kind

13    with notes on it regarding the chronology of events that

14    occurred in this case?

15         A      Not that I saved or recall.

16         Q      Do you recall --

17         A      I mean, when you're doing a deal, you're always

18    flipping things down, but there's nothing I saved.

19         Q      Do you have any of those notes, are any of those

20    notes in existence today?

21         A      No.

22         Q      In other words, a lot of your testimony is, you

23    don't recall as you sit here today, is there something

24    that you could go to and refresh your recollection other

25    than exhibit 21?

KNIPES-COHEN/SPHERION COURT REPORTING
(561) 478-0401

```
 1      A     No.

 2      Q     Exhibit 21 is it?

 3      A     This is it.

 4      Q     Okay, fair enough.  So, as you sit here today,

 5   you don't recall having any conversations with Dahlberg

 6   from June 19, your initial conversation with him, until

 7   after you received exhibit 18 executed by International

 8   Paper, is that correct?

 9      A     That's correct.

10      Q     You received exhibit 18 approximately when,

11   21st?

12      A     June 21st.

13      Q     Once you receive it what do you do?

14      A     We make arrangements to examine and review the

15   aircraft for purposes of our purchase.

16      Q     When was that?

17      A     The arrangements, the coordination of the

18   arrangements were started on June 19.

19      Q     And any and all coordination of arrangements

20   would have been done through Mr. Dahlberg?

21      A     No.  Well, no, not necessarily.  And not at that

22   time on the 19th, no.

23      Q     Okay, what did you do on the 19th regarding

24   coordination of arrangements?

25      A     Contacted the manufacturer of the aircraft to
```

```
 1   gain information on maintenance logs.  I contacted a Ken
 2   Murray, at that time, to inquire if he would be available
 3   to represent us in a review of the aircraft, aircraft
 4   records, and work in our behalf.
 5       Q    Was he available?
 6       A    Yes.
 7       Q    Did you do anything else on the 19th?
 8       A    No, other than reviewing it with the Soffers.
 9       Q    How about on the 20th, I know you faxed exhibit
10   18 to Dahlberg, anything else?
11       A    No, I don't recall anything else.
12       Q    How about on the 21st, when you received exhibit
13   18 back from Dahlberg, did you do anything else?
14       A    Yes.
15       Q    What did you do?
16       A    Contacted Ken Murray to set up a schedule for
17   him to go to Midcoast Aviation in St. Louis.
18       Q    This would have been on what day?
19       A    Monday the 21st.
20       Q    Monday the 21st you would have asked Murray to
21   go to Midcoast Aviation on which day?
22       A    As I recall it was as soon as we could possibly
23   get him out there.  As I recall there was a problem with
24   the airline reservations, and Ken said that the very
25   earliest he could be there would be on Wednesday morning
```

1    arriving, I believe, it was 9:00 a.m.

2         Q    And that would be at Midcoast Aviation in St.

3    Louis?

4         A    That is correct.

5         Q    You asked him to do that.  He went ahead and

6    booked a flight, I assume?

7         A    Yes.

8         Q    On the 21st did you have any conversations with

9    Dahlberg?

10        A    I'm sure I did, but I have nothing that is

11    recorded here on that.

12        Q    Do you have any documents on exhibit 21

13    regarding that?

14        A    No.

15        Q    Do you have anything documented anywhere

16    regarding any conversations with Dahlberg on or before

17    June 21, other than the initial conversation we discussed?

18        A    Other than receiving a fax from him on the 21st.

19        Q    That is exhibit 18?

20        A    No.

21        Q    What else did you receive from Mr. Dahlberg

22    other than exhibit 18 on the 21st?

23        A    We received a first draft of a more complete

24    aircraft sales arrangement from International Paper.

25        Q    It was from Dahlberg or directly from

```
 1   International Paper Company?

 2        A    I believe it was from Ed Dahlberg.

 3        Q    Regarding the purchase and sale negotiations of

 4   the subject aircraft, did you ever speak directly with

 5   anybody from International Paper Company?

 6        A    No.

 7        Q    Solely all your communications were totally with

 8   Mr. Dahlberg?

 9        A    Yes.

10        Q    On the 21st did you tell Mr. Dahlberg that you

11   intended to send Mr. Murray out to Midcoast Aviation?

12        A    I have no recollection of it.

13        Q    Is that recorded on exhibit 21?

14        A    No.

15        Q    Would it be recorded anywhere else?

16        A    No.

17        Q    Other than receiving exhibit 18 from Mr.

18   Dahlberg and receiving the draft purchase agreement from

19   Mr. Dahlberg, did you receive anything else from Mr.

20   Dahlberg on June 21st?

21        A    We received the signed exhibit 18, and we

22   received the additional fax.

23        Q    The draft agreement?

24        A    The draft agreement, that is correct.

25        Q    Anything else?
```

```
 1      A     No, not that I am aware of.

 2      Q     Do you recall any additional conversations with

 3    Mr. Dahlberg that you haven't told me about yet, which

 4    occurred on June 21st, 1999?

 5      A     Not that I recall, but I'm sure there was

 6    conversations.

 7      Q     Do you remember the contents of any of those

 8    conversations?

 9      A     No.

10      Q     Are they recorded in your exhibit 21?

11      A     No.

12      Q     Recorded anywhere else that you have knowledge

13    of?

14      A     No.

15      Q     Anything else happen, did anything else happen

16    on June 21st, 1999 regarding the purchase or sell of the

17    subject aircraft that you can recall today?

18      A     I'm sure I made several phone calls in

19    preparation for the purchase of the aircraft.

20      Q     What phone calls would you have made in

21    preparation for the sell?

22      A     To the manufacturer of the aircraft.

23      Q     For what purpose?

24      A     To check the maintenance status for that

25    particular type aircraft.
```

1    Q    What is a maintenance status?

2    A    Maintenance status would be an inspection

3    sequence for aircraft.  What inspections I should be

4    looking for in completion for this particular aircraft.

5    Q    Like a 7200 hour?

6    A    Like a 7200 hour.

7    Q    Other than the manufacturer, who else would you

8    have made arrangements with or made phone calls to?

9    A    I did, I believe at that time, I talked to a

10    pilot, but that was a former test pilot for Canadair

11    Bombardier.

12    Q    B-O-M-B-A-R-D-I-E-R, Bombardier.  Who was that

13    gentleman?

14    A    I don't recall the name.

15    Q    Why did you call him?

16    A    It was a name given to me by the manufacturer,

17    to gain more information about the characteristics of the

18    aircraft and the performance of the airplane.

19    Q    Were you licensed to fly the subject aircraft?

20    A    No.

21    Q    You don't have the rating to fly this Challenger

22    600?

23    A    I do have the airline transport pilot's license,

24    but I'm not current in training or time in that aircraft.

25    Q    So you could not have flown the subject aircraft

KNIPES-COHEN/SPHERION COURT REPORTING
(561) 478-0401

1    back in June or July of 1999?

2        A    Not without being checked out, no.

3        Q    You called a pilot, you don't recall his name,

4    did you have his name recorded anywhere?

5        A    No.  I'm sure it's on my telephone log here

6    somewhere.  There is no names on it, but it's one of the

7    phone numbers.

8        Q    Okay, fair enough.  What was your conversation

9    with this gentleman, again?

10       A    He was recommended to me by the manufacturer as

11   being one of the most experienced pilots in this type of

12   aircraft.  I'm sorry, let me take that back, there is the

13   pilot's name right there.

14       Q    Let's just mark that as exhibit 22 so we don't

15   get confused.  Exhibit 22 is a seven page document which,

16   I believe, the first six pages are the list of registered

17   owners of the Challengers that you talked about earlier?

18       A    That's correct.

19       Q    And the last page has some handwritten notes, is

20   that your handwriting on the seventh page?

21       A    Yes, it is.

22       Q    What was the pilot's name?

23       A    John Kermicheck.

24       Q    Spell that the best you can for us?

25       A    I have it as K-E-R-M-I-C-H-E-C-K.

KNIPES-COHEN/SPHERION COURT REPORTING
(561) 478-0401

1    Q    Phonetically?

2    A    Right.

3    Q    Now, again, I know I asked you this and we never

4    got the answer, you called him, you got his name from the

5    manufacturer, because he was a qualified pilot, but your

6    purpose of calling him was what?

7    A    The purpose of calling him was to ask him about

8    the performance of the aircraft and check the performance

9    of the aircraft, and to inquire on whether or not he could

10    recommend any pilots for permanent employment.

11    Q    What did he tell you?

12    A    As a matter of fact he told me that he could be

13    available in the future for permanent employment.

14    Q    Any other conversations with that gentleman?

15    A    That was the last conversation I had with him.

16    Q    Any other details of that first and only

17    conversation with him?

18    A    That's it.

19    Q    So, essentially you were just seeing how the

20    plane flew and if there were any negative or bad

21    characteristics of the plane?

22    A    That's correct.

23    Q    Which is an information gathering telephone

24    call?

25    A    Yes.

1    Q    Research on your part?

2    A    Yes.

3         MR. REIMER:   When it gets to a point where it's

4    convenient I'm going to have to go to the restroom.

5         MR. HUTCHISON:   We can take a break right now.

6         (A short recess was taken.)

7    BY MR. HUTCHISON:

8    Q    I believe that we got through you setting up a

9    schedule for Mr. Murray, for him to get to Midcoast on

10   Wednesday the 23rd of June, 1999, is that correct?

11   A    That's correct.

12   Q    I see on exhibit 21 you also have a notation

13   that you called Steve Bates at Midcoast, have you ever

14   dealt with Steve Bates before?

15   A    I'm not sure.  I have been in aviation all my

16   life, you know.  He is --  Not that I recall, but it

17   wouldn't surprise me if I have in the past.

18   Q    Did you ever deal with Ken Murray prior to this

19   transaction in June of 1999?

20   A    No.

21   Q    Since June of 1999 have you had any dealings

22   with Mr. Murray?

23   A    I had telephone contact.

24   Q    Regarding?

25   A    Regarding this case.

```
 1    Q    How recently?

 2    A    The last contact I had with Ken Murray was

 3  July 27.

 4    Q    Of which year?

 5    A    1999.

 6    Q    Okay, so it would have been regarding the

 7  subject aircraft?

 8    A    The Canadair Challenger 600.

 9    Q    Fifteen months ago?

10    A    Yes.

11    Q    Have you talked to him since then?

12    A    No.

13    Q    Any business dealings with him since then?

14    A    No.

15    Q    You speak with Ken Murray, he can go to St.

16  Louis, you called Steve Bates to arrange or let him know

17  that Mr. Murray is on his way, did you get Mr. Bates'

18  number from Ed Dahlberg?

19    A    I don't recall how I got his number.

20    Q    Well, Mr. Dahlberg would have informed you that

21  the plane was at Midcoast Aviation in St. Louis?

22    A    Yes.

23    Q    You would have called Mr. Bates and informed him

24  that Mr. Murray had already called him and this is all on

25  June 22nd?
```

KNIPES-COHEN/SPHERION COURT REPORTING
(561) 478-0401

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Other than what is recorded in exhibit 21, |
| 3 | | anything else of significance happen on June 21st, 1999? |
| 4 | A | June 21st, no. |
| 5 | Q | Let's move to June 22nd, 1999, tell me what |
| 6 | | happened regarding this case? |
| 7 | A | I made contact with Midcoast Aviation regarding |
| 8 | | the arrangements for Ken Murray to be arriving next day to |
| 9 | | review the records of the aircraft with Steve Bates. |
| 10 | | Steve Bates informed me that Ken Murray had already |
| 11 | | contacted him prior to my calling. |
| 12 | Q | And you're reading from exhibit 21? |
| 13 | A | That's correct. |
| 14 | Q | Anything else? |
| 15 | A | I had a conversation with Ed Dahlberg. |
| 16 | Q | You're, again, reading from the top of page 2 of |
| 17 | | exhibit 21? |
| 18 | A | Yes. |
| 19 | Q | Go ahead continue, please? |
| 20 | A | It was in regard to the first draft of the |
| 21 | | proposed sales agreement. |
| 22 | Q | Okay. |
| 23 | A | It was faxed to me. |
| 24 | Q | What was the contents of that conversation? |
| 25 | A | Going over the changes that I suggested making |

1    on the original draft.

2         Q    All right, any other conversations with Mr.

3    Dahlberg on June 22, 1999 that you recall?

4         A    Yes, the conversation went on and Mr. Dahlberg

5    informed me that he had another buyer for the aircraft.

6         Q    This is on what day?

7         A    On June 22d.

8         Q    What specifically did Mr. Dahlberg tell you

9    regarding the other buyer?

10        A    Mr. Dahlberg told me that he had a better offer

11   on the airplane, and that the person that gave him this

12   offer suggested that Turnberry was not, did not have the

13   intentions of closing on this aircraft, and that he was

14   thinking we're taking the other deal.

15        Q    Who was the other offer from?

16        A    He wouldn't tell me.

17        Q    Who was the person who told him that Turnberry

18   had no intentions of closing on the deal?

19        A    He wouldn't tell me that.

20        Q    What was your response to those comments by Mr.

21   Dahlberg?

22        A    I assured him that we had every intention of

23   closing on the aircraft under our present agreement.

24        Q    You're reading that from exhibit 21, is that

25   correct?

```
 1       A    That is correct.  And I had already contacted
 2   G.E. Capital for funding the purchase of the aircraft.  I
 3   tried to assure him that our intentions were to buy the
 4   aircraft.
 5       Q    What did he say?
 6       A    At the end of the conversation he was still
 7   uncertain whether he was going to sell the aircraft to the
 8   new offer or continue with our arrangements.
 9       Q    What did he tell you specifically regarding
10   that?
11       A    I told him specifically that we were going to
12   continue with the deal, and Ken Murray was on his way up
13   to St. Louis.
14       Q    Anything else that you can recall from that
15   specific conversation?
16       A    No.
17       Q    Any more details?
18       A    No.
19       Q    Is that the last time you spoke with Ken Murray
20   on Tuesday, was it Tuesday, June 22, 1999?
21       A    Yes.
22       Q    Was that the last time you would have spoken to
23   Mr. Murray?
24       A    No.
25       Q    I'm sorry with Mr. Dahlberg on June 22nd?
```

```
 1              MR. REIMER:  Object to the form.

 2              THE WITNESS:  On the 22nd?

 3   BY MR. HUTCHISON:

 4        Q    Yes, on that specific day, Tuesday, June 22,

 5   1999 is that your first and only conversation with Mr.

 6   Dahlberg?

 7        A    I'm not sure it was just one conversation, you

 8   know.  We were talking to each other back and forth quite

 9   a bit through this.  I'm sure that was the last

10   conversation.

11        Q    Okay, are there any other conversations or

12   details of the other conversations which occurred on June

13   22, 1999 which you haven't told me about?

14        A    On the 22nd.  No.

15        Q    Do you remember any details at all regarding any

16   other conversation with Mr. Dahlberg on June 22, 1999?

17        A    No.

18        Q    Did you argue with Mr. Dahlberg on June 22,

19   1999?

20        A    I don't recall being in an argument other than

21   we discussed the changes in the contract.

22        Q    What specific changes did you discuss?

23        A    Do you have a --

24              MR. REIMER:  Again, tell Mr. Hutchison what

25        document would help you answer that question, and
```

KNIPES-COHEN/SPHERION COURT REPORTING
(561) 478-0401

```
 1        either he will show it to you or I will produce it.
 2             THE WITNESS:  We should have an exhibit to the
 3        changes that I suggested on the original draft of the
 4        sales agreement from International Paper.
 5    BY MR. HUTCHISON:
 6        Q    So, you told Mr. Dahlberg that you had some
 7    problems with the draft contract that he had sent you
 8    earlier and that you told him what they were and then
 9    followed it up in writing?
10             MR. REIMER:  Object to form.
11    BY MR. HUTCHISON:
12        Q    Is that accurate?
13        A    I'm not sure if that is accurate.
14        Q    Well, your exhibit 21 doesn't list the concerns
15    you had with the draft contract Mr. Dahlberg sent you does
16    it?
17        A    I don't understand the question.
18        Q    You were saying that the first draft of the
19    contract that Mr. Dahlberg sent you, you had some concerns
20    or some proposed changes, is that accurate?
21        A    That's accurate.
22        Q    Does exhibit 21 list what those concerns or
23    proposed changes were?
24        A    No.
25        Q    I want to go back to exhibit 18 did you ever
```

1    provide a draft of exhibit 18 to Mr. Dahlberg to revise or

2    to make any changes or additions prior to you signing it

3    and faxing it to him on June 20th, 1999?

4    A    We're going back to the 18th through the 20th?

5    Q    I'm going back, just so we're very clear,

6    exhibit 18, which is the June 19, 99 letter, which you

7    said that you drafted and faxed to Mr. Dahlberg on June

8    20th, 1999.

9         My question is, did you ever send a draft of

10   that to Mr. Dahlberg or did he make any changes or

11   modifications or amendments to exhibit 18 prior to you

12   signing it and faxing it to Dahlberg on June 20th, 1999?

13   A    I know there was no changes by Mr. Dahlberg.

14   I'm not sure if he didn't have a fax of this, or a copy of

15   it sooner.  Because we were going back and forth on

16   negotiations over this.

17   Q    Do you recall sending him a draft of exhibit 18?

18   A    I do not.

19   Q    Let's talk about exhibit 18 a minute.  You sent

20   it to Mr. Dahlberg on the 20th of June, 1999, correct?

21   A    That's correct.

22   Q    You have a copy in front of you?

23   A    Yes.

24   Q    You write, this will confirm our telephone

25   conversation with your agent Ed Dahlberg on June 18, 1999.

KNIPES-COHEN/SPHERION COURT REPORTING
(561) 478-0401

1    Read that first sentence.

2        A    Yes.

3        Q    That conversation actually occurred on June 19,

4    1999, did it not?

5        A    As I recall, yes.

6        Q    So that is a mistake in the letter?

7        A    Not necessarily.  You know, the exhibit 21 that

8    you know, these are not all the events, these are just

9    highlight events of the notes that I had.  They don't

10   represent all of the events.

11       Q    It represents the only recordation of the events

12   that you have, though, correct?

13       A    Correct.  But what I'm saying is, is that

14   earlier, we say that there was no conversation with Ed on

15   June 18, it could have very well been a conversation or

16   other voice messages.

17       Q    Don't know, I'm just asking you.  Earlier you

18   told me know, your letter says something different.   If

19   there is a mistake we can find it and correct, it's not a

20   big deal.  If there isn't that is fine, too.

21       A    It could have been.  I don't recall one though.

22       Q    Okay, next sentence says Turnberry Charters,

23   Inc., hereby offer $7,000,000 U.S. for the above

24   referenced aircraft subject to the good faith efforts of

25   both parties to negotiate mutually agreeable terms and

1   conditions of the sale do you see that?

2       A    Yes.

3       Q    What did you mean there by that, good faith

4   efforts?

5       A    I believe what we both was there is an agreement

6   between both parties, that we would make the best efforts

7   to complete this deal.

8       Q    And specifically did Mr. Dahlberg tell you

9   anything about what he meant by good faith efforts?

10      A    No.

11      Q    So, specifically just tell me what you meant by

12  good faith efforts?

13      A    The negotiations of these terms were by both

14  parties.

15      Q    Okay, but the good faith effort, what did you

16  mean by that, when you wrote that in there?

17      A    I meant that we would both make our best efforts

18  to complete this deal.

19      Q    Were there any terms discussed regarding the

20  sale of the subject aircraft that are not reflected in

21  exhibit 18, at this time?  I'm talking about your June 19,

22  whether it was a June 18th telephone conversation with

23  Dahlberg or a June 19 telephone conversation with

24  Dahlberg, I don't care.  Prior to drafting exhibit 18,

25  okay, were there any terms discussed that are not

1    reflected in exhibit 18, your June, 19, 1999 letter?

2        A    This was our complete agreement at the time.

3        Q    Were there other terms discussed that were not

4    in that letter of June 19, 1999?

5        A    No, this is the whole agreement.

6        Q    You then write, after good faith efforts of the

7    parties to negotiate mutually agreeable terms and

8    conditions of the sale and timely execution and delivery

9    of definitive sales agreement in form and substance

10   mutually acceptable to the parties.

11            By that, do you mean that there was going to be

12   further negotiations and those terms had to be mutually

13   agreeable to both parties?

14       A    No.

15       Q    What does that mean when you write subject to

16   the good faith efforts of both parties to negotiate

17   mutually agreeable terms and conditions of the sale and

18   timely execution and delivery of definitive sales

19   agreement in the form and substance mutually acceptable to

20   both parties.   What are you saying there?

21       A    I was saying is to come up with a more

22   definitive agreement set up by the attorneys.  I'm not an

23   attorney.

24       Q    It would have other terms and conditions,

25   correct?

```
 1       A    Not other than the terms and conditions that we
 2  have in this agreement.  Just, you know, being more lawyer
 3  like in deposition.
 4       Q    Let me ask you this, prior to June 19, 1999 how
 5  many planes had you been involved with, used planes, on
 6  the purchase or sell in?
 7       A    I don't recall.
 8       Q    Approximately, 5, 100, 500?
 9       A    Maybe 50.
10       Q    Prior to June, 1999?
11       A    Yes.
12       Q    And they were all subject to contracts, correct,
13  sales agreements?
14       A    I don't understand your question.
15       Q    Those fifty planes were they just sold on a
16  handshake or were they written sale agreements?
17       A    I would guess both.  The answer to that would be
18  both.
19       Q    How many have you purchased for either of the
20  Soffers or any of their companies prior to June, 1999?
21       A    Several.
22       Q    Several, two, three, seven, ten?
23       A    Seven, ten.
24       Q    Were each one of those pursuant to a written
25  sales agreement?
```

```
 1      A    Some of them.

 2      Q    Which ones were not specifically?

 3      A    I can't recall specifically.

 4      Q    You can't name one, you can't identify on plane

 5  for me that did not have a written sales agreement?

 6      A    No, I don't recall.

 7      Q    It's fair to say that most of them were

 8  purchased or sold pursuant to a written sales agreement?

 9      A    That would be fair.

10      Q    And this says subject to agreeable to terms and

11  conditions of the sale mutually agreeable terms and

12  conditions of the sale is the quote, right, "negotiate

13  mutually agreeable terms and conditions of the sale" is

14  that correct?

15      A    That is what it says.

16      Q    So, this agreement, exhibit 18, is subject to

17  "the good faith efforts of the parties to negotiate

18  mutually agreeable terms and conditions of the sale, is

19  that correct?

20           MR. REIMER:  Object to form.

21           THE WITNESS:  Document says what it says.

22  BY MR. HUTCHISON:

23      Q    Does it also say that this agreement, exhibit

24  18, is also subject to the good faith efforts and "the

25  timely execution and delivery of a definitive sales
```

1    agreement"?

2              MR. REIMER:  Same objection.

3    BY MR. HUTCHISON:

4         Q    Is that what it says?

5         A    That is what the document says.

6         Q    And that definitive sales agreement had to be in

7    the form and substance that was mutually acceptable to

8    both parties?

9              MR. REIMER:  Object to form?

10             THE WITNESS:  That's what the document says.

11   BY MR. HUTCHISON:

12        Q    And if it wasn't mutually acceptable to both

13   parties, then you wouldn't have had a definitive sales

14   agreement, correct?

15             MR. REIMER:  Object to form?

16             THE WITNESS:  That's what the document says.

17   BY MR. HUTCHISON:

18        Q    And, again, in the second paragraph, I'm sorry,

19   the third paragraph, second sentence, you talk about you

20   had to put $100,000 in escrow, correct?

21        A    That's correct.

22        Q    Now that $100,000 is fully refundable unless a

23   definitive sales agreement was executed, correct?

24        A    Yes.  Well what the document says is deposit

25   shall be fully refundable until such time as a definitive

              KNIPES-COHEN/SPHERION COURT REPORTING
                       (561) 478-0401

67

1   sales agreement shall be executed, and then shall become

2   subject to the terms and condition of that agreement.

3   Q   And that's what the document says?

4   A   That's what the document says.

5   Q   That's what you wrote?

6   A   Yes.

7   Q   That is what the agreement was?

8   A   Yes.

9   Q   And once a definitive sales agreement was

10  executed, then that $100,000 deposit in escrow was going

11  to be subject to the terms of that definitive sales

12  agreement, is that correct?

13  A   That's correct.

14  Q   Again, this is a definitive sales agreement that

15  had to be mutually acceptable to both parties, correct?

16  A   That's correct.

17  Q   According to exhibit 18 Turnberry Charters

18  eventually Turnberry Aviation, had the right to conduct an

19  inspection and a systems check of the aircraft, correct?

20  A   That's correct.

21  Q   Both to be at the expense of Turnberry?

22  A   That's correct.

23  Q   The last page, or the second page of exhibit 18,

24  this offer shall be deemed withdrawn and invalid as of

25  5:00 p.m., I guess, that's Eastern time Monday, June 21st,

68

```
 1   1999, unless the accepted by execution below and returned
 2   prior to that time.
 3            MR. REIMER:  Object to the form.  Is that a
 4       question.
 5            MR. HUTCHISON:  It will be when I finish it.
 6            MR. REIMER:  I'm sorry.
 7   BY MR. HUTCHISON:
 8       Q    Is that what it says?
 9       A    No, that is not what it says.
10       Q    What am I reading wrong?
11       A    The date is June 28, I believe, isn't it.
12       Q    Well, I don't know, what does yours say?  I
13   think mine says the 21st, and David you can check that
14   out.
15       A    Yours is better than mine.
16       Q    Okay, well let me give you one that is much
17   better.  Here is another copy, David.
18            MR. REIMER:  He is reading here.
19            THE WITNESS:  That is a terrible copy.
20            MR. REIMER:  I think you're reading different
21       locations.
22   BY MR. HUTCHISON:
23       Q    The first sentence, page 2?
24       A    I don't have a first sentence.
25       Q    Okay, use the other copy and you can compare
```

1   them back and forth.

2       A    All right.

3       Q    Exhibit 18, I think, was the actual exhibit A to

4   the complaint, I think it was a poor copy.  But if you

5   read the copy I just provided you maybe you won't go

6   blind.

7       A    All right.

8       Q    I was reading first sentence page two, exhibit

9   18.

10      A    Yes.

11      Q    This offer shall be deemed invalid as of 5:00

12  p.m. Monday, June 21st, 1999, unless accepted by execution

13  below and returned prior to that time, correct?

14      A    That's correct.

15      Q    And then it says on the next sentence, this

16  offer, if accepted and executed, shall become null and

17  void as of 5:00 p.m. Monday, June 28th, 1999, if the

18  parties cannot agree to an execute a definitive sales

19  agreement prior to that time.  Is that what it says?

20      A    That is correct.

21      Q    And the definitive sales agreement had to be

22  executed with the terms mutually acceptable to both

23  parties, correct?

24      A    That is what the document says.

25      Q    That's what you wrote?

1      A      That's correct.

2      Q      That was your agreement as of June, 1999, that

3   correct?

4      A      That's correct.

5      Q      Any other agreements regarding the sale of the

6   subject aircraft other than what was written in exhibit 18

7   by you?

8      A      No.  Other than the changes that we made to

9   their draft of the sales agreement.

10     Q      Those were the proposed changes you made?

11     A      That's correct.

12     Q      We're going to get to those.  Prior to receiving

13  exhibit 18 from Ed. Dahlberg with Mr. Carter's signature,

14  dated June 21st, 1999, did you ever have any conversation

15  with Mr. Dahlberg regarding the plane being sold in an

16  as-is condition?

17             MR. REIMER:  Object to form.

18             THE WITNESS:  Yes.

19  BY MR. HUTCHISON:

20     Q      When did you first have that conversation with

21  Mr. Dahlberg?

22     A      That was always a representation of

23  International Paper, that the airplane was going to be a

24  where-is  as-is sale.

25     Q      And Mr. Dahlberg would have told you that in his

KNIPES-COHEN/SPHERION COURT REPORTING
(561) 478-0401

      1    first initial conversation of June 18th or June 19th,

      2    1999?

      3        A    That's correct.

      4        Q    Any other representations regarding the

      5    condition of the plane made by Mr. Dahlberg to you prior

      6    to you receiving exhibit 18 signed by Mr. Carter?

      7             MR. REIMER:   Object to form.

      8             THE WITNESS:   Yes, the format of the aircraft

      9        itself is a full representation of the equipment.

     10        The equipment that the airplane has, engine times,

     11        the total time of the aircraft, the maintenance

     12        records, that is all part of the airplane.

     13    BY MR. HUTCHISON:

     14        Q    That was part of your initial conversation?

     15        A    Absolutely.

     16        Q    Anything other than that?

     17        A    Prior to what date.

     18        Q    Prior to when you received exhibit 18, and I'm

     19    assuming it was June 21st, 1999?

     20        A    June 20, it was sent?  It was received on the

     21    21st.

     22        Q    You received it June 21st signed by Mr. Carter?

     23        A    Right.  No.

     24        Q    Any other representations by Mr. Dahlberg

     25    regarding the as-is where-is condition of the airplane

                 KNIPES-COHEN/SPHERION COURT REPORTING
                         (561) 478-0401

1    prior to June 21st, 1999?

2        A    Yes.  We're getting into an area here where, you

3    know, where-is as-is condition of the aircraft was

4    discussed.  But what was also discussed was, you know, the

5    type of review that we could do on the airplane to make

6    sure that we wanted to accept it in a where-is as-is

7    condition.

8            The sale of the aircraft was always to be, and

9    most sales of most aircraft are always on an as-is

10   condition.

11       Q    When you said what test could be conducted,

12   that's actually represented in exhibit 18?

13       A    That's correct.

14       Q    Other than what was in exhibit 18, did you have

15   any discussions with Mr. Dahlberg prior to June 21st,

16   1999?

17           MR. REIMER:  Object to form.

18           THE WITNESS:  Other than the discussions that we

19       were talking about the negotiation for the aircraft,

20       no.

21   BY MR. HUTCHISON:

22       Q    Well, those discussions came later on when he

23   sent you a draft sales agreement?

24       A    No, those negotiations, you know, were that of

25   June 19 in preparing this document.

1    Q    Right, he gave you the specifications we talked

2    about --

3    A    We talked about the specifications.  We

4    discussed the deal, how the deal would actually happen,

5    the way the aircraft was going go to be represented.

6    Q    How was the aircraft going to be represented?

7    A    We were getting into more specifics with the

8    aircraft would be MSP on the engine, or the MSP would be

9    transferred, or the MSP is paid up on all three engines.

10         What type of plan the MSP was on, whether it was

11   straight plan or gold plan for the MSP.  Whether the APU

12   was on the MSP program.  And if those kinds of policies

13   would be transferred and the condition of the sale.

14         Although we're talking a where-is as-is

15   condition for the airplane, we're also talking in making

16   an arrangement that the aircraft is going to be

17   represented a certain way.

18    Q    Okay, was the MSP transferrable by the

19   manufacturer to you, Turnberry?

20    A    Not from International Paper it wasn't, but it

21   was eventually, yes.

22    Q    You had to pay a sum of money to get it

23   transferred?

24    A    Yes.

25    Q    But International Paper couldn't transfer the

KNIPES-COHEN/SPHERION COURT REPORTING
(561) 478-0401

1    MSP to the Turnberry?

2        A    We didn't buy the airplane from International

3    Paper.

4        Q    Okay, well, when they bought it from Aero Toy,

5    you weren't able to buy the MSP from Aero Toy, were you?

6        A    Yes, it was transferred over to us.

7        Q    At a cost to the manufacturer?

8        A    At a cost, yes.

9        Q    You had to pay the manufacturer in order to

10   transfer it?

11       A    Yes.

12       Q    Aero Toy didn't control the transfer?

13       A    They do, actually.

14       Q    Well, they sign it over, but the manufacturer

15   has to approve of it and charges you a fee?

16       A    That's right.

17       Q    But anything else specific --  What is your

18   understanding of what where-is as-is, the meaning of

19   where-is as-is what does that mean?

20       A    The way the deal was, the way this document was

21   prepared is, that on the actual purchase of the aircraft,

22   there would be no further warrants or guarantees other

23   than title and the approved transfer of all the

24   maintenance, warrants and guarantees that were presently

25   on the aircraft.  Such as MSP.  Such as the Honeywell

1    maintenance program on the avionics.

2        Q    Anything other than those two?

3        A    That is the only thing that was really

4    discussed.  Other than, you know, certain warranties and

5    guarantees for maintenance the airplane that was just

6    completed.  Overhauling the landing gear that was just

7    completed by St. Louis.

8        Q    That would have been actually warranty work that

9    would have been transferred from Midcoast Aviation?

10        A    That's right.  Well, transferred from Midcoast

11    Aviation to International Paper and International Paper to

12    us.

13        Q    The warranty work would have been from Midcoast

14    Aviation?

15        A    Right.  In fact we just had a claim on that

16    airplane for specifically that.

17        Q    For landing gear work that Midcoast Aviation

18    did?

19        A    Midcoast Aviation, that's correct.

20        Q    They basically came down and took care of the

21    problem?

22        A    That's right.

23        Q    Let me ask you this, what is your understanding

24    of as-is where-is?

25        A    It's acceptance of the aircraft at the time of

KNIPES-COHEN/SPHERION COURT REPORTING
(561) 478-0401

76

```
 1    the sale.

 2        Q    In what condition?

 3        A    In the condition that it exists at that point.

 4        Q    Did you have any agreements with Mr. Dahlberg

 5    that he could not continue to market the subject aircraft?

 6        A    No.

 7        Q    Did you have any agreements with Mr. Dahlberg

 8    that he could not continue to negotiate the sale of the

 9    subject aircraft with parties other than Turnberry?

10        A    No.

11        Q    To the best of your knowledge, Mr. Dahlberg was

12    still able to market and show the subject aircraft after

13    the execution of exhibit 18?

14        A    Yes.

15        Q    Is that your signature on exhibit 18?

16        A    Yes.

17        Q    You never met Mr. Carter?

18        A    No.

19        Q    And unless Mr. Carter is the mechanic you first

20    spoke to, you never spoke to Mr. Carter?

21        A    That's right.

22        Q    Let's me show you exhibit 23, a June 21st, 1999

23    fax cover sheet, to Dennis Lainey from Ed Dahlberg.   Take

24    a look at it and tell me if this is the draft sales

25    agreement that you referred to earlier?  Look at exhibit
```

1    23, it's about a 13 page exhibit, fax cover sheet, tell me

2    if you recognize it?

3         A    Do we have this as an exhibit already.

4         Q    Already marked?

5         A    Do we have that marked as an exhibit already?

6              MR. REIMER:  What is that?

7              THE WITNESS:  This is the contract that --

8              MR. HUTCHISON:  Not to my knowledge we don't.

9              MR. REIMER:  Marked in what fashion, you mean

10        with another deposition?

11             THE WITNESS:  Yes.  This is the only exhibit to

12        this 23.

13             MR. REIMER:  I'm not sure I understand what

14        you're asking.

15             THE WITNESS:  The changes that I suggested, is

16        that also an exhibit.

17             MR. REIMER:  We have another document that

18        includes your changes.

19             THE WITNESS:  Okay.

20             MR. HUTCHISON:  Was it marked as an exhibit?

21             MR. REIMER:  I don't know. Off the record.

22             (A discussion was held off the record.)

23             MR. REIMER:  The pending question is simply is

24        this the document that Mr. Dahlberg sent to you?

25    BY MR. HUTCHISON:

KNIPES-COHEN/SPHERION COURT REPORTING
(561) 478-0401

```
 1      Q    Do you know.

 2      A    I believe so.  I believe so, but the way to

 3   accurately --

 4      Q    I think what you're getting at is if you say

 5   your handwriting you would know for sure?

 6      A    If I saw my handwriting I would know for sure.

 7      Q    Okay, so 23 may be that you just don't know.

 8      A    I don't know.

 9      Q    Fair enough, that is all I'm asking.  We can get

10   to that.  Let me ask you a question, in preparation of

11   your deposition today, other than speaking with

12   Mr. Reimer, and I don't know what your conversations were

13   with Mr. Reimer, because I understand he is Turnberry's

14   attorney, what did you do in preparation for this

15   deposition, other than prepare exhibit 21?

16      A    Other than prepare this exhibit 21.

17      Q    Yes?

18      A    I guess that is all.  I mean the preparation of

19   21 was actually going through all of my old notes and

20   everything.

21      Q    What old notes, when you say old notes?

22      A    Yes for with the deal, you know, I think I

23   explained that to you that I have notes, you know, all

24   over, a deal folder and whatnot, I went through all those

25   and any notes I had on any documents, and then I prepared
```

1    this document for this deposition.

2        Q    Where are those notes?

3        A    After I prepared this I threw them away.

4        Q    So, within the last week you threw away the

5    notes?

6        A    Yes, sure.  But they are all represented here.

7        Q    Are you telling me that you had notes that you

8    prepared exhibit 21 from, and within the last week or so,

9    you destroyed those?

10       A    Yes, sure.

11       Q    Okay, other than looking at your old notes to

12   prepare exhibit 21, did you look at any other documents?

13       A    Phone records.

14       Q    Okay, and you brought those with you?

15       A    Yes.

16       Q    Let me see those?  First one is a Bell South

17   bill for bill period July 7, 1999.  There is 18 pages, the

18   first 17 are the Bell South bill, the last part is PCS

19   phone charge, what is that, Mr. Lainey?  We will make that

20   exhibit 24.

21       A    Well, these are, you have a Bell South telephone

22   bill here.

23       Q    Which is about 17 pages.

24       A    No, 10 pages, and then you go into the AT&T.

25       Q    Part of the Bell South bill?

```
 1        A     Part of the Bell South, yes.

 2        Q     Okay, the next page is 11 through 17?

 3        A     11 through 17.

 4        Q     And then the 18th page, what is that?

 5        A     This is a, this is a Sprint PCS, cell phone bill

 6   for that period.

 7        Q     And what is important about that, the 18th page

 8   of exhibit 24?

 9        A     It would be the time in question.

10        Q     Any phone calls.

11        A     Of the deal.  There are several phone calls

12   there, I don't know if they were important or not.  It is

13   a couple of them, one is St. Louis.

14        Q     Okay.  What from exhibit 24 was used to help you

15   create exhibit 21?

16        A     It was probably number 28, the telephone call to

17   St. Louis.

18        Q     So, on page 18, or the 18th page, it's not

19   really part of the Bell South bill?

20        A     June 22nd.

21        Q     You can put an X right there on the left-hand

22   margin.

23        A     There is a line there.

24        Q     Put an X right next to it.  It says number 28,

25   June 22 phone call?
```

```
 1        A     Yes, it's at 2:02 p.m., the area code is

 2   618-337-2100, it's East St. Louis, Illinois.

 3        Q     You recognize that to be Midcoast Aviation's

 4   phone number?

 5        A     Yes, I do.

 6        Q     So that particular phone call helped you make

 7   exhibit 21?

 8        A     Yes.

 9        Q     Anything else in exhibit 24 that you used, that

10   is, the first 17 pages of the bill?

11        A     I'm not sure.

12        Q     I'm sure.  You're on page 4 of the Bell South

13   bill, the little yellow highlights represent calls for

14   this case or is that another matter?

15        A     Yes, I'm sure.  Yes they are calls for this

16   case, I believe.

17        Q     Okay, you can put an X there, the yellow

18   highlights will never copy.  Is it next to number 31?

19        A     31, 32, 33, 37, 49.

20        Q     Let's go down that page 4, which one of those,

21   each of those calls what are they?

22        A     I would have to match those up to the phone

23   numbers.

24        Q     Well, did you use them in creating exhibit 21?

25        A     Yes.
```

| | | |
|---|---|---|
| 1 | Q | Okay, do you know how? |
| 2 | A | I'm not sure. |
| 3 | Q | All right, let's go to page 5 of the Bell South |
| 4 | bill, anything? | |
| 5 | A | Marked number 54. |
| 6 | Q | Okay, put an X there next to that.  Page 6? |
| 7 | A | I have marked on number 98. |
| 8 | Q | Put an X next to that.  Page 7? |
| 9 | A | Nothing marked. |
| 10 | Q | Page 8? |
| 11 | A | Nothing marked. |
| 12 | Q | Page 9, 10? |
| 13 | A | Nothing marked. |
| 14 | Q | 11, 12? |
| 15 | A | 11 nothing marked, 12 nothing marked.  13 number |
| 16 | 90. | |
| 17 | Q | Put an X next to that.  14 and 15?  On page 13 |
| 18 | who is that phone call to number 90, do you know, do you | |
| 19 | recognize that number?  Place called, Andover. | |
| 20 | A | Andover, New Jersey. |
| 21 | Q | Who is in Andover, New Jersey? |
| 22 | A | It could have --  I'm not sure. |
| 23 | Q | Do you know why you marked it and believe you |
| 24 | used it in creating exhibit 21? | |
| 25 | A | I would guess that this is probably |

KNIPES-COHEN/SPHERION COURT REPORTING
(561) 478-0401

```
 1   International?

 2        Q    Do you know if --

 3        A    No, can't be International, no.

 4        Q    Do you know if that is a fax or a telephone

 5   call?

 6        A    No, I don't.

 7        Q    So, some of these numbers that you've marked

 8   with an X on exhibit 24 could be faxes?

 9        A    Sure, or phone calls.

10        Q    They are the same on your bill, here?

11        A    Yes.  And on page 14 I have got 93 marked.

12        Q    Put an X.

13        A    And 102 marked.

14        Q    Put an X.  Page 15?

15        A    15, I have got 138 marked.  I have got 142

16   marked.  I have got 146 marked.

17        Q    Put an X next to them?  Page 16 of the bill?

18        A    I have got 159 marked.

19        Q    Put an X.  Page 17 of the bill, nothing.  Page

20   18 of exhibit 24 we discussed.  You have already put an X

21   there, right?

22        A    Yes.

23        Q    Any other phone calls made in exhibit 24 that

24   helped you create exhibit 21?

25        A    No.
```

KNIPES-COHEN/SPHERION COURT REPORTING
(561) 478-0401

```
 1        Q     Okay exhibit 25 is a Sprint PCS bill missing

 2   some pages.  It has page 1 of 13, page 2 of 13.  I take

 3   that back, 3 of 13, 4 of 13, 5 of 13, 6, 7, 8, 9, 10, 13

 4   pages.  Did you use exhibit 25 to create exhibit 21?

 5        A     Yes.

 6              MR. REIMER:  Just let me object to the form of

 7        the question.  Just to clarify is it missing any

 8        pages?

 9              MR. HUTCHISON:  No, it's not.

10              MR. REIMER:  Thank you.

11   BY MR. HUTCHISON:

12        Q     Let's try the same exercise that we used before.

13        A     Page 3, item number 2.

14        Q     Put an X in the left-hand margin like you did

15   with the previous exhibit?  That is a call to where?

16        A     That is an incoming call.

17        Q     So, this is your cell phone?

18        A     Yes, this whole bill is my cell phone.

19        Q     Okay.  Does it say from where or what number the

20   incoming call is coming from?

21        A     Some of them do, if it was recorded.  These

22   weren't recorded.

23        Q     So number 2 you put an X by, how do you know

24   that was related to this case?

25        A     I don't, other than I have circled it for some
```

KNIPES-COHEN/SPHERION COURT REPORTING
(561) 478-0401

```
 1    reason.

 2         Q    Other than that do you know for sure?

 3         A    No, I don't.

 4         Q    Okay.  Number 7, put an X next to that, how do

 5    you know that's related to this case?

 6         A    Where.

 7         Q    On the third page of exhibit 25.

 8         A    Right on 9 I have a note that says Ed Dahlberg.

 9         Q    Now, how do you know they were from Ed Dahlberg?

10         A    That is his telephone number here, incoming

11    call.

12         Q    From Manassas is number 9, put an X next to that

13    and Overland, Missouri?

14         A    Yes.

15         Q    Okay, how do you -- Oh, number 9 is Ed

16    Dahlberg, not number 8?

17         A    Yes.

18         Q    Where is Overland, Missouri, is that relevant to

19    this case?  Is 8 supposed to be included in that circle or

20    not?

21         A    No.

22         Q    Okay, so the next number, let's go to the next

23    number page which is page 4 of the bill?  Anything

24    relevant to this case on that page 4?

25         A    I have 10 circled, I don't know what relevance
```

KNIPES-COHEN/SPHERION COURT REPORTING
(561) 478-0401

    1    it has.

    2        Q    Okay, what about page 5 of exhibit 25?

    3        A    None.

    4        Q    Page 6 of exhibit 25?

    5        A    None.

    6        Q    Page 7 and page 8 of exhibit 25?

    7        A    None.

    8        Q    What is the next page, tell me when you come to

    9    another number?

   10        A    Page 9 none, page 10 none, page 11 none.

   11        Q    There are some markings on page 12 are they

   12    relevant to this case different months?

   13        A    No.

   14        Q    How about the next page, page 13?

   15        A    No.

   16        Q    Okay.  We have got to do this exercise two more

   17    times, I apologize.  Exhibit 26 is another Sprint PCS bill

   18    also 13 pages?  Take a look at that and let's try it one

   19    more time?

   20        A    I know there is a reason for this one.

   21        Q    What is the reason for exhibit 27, I'm sorry

   22    exhibit 26 is in your hand.  This is a Sprint PCS bill and

   23    it looks like it's invoice date August 25, 1999?

   24        A    Right.

   25        Q    Any marks on pages 1, 2 or 3?

    1        A        There is no marks on it, but it shows the calls

    2    that were representative of July 27th.  Page four.

    3        Q        Put an X on number 29, that is a phone number

    4    from Manassas, Virginia.  You put a mark next to 27 and

    5    28, also but there is no incoming phone number, how do you

    6    know they are relevant to this case?

    7        A        This is on the 27th, is my cellular telephone,

    8    on the 27th of July, 1999, I received a numeric voice

    9    message mail on my cell phone that went on 7:00 p.m.  And

   10    that numeric message was from Ed Dahlberg.

   11            My phone has a function where I can just press

   12    it and it dials up the number for the numeric message,

   13    which I did, I did not recognize that was Ed Dahlberg.  I

   14    called Ed Dahlberg and we talked for a couple of minutes.

   15        Q        We will go through your exhibit 21.  Any

   16    other --

   17        A        And on the 27th I, also, at 4:50 p.m., I

   18    returned a call to Ken Murray, who informed me that he

   19    also received a telephone call from Ed Dahlberg.

   20        Q        On July 27th when you spoke with Ken Murray,

   21    what did Mr. Murray tell you that his conversation was

   22    with Mr. Dahlberg?

   23        A        Murray advised me that, he had a threatening

   24    telephone call from Ed Dahlberg.

   25        Q        Did he use the word threatening?

                    KNIPES-COHEN/SPHERION COURT REPORTING
                              (561) 478-0401

```
 1    A    Yes, he did.

 2    Q    Okay, and what was the threat?

 3    A    He said that he, Ken Murray said that Ed

 4  Dahlberg was threatening to destroy his livelihood in

 5  aviation, was the way he put it.  And he wanted to get out

 6  of this problem.

 7    Q    How was Mr. Dahlberg threatening Mr. Murray?

 8    A    I wasn't privy to the conversation.

 9    Q    Did Mr. Murray tell you how Mr. Dahlberg was

10  threatening Mr. Murray's livelihood?

11    A    No.

12    Q    Did Mr. Murray tell you specifically what

13  Mr. Dahlberg had stated that was threatening?

14    A    No.

15    Q    Did Mr. Murray give you any other details about

16  his conversation with Mr. Dahlberg?

17    A    No.

18    Q    Other than on page 4, number 27, 28 and 29 of

19  exhibit 26 are there any other phone calls or messages

20  that helped you create exhibit 21?

21    A    No, other than there is a bill of all the calls.

22  No, this wasn't specifically used to create exhibit 21,

23  but it helped.

24    Q    Anything else in exhibit 26 that helped?

25    A    Not that I can see a the moment.
```

 1       Q     Okay, exhibit 27 this is September 1 invoice

 2  from Sprint PCS, 7 pages, tell me how that helped, if at

 3  all, to create exhibit 21?

 4       A     This was not of help at all for exhibit 21. This

 5  is the time that we are into the purchase of the aircraft

 6  from Aero Toy Store.

 7       Q     So, exhibit 27, there was nothing relevant to

 8  that in creating exhibit 21?

 9       A     No.

10       Q     Any other documents that you reviewed in

11  creating exhibit 21?

12       A     No, other than the handwritten notes that I had

13  with reference to the deal, when I was doing the deal.

14       Q     But those notes are gone today?

15       A     That's correct.

16       Q     When were you first told that you were being

17  deposed today?

18            MR. REIMER:  Object to that question to the

19       extent that it requires conversations with me.

20  BY MR. HUTCHISON:

21       Q     Well, I don't care who it was, when were you

22  informed that you had a deposition today?

23            MR. REIMER:  Well, if it was with me --

24            MR. HUTCHISON:  If you're calling him up and

25       saying you're going to have a deposition on such and

```
 1          such a date, I fail to see where that can be
 2          attorney/client privilege matter, but you can object.
 3    BY MR. HUTCHISON:
 4          Q    But Mr. Lainey when were you first advised that
 5    you were having a deposition scheduled for November 15,
 6    2000?
 7               MR. REIMER:  Okay, I think that the answer
 8          requires disclosure of his communications with me,
 9          then it's privileged.
10               MR. HUTCHISON:  Regarding the date of his
11          deposition.
12    BY MR. HUTCHISON:
13          Q    Okay, do you have an answer.
14               MR. REIMER:  If it's privileged then his
15          conversations with me are privileged.
16               MR. HUTCHISON:  We haven't established that,
17          David.
18    BY MR. HUTCHISON:
19          Q    Who told you you had a deposition today, Mr.
20    Lainey?
21               MR. REIMER:  That you can answer, who told you
22          that you were to be deposed?
23               THE WITNESS:  The only conversations I had with
24          this was through my attorney.
25    BY MR. HUTCHISON:
```

1      Q     When were you told you were having a deposition

2    today?

3           MR. REIMER:  Well, if you remember you can tell

4           him when, I guess, when.  Well, no.  That starts to

5           I'm trying to cut this off before it starts entering

6           into.

7           MR. HUTCHISON:  I don't want any privileged, any

8           confidential communications regarding the facts of

9           this case.

10    BY MR. HUTCHISON:

11     Q     Were you advised that you had a deposition on

12    November 15, 2000, when?

13          MR. REIMER:  That part of it, I guess, is fine.

14    BY MR. HUTCHISON:

15     Q     You can answer the question, Mr. Lainey?

16          THE WITNESS:  Can I answer it.

17          MR. REIMER:  Yes, I guess, that question I will

18          let you answer.

19          THE WITNESS:  On 11/13.

20    BY MR. HUTCHISON:

21     Q     So, you didn't know you had a deposition today

22    until November 13?

23     A     I had a fax here on November 13.

24     Q     You were never cleared to see whether you had

25    this date open prior to November 13, 2000?

                KNIPES-COHEN/SPHERION COURT REPORTING
                          (561) 478-0401

1        A     Gets into conversation that I had with my

2    attorney.

3              MR. REIMER:   That's where this starts going back

4         into conversations that I have had with him.

5              MR. HUTCHISON:   I tell you something, you have

6         got two ways of going about this, and this is

7         something that I'm interested in.   When was his

8         deposition, when did Mr. Lainey know about this

9         deposition.   Did you send him a copy of the subpoena

10        did you send him a copy of the notice.

11             You have hid his address from me.   You promised

12        me two months ago and haven't provided it David, I'm

13        tired of the games.

14             You told him two weeks ago.   You told him a week

15        ago, or he showed up today by happenstance.   I don't

16        know but I want the answer to that question.

17             MR. REIMER:   Well, as a matter of fact, I'm not

18        going to give you the answer to that question,

19        because quite frankly, all those go to

20        attorney/client privilege, and he's here.

21             So there is no objection that are relevant.   Mr.

22        Lainey is here for this deposition.

23    BY MR. HUTCHISON:

24        Q     Mr. Lainey is it my understanding that you will

25    not tell me when you were first advised of this

1    deposition.

2         MR. REIMER:   I'm going to direct him not to

3         discuss any conversations, the contents of any

4         conversations, including when those conversations

5         occurred, between he and I.

6    BY MR. HUTCHISON:

7         Q    Is it my understanding Mr. Lainey that you will

8    not tell me when you were advised that you were being

9    deposed on November 15, 2000?

10        MR. REIMER:   The question is are you following

11        my instructions or you are you going to answer his

12        question.

13        THE WITNESS:   Under the advise of my attorney,

14        I'm not going to disclose any conversations I have

15        had with my attorney.

16   BY MR. HUTCHISON:

17        Q    So, you won't answer my question regarding when

18   you were advised of your deposition date, is that correct?

19        A    It was by conversation I had with my attorney.

20        Q    Is it correct that you're not going to answer

21   any questions regarding when you were advised of the

22   deposition date?

23        A    Yes.

24        Q    All right, let me show you what was

25   previously --   Oh, other than the phone records and the

                 KNIPES-COHEN/SPHERION COURT REPORTING
                           (561) 478-0401

1    notes that you destroyed do you have any other documents,

2    or did you review any other documents to create exhibit

3    21?

4        A    Yes, all of the documents that are here, sure.

5        Q    You did review documents?

6        A    All of these documents I reviewed.

7        Q    Okay, they relate --  When you say these

8    documents --

9            MR. REIMER:  He pointed to the documents that

10           were produced to you, our copy of the documents that

11           were produced to you.

12   BY MR. HUTCHISON:

13       Q    But that is it, the only the documents that were

14   produced for that?

15       A    Yes.

16           MR. HUTCHISON:  Did you ever clear up the

17           discrepancy between the invoice for 330 some

18           documents and there was only 287 documents, do you

19           remember that?

20           MR. REIMER:  I believe that was just a counting

21           error.  I probably should, I probably owe you a

22           clarification of the invoice, that your number was

23           right.

24           MR. HUTCHISON:  That I'm not worried about, I'm

25           just worried about whether I got all the documents?

                KNIPES-COHEN/SPHERION COURT REPORTING
                          (561) 478-0401

95

```
 1              MR. REIMER:  You received all the documents.

 2    BY MR. HUTCHISON:

 3        Q    Did you have any conversations with anybody

 4    other than your attorney in preparing exhibit 21?

 5        A    No.

 6        Q    Did you have any conversations with anybody

 7    other than your attorney in preparation for your

 8    deposition today?

 9        A    No.

10        Q    Did you discuss this case with anybody other

11    than Mr. Reimer?

12        A    No.

13        Q    Never had any conversation with Mr. Aikens,

14    Larry Aikens or Mr. Soffer?

15        A    I have had conversations with Larry Aikens and

16    Mr. Soffer on a daily basis.

17        Q    Regarding this case?  That is my question, did

18    you have any conversations with either of the Soffers or

19    with Mr. Larry Aikens regarding this case?

20        A    In what period are we talking about?

21        Q    Until today.  From the time.

22        A    Forever you're talking about?

23        Q    I'm talking about for the last 14 months?

24        A    Yes, sure.

25        Q    Okay, what conversations did you have with
```

 1   Mr. Larry Aikens?

 2        A    Again, we're getting into attorney --

 3             MR. REIMER:  Well, any conversations other than

 4        conversations --  You can answer any conversations

 5        other than conversations that involve either myself

 6        or any other attorney for Turnberry?  If it involves,

 7        if it was a conversation that we were --

 8             THE WITNESS:  If one of our attorneys were

 9        present, right.

10             MR. REIMER:  Then tell me that before yo tell

11        him.

12   BY MR. HUTCHISON:

13        Q    Did you ever have a discussion with Mr. Larry

14   Aikens about the facts of this case when an attorney was

15   not present?

16        A    No.

17        Q    You see him on a daily basis and you haven't had

18   any conversations regarding the facts of this case?

19        A    Well, I don't see Larry on a daily basis.

20        Q    Well, whenever you see him?  You're the one that

21   said daily basis earlier, not me?

22        A    We discussed the aircraft, but I don't believe I

23   have ever discussed this case with him.

24        Q    How about with either of the Soffers when a an

25   attorney wasn't present?

1      A     When an attorney was not present, no?

2      Q     Never had any conversation with either one them

3    regarding this case when an attorney wasn't present?

4      A     I have had conversations with regard to the

5    airplane, but not with reference to this case, no.

6      Q     Let me show you what was previously marked as

7    deposition exhibit 4, tell me if that is your handwriting?

8    Is that your handwriting on exhibit 4?

9      A     Yes.

10     Q     Is that what you were referring to earlier?

11     A     This is what I was referring to.

12     Q     Tell me what exhibit 4 is?

13     A     Exhibit 4 is the document that was sent by

14   Mr. Dahlberg on behalf of International Paper on

15   June 21st, the first draft of his aircraft sales

16   agreement.

17     Q     Okay, is that your handwriting on all the pages,

18   I think it's, I have got 11 pages?

19     A     I have 12 pages.

20     Q     Your right it starts with 2?

21     A     Okay, that is why.

22     Q     Yes.  Is that your handwriting on all the pages?

23     A     Yes, but not all the pages have my handwriting

24   on them.

25     Q     But is there any handwriting on exhibit 4 that's

1    not yours?

2        A    I don't believe so.

3        Q    Now, you would have received exhibit 4 when, a

4    copy of exhibit 4,which was the first time you received

5    it?

6        MR. REIMER:  Object to the form of the question.

7        Without the handwriting?

8    BY MR. HUTCHISON:

9        Q    When is the first time you received it?

10       MR. REIMER:  Object to form, again I'm asking

11       whether you're referring to the document itself or

12       exhibit 4.  When you say when is the first time you

13       received 4.

14       THE WITNESS:  The first time I received exhibit

15       four is right now.

16       MR. HUTCHISON:  Okay.

17       THE WITNESS:  But if you're referring to the

18       original document that Ed Dahlberg sent, was June 21.

19   BY MR. HUTCHISON:

20       Q    You would have made those changes, and you would

21   have made your handwritten comments on June 21 as well?

22       A    The changes would have been made between June 21

23   and June 23rd.

24       Q    Okay, when you made these changes, did you

25   discuss them with anybody at that time, between June 21

1    and June 23?

2         A    Yes.

3         Q    Who would you have discussed them with?

4         A    I would have discussed them with Mr. Soffer?

5         Q    Which Soffer?

6         A    Probably both, Don and Jeff Soffer.

7         Q    And then, let me show you exhibit 28, tell me if

8    you recognize it and tell me if that is your handwriting,

9    is that your handwriting on page 1 of exhibit 28 as well

10   at page 2 and page 3?

11             THE WITNESS:  Do you have a copy of this in

12        these documents here.

13             MR. REIMER:  I presume that we gave it to him.

14             MR. HUTCHISON:  All I can tell you is that

15        exhibit 28 was produced to me by your lawyer.

16             THE WITNESS:  Okay.

17   BY MR. HUTCHISON:

18        Q    But my question is on page 1 of exhibit 28, is

19   that your handwriting?

20        A    The first page says that there's a page 2 as

21   well.

22        Q    Yes, it's a Bates number 00264?

23        A    Yes, this appears to be.

24        Q    All of it?

25        A    Yes.

```
1       Q     Is there any handwriting on page 1 with Bates
2   number 264 that is not yours in exhibit 28?
3       A     I don't believe so.
4       Q     Page 2, same question, any handwriting that is
5   not yours?
6       A     I don't believe so.
7       Q     Page 3, same question any handwriting that is
8   not yours on Bates number 266 of exhibit 28, third and
9   final page?
10      A     I don't believe so.
11      Q     Front page of exhibit 28, can we get out and
12  win, is that your handwriting on the top left-hand corner
13  those two phrases?
14      A     Yes.
15      Q     These were your comments to the prior exhibit
16  which was the draft of the sales agreement sent to you by
17  Mr. Dahlberg, correct?
18            MR. REIMER:  Object to form.
19            THE WITNESS:  Could you repeat the question.
20  BY MR. HUTCHISON:
21      Q     Does exhibit 28 contain your comment, your
22  proposed changes to the sales draft agreement sent to you
23  by Mr. Dahlberg on June 21st, 1999?
24      A     That's correct.
25      Q     Now let me show you exhibit 29, June 23rd, 1999
```

1    letter, June 23rd, 1999 letter to Ed Dahlberg from Dennis

2    Lainey.  And it has attached to it proposed changes to

3    aircraft sales agreement from International Paper Company,

4    three pages of proposed changes, Bates numbers are 267 to

5    270.  Take a look at exhibit 29 and tell me if you

6    recognize it?

7        A    That was also produced by us to the best of my

8    knowledge, yes.

9        Q    Is that your signature on the front page of

10    exhibit 29?

11       A    Yes.

12       Q    Is that a letter you sent to Mr. Dahlberg?

13       A    Yes, that was faxed to Mr. Dalhberg on June 23,

14    1999.

15       Q    With the three pages of proposed changes

16    attached to it?

17       A    Yes.

18       Q    I want to go back to your telephone call with

19    Mr. Dahlberg on June 22nd, do you recall telling me about

20    that earlier?

21       A    Yes.

22       Q    Did you curse and swear at Mr. Dahlberg and hang

23    up on him on June 22nd?

24       A    Not that I recall.

25       Q    You don't recall hanging up on Mr. Dahlberg?

KNIPES-COHEN/SPHERION COURT REPORTING
(561) 478-0401

1          A     To end a conversation, hang up the phone?  Are

2     talking about slamming down the phone?

3          Q     I'm just talking about hanging up without saying

4     good-bye and enjoy the conversation?

5          A     No, I don't believe I've ever done that to

6     anyone.

7          Q     You didn't curse at Mr. Dahlberg during the

8     course of that conversation?

9          A     Of course not.

10         Q     Did any time during the course of a telephone

11    conversation on June 22, 1999 did you tell Mr. Dahlberg

12    that the deal was off?

13         A     No.

14         Q     You never told Mr. Dahlberg that you were no

15    longer interested in purchasing the plane on June 22,

16    1999?

17         A     No.

18         Q     How about prior to June 22, 1999, did you ever

19    tell Mr. Dahlberg that you were not interested in

20    purchasing the plane, you being Turnberry?

21         A     Yes, I guess I have.

22         Q     When was that?

23         A     On the beginning of our negotiations and I told

24    that we would not be interested in the aircraft at the

25    present price.

1      Q     Okay, other than the price issue, during your

2    initial conversation with Mr. Dahlberg, did you ever tell

3    Mr. Dahlberg that Turnberry was no longer interested in

4    purchasing the airplane on or before June 22nd, 1999?

5         A     No.

6         Q     Never had that conversation with him?

7         A     No.

8         Q     June 23rd, when you faxed this to Mr. Dahlberg,

9    when I say this, I mean exhibit 29 and its attachment,

10   where were you?

11        A     Where was I.  South Florida.

12        Q     You were still in Florida?

13        A     Yes, sure.

14        Q     The reason I ask, you can look at the sentence,

15   it's no mystery, you say that you will be going to St.

16   Louis yourself tomorrow, which would be the 24th.  You

17   wrote it.  I'm just confirming?

18        A     Yes.

19        Q     All right.  So, you were still in Florida at the

20   time you sent this letter?

21        A     Yes.

22        Q     On the 23rd did Mr. Dahlberg call you regarding

23   Mr. Murray's appearance at Midcoast Aviation?

24        A     We had a conversation.  I don't recall who

25   called who.  But the first call was from Ken Murray.

    1    Q    On what date?

    2    A    On June 22nd.

    3    Q    Tell me about that?

    4    A    Upon Ken Murray's arrival on June 23rd to

    5    Midcoast Aviation, his attempt to review the aircraft

    6    records were halted by Steve Bates.

    7    Q    What did Mr. Murray tell you when he called you?

    8    A    Murray told me that Steve Bates was given

    9    instructions not to allow Turnberry access to the

    10    airplane.

    11    Q    Did Mr. Murray tell you anything else other than

    12    that on June 23rd, 1999, when he called you?  You're

    13    reading from exhibit 21?

    14    A    Yes.  He indicated that the reason for it was

    15    the aircraft was being sold to someone else.

    16    Q    Who told you this, Murray?

    17    A    Yes.

    18    Q    What else did Mr. Murray tell you?

    19    A    That he just was not given access to the

    20    airplane, was told that the airplane had been sold to

    21    someone else.

    22    Q    And Mr. Murray told you that Mr. Bates told him

    23    that?

    24    A    Yes.

    25    Q    And when you received this phone call from

                    KNIPES-COHEN/SPHERION COURT REPORTING
                              (561) 478-0401

1    Murray, what do you do?

2    A    I told him I didn't understand the confusion

3    and, although he had told me the day before that he had

4    someone else interested in the airplane and we had a

5    discussion about it, I didn't know of any changes, and

6    that I would get together with Ed Dahlberg and try to

7    straighten it out.

8    Q    Did you call Dahlberg or did Dahlberg call you

9    on June 23, 1999 regarding this issue?

10    A    I don't recall who called who, but we certainly

11    talked about it.

12    Q    Would it be, that was my next question, would

13    that be your Sprint or your Bell?

14    A    Probably on the Bell.

15    Q    Why don't you --

16    A    Talking June 23rd, there is a call.  Okay, I

17    have a call placed to Ed Dahlberg's office at 12:27 p.m.

18    Q    That's on page 14 of exhibit 24.

19    A    Right.

20    Q    Exhibit 25 --

21    A    Number 102.

22    Q    Exhibit 25 starts with phone calls, that is your

23    Sprint PCS bill on June 24th, do you have a bill prior to

24    exhibit 25?

25    A    No.

1       Q     Did you have a cell phone in June prior to June

2    24nth, 1999?

3       A     Sure.

4       Q     That's when exhibit 25 starts on June 24th.

5       A     This one --

6       Q     You tell me.

7             MR. REIMER:    It appears the last page of exhibit

8       24 is page 4 of 4, of the billing that would have

9       ended June 22, 1999.  You're saying that bill starts.

10            MR. HUTCHISON:    On June 23rd.

11            MR. REIMER:    June 23rd.

12            MR. HUTCHISON:    24th, I'm sorry.  Starts on 24th

13      and the last page of exhibit 24 ends on June 22nd, so

14      I'm assuming you just didn't make any calls on the

15      cell phone.  You didn't make any phone calls on June

16      23rd, 1999 or receive any.

17   BY MR. HUTCHISON:

18      Q     So, either way you called Dahlberg or Dahlberg

19   called you on June 23rd regarding the Ken Murray phone

20   call?

21            MR. REIMER:    Object to the form of the question.

22   BY MR. HUTCHISON:

23      Q     Do you know?

24            MR. REIMER:    He already identified the call.

25            THE WITNESS:    Yes, the way it appears here from

                  KNIPES-COHEN/SPHERION COURT REPORTING
                            (561) 478-0401

```
 1           the records, is I probably placed the call first.

 2    BY MR. HUTCHISON:

 3        Q    And that is exhibit 24.

 4        A    The length of the call doesn't look like it's

 5    long enough, maybe it was a message left or something.

 6        Q    Let me ask you a question, what time did Murray

 7    arrive at Midcoast, did you tell me he had a 9:00 a.m.

 8    flight or he was arriving in St. Louis at 9:00 a.m. on the

 9    23rd?

10        A    I got in my notes, I got he arrived at

11    approximately 10:00 a.m.

12        Q    All right, so he would have been told by

13    Mr. Bates that he couldn't see the plane upon his arrival?

14        A    Yes.

15        Q    Is that fair to say?

16        A    Yes.

17        Q    The call that you referred to earlier on

18    June 23rd --

19        A    But in any case, you know, what happened was

20    about 1:00 p.m. Ed Dahlberg authorized Midcoast Aviation

21    to allow Ken Murray access to the records.

22        Q    But let's get to that.  I want to know who

23    called who the morning of the 23rd regarding Mr. Murray.

24    Because your phone call that you referred to was on page

25    14 of exhibit 24, or the June 23rd call to Manassas at
```

```
 1    12:27 p.m. for three minutes?

 2         A    Yes.

 3         Q    If it's 12:27 it would be, I assume St. Louis

 4    was --

 5         A    Was one hour difference.

 6         Q    You're at 10:00 a.m. approximately, in your

 7    diary are you writing Central or are you writing Eastern

 8    time?

 9         A    It would have been Eastern time, I was keeping

10    logs here.  So that would have been 11 o'clock our time.

11         Q    Wait a minute.  Time out.  Exhibit 21,

12    June 23rd, second page?

13         A    Yes.

14         Q    Of exhibit 21.  You write 10:00 a.m.

15    approximately Ken Murray arrives?

16         A    Yes.

17         Q    Now, is your 10:00 a.m. approximately Eastern

18    time or is saying Central time?  You're writing Eastern

19    time in exhibit 21 or Central time, do you know?

20         A    I don't know.

21         Q    You only made it within the last week.  Do you

22    recall when --  Would you have put Central time if you

23    were logging something in exhibit 21?

24         A    What logging is that is a time frame I had, you

25    know, recorded on that date on a folder or something.  I
```

1    had a note that 10:00 a.m. Ken arrived at the facility.

2        Q    Do you have that folder still?

3        A    No.

4        Q    Nevertheless at 12:27 p.m., you have a call to

5    Dahlberg?

6        A    Yes.

7        Q    Do you know if Dahlberg called you prior 12:27

8    p.m. Eastern time on June 23rd regarding Murray's

9    appearance at Midcoast?

10       A    No, I don't.  He could have.  I know we were in

11   contact with each other.

12       Q    Tell me the substance of your conversations with

13   Mr. Dahlberg regarding Murray's appearance at Midcoast on

14   June 23rd, 1999?

15       A    I was puzzled with Ken's, the information that

16   Ken received from Midcoast Aviation not allowing him to

17   review the records.

18       Q    Yes.

19       A    And Ed reminded me that, he said that he told me

20   that he had another deal and was going to go ahead with

21   the other deal.

22       Q    Okay.

23       A    I said, well, that was not the understanding

24   that I had, when we finished the conversation.  I told you

25   that I was going to continue the deal and Ken was on his

1    way to St. Louis.

2        Q    What did Dahlberg say?

3        A    He said, well, send him home.  I said, well, no,

4    we're not going to do that.  I said I suggest that we talk

5    to somebody in International Paper because we have a

6    contract to buy this airplane.

7            He said he would.  And at approximately 1

8    o'clock, in that area, he gave authorization for Ken

9    Murray to look at the records on the airplane.

10       Q    Well, did he call back and tell you why he

11   changed his mind?

12       A    No, he didn't.

13       Q    Other than that first conversation, Mr. Dahlberg

14   never got back to you regarding that issue.

15       A    He got back to Steve Bates.

16       Q    My question is did you have any subsequent

17   conversations with Mr. Dahlberg regarding the issue of

18   Murray's inspection at Midcoast on June 23rd, 1999?

19       A    Subsequent to --

20       Q    To what you just testified to?

21       A    I don't recall any further.

22       Q    So, just that one conversation with Dahlberg is

23   all you recall, when he told you that the plane was going

24   to be sold to someone else, you were insistent that Murray

25   should see the records?

1     A     That's what I recall.

2     Q     Your testimony today, is that your insistence is

3     what made Mr. Dahlberg change his mind and allow Murray

4     the right to review the records, even though he was going

5     to sell it to someone else?

6     A     Yes.

7     Q     I want to talk about exhibit 29, now.  You have

8     a copy in front of you.  It is your June 23rd, 1999 letter

9     to Mr. Dahlberg, and the proposed changes attached to it.

10    Look at the proposed changes, page two of the

11    exhibit.  I'm sorry, page 23 of the exhibits, I apologize.

12    It's parentheses paragraph 5 close parentheses commenting

13    on paragraph 3.B, I believe, is that correct?

14    A     Yes.

15    Q     This would have been your proposed changes to

16    the June 21st sales agreement that Mr. Dahlberg proposed

17    and sent to you on June 21st, 1999?

18    A     That's correct.

19    Q     On page 3 of this exhibit 29, Bate number is

20    269, you have clarification, colon, commence record review

21    immediately, commence aircraft inspection and flight test

22    after execution of contract, remove reference to movement

23    of aircraft is not applicable here.

24    And then you go on and give the actual proposal

25    of what you want to put in there, is that what you're

```
 1    doing?  In other words the first part is just a comment
 2    not to be included in the contract, or is the first part
 3    to be included in the contract as well as the second part
 4    of your paragraph 5 in parentheses?  Can you tell me what
 5    you mean there?
 6        A    Can I see the other exhibit, the original.
 7        Q    Sure.  I think David has it in his left hand.
 8        A    Is that it.
 9        Q    You were looking at exhibit 4, now.
10             MR. REIMER:  4.
11             THE WITNESS:  Paragraph 3.B.
12    BY MR. HUTCHISON:
13        Q    Do you understand my question?
14        A    No, I didn't --
15        Q    In your proposed changes, which is exhibit 29,
16    on the third page, under what you have as paragraph 5,
17    you're commenting on paragraph 3.B.  You see that?
18        A    3.B okay.
19        Q    What part are you proposing to be substituted
20    into the draft that Mr. Dahlberg sent to you on June 21st?
21    The first paragraph of your paragraph 5, or the second
22    paragraph of your paragraph 5?  Do you understand my
23    question?
24        A    No, what we're proposing is to change paragraph
25    B from the original contract to read what paragraph B is
```

1    on there.

2        Q    So you just want this portion in the contract,

3    not the top portion?  The first part is the comment, the

4    second paragraph is your proposed 3.B, that is my

5    question.

6             MR. REIMER:  This is the language.

7             THE WITNESS:  That is the language --

8    BY MR. HUTCHISON:

9        Q    Do you understand my question now.  In your

10   third page of exhibit 29, under your paragraph 5, you have

11   paragraph 3.B clarification, you have a sentence, right

12   underneath that, you have B, pre-purchase inspection.

13   Goes on with the rest, your proposed language that is the

14   second paragraph starting with pre-purchase inspection,

15   that is what you want to substitute into the Mr.

16   Dahlberg's June 21st draft?

17       A    Yes, that is correct.

18       Q    Fair enough.  Now, look at your proposed

19   language in that second paragraph of your parentheses 5

20   close parentheses of exhibit 29.  If you look at the

21   second sentence of your proposed language, it says the

22   aircraft and engine logs and maintenance records will

23   available at the airport for review to commence on or

24   about Wednesday, June 23rd, 1999.  That is happening about

25   the same time you're faxing this letter to Mr. Dahlberg,

1    correct?

2         A    That is correct.

3         Q    That's what Mr. Murray was there for?

4         A    That's correct.

5         Q    Mr. Murray was there to do just what you have in

6    that first sentence of paragraph B, correct?

7         A    The purpose of Ken Murray was to do what I

8    instructed him to do.  It wasn't for just the logbook

9    review.

10        Q    Right, but --

11        A    At that particular time the first steps would be

12   the logbook review and to determine the inspection status

13   of the aircraft.

14        Q    And that's what Murray was doing about the same

15   time you're faxing exhibit 29 to Dahlberg?

16        A    That's correct.

17        Q    Now, was is Murray, a pilot?

18        A    I don't know.

19        Q    Was he qualified to test fly --

20        A    He is a mechanic, he is a certified mechanic.

21        Q    Could he do a test flight or a systems check on

22   the subject aircraft?

23        A    Systems check would always be done by the

24   facility that was controlling the aircraft.  He would have

25   been present or it was my intention for him to be present

1    at that time.

2        Q    Did you coordinate -- My question is this,

3    Define systems check for me?

4        A    It is a specific review of all the systems in

5    that are set forth in the aircraft maintenance manual to

6    perform checks on each one of the systems, each one of the

7    ground and flight systems of the aircraft.  Normally done

8    on a ramp or a runway, involves several hours.

9            Normally done after heavy maintenance, or prior

10   to signing off an aircraft on a heavy inspection.

11       Q    Can that systems check you just referred to be

12   done on the ground or must some of it be done in the air?

13       A    Without seeing the specific check, I couldn't

14   answer that.

15       Q    The systems check that you wanted to do prior to

16   purchasing the subject aircraft from International Paper,

17   did it require the plane to be in the air or could those

18   systems checks be done on the ground?

19       A    We never got that far into the deal.

20       Q    Okay, was Mr. Murray there to do a systems check

21   or not?

22       A    My intentions for Ken Murray was to stay with

23   the airplane at that facility until we purchased it.

24       Q    Did Mr. Murray know that?

25       A    Yes, he did.

116

1    Q    Did Mr. Murray leave prior to you being able to

2    fulfill your intention with Mr. Murray?

3    A    Yes, he did.

4    Q    Why did Mr. Mr. Murray leave?

5    A    He told me that he had a family emergency that

6    his mother, or his mother-in-law was sent to the hospital

7    with a heart attack and he had to fly home immediately.

8    Q    So, Mr. Murray leaving prior to fulfilling what

9    you wanted done had nothing to do with International Paper

10    Company?

11    A    I don't know that, at this time.

12    Q    You are not suggestion that they gave

13    Mr. Murray's mother-in-law a heart attach, are you?

14    A    No, I'm not.

15    Q    Are you aware of any facts that would lead you

16    to believe that International Paper prevented Mr. Murray

17    from doing what he wanted to do prior to leaving on

18    Thursday, June 24th, 1999?

19    A    Yes, they prevented him from the start of the

20    process.

21    Q    For how long?

22    A    Approximately a half a day.

23    Q    Is that your testimony, that he was delayed a

24    half a day?

25    A    Appears to me he was.

```
 1        Q    Okay, let me ask you this, did Murray tell you
 2   that, that he was delayed a half a day and couldn't
 3   complete what you wanted him to complete?
 4             MR. REIMER:  Object to form?
 5             THE WITNESS:  No, he did not.
 6   BY MR. HUTCHISON:
 7        Q    I want to back up a second Mr. Lainey, when you
 8   first hired Mr. Murray, what was, did you send him any
 9   kind of employment contract agreement or written direction
10   or charge as to what his employment was going to be in
11   this matter?
12        A    No, it was a verbal agreement.
13        Q    What verbally did you tell Mr. Murray you
14   wanted?
15        A    I wanted to employ him, to utilize him for the
16   inspection all the way through the entire process of
17   pre-purchase inspection, for the purpose of Turnberry
18   buying a Canadair Challenger 600.
19        Q    Speak up so the court reporter can hear you.
20        A    Sure.
21        Q    What else, what specifically did that include, I
22   mean did you have any detail with him as far as that, what
23   that inspection would include?
24        A    Yes, I gave an assignment, his first assignment
25   was to go to St. Louis and I wanted him to conduct a
```

1    logbook, an inspection review and a damage history review

2    of the aircraft, as well as a corrosion inspection

3    physically to the exterior of the airplane.

4        Q    Anything other than those three items?

5        A    I would be joining him in St. Louis and he would

6    have further instructions from me.

7        Q    Okay, prior to leaving for St. Louis, did you

8    give him any other instructions other than those three, to

9    conduct, (1) a logbook inspection review, (2) a corrosion

10   review, and (3) a damage history review?

11       A    Those wee the only instructions.  He was to

12   report directly to.

13       Q    Okay, while he was in St. Louis, did you change

14   his assignment at all?

15       A    No.

16       Q    At any time prior to Mr. Murray leaving St.

17   Louis, did you change his assignment at all?

18       A    No.

19       Q    So, as far as Mr. Murray knew, he was only to

20   conduct a logbook inspection review, a corrosion review

21   and a damage history review of the subject aircraft?

22       A    And to await my arrival.

23       Q    And when were you to arrive in St. Louis?  Your

24   looking at exhibit 21, page 2?

25       A    On June 24.

```
 1     Q    Is that page 2 you are looking at?

 2     A    Yes, page 2.

 3     Q    Did you tell what time you were to meet him

 4   there?

 5     A    Yes.

 6     Q    What time did were you to meet Mr. Murray in St.

 7   Louis?

 8     A    It was --  I believe I told him it about 3:30,

 9   3:30 p.m.

10     Q    Okay, did Murray know why you were to meet him

11   there?

12     A    Yes, sure.

13     Q    Why?

14     A    To conduct the purchase of the aircraft.

15     Q    But did he know any specific details as to why

16   he was going to be needed after he conducted the three

17   inspections that we discussed?

18     A    Well, he knew that there was an awful lot more

19   to be doing for the purpose of purchasing of the aircraft,

20   yes.

21     Q    Did you have those specific inspection discussed

22   with him and what else he needed to do?

23     A    Not at that time.  I was prepared to.

24     Q    Let's go back to exhibit 29 --   Well, let's

25   back up, when you arrived on June 24th, 1999, at the
```

1    Midcoast Aviation facility in St. Louis, Mr. Murray had

2    already left?

3         A     When I arrived, Mr. Murray called me on my cell

4    phone at about 3:48 and informed me that he had a family

5    emergency.  And he had just left Midcoast to catch a

6    flight back home.

7              And he told me that he reviewed and finished a

8    logbook findings, and there was a brief for me waiting at

9    the receptionist's desk.  I asked him what the emergency

10   was.  He told me that his mother was rushed to the

11   hospital with a heart attack.  He had to get right home.

12             I asked him if he was going to be able to

13   return.  He said it didn't look like he would be able to

14   return.

15        Q     Did you have any further discussion with

16   Mr. Murray?

17        A     Not that day.

18        Q     Did you tell him, gee, I wanted you to do more

19   work, if there is anyway you can avoid going home?

20        A     No, I wouldn't have had that thought with his

21   explanation that his mother was in the hospital.

22        Q     Mr. Murray was never of the understanding that

23   he needed, that you intended him to stay to do more work?

24        A     Oh, yes, he knew I was disappointed, absolutely.

25        Q     Well, how did he know that?

                    KNIPES-COHEN/SPHERION COURT REPORTING
                              (561) 478-0401

1      A      He knew by the tone of my voice I'm sure.  And

2    he was supposed to meet me there.

3      Q      Anything specific that you would have told him

4    or that you did tell him, at that time?

5      A      Yes, you know, as I recall the first part of the

6    conversation was where are you.  Why aren't you here?  Why

7    aren't you going to be there.

8      Q      Any specific item that you would have said to

9    him, hey, I needed you here to do X, I needed you here to

10   do Y?

11     A      No, not that I'm aware of.

12     Q      Subsequent to that, when was your next

13   conversation with Mr. Murray subsequent your June 24th,

14   1999 conversation at approximately 3:30 p.m.?

15     A      I don't have any specific date that I recall.

16     Q      Well, tell me any conversation you would have

17   had with Mr. Murray after June 24th?

18     A      I recall calling him to check after that date,

19   talking to his wife, and made a comment to his wife, with

20   reference to his mother hopping his mother was better.

21   And she didn't know what I was talking about.  And Ken

22   wasn't there, which indicated to me that there was a good

23   chance that that emergency didn't really exist.

24     Q      Do you have any reason to believe that other

25   than your conversation with his mother, or his wife?

      1        A     I'm sorry.

      2        Q     Did you have any reason to believe that

      3   Mr. Murray was lying to you regarding that emergency other

      4   than your conversation with Murray's wife?

      5        A     No.

      6        Q     Any other facts?  Did you answer that?  Are you

      7   reading something.

      8              MR. REIMER:  He's looking at his notes.

      9              MR. HUTCHISON:  Let me know, you didn't say

     10        anything.

     11   BY MR. HUTCHISON:

     12        Q     You're reading page 2?

     13        A     Yes.  No, not that I have indicated, no.

     14        Q     Well, are there any other facts that you are

     15   aware of that Mr. Murray lied to you regarding his family

     16   emergency?

     17        A     Other than I was made aware that the Aero Toy

     18   Store had offered him a job at or about that time.

     19        Q     Who told you that?

     20        A     Was one of the maintenance people at Aero Toy

     21   Store.

     22        Q     What was his name?

     23        A     I don't recall his name.  He was in charge of

     24   the interior, interior shop.

     25        Q     You have in your exhibit 21, which we were just

1    referring, June 24th, Thursday, Ken Murray called me at

2    3:48 on my cell phone, is that 3:48 Central time or

3    Eastern time?

4         A    I don't know.

5         Q    Well, there is a sentence before that that you

6    arrived at Midcoast at 4:00 p.m. local time, local time

7    being --

8         A    I said about 4:00 p.m. local time.

9         Q    That would have been Central time?

10        A    Yes.

11        Q    St. Louis time, is that what you're referring to

12   there?

13        A    Yes, St. Louis time would have been 4:00 p.m.

14   local time, St. Louis.  This phone call was on the log on

15   my phone log would be representing East Coast time.  So

16   that would be the discrepancy, I'm sure.

17        Q    Now, I want to go back, and any other

18   conversations with Mr. Murray?  I guess you told me that

19   on June 24th you had a discussion with Mr. Murray.  He

20   said he was leaving because of a family emergency.

21             After June 24th you had a conversation with his

22   wife.  Did you ever have another conversation with

23   Mr. Murray after June 24th, 1999?

24        A    After June 24th, 1999, yes.  I don't recall the

25   exact date, but it was in reference to his bill.

1    Q    What about his bill?

2    A    He sent me a bill for his time, and he wanted to

3    get paid for it.

4    Q    Did you pay him?

5    A    Yes.

6    Q    Did you question his time?

7    A    No.

8    Q    Did you dock his pay at all?

9    A    No.

10    Q    Okay, was that discussion only about the bill

11    and nothing else?

12    A    Only about the bill.

13    Q    Any other discussions with Mr. Murray, other

14    than after June 24th, 1999 other than the one about the

15    bill?

16    A    We had the incident of July 27, that we

17    discussed earlier.

18    Q    But you told me all the details about that,

19    didn't you?

20    A    That's correct.

21    Q    Anything other than, any other phone conference

22    other than that one?

23    A    No.

24    Q    All your conversation with Mr. Murray we have

25    discussed in detail?

```
 1      A    Yes, I think so.

 2      Q    Is that correct?

 3      A    That is correct.

 4      Q    Let's go back to exhibit 29, page 3, this

 5  proposed language that you submitted to Mr. Dahlberg and

 6  the third page of exhibit 29, paragraph B.  You follow me,

 7  third sentence?

 8          Upon execution of this agreement the aircraft

 9  will be made available for inspection by Turnberry agent

10  and International Paper will conduct a fight test of up to

11  two hours for a systems check to be observed by

12  Turnberry's agent.  The cost of fuel and pilots for this

13  flight test shall be paid by Turnberry.  Was that your

14  proposal to Mr. Dahlberg on June 23rd?

15      A    Yes, I wrote that, right.

16      Q    That's part of the proposed changes that you

17  sent to Mr. Dahlberg on June 23rd, is that correct?

18      A    Yes.

19      Q    And your intention there was to sign a

20  definitive sales agreement and then have the opportunity

21  to do a test flight?

22      A    Well, yes.

23      Q    Is that correct?

24      A    Yes, unless the test flight could have been done

25  under the original agreement.
```

1      Q      Did you make any arrangements with Mr. Bates,

2   prior to going to St. Louis on June 24th, 1999 to have the

3   plane ready to be flown?

4      A      We couldn't do that.  It was under the control

5   of International Paper and Ed Dahlberg.

6      Q      Did you ask Mr. Dahlberg to do that?

7      A      Yes, I did.

8      Q      When was that?

9      A      On the afternoon of my arrival in St. Louis.

10     Q      So, Thursday, June 24th, 1999, in the afternoon

11  you asked Mr. Dahlberg for the first time if you could fly

12  the plane?

13     A      No, it was always understood we were going to

14  fly the airplane.

15     Q      Well, when, I guess would bethe operative

16  question.  When was it understood that you were going to

17  fly the plane, on what date?

18     A      When I arrived in St. Louis on the 24th, the

19  purpose of my visit was to determine that, to determine

20  exactly how much time was needed, how much work was

21  needed, to get the aircraft to the point of systems checks

22  and flight checks.

23     Q      Well, you had obtained --  When you got there on

24  June 24th, when was it your intention to take the plane

25  for a test flight?

KNIPES-COHEN/SPHERION COURT REPORTING
(561) 478-0401

1       A     After my discussion with Steve Bates.  Mr. Bates

2    said that it would take at least two days to ready the

3    aircraft for a systems check, okay.  And a systems check

4    would be first before any kind of a flight check.

5       Q     So, the earliest a systems check was going to be

6    done would have been June 26, 1999?

7       A     The discussion that we had on the afternoon of

8    June 24, we were looking at possibly Monday was the first

9    time the airplane could be ready to do systems checks.

10      Q     And then a flight test would have been sometime

11   subsequent to that?

12      A     And if we had everyone's approval.  And this

13   was, you know, this was a primary, one of the primary

14   reasons of our conversation on the afternoon of the 24th

15   between myself and Ed Dahlberg, was to coordinate just

16   exactly the way this was going to happen.

17      Q     So after you speak with Bates on June 24th --

18   You arrived at Midcoast on 24th and had a conversation

19   with Mr. Bates.  Mr. Bates tells you that it's at least

20   two days to do a systems check.  Your thinking in your

21   mind tentatively Monday?

22      A     That's not particularly true.

23      Q     Give me the chronology?

24      A     I arrived at St. Louis, I went immediately to

25   the aircraft.  I looked at the aircraft myself, walked

1    around looked at some corrosion areas that was suspect

2    that I wanted to see myself, check those corrosion areas.

3            There were several mechanics on the airplane.

4    The engines were open.  They were doing various checks to

5    the engines, I don't know exactly what they were doing.

6            I viewed the interior of the airplane.  I went

7    back to look for Steve Bates to his office.  Steve was not

8    in his office.  I checked with his secretary.  Went back

9    out to the airplane.  We paged Steve several times.

10            Finally Steve arrived at the airplane where I

11    was.

12    Q    Well, did you have clearance to go on the plane,

13    I mean that late in the evening?

14    A    No.

15    Q    You can just walk up and look at the plane?

16    A    If you know where you're walking, yes, sure.

17    Q    Mr. Bates is paged, what happened?

18    A    Steve Bates finally arrived, you know.  We

19    walked around and I show him some of my concerns, some

20    things I wanted checked out.  He agrees with me.  I told

21    him my biggest concern is to look at and review the

22    previous maintenance done to the airplane by Midcoast

23    Aviation.

24            He brought me into the inspection department

25    where we have a large conference table, and I asked him to

KNIPES-COHEN/SPHERION COURT REPORTING
(561) 478-0401

1    pull the history of the aircraft so could I compare it

2    against the future maintenance requirements of the

3    airplane and inspection sequence, such as 7200 hour

4    inspection, and we reviewed that.

5         I asked at what stage the airplane was

6    presently, and; how fast we could button the airplane up

7    to do a systems check.  He said that it would take at

8    least two days to get the airplane ready for a systems

9    check.

10    Q    This was your first conversation with Mr. Bates

11    regarding a systems check?

12    A    That's right.

13    Q    Prior to this time, did you have any

14    conversation with Dahlberg regarding a systems check,

15    other than what was in the initial June 19 letter?

16    A    No.  In the middle of that conversation, Ed

17    Dahlberg called me at the facility.  I received a call,

18    there at the he inspection department.

19    Q    That was on June 24, in the afternoon?

20    A    June 24 in the afternoon.  We started the

21    conversation. Steve Bates was present.  I don't know how

22    much of one side of the conversation he heard, but he was

23    present in the room.  And I started going over what myself

24    and Steve Bates were discussing with Ed Dahlberg and

25    asking if we could get authorization from International

1    Paper to ready the airplane for a systems check.

2       Q    You're asking who?

3       A    From Ed Dahlberg.

4       Q    On June 24th?

5       A    Yes, that's correct.

6       Q    And what does Dahlberg tell you?

7       A    Dahlberg told me that I've got until

8    5:00 o'clock to accept or reject the airplane.

9       Q    5:00 o'clock on what date?

10      A    That day.

11      Q    June 24th.

12      A    June 24th.

13      Q    What do you say in response to that?

14      A    I asked him to repeat it several times, I

15   couldn't believe what I was hearing. I said, you know,

16   we're all the way out here, we want to continue with this

17   deal.

18           He says, well, I already have the airplane sold

19   and they're buying the airplane from me where-is as-is at

20   5:00 o'clock. International Paper says that you can have

21   the airplane under the same conditions where-is, as-is

22   5:00 o'clock today. I said, our contract means nothing.

23   And he says, we don't have a contract.

24           So I said, I disagree with you, we have a

25   contract, and, you know, we have gone to a lot of trouble

1    and I want to go ahead with this deal.

2         He said you have to 5:00 o'clock.  That was as

3    far as we went on that conversation.

4    Q    Dahlberg told you that he did not think that you

5    had a contract and that you had to take the aircraft as-is

6    where-is by 5:00 p.m. Thursday, June 24th, 1999?

7    A    He didn't say that he interpreted the contract

8    that way.  He said that I had no choice.  This is the way

9    it was going to be done now.  That I was going to either

10   receive the airplane at 5:00 p.m. where-is as-is, or the

11   airplane was being sold to somebody else.

12   Q    You were willing to take it where-is as-is

13   provided the title was okay, and there was approved

14   transfer of the MSP and the Honeywell maintenance program,

15   correct?  I guess my question is what is -- I thought you

16   told me earlier that you were willing to take it where-is

17   as-is as long as there was a good title and there was a

18   transfer of the MSP and Honeywell maintenance program?

19   A    If we approved of the airplane after we checked

20   the aircraft out.  We still has the systems check and the

21   flight check to go through on the airplane.  And if you

22   ask me would I have accepted that airplane if half the

23   systems were not operating, of course not.

24   Q    So, what specific looking at exhibit 29 now --

25   Let's go back to Mr. Dahlberg, did your conversation then

KNIPES-COHEN/SPHERION COURT REPORTING
(561) 478-0401

1    end with Mr. Dahlberg?

2         A    That conversation did at that time.

3         Q    Anymore details of that first conversation with

4    Mr. Dahlberg on June 24th?

5         A    Refer to my notes here.

6         Q    On exhibit 21, correct?

7         A    That's right.  Mr. Dahlberg also indicated, he

8    said that there was a change to our agreement and that it

9    was in the agreement from International Paper that had

10   been faxed to me earlier that day.

11        Q    What was he referring to?

12        A    I asked him to fax me a copy because I never

13   received any.  I was in route to St. Louis at that time.

14   I asked him to fax me a copy of that at Midcoast since I

15   haven't seen it.

16             And I gave the fax number at the receptionist's

17   desk, and at that time I was a little unclear whether he

18   was going to fax it or not.  But I remember asking, we

19   asked Gale Shelby, which was the receptionist, if she

20   could wait because the fax machine was there at her desk.

21   And I was expecting a fax from Ed Dahlberg and we were

22   waiting for that fax.  We were waiting on a fax for

23   sometime.  And then Ed Dahlberg called me on my cell

24   phone.

25        Q    Let's back up, that first conversation with

1   Dahlberg on June 24th, any prior details regarding that

2   conversation?

3        A    No.

4        Q    And he's saying take it where-is as-is by 5:00

5   p.m. on Thursday June 24th or the deal is off?

6        A    He said, he indicated that to me in a previous

7   fax that day.

8        Q    Did you ever receive that previous fax?

9        A    No.

10       Q    Ever, as you sit here today did you ever receive

11  it?

12       A    No, never did.

13       Q    Okay, then you were sitting there waiting,

14  Dahlberg calls back a second time?

15       A    Calls back a second time.

16       Q    This is your second conversation with Dahlberg

17  on June 24th?

18       A    That's right.

19       Q    What happens?

20       A    No, the fax hadn't arrived in about 30 minutes

21  and I called Ed Dahlberg and left a message for him off my

22  cell phone.  And about eight minutes later, he called me

23  back and advised me that he would not be sending the

24  revised sales agreement, that he had consulted with

25  International Paper, and that they had accepted the other

KNIPES-COHEN/SPHERION COURT REPORTING
(561) 478-0401

1   offer at 5:00 p.m.

2        Q    At 5:00 p.m.

3        A    That's what he said.

4        Q    So, your second actual conversation with

5   Dahlberg on the 24th was after 5:00 p.m?

6        A    Yes, it was.  I show 5:05, but that would mean,

7   you know, that would be local time on my phone, so it

8   would have been 6:04 at local time in St. Louis.

9        Q    He told you that at 5:00 p.m. he accepted

10  another offer?

11       A    Yes, that is what he said.

12       Q    Then he said he is not ever going to fax you

13  anything so, there was nothing else faxed to you?

14       A    We had about a fifteen minute discussion about

15  it.

16       Q    What was the content of that discussion?

17       A    I told him how unhappy I was about all of it.

18  The conversation was on the telephone, in fact, I walked

19  through the hanger back onto the airplane, and sat on the

20  airplane, and we ended the conversation sitting on the

21  airplane.

22            But he said he had discussed it with

23  International Paper's attorneys and they said for him to

24  go ahead with the deal.

25       Q    Did he ever reference any names?

KNIPES-COHEN/SPHERION COURT REPORTING
(561) 478-0401

135

```
 1        A     No, he didn't.

 2        Q     Any other details of that second conversation

 3   with Mr. Dahlberg?

 4        A     No.

 5        Q     Okay, how did it end?

 6        A     At that time, I explained to Gale Shelby that

 7   she wasn't going to be getting a fax so she could go home.

 8   And I discussed briefly what happened with Steve Bates.  I

 9   told Steve that, looks like that Ed Dahlberg was selling

10   the airplane to someone else.  But I said I don't know

11   what this really means.  I will give you a call tomorrow

12   morning and see if the deal is still on, or what is going

13   on here.

14        Q     You told Bates that in person or you told that

15   to Bates while you were walking away?

16        A     In person.  We were there.

17        Q     With the second conference with Dahlberg you

18   were still at the facility?

19        A     Yes.

20        Q     Did you ever have a third conversation with Ed

21   Dahlberg on the 24th?

22        A     The last conversation I had was when he refused

23   to send the fax.

24        Q     He said that at 5:00 p.m. he had sold the plane

25   to someone else?
```

```
 1        A      That's right.

 2        Q      Did you ever have any other conversation with Ed

 3   Dahlberg after that last phone conversation on June 24th,

 4   1999?

 5        A      The last conversation with Ed Dahlberg was on

 6   June 29.

 7        Q      What conversation was that?

 8        A      On June 29th, I spoke to Ed Dahlberg, he advised

 9   me that the transaction with the other party had been

10   completed that day and they sold the airplane that day.

11   And he said that he held back closing on the transaction

12   until that day, one day after our original agreement

13   expired, under advisement of International Paper's legal

14   department.

15             He said "so we would not have cause to sue

16   them."

17        Q      Now, where did you get that quote from, What

18   document?

19        A      You mean as we sit here.

20        Q      You wrote that where?

21        A      It was what he said to me, my folder.

22        Q      And those folders that you destroyed?

23        A      Well, I didn't.  All that information is right

24   here.  It's not destroyed.

25        Q      But the source documents are no longer in
```

1    existence?

2        A    Well, yes, but this is the source.

3        Q    No, no, exhibit 21 you created within the last

4    week?

5        A    But you say that like I created a crime or

6    something, you know.

7        Q    I just want to know the documents --

8        A    I didn't destroy anything.

9        Q    The notes, the handwritten notes that you used

10   to make exhibit 21 have been thrown away, have they not?

11       A    The notes are right here, they're just in a

12   different format.  They are typed now instead of

13   handwritten.

14       Q    So, where are the original handwritten notes?

15       A    I threw those away.

16       Q    That was my question.  Just so I'm clear, did

17   you go to St. Louis with anybody or did you go alone?

18       A    My wife went with me.

19       Q    What is her name?

20       A    Nellie.

21       Q    Nellie?

22       A    Nellie N-E-L-L-I-E.

23       Q    That's her legal name?

24       A    Yes.

25       Q    Full legal name is Nellie Lainey?

KNIPES-COHEN/SPHERION COURT REPORTING
(561) 478-0401

```
 1      A      Nellie Frances Lainey.

 2      Q      What is her date of birth?

 3      A      9/4/48.

 4      Q      Now, is she, was she privy to any of these

 5   conversations with Mr. Dahlberg?

 6      A      No.

 7      Q      Was she privy to any of these conversations

 8   or any of the negotiations at all with Mr. Dahlberg?

 9      A      No.

10             MR. HUTCHISON:  Is she going to be a witness in

11         this case?

12             MR. REIMER:  No.

13   BY MR. HUTCHISON:

14      Q      The nature of the disagreement with Mr. Dahlberg

15   regarding the purchase of the plane is centered around Mr.

16   Dahlberg's insistence on an as-is and where-is acceptance

17   of the plane by Turnberry, is that accurate?

18      A      No, it's not accurate.

19      Q      My question is, why didn't this deal go through?

20      A      Because we weren't allowed to continue with our

21   inspection of the aircraft is the reason it didn't go

22   through.  And Mr. Dahlberg wouldn't allow it to go

23   through.

24      Q      What wasn't done that was going to be done?

25      A      Systems check, flight check, and/or anything
```

KNIPES-COHEN/SPHERION COURT REPORTING
(561) 478-0401

1   else that we were talking about.

2      Q    And the earliest the systems check could have

3   been done would have been that Monday, which would have

4   been June 28th?

5      A    You know, I would just say that if everything

6   went perfectly, which they never do with reference to an

7   aircraft that's been sitting there for seven months, but

8   if everything went perfectly, we could have done the

9   systems check Monday.

10     Q    Monday, June 28th?

11     A    The 28th.  Maybe even flown the airplane.

12     Q    Did you make any arrangements to have pilots

13  available to fly the airplane?

14     A    We had pilots available through Flight Safety

15  International.

16     Q    Who did you coordinate that with?

17     A    I didn't coordinate it at that time, I was ready

18  to.

19     Q    So, you would have called Flight Safety

20  International to obtain pilots to test flight the subject

21  aircraft had it gotten to that point?

22     A    Or they would have supplied me with pilots in

23  the local area.  We have contracts, Turnberry has a

24  contract with Flight Safety International to supply crew

25  members for us.

1      Q    But you hadn't taken any steps to actually have

2    them help out, is that correct?

3      A    That's correct.  And I do that purposely, too.

4    I do that so that we don't telegraph in the industry what

5    we're doing.  This is an industry where information passed

6    on very fast and giving this information to a pilot who

7    could pass it on and, before you know it, someone is

8    buying the airplane out from under you.

9      Q    But you were yet to obtain the availability of a

10    pilot to test fly the subject aircraft, is that correct?

11      A    That's correct.

12      Q    Now, did you ever receive a second draft of a

13    sales agreement from International Paper?

14      A    No.

15      Q    Only the June 21st draft that is exhibit, is

16    that correct?

17      A    I tried --  You know, when I leave town my fax

18    machine is turned over to a computer, and I check that

19    computer to make sure if there was any faxes on there, and

20    there was nothing on the fax machine to recover.

21      Q    Now, instead of 29 your June 23rd, 1999 letter

22    to Mr. Dahlberg with the proposed changes to the aircraft

23    sale agreement, you were willing to sign an agreement,

24    purchase agreement and then have a test flight done after

25    the purchase agreement, is that correct?

```
 1        A     I would look at the purpose of that.  The
 2   purpose of that is for the protection of insurance, so
 3   that we have something in substance that we can give the
 4   insurance company so that we can insure pilots on the
 5   airplane.  You just can't take a couple of pilots off the
 6   street and insure them in an airplane.  You have to cause
 7   with a contract and to get proper liability coverage.
 8        Q     So, you would have had to have a sales agreement
 9   with that clause on page 3 of exhibit 29 12-B in order to
10   even have sales agreement including that clause in order
11   to show the insurance company?
12        A     Something, you know, that we coordinate with the
13   insurance company and International Paper that would allow
14   us to fly that airplane.
15        Q     And that was the purpose of that clause on
16   exhibit 29, is that your testimony?
17        A     Yes.
18        Q     Is that correct?
19        A     That would be a part of it, sure.
20        Q     You need something more specific than exhibit 18
21   regarding the test flight for the insurance company
22   purpose?
23        A     Absolutely.
24        Q     The clause in exhibit 18, I guess, that's the
25   final paragraph on page 1 of exhibit 18, you need
```

1    something more specific the insurance?

2         A    Sure, we would need something more specific just

3    to hand to Midcoast Aviation in order to fly the airplane

4    or to authorize any work to be done on the airplane.

5         Q    The language in exhibit 18 wouldn't help you,

6    the last paragraph on page 1 in that regard?

7         A    No, I was confident that we could get the

8    language to fly the airplane.

9         Q    Let me show you exhibit 30, tell me if that's

10   your signature?

11        A    Yes.

12        Q    Let me back up a second.  Actually I'm going to

13   try --  It's a different Bates number it looks like.  Oh,

14   I know what it is.  Is that your signature?

15        A    Yes.

16        Q    Kirk Woford --

17        A    Was holding the escrow for us, set up the

18   escrow.

19        Q    And I guess exhibit 31 is just an executed copy

20   of exhibit 30?

21        A    Right.  We agreed to a hundred and then $50,000

22   for the expenses of Midcoast was all to be in escrow.

23        Q    Let me show you exhibit 32, tell me if these

24   were wire instructions that you would have sent or someone

25   else would have sent on Turnberry's behalf?

```
 1                    MR. REIMER:  Object to the form of the question.

 2                    THE WITNESS:  I wouldn't know what Turnberry

 3          used for instructions, the money was received, so --

 4          Q    Exhibit 32 is that, that's a document that your

 5     lawyer produced in this case, did you ever see it before

 6     today?

 7          A    It could have been from my files, but I just

 8     don't recall.  It looks all correct, though.

 9          Q    That's my question, is that --

10          A    It looks correct.

11          Q    Is that a document that you would recall

12     sending?

13                    MR. REIMER:  Object to the form of the question.

14                    THE WITNESS:  I don't send the money.

15     BY MR. HUTCHISON:

16          Q    Who would have?

17          A    It would be the accounting department or

18     someone.

19          Q    Who in the accounting department?

20          A    That day I don't know.  The instructions would

21     have been given by Mr.

22          Q    Tell me if you recognize exhibit 33, is it your

23     handwriting?

24          A    No, it's not.

25          Q    Do you know whose it is?
```

```
 1      A     Ken Murray's.

 2      Q     Ken Murray's handwriting?

 3      A     Yes.  This is the, this is what was left at the

 4   front desk when Ken Murray left.

 5      Q     Is it the only thing Murray left for you?

 6      A     Yes.

 7      Q     And that's 33.  Let me show you 34.  Did you

 8   ever have any conversations with Mr. Murray that, gee, I

 9   wish you would have, you know, after June 24th when he had

10   left prior to you arriving there, gee, I wish you would

11   have completed what I wanted you to do, or I had more

12   items that I wanted you to do, anything to that effect?

13      A     No.

14      Q     Exhibit 34, tell me what that is?

15      A     This was a report from Ken Murray that he gave

16   me on the airplane.  I believe this was accompanied with a

17   bill.

18      Q     Okay, I have a bill, I didn't know if they were

19   together or not, but he would have gave that to you on or

20   about June 25th, 1999?

21      A     I believe he faxed it to me on the 25th. I'm

22   looking at the top, looks like a fax.

23      Q     Exhibit 35 is a 2 page invoice and all it has is

24   like an airline itinerary and an invoice from Ken Murray,

25   tell me if you recognize exhibit 35 and if it appears
```

KNIPES-COHEN/SPHERION COURT REPORTING
(561) 478-0401

1    incomplete let me know that?

2         A    Well, that's complete, that's Ken Murray's

3    invoice.

4         Q    That's all it was is two pages?

5         A    I believe this was faxed at the point in time.

6         Q    It's dated June 29, 1999?

7         A    It is, okay.

8         Q    The other one is dated June 25th, I believe?

9         A    Yes, I stand corrected.

10        Q    Did you pay Mr. Murray his invoice exhibit 35?

11        A    Yes.

12        Q    The whole amount, 3688.82?

13        A    Yes.

14        Q    I may have asked you this, there was no written

15   agreement with him?

16        A    No.

17        Q    This was the only invoice you have ever received

18   from Mr. Murray?

19        A    Yes.

20        Q    Let me show you exhibit 36, two page exhibit,

21   second page is the same letter just executed by Mr.

22   Woford, tell me that June 29th letter, exhibit 36, is that

23   your signature on the first page?

24        A    Yes.

25        Q    And you received that executed by Mr. Woford,

KNIPES-COHEN/SPHERION COURT REPORTING
(561) 478-0401

1    that would have been the second page of exhibit 36?

2        A    That's correct.

3        Q    And this June 29th letter would be referring to

4    the purchase of the subject aircraft by Turnberry from

5    Aero Toy?

6        A    That's correct, sir.

7        Q    Were you involved in that purchase at all?

8        A    Yes, I was.

9        Q    What was your involvement in that purchase?

10        A    The same capacity in charge of purchasing the

11    aircraft.

12        Q    And how much money did you receive from the

13    purchase of that aircraft from Aero Toy?

14        A    I don't know the exact number, but the deal was

15    two percent of the value.

16        Q    And the value was?

17        A    7.7 million dollars.  The gross amount was

18    approximately $150,000.

19        Q    How much money have you received from Turnberry

20    in the last five years?

21        A    I don't know.

22        Q    Approximately?

23        A    No, I would have to --

24        Q    Do you have bills or invoices?

25        A    I just can't recall.

```
 1       Q     This is the only sale of the aircraft you have
 2   done in the last year, sale or purchase for Turnberry was
 3   the Aero Toy purchase of the subject aircraft?
 4       A     I believe so.
 5       Q     Do you have a record somewhere of money that you
 6   would have received from Turnberry over the last several
 7   years?
 8       A     No, not specifically.
 9       Q     You don't send them any kind of invoice or
10   letter at the end of a deal?
11       A     Oh, sure I do.
12       Q     Would you have those?
13       A     No, I don't keep records, not after the deal.
14       Q     You don't keep them as part of your business
15   records?
16       A     No.
17       Q     Look at exhibit 17, tell me if you recognize it?
18       A     Exhibit 17 pages 1 through 7 is the description
19   of the aircraft.
20       Q     Well actually they are marked 2 through 7, 1
21   through 7, okay.  Starting with page 220 right?
22       A     Right.
23       Q     I'm going through 226.  It's a description of
24   what?
25       A     The description of the aircraft, the aircraft
```

```
 1    interior layout.

 2        Q    That's the third page.

 3        A    As well as the spare parts that were being

 4    represented a part of the aircraft deal.

 5        Q    Are you qualified to give me a value of those

 6    spare parts which are on, start on page 223 of exhibit 17

 7    and runs through 226?

 8        A    No.

 9        Q    You don't have the knowledge of what the value

10    of those spare parts would be?

11        A    I could give you approximate numbers of the way

12    it was represented to me by Mr. Dahlberg.

13        Q    What did Dahlberg represent to you?

14        A    It was worth $250,000 the spare parts.

15        Q    Did you ever corroborate that or refute that?

16        A    No.

17        Q    Do you have any reason to believe whether that

18    number is high or low?

19        A    I would believe that it would be fairly

20    accurate.

21        Q    Do you have the expertise or knowledge to tell

22    me what the value of those spare parts are?

23        A    No, not without checking all of them out.

24        Q    How would you do that?

25        A    Go to maintenance facilities and check each
```

1    part, the cost of each item.

2        Q    Were any of these parts used parts to your

3    knowledge?

4        A    Not aware.

5        Q    You don't know the condition of these parts?

6        A    They were represented as all serviceable.

7        Q    Which means what?

8        A    Which means they are in working order and can be

9    put on the aircraft.

10       Q    You don't know whether they were new parts or

11   had they been used before, you don't know?

12       A    In aviation new and serviceable is close to the

13   same cost.

14       Q    Did you ever see any of the parts listed in

15   exhibit 17 and are Bates number 223 through 226, did you

16   ever see those parts?

17       A    Yes.

18       Q    Where did you see them?

19       A    At Aero Toy Store.

20       Q    How were they represented to you, that these

21   were the parts we got from International Paper?

22       A    Well, there was a storage bin that they were

23   identifying one of the starter generators and ignition

24   unit, and they were identified as items that came in on

25   the deal from International Paper.

150

```
 1      Q    They were in a bin or you actually went through
 2   them part by part?
 3      A    Just a couple of those items that we saw.
 4      Q    Okay, so you didn't see all the parts?
 5      A    No.
 6      Q    The last page looks like an estimate to do some
 7   work on the jet?
 8      A    That is correct.
 9      Q    Did you ever confirm this estimate?
10      A    No.
11      Q    Did you ever get an estimate of the work that
12   was done by Aero Toy prior to selling it to Turnberry?
13      A    I didn't sell the airplane to Turnberry.
14      Q    I'm sorry, if I said that I'm wrong.  Aero Toy
15   sold the subject aircraft to Turnberry, correct?
16      A    That's correct.
17      Q    And some work was done to the interior of the
18   aircraft?
19      A    That's correct.
20      Q    Do you know the value of the work that was done?
21      A    No, not exactly, no.
22      Q    Look at that estimate and tell me if that work
23   was done, the work that's being bid for in the last page
24   of exhibit 17?
25      A    This was a, the last page was a representation
```

1    from Ed Dahlberg as to what it would cost to refurbish the

2    interior of this aircraft.

3       Q    Do you have any reason to believe that's high or

4    low?

5       A    The number is probably, in my estimation, a

6    little bit high for this type of work.

7       Q    What kind of --

8       A    But without, you know, without negotiating

9    or seeing the previous work that the people had done or

10   anything.

11      Q    What work was done by Aero Toy prior to selling

12   it to Turnberry on the interior?

13      A    They did a full interior.

14      Q    Leather interior?

15      A    Leather interior.

16      Q    Gold plated fixtures?

17      A    They recoated the metals to a gold plate.

18      Q    Relaminate the woodwork of the interior?

19      A    Not completely.  They recoated about 80 percent

20   of the woodwork and then relaminated about 20 percent.

21      Q    Any avionics work by Aero Toy?

22      A    Nothing substantial.  I believe there was an

23   installation of a flight phone and a global positioning

24   system in the interior.

25      Q    Anything else?

```
 1      A    Not that I am aware of.

 2      Q    The whole interior was redone?

 3      A    The whole interior was, what we commonly call in

 4  the industry, was a rag job.

 5      Q    A rag?

 6      A    A rag.

 7      Q    You ripped out the interior and put in a new

 8  interior?

 9      A    We resurfaced everything that was in the

10  interior, headliners, side panels and carpeting.

11      Q    Put in new furnishings?

12      A    No, not new furnishings, they recovered the old

13  furnishings and recoated the metal with gold and recoated

14  80 of the wood and replaced, as I said, 20 percent.

15      Q    And a new phone?

16      A    New phone, fiber optic.

17      Q    Anything else in the interior?

18      A    No.

19      Q    Paint job, got an exterior paint job by Aero

20  Toy?

21      A    Not a complete paint job.

22      Q    What did they do and what didn't they do?

23      A    They painted over the old paint job on the

24  bottom of the aircraft and restriped the airplane,

25  painting over the old stripe.
```

```
 1        Q     Any other work that they did that we didn't
 2   discuss?
 3        A     Not that I am aware of.
 4        Q     Look at exhibit 6 real quick and tell me if they
 5   did all the work that is listed in exhibit 6?
 6        A     I don't believe that they completed the DVD
 7   player or the speakers.  Larry was still working on those.
 8   I don't believe those possibly weren't done.
 9        Q     Second column?
10        A     Second column.
11        Q     Sixth and seventh items down, possible new DVD
12   player with a question mark, that wasn't done possibly.
13   New speakers with a question mark, that wasn't done.  Was
14   an Airshow done?
15        A     The air show was already there.  It was an
16   upgrade to the Airshow.
17        Q     And that was done?
18        A     An upgrade.
19        Q     What were the upgrades specifically?
20        A     It was the software upgrade.  It is a computer
21   software upgrade, going from one level to another level.
22        Q     Was that work done?
23        A     I believe it was.
24        Q     Everything else was done on there except for
25   those speakers and DVD?
```

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Exhibit five, is that your signature? |
| 3 | A | Yes. |
| 4 | Q | And that's your offer to purchase that you |

5    executed with Aero Toy?  That's a spare copy of the it.

| | | |
|---|---|---|
| 6 | A | Yes, I executed this. |
| 7 | Q | Did you buy the aircraft from Aero Toy as-is |

8    where-is?

| | | |
|---|---|---|
| 9 | A | Yes.  Basically the most aircraft deals are |

10    actually done where-is as-is when it comes down to a

11    purchase.

12        Q    Prior to taking title of the aircraft from Aero

13    Toy did you test fly it?

| | | |
|---|---|---|
| 14 | A | Yes. |
| 15 | Q | Is this your signature, exhibit 37, is this your |

16    signature?

| | | |
|---|---|---|
| 17 | A | Yes. |
| 18 | Q | To Mr. Woford, July 6, 1999, that is your |

19    signature on the bottom of this letter?

| | | |
|---|---|---|
| 20 | A | Yes, that's correct. |
| 21 | Q | Did you have any conversations with Mr. Dahlberg |

22    that we haven't discussed?

| | | |
|---|---|---|
| 23 | A | Yes. |
| 24 | Q | What one is that? |
| 25 | A | The discussion with him on July 27th that we |

1    were going to come back to.

2         Q    Okay, what was that conversation?

3         A    That was when he called my cell phone and left a

4    numeric page, and I returned the call not knowing who I

5    was calling.  And it was Ed Dahlberg.

6              And I found out later that this was after he had

7    a conversation with Ken Murray, and Ed Dahlberg informed

8    me that he had just learned of our letter to International

9    Paper regarding this issue, and he was upset.

10             He said he would destroy my reputation in the

11   industry if I allowed this to continue.

12        Q    He said this to you or are you saying what he

13   said to Ken Murray?

14        A    He said this to me.

15        Q    Okay, can you just repeat that for me again, I

16   thought you were repeating Ken Murray's conversation with

17   you?

18        A    No, it was two separate conversations then.

19        Q    He called you on what day?

20        A    He called me and I received the call on my cell

21   phone.  He left a numeric page to call him back.  Not

22   recognizing the telephone number I called back.

23        Q    What did he inform you?

24        A    He in formed me, this was on July 27 at

25   1:07 p.m., he called me.  Then I returned the call at 2:57

1    p.m., and he told me that learned of our letter to

2    International Paper about this issue and he was very

3    upset. He said that he would destroy my reputation in the

4    industry if I allowed this to continue.

5        Q    Did he tell you how he was going to destroy your

6    reputation?

7        A    No, I cut the conversation short, and I told him

8    I would take it under advisement. Thanked him for his

9    concern. And I hung up.

10       Q    You said nothing else?

11       A    No.

12       Q    You weren't at all offended or angered by the

13   fact that he just made this threat to you?

14       A    No, there was no sense in getting involved in

15   that over the telephone.

16       Q    Any other conversation with Mr. Dahlberg that we

17   haven't discussed?

18       A    Not that I'm aware of, but I have received a

19   couple of phone calls that were threats, but I couldn't

20   identify them.

21       Q    What kind of threats?

22       A    I received one, a brief conversation that they

23   said that they know who I am, where I'm located and watch

24   my 6:00 o'clock. You're a dead man.

25       Q    When was this?

```
 1         A    I don't have that information with me.  I did
 2    make notes to that effect, though.
 3         Q    Approximately when was that?
 4         A    I think it was sometime in the middle of
 5    September.
 6         Q    Of 1999 or 2000?
 7         A    1999.
 8         Q    Any other threats other than that one?
 9         A    No.
10         Q    Do you have any evidence that that threat was
11    from Mr. Dahlberg?
12         A    No, I don't.
13         Q    Do you have any evidence of who that threat was
14    from?
15         A    No, I don't.
16         Q    Earlier you mentioned that you got a phone call
17    from a process server who was trying to attempt service on
18    you, but you were too busy, when was that?
19         A    About a month and a half ago, two months ago.
20         Q    August or September of 2000?
21         A    Sure.
22         Q    And did they tell you it was specifically this
23    case?
24         A    No.
25         Q    Did you know what case it was?
```

```
 1        A    No.

 2        Q    Did you ever see a copy of the subpoena in this

 3   case for you?

 4        A    No, I haven't.

 5        Q    One was never provided to you by anybody?

 6        A    I never seen one.

 7        Q    Exhibit 38, tell me if you recognize it?

 8        A    I recognize this as being the aircraft purchase

 9   and sales agreement between Turnberry Aviation and Aero

10   Toy Store.

11        Q    And that's the purchase agreement for the

12   subject aircraft?

13        A    Yes.

14        Q    That's an accurate copy, to the best of your

15   knowledge?

16        A    To the best of my knowledge, yes.

17        Q    I'm going to go back to when you were at

18   Midcoast Aviation on Friday, did you ever go back to the

19   facility, I think it would be June 25th, that is the

20   proper, from June 25th, did you ever go back to the

21   Midcoast facility?

22        A    In the facility, no.

23        Q    Did you ever go up to the facility?

24        A    Yes.

25        Q    For what purpose?
```

```
 1        A     I was just, I was curious to see if they were
 2   going to be towing the airplane out of the hangar or what
 3   they were going to do with it.
 4        Q     Did you speak with Mr. Bates while you were at
 5   the facility?
 6        A     No, I called Steve Bates earlier that morning.
 7        Q     When you were at the facility, you never talked
 8   to Mr. Bates?
 9        A     No.
10        Q     Did you talk to anybody from Midcoast?
11        A     No.
12        Q     Why did you call Mr. Bates on the morning of
13   Friday, June 25th, 1999?
14        A     I called Steve Bates to see if we could still
15   continue our examination of the aircraft.
16        Q     And what did he say?
17        A     Steve told me that he was informed by Ed
18   Dahlberg to not allow Turnberry access to the aircraft or
19   the records, that international paper had sold the
20   aircraft to another party.
21        Q     And what -- Mr. Bates told you that?
22        A     Mr. Bates told me that.  Mr. Bates apologized to
23   me, he said that Turnberry was certainly welcome at the
24   facility, but he could not give me access to the airplane.
25        Q     Any other details of that conversation with
```

160

1    Mr. Bates?

2         A    No.

3         Q    Did you ever tell Mr. Bates on Friday, June

4    25th, 1999, that you and Mr. Dahlberg had been unable to

5    come to an agreement over the purchase of the airplane?

6         A    No.

7         Q    Did you ever tell Mr. Bates anything to the

8    effect that you and Mr. Dahlberg had not been able to come

9    to an agreement regarding the terms of the sale of the

10   plane?

11        A    No.

12        Q    What does the term preflight mean?

13        A    Preflight.  Preflight is inspection of the

14   aircraft prior to flight.  A specific series of events.

15        Q    Regarding the subject aircraft and your trip to

16   Midcoast in June, 1999 -- Strike that.  Regarding your

17   trip to St. Louis in June of 1999, you never had Midcoast

18   Aviation preflight the subject aircraft?

19        A    On behalf of Turnberry, correct?

20        Q    Yes.

21        A    No.

22        Q    Is that correct?

23        A    No.

24        Q    Aero Toy have to make any mechanical repairs to

25   the plane prior to Turnberry purchasing it?

1             MR. REIMER:  Object to form.

2             THE WITNESS:  I'm sure they did.

3    BY MR. HUTCHISON:

4        Q    Do you know what they were?

5        A    There was always going to be repairs on the

6    plane, the work, the kind of work they were doing for the

7    airplane.

8        Q    What kind of work?

9        A    They were doing the interior.

10       Q    What about the engine inlet, I-N-L-E-T, what is

11   that?

12       A    It's, I think they are referring to a cracked

13   inlet to one of the engines that was found at the

14   inspection facility, Bombardier in Fort Lauderdale.

15       Q    Did Aero Toy pay for any of those inspections?

16       A    I don't believe so.  It was an item that we were

17   negotiating to try to get the participation of Aero Toy

18   Store, but I believe Mr. Soffer made an allowance.

19       Q    Did you have a technical survey done when you

20   bought the aircraft from Aero Toy?

21       A    Yes, sir.

22       Q    Was that done by Bombardier?

23       A    Yes.

24       Q    Was a systems check done?

25       A    Yes.

1    Q    And a flight test was done?

2    A    Yes.

3    Q    The flight test was done after the sales

4    agreement was signed?

5    A    Yes.

6    Q    What you proposed to Mr. Dahlberg in your

7    June 23rd letter, right?  Exhibit number 29.  Still in

8    front of you.  There it is right in front of you.

9    A    What is the question again.

10   Q    That the flight test was done after the sales

11   agreement was signed to Aero Toy similar to what you had

12   proposed to Mr. Dahlberg in exhibit 29?

13   A    I don't know if the language was the same.  I

14   would have to check it.

15   Q    Feel free to check it?

16   A    It's a different language that we're using.

17   Specific language in the contract to Aero, Turnberry

18   Aviation to Aero Toy Store is in reference to a particular

19   inspection that we were going to do.  The inspection shall

20   be conducted Bombardier, Fort Lauderdale, Florida at

21   buyers sole cost and expense.  Cost includes rate.  Cost

22   of such inspections as well as the cost to correct any

23   discrepancies for items required to be paid as noted in

24   afore said 7200 hour inspection.  Then we were requiring

25   the aircraft brought back to service.  By making that

```
 1    notation the aircraft would be test flown before it was
 2    signed back off to service.  We don't specifically call --
 3    Oh, I don't see that here.
 4         Q    You don't specifically require a test flight in
 5    your contract with Aero Toy, is that correct?  Let's
 6    strike that for now.  The language, I just want to make
 7    sure I understand.  Do you know what the damages are that
 8    the plaintiffs are seeking in this lawsuit?
 9         A    Not exactly.
10         Q    Do you know any part of the damages?
11         A    I believe the figure is a million dollars.
12         Q    Do you know what that is comprised of, the
13    components?
14         A    No.  $700,000 difference in purchase price and
15    $300,000 difference in the parts.
16         Q    Did you say $700,000 in the purchase price and
17    300,000 in parts?
18         A    Yes.
19         Q    And your question to me is, correct.  I only
20    wish I could tell you.  To your knowledge, do you have any
21    more detail regarding this and components other than that?
22         A    No.
23         Q    Who told you that?
24         A    It is a letter that I saw.
25         Q    The interior repairs or renovations that were
```

KNIPES-COHEN/SPHERION COURT REPORTING
(561) 478-0401

1    done by Aero Toy, you don't have the qualifications to

2    give me an evaluation as to how much those renovations

3    cost, do you?

4         A    Other than having the expense of doing it on

5    other aircraft and I would actually pay for a job of that

6    sort.

7         Q    What were the renovations valued at?

8         A    I would say that the numbers are probably within

9    175,000 to 200,000, renovating the interior and painting

10   the outside.  The paint job we're talking about was

11   probably less than a $10,000 job.  Because the aircraft

12   was not stripped completely and brought down to the bare

13   metal and retreated and brought back up again.  It was

14   painted over.

15        Q    Can you value the work done by Aero Toy?

16        A    I believe that is what it is, 175,000 to

17   200,000.  If I was negotiating a deal that is what I would

18   probably pay them to do that work.

19        Q    Have you ever personally done any renovations of

20   that nature, the inside of any --

21        A    Yes.

22        Q    What were those that you did?

23        A    The closest to that size and nature would

24   probably be a Gulfstream GIIB, which was owned by

25   Turnberry Charters.

1    Q    Tell me what exhibit 12 is?  You recognize the

2    signature on the second page?

3    A    The first two pages would be the aircraft

4    specification represented by Aero Toy Store for a Canadair

5    Challenger.

6    Q    The third?

7    A    The third page are the logbooks and paperwork

8    that accompanied the aircraft.

9    Q    Whose signature is that for Turnberry, do you

10    know?

11    A    Craig Mozly.

12    Q    Craig who?

13    A    Mozly.

14    Q    Based on your review of the airplane are those

15    specifications accurate?

16    A    Is part of -- Yes, accurate.  This is part of

17    our contract the specifications.

18    Q    I want to go over exhibit 3 with you quickly,

19    that is the complaint in this lawsuit.  Would you turn to

20    page four of what has been previously marked as deposition

21    exhibit 3, a claim for breach of contract, specifically

22    paragraph 24, says International Paper breached the

23    contract by, one, refusing to allow Turnberry to conduct a

24    systems check and a flight check.  When did International

25    Paper refuse to do that?  What are you looking for, this?

```
 1        A      Right.

 2        Q      Exhibit 21?

 3        A      Okay, repeat the question.

 4        Q      Yes, paragraph 24 A, page four of exhibit number

 5    3, International Paper breached the contract by A,

 6    refusing to allow Turnberry to conduct a systems check and

 7    flight check.  When did they do that?

 8        A      On June 25.

 9        Q      That was Mr. Dahlberg?

10        A      That's correct.

11        Q      That was a telephone conference conversation

12    that you had with Mr. Dahlberg on June 24 that you are

13    referring to?

14        A      That's correct.

15        Q      You never saw Mr. Dahlberg on June 25th?

16        A      That's correct, but Steve Bates was told that Ed

17    Dahlberg instructed him not to give access to Turnberry to

18    the aircraft.

19        Q      Exhibit 18, which is the June 19 letter that you

20    signed on behalf of Turnberry, are there any requirements

21    that that letter could be withdrawn only in writing?

22               MR. REIMER:  Object to form.

23               THE WITNESS:  I don't understand your question.

24    BY MR. HUTCHISON:

25        Q      Well, exhibit 19, you're telling me is a letter
```

1    agreement with International Paper, I'm sorry, exhibit 18

2    you testified to me was a letter agreement with

3    International Paper, correct?

4        A    There was, exhibit 18 is the contract that

5    International Paper and Turnberry Charters had reference

6    to the aircraft, Canadair Challenger 600.

7        Q    Is there any provision of that exhibit 18 that

8    prohibits either party from withdrawing the contract?

9             MR. REIMER:   Object to form.

10   BY MR. HUTCHISON:

11       Q    Or the agreement that you have testified to?

12            MR. REIMER:   Same objection.

13            THE WITNESS:   You know I'm not an attorney, that

14       would be a question for an attorney, I believe.

15   BY MR. HUTCHISON:

16       Q    Was there any provision in there that you are

17   aware of?  You wrote it, is there any provision in there

18   that you are aware of?

19       A    It could be.  Actually I thought that this was a

20   binding agreement contract between the two parties.  We

21   had a meeting of the minds.  We had an agreement to its

22   fullest extent.  All our agreement was indicated on

23   exhibit 18, at that time.

24       Q    Well, your agreement was subject to the parties

25   agreeing to a definitive sales agreement, correct?

```
 1                MR. REIMER:  Object to the form.

 2                THE WITNESS:  That is in reference --

 3   BY MR. HUTCHISON:

 4        Q    To what?

 5        A    The attorneys putting whatever they had to put

 6   together to complete this deal.

 7        Q    But this letter say, this first paragraph,

 8   subject to the good faith efforts of both parties to

 9   mutually agree to the terms and conditions of sale and

10   timely execution and delivery of a definitive sales

11   agreement?

12                MR. REIMER:  Object to form.

13   BY MR. HUTCHISON:

14        Q    In form and substance mutually acceptable to

15   both parties, is that what exhibit 18 says?

16                MR. REIMER:  Object to the form.  We have

17           already gone down this path.  He already confirmed

18           that the document is the document.

19   You

20        A    You read the document, the document says, 18,

21   exactly what I wrote.

22        Q    And that's what you wrote?

23        A    That is the document.

24        Q    Okay, would you agree with me that not being

25   able to, or the provision that you wanted International
```

1    Paper to agree to regarding a test flight was a

2    significant provision?

3                MR. REIMER:  Object to the form.

4                THE WITNESS:  I would say that.

5    BY MR. HUTCHISON:

6        Q    I'm not referring exhibit 18, I'm referring to

7    the proposed amendments that you sent Mr. Dahlberg on June

8    23rd?  I think it is directly in front of you, exhibit 20.

9    You wanted to do a test flight, your testimony was Mr.

10   Dahlberg wouldn't permit you to do a test flight, is that

11   your testimony?

12               MR. REIMER:  Object to form.

13               THE WITNESS:  I said that.  I also said that he

14          wouldn't allow us to do a systems check.

15   BY MR. HUTCHISON:

16       Q    Would you agree with me that doing a systems

17   check is important?

18       A    Yes, it was.

19       Q    Would you agree doing a test flight was an

20   important provision?

21       A    I would.

22       Q    Neither of those provision are of minor

23   significance, would you agree with me?

24               MR. REIMER:  Object to form.

25       A    Both of those provisions are important to this

              KNIPES-COHEN/SPHERION COURT REPORTING
                        (561) 478-0401

170

1    contract.

2              MR. HUTCHISON:  Give me a few minutes to check

3         and see where we're going here, so I can get us out

4         of here a little quicker.

5    BY MR. HUTCHISON:

6         Q    Mr. Lainey, were there any discrepancies between

7    Midcoast's technical survey and one that Turnberry had

8    done by Bombardier?

9              MR. REIMER:  Object to the form.

10             THE WITNESS:  I don't understand the question.

11   BY MR. HUTCHISON:

12        Q    Midcoast had done a technical survey prior to

13   the plane being sold to Aero Toy did you review it?

14             MR. REIMER:  Object to the form.

15        A    No.  No, I didn't review the technical report, I

16   reviewed some work was done to the airplane.

17   BY MR. HUTCHISON:

18        Q    You never saw a saw a technical report?

19        A    No.

20        Q    How about any inspections that were done by

21   Midcoast and then done subsequently by Bombardier, was

22   there any discrepancies?

23             MR. REIMER:  Object to the form.  Wait minute,

24        before you answer that, let me just, because a

25        discrepancy is a term of art for the report.  Do you

                KNIPES-COHEN/SPHERION COURT REPORTING
                          (561) 478-0401

```
 1        mean are there any differences between the two

 2        reports, because discrepancy is a term of art.

 3            MR. HUTCHISON:  Were there any discrepancies

 4        between the two reports.  I'm not --

 5            MR. REIMER:  No, I know that and I just want to

 6        clarify the question.

 7            THE WITNESS:  You know, I never saw the

 8        technical reports from Midcoast in St. Louis.

 9        Q    How about any inspections that were done by

10   Midcoast?

11        A    The inspections that I looked at in St. Louis

12   was specifically the landing gear inspection/overhaul and

13   a 300 hour and a 150 hour inspection sequence on the

14   airplane.

15        Q    Okay.

16        A    The 50 hour, 150 hour, 300 hour inspections were

17   completed again at Bombardier on behalf of Turnberry,

18   along with the 7200 hour inspection.

19        Q    Did you find any discrepancies or differences in

20   those two inspections?

21        A    There was additional squawks here.

22            THE REPORTER:  Additional what.

23            MR. HUTCHISON:  Discrepancies, concerns.

24   BY MR. HUTCHISON:

25        Q    Who paid for those concerns?
```

```
 1      A     Turnberry did.

 2      Q     That was part of the purchase agreement?

 3      A     Yes.

 4      Q     So, Bombardier had identified problems that were

 5   not previously identified by Midcoast and Turnberry paid

 6   for those?

 7      A     Turnberry paid for all of the inspections, and

 8   all of the discrepancies that were found in relationship

 9   to those inspections made by Bombardier.

10      Q     I'm not worried about the inspections, but cost

11   of the concerns, what were the costs of the concerns,

12   disputes, or the problems that had to be repaired or

13   resolved as a result of Bombardier's inspections?

14      A     The total cost was approximately $255,000.

15      Q     And that included the cost of the inspections?

16      A     Yes, that included the inspections.

17      Q     Help me out, what was the approximate cost of

18   the inspections?

19      A     The inspections was probably 90 or a $100,000.

20      Q     So, it was about $130,000 for the repairs?

21      A     Yes.

22      Q     Now and that was in addition to the purchase

23   price?

24      A     Yes.

25      Q     The purchase price was 7.7 million dollars.
```

```
 1        A    Yes.

 2        Q    This money to Bombardier, this extra $130,000

 3    was paid to Bombardier, that is not part of your damages

 4    in this lawsuit?

 5        A    I didn't file the lawsuit.

 6        Q    You don't know about the damages in this

 7    lawsuit?

 8        A    I don't know what the damages are in this.

 9        Q    Is that fair?

10        A    Fair?

11             MR. REIMER:  I have already stipulated that that

12        is not part of our damages.

13    BY MR. HUTCHISON:

14        Q    Mr. Dahlberg, what was your understanding of his

15    involvement in this sale of this plane from International

16    Paper to Turnberry?

17             MR. REIMER:  Object form.

18             THE WITNESS:   Mr.  Dahlberg represented himself

19        as the broker in charge of selling the aircraft on

20        behalf of International Paper.

21        Q    He was a broker?

22        A    Yes.

23        Q    So, he was not an employee of International

24    Paper?

25        A    I don't know that to be sure.
```

174

```
 1      Q    Well, you understood he worked for Emerald
 2    Aviation?
 3      A    That's the way he represented himself, yes.
 4      Q    And that was where you sent faxes to Manassas?
 5      A    Yes, that's correct.
 6      Q    Was his office in Manassas?
 7      A    As far as I'm aware.
 8      Q    And the letterhead that came from him was on
 9    Emerald Aviation letterhead?
10      A    Yes.
11      Q    He never represented himself as an employee of
12    International Paper, did he?
13      A    No.
14      Q    He represented himself as a broker/dealer on
15    behalf of International Paper Company, correct?
16      A    Yes.
17      Q    You never had any conversations, that you know
18    of, with anybody from International Paper Company about
19    the sale of the plane other than that initial phone call
20    with someone you believe was a mechanic?
21      A    That's correct.
22      Q    And all your conversations with Mr. Dahlberg we
23    have discussed?
24      A    Yes.
25      Q    And all your conversations with Mr. Murray we
```

```
 1   have discussed?

 2        A    As far as I recall.

 3        Q    Did we discuss all your conversations with

 4   Mr. Bates, did you have any conversations with Mr. Bates

 5   after Friday, June 25th, 1999?

 6        A    No, I haven't.

 7        Q    That was it?

 8        A    Yes.

 9        Q    Any conversations with anybody from Aero Toy

10   regarding their purchase of the plane from International

11   Paper Company?

12        A    Yes.

13        Q    Did you ever ask anybody from Aero Toy when

14   they, in fact, came to an agreement with International

15   Paper regarding the purchase of the plane from

16   International Paper?

17        A    Yes, I have.

18        Q    Who did you discuss that with?

19        A    I asked that question to Morris, the owner of

20   Aero Toy.

21        Q    Shirazi?

22        A    Shirazi.

23        Q    S-H-I-R-A-Z-I, something to that effect, is that

24   correct?

25        A    Yes.
```

```
 1      Q     When did you speak to Mr. Shirzai?

 2      A     I spoke with him, you know, numerous times in

 3   conducting a deal and purchase of the aircraft.

 4      Q     Did you maintain any notes from those

 5   conversations?

 6      A     No, just basically the same.

 7      Q     Are there any handwritten notes that you used

 8   during the course of this deposition?

 9      A     Yes.

10            MR. REIMER:  Did you use them during the

11         deposition, he asked?

12            THE WITNESS:  No, I didn't.

13   BY MR. HUTCHISON:

14      Q     what are those notes?

15      A     Usual notes that this morning that I gist took

16   down to him refresh my memory from looking at this.

17      Q     Did they do those notes help refresh your

18   memory?

19      A     No, these are just my thoughts, that's all.

20      Q     May I look at them?

21            MR. REIMER:  Before you do make sure they are

22         not privileged, before you let him see them.

23   BY MR. HUTCHISON:

24      Q     When did you make those notes?

25      A     Just prior to this deposition.
```

```
 1      Q    Okay, you reviewed some documents?

 2      A    An hour and a half are two hours before.

 3      Q    You didn't make them with Mr. Reimer?

 4      A    He was present for some of them, yes.

 5           MR. HUTCHISON:  Off the record.

 6           (A discussion was held off the record.)

 7           MR. HUTCHISON:  Back on the record.

 8  BY MR. HUTCHISON:

 9      Q    When did you first Mr. Bates Morris Shirazi

10  regarding his purchase or Aero Toy's purchase of the plane

11  from International Paper?  Look at exhibit 21, is it in

12  there?

13      A    It's not in here, but it's just making reference

14  to the days of the week.  It was somewhere on the 26th or

15  27th of June when we started.

16      Q    Tell me about your first conversation with Mr.

17  Shirazi?

18      A    It was in reference to the purchase of the

19  aircraft.

20      Q    And how did it come about, that conversation?

21  When did you see Mr. Shirazi, or do you recall?

22      A    There was an appointment made between Morris and

23  myself and Mr. Don and Jeff Soffer.

24      Q    Who?

25      A    Don Soffer and Jeff Soffer.
```

```
 1        Q      And the appointment was made by the Soffers with

 2   Mr. Shirazi?

 3        A      It was made by Jeff Soffer.

 4        Q      And when was that appointment, for what date?

 5        A      I believe it was somewhere around the 28th and

 6   29th.

 7        Q      Of June, 1999?

 8        A      June, 1999.

 9        Q      Would you have any diary or expense

10   reimbursement voucher or anything of that nature that

11   would tell us the date of that?

12        A      No.

13        Q      Where was the appointment, where was the

14   meeting?

15        A      Aero Toy store.

16        Q      And the two Soffers, Mr. Shirazi and you were

17   present, no one else?

18        A      That's it.

19        Q      Tell me what happened during the course of that

20   meeting?

21        A      We discussed the possibility of purchasing the

22   aircraft from Aero Toy Store.

23        Q      Had Arrow store even purchased it from

24   International Paper by June 27th, June 28th?

25        A      It was represented that they owned the airplane.
```

```
 1    Q    What did Mr. Shirazi tell you specifically?

 2    A    He said he bought the airplane.

 3    Q    Did he tell you when?

 4    A    He told Jeff Soffer that he bought the airplane

 5  and Jeff was the one that told me that we were going to

 6  meet with him and see if we could get a deal with them.

 7    Q    Did Mr. Shirazi tell you specifically when he

 8  negotiated the terms or made an offer to buy it or was

 9  told that he had a deal with International Paper regarding

10  purchase of the airplane?

11    A    I specifically asked and he wouldn't tell us

12  that.

13    Q    He never did give a date?

14    A    No.

15    Q    Did Mr. Soffer make any comment to that?

16    A    We all asked the same question.

17    Q    Mr. Shirazi would not tell you?

18    A    That's right.

19    Q    So, as you sit here today you don't know when

20  Aero Toy made an agreement with International Paper to

21  purchase the subject aircraft other than what Mr. Dahlberg

22  had told you?

23    A    I would have to assume that Mr. Dahlberg was

24  talking about the same person since he told me that he had

25  another buyer for the aircraft.
```

```
 1        Q    But Mr. Dahlberg never told you who that other

 2   buyer was?

 3        A    No, he didn't.

 4        Q    It's your guess, however, that it was Aero Toy

 5   and it was Mr. Shirazi?

 6        A    That's correct.

 7        Q    Mr. Shirazi never confirmed that for you?

 8        A    He confirmed purchasing the aircraft.

 9        Q    But he never confirmed when he had purchased it?

10        A    That's correct.

11        Q    He never confirmed, you were never able to link

12   the fact that Mr. Shirazi was the person Dahlberg was

13   referring to.

14        A    That's right.

15        Q    You weren't able to do that, were you?

16        A    No.

17        Q    Did you ever speak with anybody from Aero Toy

18   regarding when that purchase had occurred?

19        A    Just Morris.

20        Q    Is that the only conversation you had with

21   Mr. Shirazi regarding that?

22        A    Yes.

23        Q    Did you have any other conversations with Mr.

24   Shirazi ever in your life?

25        A    On, many many with reference to the purchase of
```

1   the aircraft.

2        Q    With reference of Turnberry's purchase from Aero

3   Toy?

4        A    Yes.

5        Q    Did you ever have any other discussions with Mr.

6   Shirazi or anybody else from Aero Toy regarding Aero Toy's

7   purchase from International Paper Company?

8        A    No.

9        Q    Were you ever able to establish when the deal

10  between Aero Toy and International Paper was made?

11       A    No.

12            MR. HUTCHISON:   I have no other questions.

13            (At 6:05 p.m. the deposition was concluded.)

14

15

16

17

18

19

20

21

22

23

24

25

1    STATE OF FLORIDA

2

3    COUNTY OF PALM BEACH

4

5              I, WAYNE McDANIEL, the undersigned Notary Public,

6    in and for the State of Florida, hereby certifies that

7    DENNIS LAINEY personally appeared before me and was duly

8    sworn.

9              WITNESS my hand and official seal this 4th day of

10   December, 2000.

11

12

13                    _____
                      WAYNE McDANIEL

14

15            WAYNE MCDANIEL
              COMMISSION # CC733385
              EXPIRES MAY 21 2002
16            BONDED THROUGH
              ADVANTAGE NOTARY OF FLORIDA

17

18

19

20

21

22

23

24

25

```
1                    C E R T I F I C A T E

2

3    STATE OF FLORIDA

4    COUNTY OF PALM BEACH

5

6           I, WAYNE McDANIEL, Professional Reporter, do hereby
     certify that I was authorized to and did stenographically
7    report the foregoing deposition; and that the transcript
     is a true and correct transcription of the testimony given
8    by the witness.

9

10          I further certify that I am not a relative,
     employee, attorney or counsel of any of the parties, nor
11   am I a relative or employee of any of the parties'
     attorney or counsel connected with the action, nor am I
12   financially interested in the action.

13

14          Dated this 4th day of December, 2000.

15

16

17                        _____
                          WAYNE McDANIEL

18

19                              WAYNE MCDANIEL
                            COMMISSION # CC733385
                              EXPIRES MAY 21 2002
20                               BONDED THROUGH
                          ADVANTAGE NOTARY OF FLORIDA

21

22

23   The foregoing certification of this transcript does not
     apply to any reproduction of the same by any means unless
24   under the direct control and/or direction of the
     certifying reporter.

25
```

```
 1                          -  -  -

 2                   C E R T I F I C A T E

 3                          -  -  -

 4              I, DENNIS LAINEY, hereby certify that I have read the
        foregoing transcript of my deposition and that the
 5      statements contained therein, together with any additions
        or corrections made on the attached Errata Sheet, are true
 6      and correct.

 7              Dated this_____day of _____,2000.

 8

 9                             _____

10

11

12              The foregoing certificate was subscribed to before me
        this____day of_____, 2000, by the witness
13      who has produced a_____as identification
        and who did not take an additional oath.
14

15

16                             _____
                               Notary Public
17

18

19

20

21

22

23

24

25
```

**KNIPES-COHEN OF FLORIDA, INC.**
**COURT REPORTING SERVICE**
**A Spherion AFFILIATE**

December 5, 2000

Dennis Lainey
c/o David H. Reimer, Esquire
REIMER & ROSENTHAL, LLP
3801 Hollywood Blvd., Suite 350
Hollywood, Florida  33021

Re:  Turnberry Charters, Inc. v International Paper Company

Dear  Mr. Lainey:

Take notice that on   11/15/00       you gave your deposition in the above referred to matter. At that time you did not waive signature. It is now necessary that you read and sign your deposition.

David H. Reimer, Esquire       has been furnished with a copy of the transcript of your deposition for you to read and sign. If you find it necessary to make any corrections please do so on the enclosed errata sheet and not on the transcript.

After reading the transcript please sign the enclosed signature page and mail it along with the signed errata sheet to Knipes-Cohen/Spherion Court Reporting, 1400 Centrepark Boulevard, Suite 960, West Palm Beach, Florida 33401. If you wish to waive signature please sign your name in the place provided below and return this page to us.

Your prompt attention to this matter would be appreciated by all parties.

Sincerely,

Tracie D. L. Johnson, Secretary
**I DO HEREBY WAIVE MY SIGNATURE.**

_____ Date _____

cc:  Richard C. Hutchison, Esq.
     David H. Reimer, Esq.
cc:

1400 CENTREPARK BOULEVARD, SUITE 960, WEST PALM BEACH, FL 33401 – (561) 478-0401 – (561) 478-6570 – FAX (561) 478-6570
WEST PALM BEACH – BOCA RATON – DEERFIELD BEACH – FORT LAUDERDALE – N. MIAMI BEACH – MIAMI
NAPLES – FORT MYERS – VERO BEACH – MELBOURNE