```
1           UNITED STATES DISTRICT COURT     ORIGINAL
            SOUTHERN DISTRICT OF FLORIDA
2
3      CASE NO. 00-6111-CIV(DIMITROULEAS/JOHNSON)
                                            FILED by          D.C.
4
       TURNBERRY CHARTERS, INC.,
5                                            DEC - 8 2000
                          Plaintiff,
6                                          CLARENCE MADDOX
                                           CLERK U.S. DIST. CT.
       vs.                                 S.D. OF FLA. FT. LAUD.
7
       INTERNATIONAL PAPER COMPANY,
8
                          Defendant.
9
       _____/
10
11
            DEPOSITION OF LARRY MILO AITKENS
12
13            Taken before NANCY SIEGEL,
14      Registered Merit Reporter and Notary Public
15      in and for the State of Florida at Large, pursuant
16      to Notice of Taking Deposition filed by the
17      Defendant in the above cause.
18                      - - -
19
20
21
22
        Thursday, October 5, 2000
23      3801 Hollywood Boulevard
        Suite 350
24      Hollywood, Florida  33021
        9:20 a.m. to 1:05 p.m.
25
```



```
 1   Appearances:

 2
          On Behalf of the Plaintiff:
 3
          REIMER & ROSENTHAL, LLP
 4        3801 Hollywood Boulevard
          Suite 350
 5        Hollywood, Florida  33021
          (954) 893-9800
 6        BY:  DAVID H. REIMER, ESQ.

 7
          On Behalf of the Defendant:
 8
          HOLLAND & KNIGHT, LLP
 9        One East Broward Boulevard
          Suite 1300
10        Ft. Lauderdale, Florida  33301
          (954) 525-1000
11        BY:  RICHARD C. HUTCHISON, ESQ.

12

13                    _  _  _

14                  I N D E X

15                    _  _  _

     WITNESS:  LARRY MILO AITKENS
16
     EXAMINATION      DIRECT    CROSS    REDIRECT    RECROSS
17
     BY MR. HUTCHISON   4        --         --          --
18

19

20

21

22

23

24

25
```

```
 1    EXHIBITS:        FOR IDENTIFICATION              PAGE

 2    Deposition Exhibit No. 1....................    7
      Deposition Exhibit No. 2....................   35
 3    Deposition Exhibit No. 3....................   49
      Deposition Exhibit No. 4....................   68
 4    Deposition Exhibit No. 5....................   71
      Deposition Exhibit No. 6....................   73
 5    Deposition Exhibit No. 7....................   78
      Deposition Exhibit No. 8....................   80
 6    Deposition Exhibit No. 9....................   84
      Deposition Exhibit No. 10...................   86
 7    Deposition Exhibit No. 11...................   87
      Deposition Exhibit No. 12...................   88
 8    Deposition Exhibit No. 13...................   92
      Deposition Exhibit No. 14...................   95
 9    Deposition Exhibit No. 15...................   98
      Deposition Exhibit No. 16...................   99
10    Deposition Exhibit No. 17...................  101

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

SPHERION DEPOSITION SERVICES

```
 1              P R O C E E D I N G S
 2                   - - -
 3   Thereupon,
 4              LARRY MILO AITKENS,
 5   being by the undersigned Notary Public first duly
 6   sworn, responded as follows:
 7              THE WITNESS:  I do.
 8              DIRECT EXAMINATION
 9   BY MR. HUTCHISON:
10   Q    Please state your full legal name.
11   A    Larry Milo Aitkens.
12   Q    I know you just did this, but can you spell
13   it for the record?
14   A    Aitkens?
15   Q    Aitkens.  Milo is M-I-L-O?
16   A    Milo M-I-L-O.  Aitkens is A-I-T-K-E-N-S.
17   Q    Did you ever use any other name?
18   A    No.
19   Q    What is your current address?
20   A    825 Stanton Drive, Weston, Florida.
21   Q    Residence?
22   A    Yes.
23   Q    Date of birth?
24   A    August 9th, 1957.
25   Q    And where do you work?
```

```
 1      A     Turnberry Aviation.

 2      Q     Now, that's called Turnberry Aviation, Inc.?

 3      A     Turnberry Aviation, LLC.

 4      Q     LLC?

 5      A     Yes.

 6      Q     Just a few little ground rules, and I want

 7   you to listen to me and tell me if at any time during

 8   this deposition I speak too quickly, I say something

 9   you don't understand, stop me, let me know, tell me

10   you don't understand the question or ask me to

11   rephrase it and I'll do the best I can to make my

12   question as clear as possible.  Will you do that?

13      A     Sure.

14      Q     You understand you are here to testify and

15   you are under oath and you have an obligation to tell

16   the truth?

17      A     Yes.

18      Q     Probably the most significant thing I can

19   tell you is the court reporter has to take us down, so

20   I will do my best to let you finish an answer before I

21   start my next question, and if you would let me finish

22   my question before you answer, because she can't take

23   down the two of us at once, so will you do that for

24   me?

25      A     Sure.
```

SPHERION DEPOSITION SERVICES

1    Q    Are you under the influence of any drugs or
2    alcohol this morning?

3    A    No.

4    Q    Any reason why we shouldn't go forward with
5    this deposition this morning?

6    A    No.

7    Q    If at any time during the deposition you
8    recall an answer to a previous question or you want to
9    change an answer, add to an answer from a previous
10    question, and you think of a new fact or new something
11    that you want to tell me, will you stop me and let me
12    know that?

13    A    Okay.

14    Q    And if at any time during the course of this
15    deposition you think of any documents that would help
16    you answer a question or a previous question or
17    provide the answer to that previous question, would
18    you stop me and let me know what those documents are?

19    A    Okay.

20    Q    Will you do that for me?

21    A    Sure.

22    Q    Have you ever been deposed before?

23    A    Yeah, in an automobile accident years ago.

24    Q    Approximately how many?

25    A    20.

```
 1      Q     Work-related or personal?
 2      A     Personal.
 3      Q     Were you a plaintiff in that case?
 4      A     No.
 5      Q     Were you suing someone or were you a witness?
 6      A     No, I was a witness, I was a passenger in a
 7   car.
 8      Q     And that was the only time you were deposed?
 9      A     Yes.
10      Q     Have you ever testified in court before?
11      A     No.
12      Q     Can I just write number 1 on these?  I'm
13   going to provide you a copy of the notice of taking
14   deposition that you are here pursuant to today marked
15   deposition exhibit number 1, it's a notice that was
16   sent out on September 13th, 2000.  Take a look at
17   deposition exhibit number 1 and tell me if you have
18   seen that before.
19             (Deposition Exhibit No. 1 was marked for
20          identification.)
21      A     (Witness examining document.)  No, not in
22   this form.
23      Q     If you take a look at page 2 and 3 where it
24   says Areas of Examination, take a second to take a
25   look at those and tell me if you have seen those
```

SPHERION DEPOSITION SERVICES

```
 1   requests before or subject matters.

 2              (Witness examining documents.)

 3       A    Like I said, as it's here, no, I haven't seen

 4   it like this, not to this detail.

 5       Q    Okay.  What do you recall seeing, if you

 6   remember?

 7       A    One page, and the page was -- I have that

 8   document in another room, the only thing associated

 9   with the case, but it is a one-page document that I

10   was subpoenaed on, and it had some of this, some of

11   these items, but not to this, I mean it was two lines.

12       Q    What is your position with Turnberry

13   Aviation, LLC?

14       A    Director of flight operations.

15       Q    And how many employees are employed with

16   Turnberry Aviation, LLC?

17       A    Seven.

18       Q    Who do you directly report to?

19       A    Jeff Soffer.

20       Q    What's his title?

21       A    His title at Turnberry Aviation, I believe

22   he's the president of Turnberry Aviation.

23       Q    Spell Soffer for me.

24       A    S-O-F-F-E-R.

25       Q    The hierarchy, Jeff is at the top?
```

SPHERION DEPOSITION SERVICES

```
 1      A    Yes.

 2      Q    And then you report to him.  Is there anyone

 3   else that directly reports to him other than you for

 4   Turnberry Aviation?

 5      A    No.

 6      Q    Okay.  Are there any other officers or

 7   directors for Turnberry Aviation, LLC that you are

 8   aware of?

 9      A    Jeff's sister, Jackie Soffer is an officer.

10      Q    Anyone else?

11      A    Not that I know of.

12      Q    I assume Jackie is Jacqueline?

13      A    Yes.

14      Q    What is Turnberry Aviation, LLC's

15   relationship to Turnberry Charters, Inc.?

16      A    We operated as Turnberry Charters and

17   probably about a year ago we became Turnberry

18   Aviation.

19      Q    Does Turnberry Charters, Inc., when you say

20   "we became," do you know what happened or how it

21   happened?

22      A    I don't know, really.  Some legal issues,

23   they decided to go with Turnberry Aviation.

24      Q    Is Turnberry Charters, Inc. still in business

25   today?
```

SPHERION DEPOSITION SERVICES

```
 1      A    As far as I know, yes.

 2           MR. REIMER:  Object to the form.

 3    BY MR. HUTCHISON:

 4      Q    Has Turnberry Charters, Inc. been

 5    administratively dissolved as a corporation?

 6      A    I don't believe so, no.

 7      Q    You said -- and correct me if I am wrong, I

 8    am trying to expedite this.  I am not trying to trick

 9    you.  If at any time during the course of this that

10    you think that I am putting words in your mouth, you

11    will tell me, won't you?

12      A    Yes.

13      Q    Did you just tell me that you think Turnberry

14    Charters, Inc. is still in business?

15      A    Yes, I did.

16      Q    What does it do?

17      A    Turnberry Charters held the airplanes and

18    also some boats for the company.

19      Q    It still has assets, then, in its name?

20      A    As far as I know.

21      Q    Okay.

22      A    Something could have happened yesterday,

23    something could have happened today, I don't know.  As

24    far as I know.

25      Q    Does it do anything else as far as have any
```

1    assets in its Turnberry Charter name; does it charter

2    boats in its name or does it go through Turnberry

3    Aviation?

4       A    The charter of airplanes go through Turnberry

5    Aviation.

6       Q    What about the boats?

7       A    I don't know what's going on with the boats.

8       Q    Does Turnberry Aviation lease the planes that

9    it has to charter from Turnberry Charters, Inc., do

10   you know?

11      A    No, I don't believe we do.

12      Q    Who would have that information?

13      A    Turnberry's legal department.

14      Q    As a director, what are your duties and

15   responsibilities?

16      A    To manage the flight operation, the

17   day-to-day operation of the flight operation.  We

18   support Turnberry Associates corporate travel needs

19   with the airplanes and also self-charter the airplanes

20   that are not being used by Turnberry Associates, and I

21   manage the operation, manage the people, manage the

22   airplanes and manage the charter operation.

23      Q    You have of the seven -- I think you said

24   seven employees --

25      A    Yes.

```
1      Q     -- under you?
2      A     Yes.
3      Q     Any pilots?
4      A     We have three pilots, two mechanics, and one
5   broker, a sales broker, a charter sales broker.
6      Q     How long has the broker been with you?
7      A     She's been with us close to three years.
8      Q     And a sales broker, when you say a sales
9   broker, you are not talking about for buying and
10  selling airplanes, she sells the charter --
11     A     She sells the charter on the airplane.
12     Q     Thanks.  Who takes care of the books and
13  records of Turnberry Aviation?
14     A     Our accounting department, Turnberry
15  Associates' accounting department.
16     Q     Who do you deal with in that regard from
17  Turnberry Associates?
18     A     Marjorie Osborne.
19     Q     How long have you been employed first with
20  the -- how long have you been employed with Turnberry
21  Aviation, LLC?
22     A     Since it was formed, so it has been about a
23  year.
24     Q     Prior to that you were employed by who?
25     A     Turnberry Charters.
```

```
1      Q     How long were you employed with Turnberry
2   Charters?
3      A     Approximately six years.
4      Q     Prior to being employed with Turnberry
5   Charters, roughly '94, '95, what did you do?
6      A     The same position, director of operations.
7      Q     For what company?
8      A     Turnberry Charters.
9      Q     I'm sorry, before that.
10      A     Before the six years?
11      Q     Yes.
12      A     Before I started with Turnberry Charters?
13      Q     Yes.
14      A     I was working for American Environmental as a
15   pilot.
16      Q     What licenses do you hold?
17      A     My pilot ratings?
18      Q     What ratings?
19      A     Commercial, ATP, instrument, multiengine,
20   single engine land, single engine sea, and flight
21   instructor.
22      Q     Do you have any other license or certificates
23   other than what you just --
24      A     I have a maintenance license, an airframe and
25   power plant license, A&P license is what it is known
```

SPHERION DEPOSITION SERVICES

1    as, and an inspection authorization for maintenance.

2         Q    Now, are they licenses with the state of

3    Florida?

4         A    No, FAA.

5         Q    All of them?

6         A    Yes.

7         Q    Do you have any other federal licenses or

8    certificates?

9         A    No.

10        Q    Do you have any state licenses or

11   certificates?

12        A    No.

13        Q    Are all your licenses that you just named for

14   me still active?

15        A    Yes.

16        Q    How long were you a pilot for American

17   Environmental?

18        A    About one year.

19        Q    And where was that American Environmental?

20        A    The company was based in Chicago, but we flew

21   out of south Florida, out of Ft. Lauderdale.

22        Q    Is that company still in business today?

23        A    I don't know if it is or not.

24        Q    Prior to American Environmental, what did you

25   do?

```
 1      A     I worked for Courtelis Companies in Miami.

 2      Q     Do you want to spell that for her?

 3      A     C-O-U-R-T-E-L-I-S.

 4      Q     And what did you do for Courtelis Companies?

 5      A     A chief pilot, which is kind of synonymous

 6   with director of flight operations.

 7      Q     So for Turnberry Charters you also are a

 8   pilot?

 9      A     Yes, I am.

10      Q     And then there are two additional pilots?

11      A     Actually, we have two additional pilots and

12   one contract employee, so as far as employed by

13   Turnberry we have two employees.

14      Q     You and two other ones?

15      A     Right.

16      Q     And as far as being a director, you also fly

17   the charters?

18      A     Yes.

19      Q     How many planes does Turnberry charter, what

20   do you call it, lease, rent, charter?

21            MR. REIMER:  Object to the form.  How many

22   does Turnberry charter?

23            MR. HUTCHISON:  Yes.

24            THE WITNESS:  Are we asking if it's

25      Turnberry Charters charters or Turnberry
```

SPHERION DEPOSITION SERVICES

```
 1      Aviation?

 2    BY MR. HUTCHISON:

 3      Q    Let's go with Turnberry Aviation, I guess

 4    would be the better question, since it is now

 5    Turnberry Aviation.  How many planes do you have?

 6      A    Well, Turnberry Aviation has the Challenger,

 7    the one airplane that is registered with the FAA.

 8      Q    When we say the Challenger, we are talking

 9    about the Challenger 600, which is the subject of this

10    lawsuit?

11      A    Yes.

12      Q    Do you have any other Challengers?

13      A    No.

14      Q    At all?

15      A    That's it.

16      Q    If we talk about the Challenger this morning,

17    we will always know it is the plane that is the

18    subject of this lawsuit?

19      A    Yes.

20      Q    So Turnberry Aviation has the Challenger 600?

21      A    Yes.

22      Q    Does it have any other airplanes?

23      A    Not that is registered in Turnberry

24    Aviation's name.

25      Q    What other airplanes does Turnberry Aviation
```

1    charter other than the Challenger 600?

2        A    That's the only airplane, just the

3    Challenger.

4        Q    What other airplanes are you responsible for

5    or do you fly for Turnberry?

6        A    Well, we also have an Astra.

7        Q    Spell that.

8        A    A-S-T-R-A.

9        Q    Model, type?

10       A    It's an Israeli aircraft, the new name is

11   Galaxy, Galaxy Aerospace, and the model is Astra.

12       Q    Any other planes?

13       A    These are planes that we crew and manage, and

14   also a Piper Saratoga.

15       Q    Now, do any of the Turnberry companies have

16   any other aircrafts that you are aware of other than

17   the three we just discussed?

18       A    No, no others, not that I know of.

19       Q    I understand that the Challenger 600 that is

20   the subject of this lawsuit is for sale today as of --

21   you know, it recently has been put up for sale.  Do

22   you have any involvement in that sale?

23       A    No, I don't.

24       Q    Do you want a glass of water while I'm

25   pouring?

SPHERION DEPOSITION SERVICES

```
 1      A    Yes.
 2      Q    Who would be responsible for the sale of that
 3  airplane?
 4      A    Dennis Lainey.
 5      Q    Is Dennis Lainey employed by Turnberry
 6  Aviation, LLC?
 7      A    I can't say for sure if he is or he isn't.
 8      Q    Why do you answer that that way?
 9      A    Because I think when Dennis enters an
10  agreement to buy and sell an airplane for Turnberry he
11  becomes an employee of Turnberry.  I don't know if he
12  is an employee of Turnberry Aviation, of Turnberry
13  Charters, of Turnberry Associates, or whatever else, I
14  don't know.  I am not privy to that information, that
15  is not important to me.
16      Q    Do you know if he was ever an employee of
17  Turnberry Charters, Inc.?
18      A    I can't say for sure whether he was or he
19  wasn't, no.
20      Q    Do you know if he was ever an employee of
21  Turnberry Aviation, LLC?
22      A    The same thing, I'm not sure.
23      Q    Do you know --
24      A    Like I said, when he enters into a contract,
25  from what I understand, I haven't seen the contract,
```

1    that he becomes an employee of the Turnberry group,

2    but I don't know an employee of who.

3         Q    Who told you that Mr. Lainey signs a contract

4    with Turnberry regarding sales of airplanes?

5         A    Dennis, Dennis Lainey did.

6         Q    It is actually a written contract?

7         A    My understanding, yes.

8         Q    Mr. Lainey told you that?

9         A    Yes.

10        Q    Other than Turnberry Associates, Turnberry

11   Charters, Inc. and Turnberry Aviation, LLC, what other

12   Turnberry companies are there?

13             MR. REIMER:    I object to the form of the

14        question.

15             THE WITNESS:    What I understand, they are

16        involved in development, they are real estate

17        developers, they may form companies for those

18        developments, and that is not really my end of

19        the business, and I am not really sure how those

20        companies are formed.

21   BY MR. HUTCHISON:

22        Q    Do you know of any of the other names of the

23   companies, for example?

24        A    I know names of developments, but I don't

25   know if those are companies or not.

                    SPHERION DEPOSITION SERVICES

1              MR. REIMER:  Off the record for a second.

2              (Discussion off the record.)

3     BY MR. HUTCHISON:

4         Q    When you say developments, you are talking

5     about residential developments or commercial?

6         A    Or commercial, yes.

7         Q    Real estate?

8         A    Right.

9         Q    Regarding charters of the airline industry or

10    airplanes, are there any Turnberry companies involved

11    other than Turnberry Charters, Inc. and Turnberry

12    Aviation, LLC, to your knowledge?

13        A    No, to my knowledge, no, there isn't.

14        Q    And the only two Turnberry companies you ever

15    worked for were Turnberry Charters, Inc. and Turnberry

16    Aviation, LLC?

17        A    Yes.

18        Q    When we talk about Turnberry, just so we

19    don't slide during this deposition, can you just make

20    sure you distinguish in your answers between Turnberry

21    Charters and Turnberry Aviation?

22        A    Yes.

23        Q    And I will try to do the same, otherwise, we

24    are just going to hear reference to Turnberry.

25        A    Okay.

```
 1        Q    Do you understand that you have been
 2   designated by the plaintiff to be the corporate
 3   representative for Turnberry Charters, Inc. today?
 4        A    I do realize that, yes.
 5        Q    Okay.  And if you take exhibit number 1, we
 6   are just going to go through it real quickly, David,
 7   my understanding is he's here on all these topics as a
 8   corporate rep?
 9             MR. REIMER:   That's correct.  He may not have
10        information regarding all of the topics, but
11        since there's no other employees, or, to my
12        knowledge, there was no other employees who had
13        information, he's it for everything, but as I
14        said before, Dennis Lainey has become an
15        employee, as I understand it, of whom I don't
16        know, I really don't, because he's an on again,
17        off again employee solely for the purpose of
18        brokering aircraft, and we have agreed, and I
19        will say on the record that we now have agreed
20        that he's contacted me and that we will produce
21        him at a later date for the issue of the sale of
22        the aircraft.
23             MR. HUTCHISON:   Right, but as far as the
24        areas of examination today, Mr. Aitkens will
25        speak for the company?
```

```
 1              MR. REIMER:  That's correct.
 2    BY MR. HUTCHISON:
 3        Q    Let's go, Larry, we are quickly going to go
 4    down, if you could turn to page 2 of the deposition,
 5    exhibit number 1, Areas of Examination, you are here
 6    regarding topic number 1, "All facts supporting all
 7    allegations contained in the plaintiff's Complaint."
 8              Have you ever read the plaintiff's Complaint?
 9        A    No, I haven't.
10        Q    Have you discussed this topic with your
11    counsel?
12        A    No.
13        Q    Have you discussed this topic with anybody?
14        A    No, I haven't.
15        Q    Do you know if anybody else employed for the
16    plaintiff has knowledge regarding the facts alleged in
17    the Complaint?
18        A    Dennis Lainey.
19        Q    Assuming he is employed by the plaintiff.
20        A    Yes.
21        Q    Anyone else?
22        A    And I would imagine that Jeff Soffer.
23        Q    Anybody else?
24        A    No.
25        Q    Other than Mr. Reimer, did you speak with
```

```
 1    anyone else regarding this deposition?
 2    A    My wife.
 3    Q    Did you speak with Mr. Lainey?
 4    A    Yeah, briefly, I did, yes.
 5    Q    When was that?
 6    A    Late last week.
 7    Q    Did you talk to him about this deposition?
 8    A    Yes, that I was going to be deposed, right.
 9    Q    On the telephone or in person?
10    A    In person.
11    Q    Where was that?
12    A    I'm sorry?
13    Q    Where was that?
14    A    At our office at Opa-Locka Airport.
15    Q    Was anyone else present?
16    A    David was present.
17    Q    Anyone besides Mr. Reimer?
18    A    No.
19    Q    Is that the only time you spoke with Mr.
20    Lainey about this deposition?
21    A    Maybe on the phone before he came, yes, maybe
22    the day before he came.
23    Q    Was anyone else present on the phone?
24    A    No.
25    Q    Tell me what you spoke with Mr. Lainey about
```

SPHERION DEPOSITION SERVICES

```
 1   specifically.
 2           MR. REIMER:  I object to the form.  Are we
 3       talking about the telephone conversation?
 4           MR. HUTCHISON:  The telephone conversation.
 5           THE WITNESS:  I knew that they were
 6       attempting to depose -- there was an attempt made
 7       to depose Dennis, and Dennis was saying he was
 8       open to it, but he lives down in the Keys and it
 9       was I guess hard to get him, and I called Dennis
10       just to say, well, I was being deposed, I just
11       got back from a trip, I walked off the airplane
12       and I got subpoenaed, I told him that, and that
13       was basically it, though he did come up to check
14       on the interior of one of our airplanes that we
15       were redoing the interior the next day, so when
16       he came in for that we talked about it.
17   BY MR. HUTCHISON:
18       Q    And that was with Mr. Reimer?
19       A    Yes.
20       Q    Where does he live in the Keys?
21       A    Marathon.
22       Q    What mile marker; do you know?
23       A    I don't know.
24       Q    Do you know his address?
25       A    No, I don't.
```

```
 1    Q    Do you know his home phone number?

 2    A    No, just his office number.

 3    Q    Is he married?

 4    A    Yes.

 5    Q    What's his wife's name?

 6    A    Nellie.

 7    Q    What's her real name; do you know?

 8    A    No, I don't.

 9    Q    Did you ever meet her?

10    A    Yes.

11    Q    What's Mr. Lainey's middle name?

12    A    I don't know.

13    Q    How old is he?

14    A    I don't know.

15    Q    Approximately?

16    A    52.

17    Q    What does he look like, physical description?

18    A    6' 1, 210 pounds, kind of, you know, a big

19   guy, kind of heavyset.

20    Q    A white male?

21    A    Yes.

22    Q    What color hair?

23    A    Brown, light brown.

24    Q    Facial hair?

25    A    No.
```

                    SPHERION DEPOSITION SERVICES

```
 1      Q    Glasses?

 2      A    No.

 3      Q    Any distinguishing marks or characteristics?

 4      A    No.

 5      Q    Does he work anywhere else other than for

 6   Turnberry occasionally?

 7      A    I believe he does do broker airplanes on his

 8   own.

 9      Q    Where's his office located?

10      A    He doesn't have an office, he works out of

11   his house.

12      Q    His office phone number is his house?

13      A    Yes.

14      Q    And that rings him in the Keys?

15      A    Yes, it does.

16      Q    When did you first meet Mr. Lainey?

17      A    Probably 11 years ago.

18      Q    How did you do that?

19      A    I was flying out of Orlando and he needed a

20   pilot to fly a new airplane that they got and he just

21   got in touch with me through some mutual friends and I

22   arranged for his crew in his airplane, that is

23   basically how we met 11 years ago.

24      Q    I'm sorry?

25      A    Just that's it, I helped him crew his
```

1    airplane.

2        Q    When you say he needed an airplane crewed,
3    was it the company he was working for or him?
4        A    He was working for Turnberry at the time, he
5    was a chief pilot.  They bought a new model airplane
6    that the crews hadn't been trained on that.  I was
7    trained on that airplane, so through the Flight
8    Safety, which is a training company that trains
9    pilots, he got in touch with me, knowing that I was
10   trained in that airplane, hoping I could fly some
11   trips for him.  I couldn't, but I arranged pilots to
12   do it for him, and that's really the way I first met
13   him.

14       Q    Do you know his work history, his experience
15   in the industry?

16       A    In the late '70s I believe he became -- he
17   took over Turnberry's operation or really started
18   their flight department and was there for about 15
19   years and then went out on his own and got into
20   brokering airplanes toward the end of his employment
21   with Turnberry and went out on his own after that.

22       Q    How long has he been brokering airplanes, do
23   you know, 5, 10 years, 15 years, approximately?

24       A    15 years.

25       Q    He's pretty knowledgeable in the industry?

SPHERION DEPOSITION SERVICES

```
 1      A    Yes.

 2      Q    Well-respected?

 3      A    Yes.

 4      Q    Involved in the purchase or sale of a number

 5   of planes?

 6      A    Yes.

 7      Q    The second topic in deposition exhibit number

 8   1 is, "All documents and facts supporting plaintiff's

 9   claim for damages in this lawsuit."  Did you review

10   any documents in preparation for your deposition

11   today?

12      A    No.  I didn't have -- I wasn't privy to any

13   documents.

14      Q    You haven't reviewed any documents in the

15   last couple of weeks in preparation for this

16   deposition?

17      A    No.

18      Q    How long was your meeting with Mr. Reimer and

19   Mr. Lainey?

20      A    Maybe an hour and a half, I am guessing

21   somewhere in there.

22      Q    That was the total time you spent with Mr.

23   Reimer preparing for this deposition?

24      A    I would say besides interruptions and what

25   not, probably about an hour and a half.
```

1    Q    Any other preparation for this deposition

2    other than the hour and a half with Mr. Reimer and/or

3    Mr. Reimer and Mr. Lainey?

4    A    No.

5    Q    The third area of examination listed in

6    deposition exhibit 1, "All documents, photographs,

7    videotapes and communications regarding the attempted

8    purchase of the subject aircraft," which we know as

9    the Challenger 600, "from defendant."  Do you have

10    any -- are you aware of any photographs or videotapes

11    of the Challenger 600?

12    A    That was taken at what point?

13    Q    At any time within the last year, year and

14    three months, I guess.

15    A    Well, yeah, there are some pictures of the

16    airplane that have been taken, as far as maybe six

17    months ago we had a local professional photographer

18    take pictures of our airplanes for a website, so we

19    sell brochures of our airplanes and what not.

20    Q    Other than that, are you aware of any

21    photographs or videotapes of the airplane?

22    A    No, I am not.

23    Q    Are you aware whether there were any

24    photographs or videotapes taken of the airplane prior

25    to the renovations done last summer?

SPHERION DEPOSITION SERVICES

```
1        A     No, I am not.

2        Q     You know what I mean by the renovations last

3     summer, right?

4        A     Yes.

5        Q     Who would have knowledge regarding areas of

6     examination number 2 and 3 that we just discussed

7     other than you on behalf of the plaintiff?

8        A     Dennis Lainey.

9        Q     Anyone else?

10       A     No, I don't believe.

11       Q     Number 5 -- let me ask you this, going back

12    to number 3, communications, oral and written,

13    regarding the attempted purchase of the subject

14    aircraft from the defendant, which is International

15    Paper, were you involved with the purchase or

16    attempted purchase of the aircraft from International

17    Paper?

18       A     To some degree, I guess.  I get involved,

19    it's really important to avionics equipment that is on

20    the airplane what costs are going to be into the

21    airplane after we buy it, to that degree the

22    maintenance status of the airplane, where we are with

23    inspections, which can involve a lot of downtime on an

24    airplane when we get it, and to that degree, yes.

25       Q     Regarding the terms of the proposed purchase,
```

```
 1    the negotiations of the purchase, were you involved in
 2    any of that?
 3         A    No, I wasn't.
 4         Q    Did you ever speak with a Mr. -- did you ever
 5    meet Bob Cassidy?
 6         A    No.
 7         Q    Have you ever heard that name before today?
 8         A    No, I haven't.
 9         Q    Okay.  Did you ever meet Ed Dahlberg?
10    D-A-H-L-B-E-R-G.
11         A    No, I haven't met him.
12         Q    Did you ever speak with Mr. Cassidy on the
13    telephone?
14         A    No.
15         Q    Did you ever receive any faxes or send any
16    faxes to Mr. Cassidy or communicate with him in any
17    way?
18         A    No.
19         Q    Did you ever speak with a Mr. Ed Dahlberg on
20    the telephone?
21         A    No.
22         Q    Did you ever communicate in either faxes or
23    any other way with Mr. Dahlberg?
24         A    No.
25         Q    Any other representatives of International
```

1    Paper or employees of International Paper have you

2    ever communicated with regarding this airplane?

3        A    No, I haven't.

4        Q    Have you ever spoken with an employee or

5    representative of International Paper, to your

6    knowledge?

7        A    Not to my knowledge.

8        Q    Number 4, it says, "All documents,

9    photographs, videotapes and communications regarding

10   the purchase of the subject aircraft from Aero Toy

11   Store, Inc." You told me already about the

12   photographs taken approximately six months ago by the

13   professional photographer.

14           Are you aware of any other photographs taken

15   of the plane either before or after the purchase of

16   the airplane from Aero Toy Store?

17       A    No, I am not.

18       Q    How about documents or communications?

19       A    Ask the question again.

20       Q    Read number 4, which is in deposition exhibit

21   number 1, "All documents, photographs, videotapes and

22   communications regarding the purchase of the subject

23   aircraft from Aero Toy Store, Inc." Did you read

24   that?

25       A    Yes.

SPHERION DEPOSITION SERVICES

```
1      Q     Do you have any knowledge regarding any of

2    those areas?

3      A     The only documents that I may have in my

4    possession would be -- it's been a while since I have

5    seen this, but for some interior stereo upgrades, a

6    couple of entertainment system upgrades in the

7    airplane --

8      Q     Anything else?

9      A     -- that we communicated with the Toy Store

10   about.

11     Q     Anything else?

12     A     No.

13     Q     How about any avionic equipment?

14     A     No, no, nothing avionics.

15     Q     How about any renovations as far as painting

16   or new furnishings in the inside of the plane?

17     A     No, I don't have anything, no.

18     Q     Does the company have anything -- remember,

19   you are here on behalf of the company -- to your

20   knowledge, does the company have anything?

21     A     Yes, I'm sure they do.

22     Q     Do you know where it would be?

23           MR. REIMER:  We have brought with us all of

24       the documents in that regard, it's all the

25       documents we have already produced to you, we
```

SPHERION DEPOSITION SERVICES

```
1    have them with us.
2         MR. HUTCHISON:  I have those documents, if
3    it's the 375 pages --
4         MR. REIMER:  It's the same documents.
5         MR. HUTCHISON:  -- the same 375 pages.
6         MR. REIMER:  We brought them with us, it is
7    sitting in the binder.
8         MR. HUTCHISON:  There is nothing in addition
9    to what you have sent us?
10        MR. REIMER:  The company has been requested
11   to produce all documents as we discussed and
12   that's the ones they produced to us.
13        MR. HUTCHISON:  Was Mr. Aitkens involved in
14   the gathering or production of documents pursuant
15   to deposition exhibit number 2, which is the
16   defendant's request for production?
17        MR. REIMER:  You will have to ask him that.
18   Why are you asking me that?
19        MR. HUTCHISON:  I was asking David.
20        MR. REIMER:  It is not that I don't want to
21   answer it.  I asked the company --
22        MR. HUTCHISON:  You didn't ask Mr. Aitkens.
23        MR. REIMER:  I did not directly ask
24   Mr. Aitkens, I will say that.  I asked my company
25   contacts to gather the documents; whether
```

1          internally he was asked by the legal department

2          for assistance in gathering the documents, I

3          can't say that or not.

4               (Deposition Exhibit No. 2 was marked for

5          identification.)

6     BY MR. HUTCHISON:

7     Q    Mr. Aitkens, were you ever asked at any time

8     to provide some documents either to Mr. Reimer or to

9     the people inside the Turnberry companies to provide

10    documents to them for this litigation?

11    A    No, I wasn't.

12    Q    Do you know if your files were ever copied or

13    provided to Mr. Reimer through the Turnberry legal

14    department or otherwise?

15    A    No, they weren't.

16    Q    Would your files have -- what would be in

17    your files, generally?  I would assume they would have

18    documents regarding what maintenance was needed had

19    the Challenger 600 been purchased from International

20    Paper?

21    A    Yes, I think basically anything that would

22    have been in my file I would have probably gotten it

23    from Dennis Lainey on the details of the airplane

24    while he was purchasing it or on some interior

25    modifications that needed to be done, as far as the

1    entertainment system and where we were on the avionics
2    issues, not that the Toy Store got involved at all in
3    that, but that would probably be in my files, but
4    that's about all that I have.
5        Q    When is the first time that you saw the
6    Challenger 600 that is the subject of this lawsuit?
7        A    When it was at the Toy Store.
8        Q    You never saw it prior to it belonging to
9    Aero Toy Store?
10       A    No, I didn't.
11       Q    When you first saw the aircraft, what was the
12   purpose of you inspecting it?
13       A    Well, as I remember, we hadn't bought the
14   airplane yet, it was at the Toy Store and we were
15   looking at it, and I went out there with Jeff Soffer
16   to try to make some decisions on some paint and what
17   he wanted on the interior of the airplane.
18       Q    Did you prepare any reports, draft any notes
19   or any correspondence at all regarding that
20   inspection?
21       A    Regarding the trip with Jeff --
22       Q    Yes.
23       A    -- to look at the airplane?  No.  As I
24   remember, Dennis Lainey was there and Dennis was
25   really involved in buying the airplane and he was

SPHERION DEPOSITION SERVICES

1    involved in the interior modifications and setting it
2    up.

3        Q    Did you ever see any reports or memos or any
4    correspondence of any type regarding that initial
5    inspection?

6        A    Yes, there was notes.  I am trying to
7    remember exactly.  As I remember, there was some
8    discussions with the Toy Store, Aero Toy Store people
9    about the colors of the interior and the paint, and I
10   know at first we decided -- they wanted to paint the
11   belly a dark color and decided to go with white, there
12   was talk like that, I am sure there's notes in those
13   areas.

14       Q    Whose notes would they be?

15       A    Dennis Lainey would have the notes on all
16   that.

17       Q    Was there ever any formal memo or report
18   typed up from that?

19       A    Yes, I believe there was, I believe Dennis
20   Lainey typed up notes so there was no misunderstanding
21   between us and Aero Toy Store of what we expected in
22   the airplane.

23       Q    I'm going to show you some exhibits later, I
24   may have it, I may not.  If I do show it to you, would
25   you say, hey, this is what I was referring to?

SPHERION DEPOSITION SERVICES

1    A    Yes.

2    Q    Thanks.  Did you ever see -- have a

3    subsequent or have an occasion to subsequently inspect

4    or view the airplane while it was at Aero Toy after

5    this initial one with Mr. Lainey and Mr. Soffer?

6    A    Yes, I was out there several times looking at

7    the progression of the interior job.

8    Q    Approximately how many times?

9    A    Oh, six times.

10    Q    Any notes, memos, correspondence, reports

11    from any of those six visits?

12    A    No, I don't think so, no.

13    Q    Who was your contact person at Aero Toy when

14    you would go to check on the status with the

15    progression of the renovations, or who would you

16    communicate regarding your concerns regarding those

17    renovations?

18    A    The interior shop foreman, I believe his name

19    was John Grothie.

20    Q    Spell that for her.

21    A    Your guess is as good as mine.

22    Q    John?

23    A    Grothie.

24    Q    Grothie?

25    A    Yes.

1    Q    His job was what, basically?

2    A    Well, he was an interior shop foreman, he

3    took care of supervising the crews to do the interior

4    of the airplane.

5    Q    When you say the interior, are you talking

6    about just the carpentry work or are you talking about

7    the avionics equipment; everything?

8    A    Not the avionics, they did no avionics there.

9    Just the entertainment system, the stereo, T. V., DVD,

10   and the interior completion of the airplane, fabrics,

11   you know, side walls.

12   Q    They did the furnishings and the paint, the

13   aesthetics?

14   A    Yes.

15   Q    Now, there were also equipment upgrades done?

16   A    After we bought the airplane?

17   Q    Not prior to?

18   A    The only equipment upgrades, as I remember,

19   were some, like I said, some stereo, some

20   entertainment system upgrades, yes.

21   Q    And define avionics equipment for us.

22   A    Avionics is in the cockpit, avionics is

23   flight instruments pertaining to the pilots flying the

24   airplane.

25   Q    And that work was done subsequent to the

1  purchase?

2      A    Yes.

3      Q    And who did that?

4      A    ElectroSonics.

5      Q    ElectroSonics?

6      A    Right.

7      Q    Do they have another name?

8      A    Well, they are a GE subsidiary company, so

9  General -- GE Capital.

10     Q    Let's go to the next item in deposition

11 exhibit number 1, number 5, you can read that to

12 yourself.

13     A    (Witness examining document.)

14     Q    Are you aware of any communications, written

15 or oral, between the plaintiff and the defendant or

16 the defendant's representatives regarding the subject

17 aircraft and the allegations in the Complaint?

18     A    No, I'm not.

19     Q    Who would on behalf of the plaintiff?

20     A    I would think -- I would say Turnberry's

21 legal department and Jeff Soffer.

22     Q    Jeff Soffer; anyone else?

23     A    Not that I know, no, I mean there may be

24 others, but not that I would know of.

25     Q    And Mr. Lainey would?

SPHERION DEPOSITION SERVICES

1      A     I don't know how much to the extent he has
2    gotten involved in the Complaint.

3      Q     How about the communications between them,
4    between the plaintiff and the defendant regarding the
5    aircraft?

6      A     Yeah, during the purchase up in Saint Louis,
7    Dennis, yes, he was involved there, but I understood
8    this to say in the Complaint after the fact, after we
9    were talking about in the last couple of months.

10     Q     Let's go over it real quick.  Number 5, "All
11   communications between plaintiff and defendant, or its
12   representatives, regarding the subject aircraft and
13   allegations in the Complaint."  So let's just take the
14   subject aircraft first.

15     A     Okay, Dennis Lainey would definitely be.

16     Q     Would anyone else have negotiated with
17   International Paper or International Paper
18   representatives on behalf of the plaintiff other than
19   Mr. Lainey for the subject aircraft?

20     A     Would anybody?  I guess I'm going to try to
21   rephrase your question.  Would anybody have been
22   authorized by Turnberry to represent Turnberry?

23     Q     Right.

24     A     No.

25     Q     And, to your knowledge, did anybody else ever

```
 1    communicate with International Paper or International

 2    Paper representatives regarding the purchase of the --

 3         A    No, in -- I'm sorry.  I interrupted your

 4    question.

 5         Q    -- regarding the purchase of the airplane

 6    from International Paper?

 7         A    No.

 8         Q    I didn't mean to cut you off.

 9         A    No, I understand.

10         Q    She can only take down one of us.

11         A    Yes.

12         Q    So regarding the whole negotiations with

13    International Paper and Turnberry, Dennis Lainey would

14    have that knowledge, to the best of your knowledge?

15         A    Yes.

16         Q    Let's go to number 6.  Who would have

17    negotiated the sale and renovations with Aero Toy?

18         A    Dennis Lainey, and Jeff Soffer to a degree.

19         Q    Anyone else on behalf of the plaintiff?

20         A    No.

21         Q    Who from Aero Toy did they negotiate with?

22         A    The owner.

23         Q    Whose name is?

24         A    Morris.

25         Q    Sharadi?
```

1      A      Sharadi, yes, okay.

2      Q      Anyone else on behalf of Aero Toy that got

3   involved in the negotiations while you were involved

4   with the aircraft?

5      A      No.

6      Q      And the only person that you can think of

7   that was involved with the renovations is the shop

8   foreman?

9      A      Yes.

10     Q      Number 7, obviously there's a little bit of

11  overlap, because we know about the photographs that

12  were taken six months ago.  Are you aware of any other

13  photographs or videotapes that were taken prior to

14  Turnberry's purchase of the aircraft from Aero Toy?

15     A      No, I'm not.

16     Q      I may have asked you this and if I have I am

17  sorry.  Are you aware of any other photographs,

18  videotapes that were taken while the subject aircraft

19  was still owned by International Paper?

20     A      No.

21     Q      Did you ever go out to Midcoast Aviation at

22  all and look at the Challenger 600?

23     A      No, I didn't.

24     Q      Did you ever deal with Steve Bates or anyone

25  else from Midcoast regarding this aircraft?

1    A    After we owned the airplane.

2    Q    For what purposes?

3    A    We had a landing gear problem, they had done

4    a landing gear overhaul at Midcoast and we had a

5    problem with the landing gear.

6    Q    They did the landing gear overhall at

7    Midcoast while the plaintiff owned --

8    A    While International Paper owned the airplane.

9    Q    Okay.  And you had a problem with the landing

10    gear, so you did what?

11    A    They came -- well, we had a problem with our

12    landing gear and we felt it was a warranty issue and

13    they were responsible for it, and they owned up to it

14    and came to our facility and took care of it.

15    Q    And they fixed it pursuant to the warranty?

16    A    Yes.

17    Q    You were happy with it, the way it was

18    handled?

19    A    Yes, very.

20    Q    Number 8, "All changes, improvements or

21    repairs made to the subject aircraft after January,

22    1999, and documents relating thereto."  What is the

23    first knowledge you have of any repairs or

24    improvements made to the airplane?

25    A    After January of '99.

```
 1     Q    I believe you guys purchased it in July or
 2   August of 1999, is that right?
 3     A    It sounds right.
 4     Q    So it would be prior to that.  When is the
 5   first time you were aware that the plane was repaired
 6   or improved?
 7     A    I'm just trying to understand the question,
 8   maybe.  After January of 1999, from there until
 9   present?
10     Q    Yes, sir.
11     A    I know the airplane was at Midcoast for a
12   prebuy, a purchase inspection, and issues came up like
13   the landing gear overhaul, and that work was done at
14   Midcoast.  Other than the landing gear overhaul at
15   Midcoast, I don't know what else was done.  All that
16   stuff, any work done to the airplane is documented in
17   the aircraft logbook, so the documents would be the
18   aircraft logbooks.
19          Besides the interior work that I am familiar
20   with that Aero Toy Store did, entertainment system
21   upgrades, after we purchased the airplane we did a
22   7200 hour inspection at Bombardier Airport in Ft.
23   Lauderdale, and after that we did avionics upgrades at
24   our hangar through ElectroSonics.
25     Q    So prior to the landing gear, you don't know
```

```
 1    of upgrades done by Midcoast prior to the plaintiff

 2    owning the aircraft, you don't know what was done or

 3    when that was done?

 4        A    The landing gear overhaul.

 5        Q    Do you know when that was done?

 6        A    I believe it was done in March of '99.

 7        Q    How do you know that, just from the logbooks?

 8        A    Yes, from the dealings that we had with the

 9    warranty issue.

10        Q    In March of 1999, approximately?

11        A    Yes.

12        Q    Any work to the plane itself as far as

13    avionics would be in the logbooks?

14        A    Yes.

15        Q    The internal work that was done at Aero Toy

16    by Aero Toy, that wouldn't be in the logbooks, right?

17        A    Oh, yes, yes.

18        Q    Even the painting and the inside changing the

19    leather?

20        A    The interior painting documentation, yes, on

21    materials and certification, yes.  Since then we have

22    done some routine inspections on the airplane and

23    those are all documented in the logbooks.

24        Q    How many airplanes were bought by the

25    plaintiff in the last -- since 1995, for example, do
```

1    you know?

2         A    Since '95?  Probably -- the Turnberry group?

3         Q    Yes, the Turnberry group.  Thanks.

4         A    Really, the Astra, the Challenger, the Piper

5    Saratoga.  Since '95 -- we owned a Gulf Stream before

6    the Challenger, a Gulf Stream IIB, but I believe that

7    was purchased before, I think it was '94, it could

8    have been '95, right around that time.

9         Q    So three or four?

10        A    Yes.

11        Q    How many were sold by Turnberry since --

12        A    Since then?  Just the -- I'm sorry, there was

13   one other.  The Cessna Citation, I forgot about that

14   one.  The Cessna Citation, that was bought and sold in

15   that time period.

16        Q    So you sold about two and you would have

17   bought about four or five --

18        A    Yes.

19        Q    -- since 1995?  And would you have been

20   involved in the purchase or sale of any of those

21   planes?

22        A    No.

23        Q    Who would have?

24        A    Dennis Lainey.

25        Q    Anyone else?

```
1      A     Dennis.

2      Q     Jeff Soffer?

3      A     Yes, Jeff Soffer.

4      Q     Anyone else besides those two?

5      A     No.

6      Q     Do you know who would have inspected the

7    plane while it was still in the ownership of

8    International Paper on behalf of the plaintiffs?

9      A     Midcoast, Midcoast was doing the inspection

10   on the airplane.

11     Q     They were hired by the plaintiffs to inspect

12   the airplane?

13     A     I am trying to reconstruct it.

14     Q     I'm going to move through this quicker.  Do

15   you know a gentleman Ken Murray?

16     A     Ken Murray was hired by Turnberry to help

17   with the prepurchase of the inspection of the

18   airplane.

19     Q     Anyone else while it was still in the employ

20   of International Paper?

21     A     No one else, just at Midcoast's facility.

22     Q     And then once it was in the ownership of Aero

23   Toy, who was hired by the plaintiff to inspect the

24   plane?

25     A     At that point no one was hired by Turnberry,
```

SPHERION DEPOSITION SERVICES

1    as far as I know, once it was at the Aero Toy Store.

2        Q    Okay.

3        A    We have our own mechanics, and at that time

4    we were arranging for the inspection, the 7200 hour

5    inspection at Bombardier, by then we knew the status

6    of the airplane.

7        Q    And let's jump to number 11 in deposition

8    exhibit number 1, read that yourself.

9        A    (Witness examining document.)

10       Q    Can you think of any consultants, independent

11   contractors or authorized representatives other than

12   Mr. Murray or Mr. Lainey?

13       A    No.

14       Q    That's it, to the best of your knowledge?

15       A    That's it.

16       Q    I'm going to go over the Complaint with you,

17   Mr. Aitkens, and tell me what you have knowledge

18   about.  There, do you want a copy?  I'm going to mark

19   this deposition exhibit number 3, it's a copy of the

20   Complaint in this action.  Take a look at it, we are

21   going to go over it together.

22            Have you ever seen deposition exhibit number

23   3 before?

24       A    No, I haven't.

25            (Deposition Exhibit No. 3 was marked for

SPHERION DEPOSITION SERVICES

```
 1          identification.)
 2      Q    Do you understand what the allegations are by
 3   the plaintiff against International Paper in this
 4   action?
 5      A    I understand that it was a breach of
 6   contract.
 7      Q    How is it that that's your understanding?
 8   You weren't involved with the negotiations with
 9   International Paper, were you?
10      A    No.
11      Q    How did you get the understanding that this
12   case is about a breach of contract?
13      A    I guess right at the end of the deal, with
14   Dennis Lainey coming back without the airplane, I
15   guess that's how I found out about it, that he felt
16   that we had the airplane, he felt confident about it,
17   and wound up with not having the airplane, and that
18   was his view.
19      Q    What specifically did he tell you?
20      A    That the Toy Store had bought the airplane
21   out from under us.
22      Q    Anything else?
23      A    That's really it.
24      Q    Turn to page 2 of exhibit number 3, paragraph
25   number 6, take a look at that and read it to yourself.
```

```
 1      A     (Witness examining document.)

 2      Q     Take a look at exhibit A and tell me if you

 3   have ever seen that letter before today.

 4      A     No, I haven't.

 5      Q     Exhibit A of the Complaint, which is

 6   deposition exhibit 3, you have never seen that letter

 7   dated June 19, 1999 before today?

 8      A     No, I haven't.

 9      Q     And I know I asked you this question, bear

10   with me, you had no conversations with International

11   Paper or any of International Paper's representatives

12   regarding the purchase or attempted purchase of the

13   subject aircraft?

14      A     No, I haven't.

15      Q     At any time?

16      A     No, at no time.

17      Q     Paragraph number 9, it says, "In further

18   accordance with the terms of the contract," which is

19   exhibit A, "Turnberry was afforded the opportunity

20   to," and it lists three separate points there listed

21   A, B and C.  Do you see that in paragraph 9?

22      A     Yes.

23      Q     Do you have any knowledge regarding what the

24   understanding was between Turnberry and International

25   Paper regarding A, which is "Review the records
```

1    relating to the prepurchase inspection, landing gear

2    overhaul, and 120 month and 36 month inspections on

3    the aircraft"?

4        A    No, I don't.

5        Q    Do you know if that was done by Turnberry?

6        A    If those items were reviewed?

7        Q    Yes, while the aircraft was still owned by

8    International Paper.

9        A    I believe they were, yes.

10       Q    So those items, the items listed in A were in

11    fact done, but while International Paper owned the

12    plane?

13       A    Are you asking were the inspections done or

14    was it reviewed and we knew the status of these

15    inspections?

16       Q    Let's go to 9-A.  Were the documents listed

17    there, records relating to the prepurchase inspection,

18    landing gear overhaul, and 120 month and 36 month

19    inspections on the aircrafts, were those records

20    reviewed while International Paper owned the subject

21    airplane?

22       A    Yes.

23       Q    And while International Paper owned the

24    subject plane, Turnberry, the plaintiff, was aware of

25    the status of those records?

SPHERION DEPOSITION SERVICES

1       A    Yes.

2       Q    How about B, "Conduct a systems check," do

3   you know if the plaintiff had an opportunity to

4   conduct a systems check while International Paper

5   owned the subject airplane?

6       A    I can't say for sure, but I would imagine

7   that would have been done, usually it's done kind of

8   in conjunction with the flight check, and I don't

9   think we got that far.

10      Q    How is systems check being used in B?

11      A    Systems check of -- what is a systems check?

12      Q    Yes, tell me what it is, what it --

13      A    Full avionics system check, you get an

14  avionics inspector, in the avionics department they

15  would go through the avionics and make sure everything

16  is functioning properly in the cockpits.  You have a

17  full systems check of the airplane, landing gear, you

18  know, the hydraulic systems, electrical systems, just

19  all the systems you go through and make sure

20  everything is functioning properly.

21      Q    Do you have to fly the plane to do a full

22  systems check as referred to in 9-B?

23      A    Yes.

24      Q    The plane has to be off the ground, that is

25  your testimony?

1       A     Well, I am saying that if the FAA doesn't

2    mandate that, there is no FAA mandated inspection for

3    prepurchase of an airplane, but it's common to do a

4    flight check along with a systems check to make sure

5    everything is functioning properly.

6       Q     But that's my question.  Does it have to be

7    done together or can a systems check be done while it

8    is on the ground?

9       A     A systems check should be done while it is on

10   the ground.

11      Q     It can?

12      A     Yes.

13      Q     And, to your knowledge, did Turnberry conduct

14   a systems check while International Paper still owned

15   the plane?

16      A     I can't say whether a complete systems check

17   was done.

18      Q     Who would have knowledge of that fact?

19      A     Dennis Lainey.

20      Q     Who would have conducted a systems -- a

21   partial systems check or any systems check on behalf

22   of the plaintiff?

23      A     Midcoast would have done that.

24      Q     Would Ken Murray have done that?

25      A     Ken Murray would have supervised it,

                  SPHERION DEPOSITION SERVICES

1    possibly, but the hands-on inspection would have

2    probably been done by Midcoast.

3        Q    Why was Ken Murray employed by Turnberry

4    regarding this aircraft?

5        A    To have someone knowledgeable with that type

6    of airplane involved in the purchase of the airplane.

7    I mean Midcoast is a reputable operation and I'm sure

8    they would have done a good job, but you do need an

9    independent source away from the facility doing the

10    maintenance.

11       Q    Did you ever speak with Ken Murray regarding

12    the subject aircraft?

13       A    No.    The only conversation I think I ever had

14    with Ken Murray was on some of his expenses.

15       Q    Okay.

16       A    I believe that's it.

17       Q    Did you hire Ken Murray?

18       A    No.

19       Q    Who would have done it?

20       A    Dennis Lainey.

21       Q    Did Mr. Murray ever do any work for the

22    Turnberry companies prior to this case?

23       A    No, not to my knowledge.

24       Q    After this case has Mr. Murray done any work

25    for the Turnberry companies?

```
1       A    No.

2       Q    Was Turnberry happy with Mr. Murray's work?

3       A    I would say no.  We did want to purchase the

4    airplane and maybe we felt we weren't represented

5    properly, but, no, I don't think we were happy with

6    him.

7       Q    Why?  I missed the why.

8       A    Well, I guess why, because we didn't get the

9    airplane.

10      Q    And that was Murray's fault?

11      A    I don't know whose fault it was, but as far

12   as my first-hand knowledge of whether Ken Murray did a

13   good job for Turnberry or not, I guess I would have to

14   say I don't know.

15      Q    How about your secondhand knowledge, did you

16   ever have any conversations with anyone else regarding

17   Mr. Murray and the work he did for Turnberry?

18      A    Yes, just briefly, not in much detail.

19      Q    With who?

20      A    With Dennis Lainey.

21      Q    And what did Dennis Lainey tell you?

22      A    That he felt he wasn't doing a quality job

23   and he wasn't doing a good job representing Turnberry

24   out there.

25      Q    "Out there" meaning at Midcoast?
```

1      A     At Midcoast.

2      Q     Inspecting this plane?

3      A     Yes.

4      Q     Do you know if Mr. Lainey ever used

5    Mr. Murray before this incident?

6      A     I don't think he had, no.

7      Q     Do you know if Mr. Lainey used Mr. Murray

8    since this incident?

9      A     No, I don't think so.

10     Q     C, 9-C in deposition exhibit number 3, which

11   is the Complaint, "Conduct a flight check," that was,

12   to your knowledge, that was never done by Turnberry

13   while the subject aircraft was owned by International

14   Paper?

15     A     To my knowledge, it wasn't done.

16     Q     And if it was done, who would have the

17   knowledge?

18     A     Dennis Lainey.

19     Q     Do you know why it wasn't done?

20     A     We weren't able to complete our inspection of

21   the airplane.

22     Q     Who told you that?

23     A     Dennis Lainey.

24     Q     Why was the plaintiff not able to complete

25   its inspection of the airplane while the airplane was

SPHERION DEPOSITION SERVICES

1    owned by International Paper?

2        A    I don't know, the airplane was sold to Aero

3    Toy Store, but in the particulars up at Midcoast about

4    what sequence of events happened exactly and why we

5    weren't able to finish our inspection of the airplane

6    I can't say, I don't know.

7        Q    Number 10, "The contract provided that the

8    parties were to execute a definitive sales agreement

9    by 5:00 p.m." What's a definitive sales agreement?

10       A    Are you asking me? I don't know.

11       Q    Who on behalf of the plaintiffs would have

12   that knowledge?

13       A    Dennis Lainey, our legal department, Jeff

14   Soffer.

15       Q    Anyone else?

16       A    I don't believe, no.

17       Q    Number 11 states that -- paragraph number 11,

18   we are still on the same exhibit, which is the

19   Complaint, that "On June 23, 1999, an agent of

20   Turnberry arrived at the location where the aircraft's

21   records were maintained" -- that agent would have been

22   Mr. Ken Murray?

23       A    Yes.

24       Q    -- "and Turnberry's agent was intentionally

25   prevented from reviewing the records for several hours

1    by International Paper's agents."  What knowledge do

2    you have that International Paper intentionally

3    prevented Mr. Murray from reviewing the records at

4    Midcoast?

5        A    I don't have any knowledge of -- I don't

6    know.  It's also a Dennis Lainey issue.

7        Q    Number 12, "After several hours, Turnberry's

8    agent was finally allowed to review the records

9    referenced in 9-A above."  Do you see that?

10       A    Yes.

11       Q    Do you know if Mr. Murray completed his

12   review of the records at Turnberry?

13       A    No, I don't know.

14       Q    Number 13, "On June 24, 1999, a different

15   agent of Turnberry arrived."  Would that have been --

16   who was that?

17       A    I would imagine it was Dennis Lainey.

18       Q    Do you know that?

19       A    I don't know that date for a fact.

20       Q    Okay.  Number 14, "Turnberry's agent was told

21   on June 24, 1999 that the aircraft was not ready for

22   the systems check or the flight check."  Do you have

23   any firsthand knowledge of that?

24       A    No, I don't.

25       Q    Do you know whether that statement is true or

SPHERION DEPOSITION SERVICES

1    not?

2        A    No, I don't.

3        Q    Were you ever told that by anyone?

4        A    No.

5        Q    Number 15, "On June 24, 1999, International

6    Paper notified Turnberry that International Paper had

7    located another purchaser, and that unless Turnberry

8    agreed by 5:00 p.m. to purchase the plane in, quote,

9    "as is," closed quotes, condition, without conducting

10   the systems check and flight test, it would not sell

11   the aircraft to Turnberry."

12        Do you have any firsthand knowledge of that?

13       A    No, I don't.

14       Q    Were you ever told that fact or that

15   allegation that's in 15, paragraph 15?

16       A    No.

17       Q    Do you know if it's true or not?

18       A    Oh, I don't know if it's true or not, no.

19       Q    What is "as is" condition as used in

20   paragraph 15, what does that mean?

21       A    As the airplane sits in the hangar, that's

22   what it would mean to me, after they completed their

23   inspections and take the airplane "as is," without

24   furthering the flight test and the systems check.

25       Q    Is it customary in the industry to purchase

SPHERION DEPOSITION SERVICES

```
 1   used aircrafts such as the Challenger 600 in an "as
 2   is" condition?
 3       A    It happens, but, no, I don't think -- it is
 4   not customary, no.
 5       Q    It's not the common practice?
 6       A    No, it isn't.
 7       Q    But it does happen?
 8       A    It does happen.
 9       Q    Has the Turnberry's companies ever purchased
10   aircrafts in an "as is" condition prior to purchasing
11   the subject aircraft?
12       A    No.
13       Q    No, or you don't know?
14       A    As far as I know, no.
15       Q    Was the subject aircraft purchased from Aero
16   Toy in an "as is" condition?
17       A    No, it wasn't.
18       Q    How do you know that?
19       A    We did the inspection on the airplane at
20   Bombardier, as I remember, before we took delivery of
21   the airplane.
22       Q    Do you know if you did the inspection prior
23   to signing and executing a purchase and sale agreement
24   with Aero Toy?
25       A    All I know in that regard is that we did the
```

1      inspection at Bombardier before we owned the airplane,

2      and I don't know the status of the contract.

3          Q    Is it customary in the industry to enter into

4      a contract allowing the prospective purchaser to

5      inspect the airplane before taking delivery?

6          A    Yes.

7          Q    Do you know if that was ever a negotiation

8      brought up during the negotiations between

9      International Paper and the plaintiff?

10         A    Secondhand from Dennis Lainey, yes, I believe

11     he did discuss doing an inspection.

12         Q    What did Mr. Lainey tell you?

13         A    That he wanted to complete an inspection on

14     the airplane, and, as I remember, the one we wound up

15     doing at Bombardier.

16         Q    That was with Aero Toy, though, but we are

17     talking about International Paper.

18         A    Right.

19         Q    What else --

20         A    We are talking about the same inspection,

21     though.

22         Q    The same type of inspection, right, the 7200

23     hour inspection?

24         A    The 7200 hour inspection, yes.

25         Q    Was there any other inspection that Mr.

SPHERION DEPOSITION SERVICES

1    Lainey wanted to do prior to purchasing the plane from

2    International Paper other than the 7200 hour

3    inspection?

4       A     I think, as we talked about earlier, the

5    systems check and the flight check, I would imagine he

6    would have wanted to do that.

7       Q     Okay.  Anything else?

8       A     Not that I know of, no.

9       Q     I think that was 15.  Let's go to 16.  Read

10   that.

11      A     (Witness examining document.)

12      Q     "On June 25, 1999, Turnberry's agent was told

13   by agents for International Paper that Turnberry could

14   not have access to the aircraft as a result of its

15   failure to agree to purchase the aircraft in "as is"

16   condition by International Paper's unilaterally

17   imposed deadline of 5:00 p.m. June 24, 1999."

18            Do you have any firsthand knowledge of that

19   allegation?

20      A     No, I don't.

21      Q     Do you know whether it is true or not?

22      A     No firsthand knowledge that it is true, no.

23      Q     And who would?

24      A     Dennis Lainey.

25      Q     17, read that.

SPHERION DEPOSITION SERVICES

```
 1      A     (Witness examining document.)

 2      Q     "Between June 25, 1999 and June 28, 1999,

 3    International Paper refused to allow Turnberry access

 4    to the aircraft for purposes of conducting the systems

 5    check and flight check."  Do you have any firsthand

 6    knowledge of that allegation?

 7      A     No.

 8      Q     How about 18, any firsthand knowledge of that

 9    allegation?

10      A     No, I don't.

11      Q     Do you know whether the allegations contained

12    in paragraph 17 and 18 are true or not?

13      A     No, I don't know.

14      Q     Let's go to Count I on page 4, paragraph

15    number 25 and 26.  25 is, "Turnberry suffered

16    significant damages as a result of International

17    Paper's breach," and 26 says, "Turnberry's damages

18    include but are not limited to the increased costs and

19    expenses in the purchase of a 1981 Canadair Challenger

20    and expenses incurred in attempting to complete the

21    terms of the contract."

22            Paragraph 25, what damages are the plaintiff

23    claiming in this case?

24      A     I don't know.

25      Q     26, what expenses or damages are the
```

1    plaintiffs alleging in paragraph 26?

2        A    I don't know.

3        Q    You have no knowledge regarding the damages

4    that are alleged by the plaintiff in this case?

5        A    What we are alleging in this?  No, I don't,

6    without reading it.

7        Q    And you have no dollar figure or amount for

8    me regarding the damages the plaintiffs are alleging

9    in this case?

10       A    A guess?

11       Q    Do you know?  You are here to testify on

12   behalf of the plaintiff, either you know or you don't

13   know.

14       A    I don't know.

15       Q    Okay.  And that would be the same for Count

16   II, page 5, paragraphs 30 and 35, regarding Count II,

17   do you know what damages the plaintiffs are claiming

18   in this case as alleged in Count II, paragraphs 30 and

19   31?

20       A    No, I don't.

21       Q    The same with Count III on page 6, do you

22   know what damages the plaintiffs are alleging as a

23   result of Count III in this case?

24       A    No, I don't.

25       Q    I would take that just in general, you don't

SPHERION DEPOSITION SERVICES

1    know what the damages are that the plaintiffs are

2    alleging in this litigation?

3         A    Yes.

4         Q    Is that true?

5         A    That's true.

6         Q    I want to go back to "as is" again.  What is

7    your understanding of the definition of "as is" again,

8    "as is" condition as used in the Complaint?

9         A    That --

10             MR. REIMER:  I object to the form of the

11        question.

12             THE WITNESS:  That the airplane, you would

13        purchase -- Turnberry would purchase the

14        airplane, or whoever the purchaser would be,

15        would purchase the airplane as it sits in the

16        hangar, with the inspection status and without

17        doing any further inspections to the airplane.

18   BY MR. HUTCHISON:

19        Q    And it is your understanding that the deal,

20   the transaction between -- strike that.  Is it your

21   understanding that the transaction between

22   International Paper and plaintiff fell through because

23   of the "as is" provision required by International

24   Paper?

25        A    No, that's not my understanding.

```
 1      Q    What is your understanding?
 2      A    That I think we weren't allowed access to the
 3   airplane to complete the areas we wanted to look at.
 4      Q    So the requirement that the plane be sold "as
 5   is" was not the reason the deal fell through with
 6   International Paper?
 7      A    I didn't --
 8           MR. REIMER:  I object to the form.
 9           THE WITNESS:  I didn't see the contract, so
10      I don't know what was presented to Turnberry.  I
11      don't know is the answer to that question.
12   BY MR. HUTCHISON:
13      Q    Just so I can expedite this, you have no
14   knowledge, as the corporate representative of the
15   plaintiff, regarding the communications and
16   negotiations with International Paper or International
17   Paper's representative, is that correct?
18      A    That's correct.
19      Q    And the first time that you were involved
20   with the Challenger 600, which is the subject of this
21   lawsuit, was approximately when?
22      A    When it was delivered to the Aero Toy Store
23   and we began -- Aero Toy Store began interior
24   modifications to the airplane and the paint.
25      Q    So the first time you had any involvement
```

1    with the subject aircraft it was already in the

2    ownership of Aero Toy Store?

3        A    Yes.

4        Q    Did you have any communications or any

5    discussions with Mr. Lainey or Mr. Soffer regarding

6    the transaction or negotiations with International

7    Paper for the subject aircraft?

8        A    No.    The only communication with Dennis

9    Lainey was at the end of the deal when he said that it

10   didn't look like we were going to get the airplane,

11   something to that effect.

12       Q    Let me show you exhibit number 4 quickly and

13   just tell me -- David, do you have a stapler handy?

14           MR. REIMER:    Yes.

15           MR. HUTCHISON:    You can go off the record.

16           (Discussion off the record.)

17           (Deposition Exhibit No. 4 was marked for

18       identification.)

19   BY MR. HUTCHISON:

20       Q    Mr. Aitkens, I just showed you deposition

21   exhibit 4, which is an Aircraft Sale Agreement.    The

22   fax header appears that it was dated 6/21/99.    I

23   understand that you had no involvement or have no

24   knowledge of these negotiations involving exhibit

25   number 4, but do you recognize the handwriting?

```
 1      A     No, I don't, I can't say for sure.
 2      Q     I just want to make one point clear, you
 3   never had any discussions with -- have you ever met
 4   Ken Murray in person?
 5      A     No.
 6      Q     And you talked to him on the phone only one
 7   time?
 8      A     I believe only one time, yes.
 9      Q     And that was regarding his expenses.  What
10   was the matter with Mr. Murray's expenses?
11      A     It's been a while, I don't really remember.
12   It wasn't a problem with him, I don't think, it was
13   just how to go about getting reimbursed I think was
14   the issue.
15      Q     Let's take a five-minute break, I need to use
16   the rest room, and I assume, David, that somebody for
17   the plaintiffs is going to be a corporate rep.
18   regarding the front end of this sale, I mean the
19   negotiations with International Paper.
20           MR. REIMER:  Well, not necessarily, you know,
21      not necessarily.  I don't have -- you know, I'm
22      in a position where certain information necessary
23      to prove my case is not necessarily going to be
24      presented at trial by a corporate representative.
25           I have a case where the majority of the case
```

```
1        has to be presented by witnesses, outside
2        witnesses, and so that's the answer.  If I don't
3        have a corporate representative that has
4        knowledge with respect to the facts of the case
5        necessary to prove my case, I can't do anything
6        about that.
7             I have told you that I was contacted by
8        Dennis Lainey, who informed me that he's recently
9        been retained by the Turnberry group for other
10       purposes, and that he would appear to present
11       deposition testimony as to the facts, but that
12       doesn't necessarily mean that I have anybody I
13       can produce as a corporate representative.
14            MR. HUTCHISON:  I am going to make a
15       request, because I don't have any of them, are
16       Mr. Lainey's employment contracts with Turnberry
17       in writing?
18            MR. REIMER:  It was my understanding, and
19       I'll have to go back and research this, it was my
20       understanding that for the purposes -- that they
21       are not always in writing, and that for the
22       purposes of this deal, for the purposes of this
23       deal that it wasn't in writing, and I can
24       investigate whether there was contracts for other
25       deals, because, again, every deal, every purchase
```

```
 1        or sale of an aircraft is a separate engagement.
 2             MR. HUTCHISON:  That may be correct, but I
 3        want them all, and the reason is it goes to his
 4        credibility.
 5             MR. REIMER:  I understand.
 6             MR. HUTCHISON:  Could you just make an
 7        effort to try to get them?  There may be a number
 8        of them.
 9             MR. REIMER:  Absolutely, I will do that, in
10        fact, I am learning for the first time that a
11        professional photographer was hired.
12             MR. HUTCHISON:  I do need a break.
13             (Thereupon, a recess was taken from 10:45
14        a.m. to 10:55 a.m.)
15   BY MR. HUTCHISON:
16        Q    Let me show you, Mr. Aitkens, deposition
17   exhibit number 5, which is an Offer to Purchase, dated
18   July 6, 1999, and it apparently is between Aero Toy
19   and Turnberry Aviation, Inc.  Have you ever seen that
20   document before?
21        A    No, I haven't.
22             (Deposition Exhibit No. 5 was marked for
23        identification.)
24        Q    Again, would you have been involved at all --
25   and we probably touched on this generally before, but
```

SPHERION DEPOSITION SERVICES

```
 1    I just want to put some closure to this topic -- at
 2    all with the negotiations for the purchase of the
 3    subject aircraft from Aero Toy?
 4    A    No.
 5    Q    And as far as the sale agreement that was
 6    entered into between Aero Toy and the plaintiff, you
 7    never saw a copy of the sale agreement?
 8    A    No, I didn't.
 9    Q    You never read it?
10    A    No.
11    Q    You didn't participate in the drafting of it?
12    A    No.
13    Q    Your relationship with Mr. Lainey, are you
14    social friends?
15    A    Yes, to a degree.
16    Q    Ever go out with him after work?
17    A    We have been to dinner, yes.
18    Q    Go out with his wife and your wife?
19    A    Yes.
20    Q    Been to his house?
21    A    Yes.
22    Q    Has he been to your house?
23    A    Yes.
24    Q    Tell me, if you can, if you recognize, I'm
25    going to hand you deposition exhibit number 6, David,
```

```
 1   these are copies if you want, it's a two-page exhibit,
 2   the Bates numbers end in TB 00216 and 217, the first
 3   page is handwritten and it's called Jet Center
 4   Interiors, dated 7/2/99, and then the second page is
 5   typed, called Jet Center Interiors.  Tell me if you
 6   recognize that handwriting.
 7      A    The handwriting on the first page here?
 8      Q    Yes.  "Thanks, John.  Attention:  Nellie."
 9      A    Yes, I don't recognize the handwriting.  I
10   imagine this is John Growthie at the interior shop.
11           (Deposition Exhibit No. 6 was marked for
12      identification.)
13      Q    Who is Nellie?
14      A    That is Dennis's wife.
15      Q    Where does she work?
16      A    She works with Dennis.
17      Q    What's the name of Dennis's company?
18      A    He doesn't have a company.
19      Q    So he works -- when you say Nellie works with
20   Dennis, she assists him in his brokerage business?
21      A    Yes.
22      Q    Okay.  Jet Center Interiors did work on the
23   subject plane?
24      A    Yes.
25      Q    Where?
```

```
 1      A     At the Aero Toy Store.

 2            MR. REIMER:  Objection to form.

 3   BY MR. HUTCHISON:

 4      Q     Does the second page of exhibit number 6

 5   reflect the work that was done to the aircraft at Aero

 6   Toy?

 7      A     Generally, yes.

 8      Q     Anything that's listed there that was not

 9   done, to your knowledge?

10      A     Airshow, we did nothing with the Airshow,

11   nothing, no upgrades to the Airshow system.

12      Q     Just like it sounds, Airshow A-I-R-S-H-O-W.

13   Is that the only item listed on the second page of

14   exhibit number 6 that was not done by Jet Center

15   Interiors?

16      A     The paint, I know we went back and forth on

17   the paint, but the paint here originally it was going

18   to be a navy blue on the belly, it wound up being

19   white.

20      Q     Which bullet item are you talking about, the

21   first item?

22      A     The last item.

23      Q     The last bullet item in the second column?

24      A     Yes.

25      Q     Outside paint colors, it was white instead of
```

1    navy blue?

2        A    Yes.

3        Q    Any other?  Are all the other bullet items

4    listed on exhibit number 6, page 2, were they done?

5        A    I believe so.

6        Q    Jet Center Interiors is located where?

7        A    Ft. Lauderdale Executive Airport at Aero Toy

8    Store.

9        Q    Is Jet Center Interiors part of Aero Toy

10   Store or is it another business?

11       A    It's part -- my understanding, it's part of

12   Aero Toy Store.

13       Q    It is a related company to Aero Toy?

14       A    Yes.

15       Q    Was the work that is reflected in exhibit

16   number 6 paid for by the plaintiff directly or was it

17   part of the purchase price?

18       A    It was part of the purchase, as far as I

19   know.

20       Q    Did you go out and get quotes done for an

21   independent purchase price by any company?

22       A    No.

23       Q    Would you have been involved in that?

24       A    If we would have gone out and got quotes?

25       Q    Yes.

1     A     Yes.

2     Q     Were you involved with Jet Center Interiors?

3     A     About the price?

4     Q     Yes, about the work that was being done as

5     shown in exhibit number 6.

6     A     Yes, yes, to a degree I was involved in it,

7     yes.

8     Q     What was your involvement?

9     A     Like I had said before, some of the

10    entertainment system that is listed here, DVD, new

11    speakers, there is some questions about the stereo

12    system, the airplane was going to be put on a 135, a

13    charter certificate, so we had some questions that the

14    paperwork was all up to the FAA's liking and it meets

15    FAA's requirements, which is really scrutinized in a

16    charter airplane, so to that degree, and probably some

17    small decisions were made during the interior work.

18    Q     And that work that you are referring to in

19    exhibit 6, page 2, that's all the work that would have

20    been done had you bought the aircraft from

21    International Paper or from some other company?

22          MR. REIMER:   Object to the form.

23          THE WITNESS:   We would have, yes, the

24    interior would have been done, that was our

25    intention.

SPHERION DEPOSITION SERVICES

```
1   BY MR. HUTCHISON:

2       Q    You were making it commuter friendly?

3       A    Yes.

4       Q    Adapting it to your usage?

5       A    Exactly.

6       Q    And the work that was done while -- strike

7   that.  The work that was done at the plaintiff's

8   requests while the airplane was still owned by Aero

9   Toy would have been done regardless of who the

10  plaintiff purchased the plane from?

11      A    It may have not been done by who we purchased

12  the plane from, but it would have been done.

13      Q    That's what I meant.

14      A    Yes.

15      Q    If you would have bought the plane from

16  International Paper, you then would have had someone

17  else do the work.  Since you bought the plane from

18  Aero Toy and they had a related company, you just had

19  them do the work, fair?

20      A    Well, fair, in that they did the work, yes.

21      Q    Right.

22      A    Yes, and we would have had the work done on

23  it had we bought it from someone else, yes.

24      Q    I mean it was specific work that you

25  requested to be done?
```

SPHERION DEPOSITION SERVICES

```
 1       A    Yes.

 2       Q    Is that exhibit number 6 that I gave you?

 3            MR. REIMER:  Yes.

 4            THE WITNESS:  Yes

 5   BY MR. HUTCHISON:

 6       Q    Let me show you exhibit number 7, and take a

 7   second, take a look at it, they didn't come together,

 8   as most of the documents didn't come together, but I

 9   think the three documents go together, it's three

10   pages, the Bates number end in 20, 73 and 18.

11            Tell me if those three documents go together,

12   number 1, and then tell me if you recognize them.  The

13   first page is Bates stamp TB 00020, it is a Turnberry

14   Associates check request submitted on 7/6/99.  The

15   second page is a photocopy of a check number 010650,

16   which is Bates number TB 00073.  The third page, which

17   is Bates number 00018, is a copy of an invoice from

18   Bombardier Aerospace, Learjet, Inc.  Do you recognize

19   those three?

20       A    Yes.

21       Q    They go together?

22       A    Yes, they do.

23            (Deposition Exhibit No. 7 was marked for

24       identification.)

25       Q    Tell me, let's start with the last page, the
```

SPHERION DEPOSITION SERVICES

 1    invoice from Bombardier Aerospace.  Who is Bombardier

 2    Aerospace?

 3        A    It is pronounced Bombardier.

 4        Q    Bombardier?

 5        A    That's a French --

 6        Q    Bombardier, okay.

 7        A    Bombardier is the manufacturer of the

 8    airplane.

 9        Q    It is B-O-M-B-A-R-D-I-E-R.  Bombardier

10    manufactured the Challenger 600?

11        A    Yes.

12        Q    And who is Learjet, Inc.?

13        A    Learjet is a company owned by Bombardier.

14        Q    And what is this invoice for; this is the

15    7200 hour inspection?

16        A    Yes, I think this was for the flat rate on

17    the inspection, I believe.  Any discrepancies after

18    that would have been additional monies, but this was

19    the flat rate inspection.

20        Q    Okay.  This inspection would have been

21    done -- this is the inspection that the plaintiff

22    wanted to do prior to purchasing the airplane from

23    International Paper?

24        A    Yes.

25             MR. REIMER:  Objection to form.

1    BY MR. HUTCHISON:

2        Q    Is this amount part of your damage claim in

3    this case?

4        A    I can't say whether it is or not.

5        Q    All right.  Now a document that you can tell

6    me about.  Let me show you deposition exhibit number

7    8, it is a six-page document starting with Bates

8    number TB 00026, the second page is TB 00001 through

9    00005, it's a fax cover sheet dated July 2nd, 1999 to

10   Mr. Larry Aitkens.  Tell me if you recognize exhibit

11   number 8 and then tell me what it is.

12            (Deposition Exhibit No. 8 was marked for

13        identification.)

14       A    (Witness examining document.)

15       Q    Have you ever seen that document before?

16       A    Yes.

17       Q    The document goes with the fax cover page?

18       A    Yes.

19       Q    The fax cover page says that it's a total of

20   14 pages.  What other pages are missing?

21       A    I don't know, I'm not sure.  They were

22   working on some proposals and some quotes on some

23   avionics work possibly that could have been included

24   with this, but other than that, I don't know.

25       Q    This proposal on the last page which ends in

                   SPHERION DEPOSITION SERVICES

1    05, is that your signature in deposition exhibit

2    number 8?

3        A    Yes.

4        Q    Tell me what this proposal was for.

5        A    This was a proposal for the 7200 hour

6    inspection.

7        Q    Tell me how you know that.  How do I read

8    this?  When I look at the third page of deposition

9    exhibit number 8 it says, "Total Pricing for Work to

10   Be Accomplished, Sub-totals," do you see that?

11       A    What page is that on?

12       Q    It's the third page of the document, ending

13   in 02, the Bates number ends in 02.

14       A    All right.

15       Q    Do you see the "Total Pricing for Work to Be

16   Accomplished"?

17       A    Yes.

18       Q    Guaranteed, $44,128.00."  What is that for?

19       A    That was the flat rate for the inspection.

20       Q    They invoiced you, when we look at exhibit

21   number 7, which I just gave you, $46,045.00.  Did

22   there come a point in time when they upped the flat

23   rate?

24       A    I think we talked about that and that

25   included the 1,917.  Do those add up?  It's been a

1    while since I have seen this.

2        Q    Hang on a second.

3        A    Yeah, I think that's it.

4        Q    I see.  So it is the first two items?

5        A    Yes.

6        Q    In other words, they told you it would be a

7    minimum of $44,128.00, and they would put a ceiling on

8    it, the most it would be would be an additional 1,917,

9    and the total price for the 7200 hour inspection was

10   the addition of those two numbers?

11       A    For the flat rate inspection without any

12   discrepancies.

13       Q    Okay.

14       A    Right.

15       Q    Then the last part, Estimates, it doesn't

16   have anything.  Guidelines, $250,150.00, what is that

17   for?

18       A    To give you a price, kind of a mean price, an

19   average price that it could possibly run up to, just

20   to give you an idea of where the inspection can go if

21   they find discrepancies.

22       Q    So if they found no discrepancies, the most

23   that they were going to charge you were the two

24   numbers, the 44,128 plus the 1,917?

25       A    Yes.

SPHERION DEPOSITION SERVICES

```
 1       Q    If there were discrepancies they said it
 2   could be as high as $250,000?
 3       A    That would be it if there were absolutely no
 4   discrepancies.
 5       Q    And there were no discrepancies?
 6       A    No, there were discrepancies.
 7       Q    So work had to be done in addition to the
 8   inspection?
 9       A    Why, you couldn't possibly do an
10   inspection -- you can't possibly do this level of work
11   without having discrepancies, this amount of work on
12   an airplane.
13       Q    So typically the result of a 7200 hour
14   inspection is additional work needs to be done, it is
15   just a question of how much?
16       A    Yes.
17       Q    So exhibit number 7 is just for the
18   inspection cost, not the additional work?
19       A    You have to open an airplane up, look at
20   everything, close it all up, that's what it would cost
21   you in a perfect world.
22       Q    Tell me, if you can, what exhibit number 9
23   is, please.  It's got a fax header of July 6th, it's a
24   two-page document, it's on Turnberry Aviation
25   letterhead, and the Bates numbers are 212 and 213.
```

```
 1              MR. REIMER:  Before we go on to that, while
 2     he is looking at that, we gave you in our production
 3     additional statements from Bombardier.
 4              MR. HUTCHISON:  We are going to get to them.
 5     I am trying to stay chronologically.
 6              MR. REIMER:  Okay.
 7              MR. HUTCHISON:  I don't know if I have them
 8     all, but I do have two more, I think, and I don't have
 9     checks or anything that shows that they were in fact
10     paid, and I don't know what they are for, but we will
11     get to those in a minute.
12              (Deposition Exhibit No. 9 was marked for
13          identification.)
14     BY MR. HUTCHISON:
15     Q    Tell me what deposition exhibit number 9 is,
16     would you, please, Mr. Aitkens.
17     A    As I remember, this is a list that Dennis
18     Lainey had typed up to make it clearer to Aero Toy
19     Store what we expected in the interior job and the
20     paint.
21     Q    Whose initials are that on that right-hand
22     column at the end of each point or almost every point?
23     A    I think it is okay, and I think that was
24     Dennis Lainey's.
25     Q    Is that Dennis Lainey's handwriting also,
```

1   "customer to supply" on page 1, "customer to supply,

2   customer to supply, customer to supply"?

3       A    Actually, looking at this, let me see.  No, I

4   think Dennis typed up this list and that must be an

5   Aero Toy Store okay and the customers to supply.

6       Q    Does this accurately reflect the work that

7   was done on the Challenger 600 by Aero Toy Store?

8       A    Pretty much, you know, like we went through

9   before the last item on the second page of the

10  Airshow, that was not modified, but other than that, I

11  think, yeah, it looks accurate.

12      Q    This is something that you would have

13  knowledge of, right?

14      A    Yes.

15      Q    This is something that you can look at this

16  and tell me from your firsthand personal knowledge

17  that it was done?

18      A    Yes.

19      Q    With the exception of page 2, the Airshow,

20  everything else was done?

21      A    Yes.

22      Q    10, deposition exhibit 10, tell me if you

23  recognize this July 14th, 1999 letter to Mr. Lainey,

24  and.  If so, how is it that you recognize it.

25      A    Yes, I believe I remember seeing this, yes.

SPHERION DEPOSITION SERVICES

```
 1              (Deposition Exhibit No. 10 was marked for
 2         identification.)
 3    Q    Was all the work listed in exhibit number 10
 4    done by Aero Toy Store or Jet Center?
 5    A    Yes, the only item, I believe that the last
 6    paragraph, I am checking about the microwave oven, the
 7    microwave oven was never installed.
 8    Q    Other than the microwave oven, are all the
 9    items listed above the microwave oven paragraph, were
10    they included in the plane?
11    A    Yes.
12    Q    And, again, they are all items that were part
13    of the purchase price?
14    A    As far as I know, yes.
15    Q    And did Turnberry ever get any other bids or
16    proposals for the cost of those items or to have those
17    items done by someone other than Aero Toy or Jet
18    Center?
19    A    Not to my knowledge, no.
20    Q    Here is another fax cover sheet to Larry
21    Aitkens, dated 7/19/1999, from Ralph Colon C-O-L-O-N,
22    and attached to it is it looks like another fax cover
23    sheet to Marjorie Osborne from Larry Aitkens, and the
24    message is a check request for $30,000.  Tell me if
25    the two pages in exhibit number 11 go together, which
```

```
 1    the Bates numbers are TB 00017 and 00021.
 2              (Deposition Exhibit No. 11 was marked for
 3         identification.)
 4         A    (Witness examining document.)
 5         Q    Do you recognize that?
 6         A    Yes.
 7         Q    Do those two pages go together?
 8         A    Yes, they do.
 9         Q    Was that money paid?
10         A    Yes.
11         Q    What was that money paid for?
12         A    Beyond the scope of the inspection,
13    discrepancies found during that 7200 hour inspection.
14         Q    Is that $30,000 part of the plaintiff's
15    damage claims in the litigation?
16         A    I don't know.
17         Q    I have some sample draft agreements and some
18    proposed changes that were -- of the contract, I
19    should say -- strike that.  I have some draft
20    agreements and proposed changes for the aircraft
21    purchase/sale agreement between Aero Toy and the
22    plaintiff.  You never saw these agreements before
23    today?
24         A    No, I didn't, I have not.
25         Q    Have you reviewed them at all for your
```

1    deposition?

2        A    No.

3        Q    You did not participate in those

4    negotiations?

5        A    No, I didn't.

6        Q    You didn't author any of the purchase/sale

7    documents between the plaintiff and Aero Toy?

8        A    No.

9        Q    Let me show you exhibit 12, it's a composite

10   exhibit, the top is entitled exhibit A, page 1 of 3,

11   the Bates number is TB 00167, the second page is

12   exhibit A, page 2 of 3, the Bates number ends in 168,

13   the third page is exhibit A, page 3 of 3, the Bates

14   number ends in 169, the fourth page is exhibit B, 1 of

15   3, the Bates number ends in 170, the next page is

16   exhibit B, page 2 of 3, the Bates number ends in 171,

17   and the last page is exhibit B, page 3 of 3, and the

18   Bates number ends in exhibit 172.  Tell me if you

19   recognize that, exhibit number 12.

20       A    Yes, this is a spec. sheet that Aero Toy

21   Store put together.

22            (Deposition Exhibit No. 12 was marked for

23       identification.)

24       Q    Let's talk about that.  Exhibit A and B, does

25   that mean they were exhibit A and B to the sales

SPHERION DEPOSITION SERVICES

```
 1    contract with Aero Toy Store and the plaintiff?

 2    A    I don't know that.

 3    Q    Any other reason why Aero Toy would have put

 4    this spec. sheet together?

 5    A    Well, it's common when you have an airplane

 6    for sale you have a spec. sheet, but I would imagine.

 7    Q    What does page 1 tell us, that this is just

 8    the particulars of the Challenger 600?

 9    A    Yes, the time on the airplane and the

10    equipment that is installed in the airplane.

11    Q    Was that accurate and complete, page 1?

12    A    Yes, I believe it is, yes.

13    Q    Page 2, is that accurate and complete?

14    A    Yes.

15    Q    When I say accurate and complete, this would

16    include the work done by Aero Toy for Turnberry?

17    A    Yeah, again, I hate to keep bringing it up,

18    he has the Airshow 400 here, that was never installed,

19    that last paragraph.

20    Q    Other than that?

21    A    There is no VCR installed in the airplane.

22    Q    Other than that, is page 2 complete and

23    accurate?

24    A    There's no cassette player, these are small

25    items, but, no, other than that, it looks accurate.
```

```
 1      Q    So under Interior on page 2, the Airshow 400,
 2  the VCR and the cassette player were not included in
 3  the airplane, but other than that page 2 is accurate?
 4      A    Yes, I believe so.
 5      Q    Page 3, what are the items listed there?
 6      A    These are aircraft logbooks and flight
 7  manuals.  These are -- Craig Maudsley is one of our
 8  pilots who signed for this, he picked them up so we
 9  could start going over the logs.
10      Q    That is Mr. Maudsley's signature?
11      A    Yes.
12      Q    Spell his last name.
13      A    M-A-U-D-S-L-E-Y.
14      Q    Thanks.  Exhibit B, so page 3 is accurate and
15  complete?
16      A    Yes, I believe so, it looks accurate.
17      Q    Page 4, which is page 1 of exhibit B, we saw
18  this page before, that was accurate and complete,
19  correct?
20      A    Yes.
21      Q    Page 2, except for the last item, the
22  Airshow, that's accurate and complete?
23      A    Yes.
24      Q    Now, Airshow, there's obviously different
25  models, the previous two pages go ahead and have
```

SPHERION DEPOSITION SERVICES

```
 1    Airshow 400.  This one says, "Change present Airshow
 2    100 to Airshow 200."  Was Airshow changed at all?
 3        A    No, it wasn't.  The Airshow 100 original was
 4    in the airplane and that's still what is in the
 5    airplane.
 6        Q    Still in it today?
 7        A    Yes.
 8        Q    And other than that, is that page complete?
 9        A    Yes, it is.
10        Q    The next page, which is exhibit B, page 3 of
11    3, and also the last page of exhibit 12 of this
12    deposition, again, we saw that page before, that's
13    accurate and complete with the exception of the last
14    paragraph regarding the microwave oven?
15        A    Yes, right.
16        Q    To your knowledge, other than what was in
17    exhibit number 12, was there any other work done by
18    Aero Toy at Turnberry's request?
19        A    No, I don't believe so, no.
20        Q    I'm going to show you exhibit 13, it is a fax
21    cover sheet to Mr. Larry Aitkens, dated July 26, 1999,
22    it's a composite exhibit and the Bates numbers may be
23    out of order, but the fax headers indicate that there
24    are 15 pages, as reflected in the fax cover sheets
25    dated July 26th, 1999 from Humberto Moas M-O-A-S.
```

 1    Tell me if you recognize deposition exhibit number 13.

 2              (Witness examining document.)

 3        A    Yes, I recognize it.

 4              (Deposition Exhibit No. 13 was marked for

 5         identification.)

 6        Q    Are any of these documents that we discussed,

 7    and this is exhibit number 13, so the 12 prior to this

 8    one, would they be in your personal files in your

 9    office?

10        A    Possibly, yes, some of them.

11        Q    Which ones; do you recall?

12        A    The ones relating to the maintenance at

13    Bombardier.

14        Q    And how would they be kept?

15        A    And possibly the check requests, Turnberry

16    internal check requests.

17        Q    So anything -- you pretty much have copies of

18    the stuff, the repairs that were made to the airplane,

19    whether it was done by Aero Toy or by Learjet?

20              MR. REIMER:  Object to the form of the

21         question.

22              THE WITNESS:  The copies I would have would

23         be the Bombardier and Learjet work that was done

24         and probably not the Toy Store, and the check

25         request.

```
 1    BY MR. HUTCHISON:

 2         Q    How would they be kept in your office?

 3         A    Probably in an envelope, a large envelope.

 4         Q    Labeled?

 5         A    Yes.

 6         Q    Together?

 7         A    Yeah, I would imagine so, yes.

 8         Q    Tell me what exhibit 13 is.

 9         A    That's an estimate on some avionics work that

10    we were considering.

11         Q    Now, is this avionics work that was the

12    result of the 7800 hour inspection or is this

13    additional work?

14         A    The 7200 hour inspection.

15         Q    I called it 7800 hour inspection.  I was just

16    trying to give --

17         A    No, it was completely independent of that.

18    This could be done in conjunction with the inspection

19    and it would require less tearing up the airplane to

20    access some areas, but other than that, it is

21    completely independent of it.

22         Q    Was any of this work -- let's go to page 3,

23    the Total Pricing for Work to Be Accomplished, Option

24    1, $146,943.  What was Option 1?

25         A    I don't know without looking through it here.
```

SPHERION DEPOSITION SERVICES

```
 1      Q    Take your time.  I think it is on page 5, but
 2   I'm going to have you explain it to me, page 4 and 5.
 3      A    (Witness examining document.)  Well, Option 1
 4   here listed on page 5 is the Satcom system, satellite
 5   communication system.
 6      Q    Right, and it doesn't add up -- if you look
 7   at page 3 of exhibit number 13, it doesn't jibe with
 8   Option 1, so can you tell me what's going on here?
 9      A    I am going to have to look at it here, it is
10   very confusing the way they assemble proposals, so.
11   (Witness examining document.)  Well, I think the
12   reason it doesn't add up is because that's a not to
13   exceed number, in case they run into difficulties or
14   problems.
15      Q    The option number is?
16      A    Yes.
17      Q    Okay.  Then let's just go to page 4 of
18   exhibit number 13, and let's talk about what work was
19   done as a result of exhibit 13; any?
20      A    No work was done, no.
21      Q    So these were just estimates of work that
22   needed to be done but --
23      A    All of it didn't need to be done.  We were
24   considering doing some of it.  We just wanted prices.
25      Q    So no work was done as a result of exhibit
```

SPHERION DEPOSITION SERVICES

```
 1   13?

 2       A     Right, no work at Bombardier.

 3       Q     Was it ever done subsequent?

 4       A     Yes, some of it.

 5       Q     All right.  Let me show you exhibit 14, it's

 6   an 8/3/99 fax cover sheet to Marjorie -- is it

 7   Marjorie Osborne?

 8       A     Yes.

 9       Q     -- from Larry Aitkens, request for $50,000.

10   The second page is a fax cover to Larry Aitkens, which

11   is a bill for $50,000, and the third page is a copy of

12   the invoice or the bill referenced in the second page,

13   which is the 8/2/99 fax cover page to Larry Aitkens.

14   Tell me if these three pages go together which are in

15   deposition exhibit 14 and then we will discuss it.

16       A     (Witness examining document.)  Okay.

17             (Deposition Exhibit No. 14 was marked for

18       identification.)

19       Q     Do they go together?

20       A     Yes, it looks like it.

21       Q     What is the -- if you just turn to the page,

22   obviously the first page you are just requesting a

23   check?

24       A     Right.

25       Q     The second page is the fax cover page to you
```

1    dated 8/2/99 from Ralph Colon C-O-L-O-N. "This is an

2    estimate of the bill up to this point. At this time I

3    would request another payment of $50,000 to continue

4    with workscope." Do you see that in the middle of the

5    page?

6        A    Yes.

7        Q    What was the workscope?

8        A    That was discrepancies on the 7200 hour

9    inspection.

10       Q    Was there ever a subsequent proposal or scope

11   of work provided to the plaintiff regarding these

12   subsequent maintenance and bills?

13       A    As I remember, we had a discrepancy list from

14   Bombardier showing the items that were beyond the

15   scope of the 7200 hour inspection.

16       Q    And do you have a copy of that in your

17   office?

18       A    I may have a copy of that, yes.

19       Q    Are any of these items that were done in

20   either the 7200 hour inspection or the discrepancy

21   maintenance or maintenance -- strike that. Are any of

22   these items, meaning the cost of the 7200 hundred hour

23   inspection and the maintenance done for the

24   discrepancy items identified during that inspection

25   part of the plaintiff's damages in this litigation?

```
 1     A     I don't know.
 2           MR.  HUTCHISON:  David, if they are --
 3           MR. REIMER:  They are not.
 4           MR. HUTCHISON:  Okay.  I don't have the
 5     discrepancy list.
 6           MR. REIMER:  $226,000 was paid to Bombardier
 7     for inspection work, we are not claiming that as
 8     part of our damages.  There should be four
 9     requests.
10           MR. HUTCHISON:  Proposals?
11           MR. REIMER:  It all falls under the one
12     proposal we already spoke about, the one which
13     was not to exceed $250,000 that Mr. Aitkens
14     testified about.  There were then four which
15     should have been produced to you, four of these
16     invoices, I think we already -- you just handed
17     me another one, I guess -- no.  There was 46,000,
18     30,000, 50,000 and 100,000.
19           MR. HUTCHISON:  And that is all for the
20     discrepancy work.
21           MR. REIMER:  That all relates to the
22     discrepancy work, is that correct, Larry?
23           THE WITNESS:  Yes.
24           MR. REIMER:  Okay.  They are all related to
25     the 7200 hour inspection and the subsequent
```

```
 1        discrepancies that were identified, and they are

 2        not within the scope of the plaintiff's damages.

 3   BY MR. HUTCHISON:

 4        Q    Larry, take a look at deposition exhibit

 5   number 15, it's a fax cover page to you dated August

 6   3, 1999, from Humberto Moas M-O-A-S.  Tell me if you

 7   recognize it.

 8        A    Yes.

 9        Q    Tell me what it is.

10        A    It is an estimate on an avionics upgrade for

11   the ground prox system.

12             (Deposition Exhibit No. 15 was marked for

13             identification.)

14        Q    Was that ever -- did you ever enter into an

15   agreement to have Bombardier install that system?

16        A    No.

17        Q    This is just a proposal that was never

18   followed through with?

19        A    Right, followed through with at Bombardier.

20        Q    Was it subsequently thereto followed through

21   with?

22        A    Yes.

23        Q    I believe this may be the last invoice that

24   Mr. Reimer was talking about, take a look at exhibit

25   number 16.  I don't have the check request and I don't
```

1    have the cover sheet like I did previously, but it

2    does look like an invoice from Bombardier to Turnberry

3    Aviation for a hundred thousand dollars.  Pass this

4    over to David for me, would you, please.

5              Was this the last and final payment regarding

6    the discrepancy work identified during the 7200

7    maintenance inspection, the 7200 hour inspection?

8       A     Yeah, I believe it was, yes.

9              (Deposition Exhibit No. 16 was marked for

10         identification.)

11      Q     Did the plaintiff hire Bombardier or Learjet

12   to do any other work other than the work reflected in

13   the three invoices that we saw -- the four invoices

14   that we saw?

15      A     At this time?

16      Q     At this time.

17      A     No.

18      Q     When did they do it?  They must have done it

19   later.  When did they do it later?

20      A     Well, I am sorry, ask the question again.

21      Q     We saw four invoices from Bombardier to the

22   plaintiff.

23      A     Right.

24      Q     Did the plaintiff pay those four invoices?

25      A     Yes.

SPHERION DEPOSITION SERVICES

1      Q     In the amount that we saw?

2      A     Yes.

3      Q     Plaintiff paid exhibit 16 in the amount of

4    $100,000?

5      A     Yes.

6      Q     Did the plaintiff have any additional work

7    done by Bombardier or Learjet on the subject aircraft?

8      A     Not during that inspection, but later on,

9    yes, they were continually working on the airplane.

10     Q     Approximately when?

11     A     Oh, they are working on it right now.

12     Q     Just give me a general idea what they were

13   doing, what they did.

14     A     Now we are doing a 600 hour inspection on the

15   airplane, but discrepancies, they come to our facility

16   and help us with maintenance, so we continue to use

17   them.

18     Q     Okay.  Who is Rob McBridge, M-c capital

19   B-r-i-d-g-e?

20     A     Rob McBride is one of our pilots.

21     Q     Okay, McBride.  It says McBridge, but it must

22   have an extra G in it.  Rob McBride?

23     A     Yes.

24     Q     Who is Mike Flint?  F-L-I-N-T.

25     A     Mike Flint is with GE Capital.

SPHERION DEPOSITION SERVICES

```
 1        Q      David, give me five minutes and I think I can
 2    wrap up.  I just need to review my notes.  Off the
 3    record.
 4              (Thereupon, a recess was taken from 12:45
 5         p.m. to 12:56 p.m.)
 6              (Deposition Exhibit No. 17 was marked for
 7          identification.)
 8    BY MR. HUTCHISON:
 9        Q      Deposition number 17 I believe is one
10    package, and I am only going by that simply because of
11    the fax header.  Do you have any reason to believe
12    that it wasn't all together?
13        A      No, no, I don't.
14        Q      Now, the front page has Emerald Aviation.
15    You never dealt with Emerald Aviation, Incorporated?
16        A      No, I didn't.
17        Q      And you never had any communications with
18    anyone from Emerald Aviation regarding the subject
19    aircraft?
20        A      No.
21        Q      I want to turn to the fourth page of exhibit
22    number 17 and the fourth, fifth, sixth, seventh pages
23    list -- those four pages list a number of spare parts,
24    do you see that, or parts?
25        A      Yes.
```

SPHERION DEPOSITION SERVICES

```
 1    Q    Have you ever seen that list before?

 2    A    Yes.

 3    Q    Tell me how you first saw that list.

 4    A    Dennis Lainey provided it to me.

 5    Q    Did he tell you what it was?

 6    A    It was a spare parts list on the Challenger.

 7    Q    A spare parts list, that's what Mr. Lainey

 8  told you?

 9    A    Yes.

10    Q    And all your knowledge regarding that list

11  came from Mr. Lainey?

12    A    Yes.

13    Q    No other knowledge regarding that list?

14    A    No.

15    Q    Now, the last page, can you tell me what that

16  is?

17    A    I haven't seen it before, it looks like an

18  estimate on the interior, on an interior job.

19    Q    Was the first part, "Interior - all leather

20  fireblocked with new foam to restyle seats to your

21  specs, carpet headliner, sidepanels, cockpit to

22  baggage area," was that work done?

23    A    Some of it was done.

24    Q    Do you know what was done and what wasn't

25  done?
```

```
1      A    The "relaminate all woodwork in interior,"
2  all woodwork was not relaminated, that was not done.
3      Q    Was any relaminated?
4      A    Some was relaminated, yes.
5      Q    Was the first part, "Interior - all leather
6  fireblocked with new foam to restyle seats to your
7  specs, carpet headliner, sidepanels, cockpit to
8  baggage area," was that done?
9      A    Yes, to my knowledge, that was done.
10     Q    The second item is, "Relaminate all woodwork
11 in interior," some was, some was not?
12     A    Right.
13     Q    And the third item is, "Satin brass or gold
14 plating on all interior fixtures."  Was that done?
15     A    The gold plating was done.
16     Q    On all interior fixtures?
17     A    Yes.
18     Q    Okay.  Any items done in addition to those
19 three that were listed there?
20     A    Well, it doesn't get into details of the --
21     Q    Of the other exhibits that had the bullet
22 points?
23     A    Yes, it had more detail, was broken out
24 better, yes.
25     Q    The one exhibit that had exhibit A?
```

                     SPHERION DEPOSITION SERVICES

```
1       A    Yes.

2       Q    Is that the one you are referring to?

3       A    Yes, I am.

4       Q    That would be exhibit 12 that you are

5    referring to, it gave more detail?

6       A    Yes.

7       Q    Going back to exhibit 17, the pages 4 through

8    7, did you ever try to put a dollar figure or

9    valuation of the spare parts listed on those four

10   pages of exhibit 17?

11      A    No, I didn't.

12      Q    Do you know if anybody did?

13      A    I don't know if anybody did, no, other than

14   just, like I said, just a cursory look at it and

15   saying, gee, that would be nice to have the spares,

16   some of these items, other than that, no pricing.

17      Q    I'm talking about a valuation, a number, did

18   you do that?

19      A    No, I didn't.

20      Q    Do you know if anybody did?

21      A    I don't know.

22      Q    Did you ever try to put a valuation on the

23   improvements that were in fact done by Aero Toy at

24   Turnberry's request?

25      A    No.
```

```
 1      Q    By Aero Toy, I obviously mean their
 2   associated company.
 3      A    Right.  No, no, I never did.
 4      Q    Do you know if anybody did?
 5      A    I don't know if anybody has done it, no.
 6      Q    Subject to any future documents being
 7   provided and any future rulings regarding same, I am
 8   finished with your deposition for today.  Thank you
 9   for your time.
10      A    Okay.
11           MR. HUTCHISON:  Any questions?
12           MR. REIMER:  No questions.  I reserve any
13      objections to recalling him and he will read.
14           MR. HUTCHISON:  What's "I reserve any
15      objections to recalling him"?
16           MR. REIMER:  You said subject to any
17      documents being produced, and we will deal with
18      whether he needs to be recalled on a later date,
19      that's all.
20           MR. HUTCHISON:  Got you.  Thank you.  Thank
21      you, Nancy.
22           (At 1:05 p.m., the deposition was
23      concluded.)
24
25
```

SPHERION DEPOSITION SERVICES

1    STATE OF FLORIDA

2

3    COUNTY OF PALM BEACH

4

5        I, NANCY SIEGEL, the undersigned

6    Notary Public, in and for the State of Florida,

7    hereby certify that LARRY MILO AITKENS personally

8    appeared before me and was duly sworn.

9

10        WITNESS my hand and official seal

11

12    this _9th_ day of _October_, 2000.

13

14

15    _____

16        NANCY SIEGEL

17        Notary Public, State of Florida

18        My Commission No.: CC934676

19        Expires:  May 8, 2004

20

21

22

23

24

25

SPHERION DEPOSITION SERVICES

```
 1              C E R T I F I C A T E

 2    STATE OF FLORIDA

 3    COUNTY OF PALM BEACH

 4

 5        I, NANCY SIEGEL, Registered Merit Reporter,
      do hereby certify that I was authorized to and did
 6    stenographically report the foregoing deposition;
      and that the transcript is a true and correct
 7    transcription of the testimony given by the
      witness.
 8
          I further certify that I am not a relative,
 9    employee, attorney or counsel of any of the parties,
      nor am I a relative or employee of any of the
10    parties' attorney or counsel connected with the
      action, nor am I financially interested in the
11    action.

12        Dated this ____ day of _____, 2000.
                      9th          October
13

14            Nancy Siegel

15    NANCY SIEGEL
      Registered Merit Reporter
16

17

18

19

20

21

22

23
      The foregoing certification of this transcript
24    does not apply to any reproduction of the same
      by any means unless under the direct control
25    and/or direction of the certifying reporter.

              SPHERION DEPOSITION SERVICES
```

```
1                          _  _  _

2                   C E R T I F I C A T E

3                          _  _  _

   STATE OF FLORIDA
4
   COUNTY OF PALM BEACH
5

6        I, LARRY MILO AITKENS, hereby certify that I have
   read the foregoing transcript of my deposition and
7  that the statements contained therein, together
   with any additions or corrections made on the
8  attached Errata Sheet, are true and correct.

9        Dated this _____ day of _____, 2000.

10

11              _____

12

13
         The foregoing certificate was subscribed to
14 before me this _____ day of _____, 2000, by
   the witness who has produced a _____ as
15 identification and who did not take an additional
   oath.
16

17

18              _____
                Notary Public
19

20

21

22

23

24

25
                  SPHERION DEPOSITION SERVICES
```