UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  00-6111-Civ-Dimitrouleas/Johnson

TURNBERRY CHARTERS, INC.

Plaintiff,

vs.

INTERNATIONAL PAPER COMPANY

Defendant.

_____/

## DEFENDANT, INTERNATIONAL PAPER COMPANY'S NOTICE OF FILING DEPOSITION TRANSCRIPTS AND DEPOSITION EXHIBITS

**DEFENDANT, INTERNATIONAL PAPER COMPANY,** by and through

its undersigned counsel, hereby gives notice of filing the following:

1.    October 20, 2000, original deposition transcript of Stephen Bates;

2.    November 30, 2000, deposition transcript of Edward Dahlberg with

exhibits 39-47.

These transcripts are referenced in International Paper's Motion for Final

Summary Judgment or, Alternatively, For Partial Summary Judgment Limiting

Damages and Incorporated Memorandum of Law, as well as for use at any other

motion or hearing, including trial of this matter.



## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that on this 20ᵗʰ day of December, 2000, a true and correct copy of the foregoing has been furnished via U.S. Mail to: David H. Reimer, Attorney for Plaintiff, Reimer & Rosenthal, LLP, 3801 Hollywood Blvd., Suite #350, Hollywood, Florida 33021.

HOLLAND & KNIGHT LLP

Attorneys for International Paper

One East Broward Boulevard, 13th Floor
P.O. Box 14070
Fort Lauderdale, FL 33302-4070
Tel: (954) 525-1000
Fax:(954) 463-2030

By: _____
    Richard C. Hutchison
    Florida Bar No. 709360
    Heather C. Keith
    Florida Bar No. 905690

FTL1 #522809 v1

# TAYLOR & ASSOCIATES
**COURT REPORTERS**
An **Indigium** LEGAL SERVICES COMPANY

# ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

TURNBERRY CHARTERS, INC.,      )
                               )
              Plaintiff,       )
                               )
v.                             )  CASE NO: 00-6111-CIV-DIMITROULEAS
                               )  MAGISTRATE:     JOHNSON
INTERNATIONAL PAPER COMPANY,   )
                               )
              Defendant.       )

THE DEPOSITION OF STEPHEN BATES
TAKEN ON BEHALF OF THE PLAINTIFF
OCTOBER 20, 2000

REPORTED BY CHERI A. RAIFFIE
CERTIFIED SHORTHAND REPORTER

SEE INDEX PAGE 2

### INDEX OF QUESTIONERS

QUESTIONS BY:                                    PAGE NO.

Direct-Examination
    Mr. Reimer                                    5

Cross-Examination
    Ms. Keith                                     63

Redirect-Examination
    Mr. Riemer                                    87

Recross-Examination
    Ms. Keith                                     89

### INDEX OF OBJECTIONS

By Ms. Keith                          46, 54, 55, 61

By Mr. Reimer                               83, 89

### INDEX OF EXHIBITS
(NO EXHIBITS WERE MARKED.)

NOTARIAL CERTIFICATE                           92
SIGNATURE PAGE                                 93
LETTER TO MS. GODDARD                          94

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

TURNBERRY CHARTERS, INC.,       )
                                )
            Plaintiff,          )
                                )
v.                              ) CASE NO: 00-6111-CIV-DIMITROULEAS
                                ) MAGISTRATE:        JOHNSON
INTERNATIONAL PAPER COMPANY,)
                                )
            Defendant.          )

THE DEPOSITION OF STEPHEN BATES, produced, sworn, and

examined on the 20th day of October, 2000, between the hours of

eight o'clock in the forenoon of that day and six o'clock in

the afternoon of that day at the law offices of McMahon,

Berger, Hanna, Linihan, Cody & McCarthy, 2730 North Ballas

Road, Suite 200, St. Louis, before CHERI A. RAIFFIE, Certified

Shorthand Reporter and Notary Public within and for the State

of Missouri, in a certain cause now pending in the United

States District Court, Southern District of Florida, between

Turnberry Charters, Inc., Plaintiff, and International Paper

Company, Defendant; taken on behalf of the Plaintiff.

A P P E A R A N C E S


**COUNSEL ON BEHALF OF THE PLAINTIFF:**
REIMER & ROSENTHAL, L.L.P.
3801 Hollywood Boulevard, Suite 350
Hollywood, Florida 33021
(954) 893-9800
By:  Mr. David H. Reimer


**COUNSEL ON BEHALF OF THE DEFENDANT:**
HOLLAND & KNIGHT, L.L.P.
One East Broward Boulevard, Suite 1300
Ft. Lauderdale, Florida 33301
(954) 525-1000
By:  Ms. Heather C. Keith


**LEGAL REPRESENTATIVES FOR MIDCOAST AVIATION:**
MCMAHON, BERGER, HANNA, LINIHAN, CODY & MCCARTHY
2730 New Ballas Road, Suite 200
St. Louis, Missouri 63131
(314) 567-7350
By:  Ms. Courtney E. Goddard
     Mr. William M. Lawson


**THE WITNESS:**
Mr. Stephen Bates

```
1              IT IS HEREBY STIPULATED AND AGREED, by and between
2     counsel for the Plaintiff and counsel for the Defendant that
3     this deposition may be taken in machine shorthand by Cheri A.
4     Raiffie, A Notary Public and Certified Shorthand Reporter, and
5     afterwards transcribed into typewriting; and the signature of
6     the witness is expressly Reserved.
7                            *  *  *  *  *
8                          MR. STEPHEN BATES,
9     of lawful age, produced, sworn and examined on behalf of the
10    Plaintiff, deposes and says:
11                         DIRECT-EXAMINATION
12    QUESTIONS BY MR. REIMER:
13         Q.    Mr. Bates, could you state your name and spell your
14    last name for the record, please.
15         A.    Stephen M. Bates, B-A-T-E-S.
16         Q.    My name is David Reimer.  I represent the company in
17    Florida called Turnberry Charters.  With me is Heather Keith
18    who represents International Paper.  We are currently attorneys
19    in a lawsuit that is pending in the Federal District Court for
20    the Southern District of Florida.  It's a lawsuit that involves
21    those two parties and those two parties only and it involves
22    the sale of a 1980 Canadair Challenger 600.
23              Your name has come up during the discovery
24    process of this lawsuit solely as somebody who at some point
25    touched on or was somehow associated with the events as they
```

1   relate to the lawsuit.  It does not mean that you are
2   necessarily someone who is subject to investigation with
3   respect to the lawsuit, or that you are a target of the
4   lawsuit, or anything like that.  It simply means that in order
5   to adequately prepare for the trial of this matter we simply
6   need to know what if any information you have that assists one
7   of us or the other or neither with relation to this lawsuit.
8           So, as a result I'm here to ask you a bunch of
9   general questions with regard to this particular aircraft, your
10  involvement with the aircraft, Midcoast's involvement with the
11  aircraft.
12          If at any time my question that I ask you is
13  unclear to you, you're not sure what I mean, you misunderstand
14  something I say, please just ask me to repeat or rephrase the
15  question and I'll be happy to do so.  I want to make this as
16  easy for you as possible.  And at the same time when I ask a
17  question and you answer it I'm going to assume that you
18  understood what I was asking.
19          Have you ever had your deposition taken before?
20      A.  Yes, I have.
21      Q.  In relation to what type of a lawsuit or if it was
22  multiple lawsuits?
23      A.  It was lawsuits.  I don't exactly know what the
24  circumstances were, but again I was asked questions about my
25  involvement in it.

1    Q.   How many times have you been deposed?

2    A.   I would say approximately five or six.

3    Q.   Have you ever testified at trial as a witness?

4    A.   No.

5    Q.   In relation to these lawsuits were these lawsuits

6  where you or Midcoast Aviation was a party?

7    A.   I believe in one.

8    Q.   Midcoast was a party?

9    A.   I believe so.

10   Q.   You were not a party to any of these lawsuits?

11   A.   No.

12   Q.   In relation to any of these lawsuits were you an

13  expert witness that was retained?

14   A.   Yes.

15   Q.   In how many of the cases?

16   A.   At least two.

17   Q.   In respect to your being an expert witness in what

18  capacity were you to testify as an expert?

19   A.   It was concerning aircraft.

20   Q.   So, then let me just jump to your knowledge with

21  respect to aircraft.  Who is your current employer?

22   A.   Midcoast Aviation.

23   Q.   How long have you worked for Midcoast Aviation?

24   A.   Over 24 years.

25   Q.   What is your current role or employment title at

1  Midcoast?

2      A.    I'm director of programs.

3      Q.    What does that mean in terms of day-to-day

4  responsibilities, director of programs?

5      A.    We have program managers for the different type of

6  aircraft we work on.  We have a program manager for the Hawker

7  aircraft, we have a program manager for the Gulf Stream

8  aircraft, two for the Falcon aircraft, a program manager for

9  the Challengers, and a program manager for Sabreliner, and then

10  they report to me and I'm still involved in the Challenger.  I

11  assist with the existing program manager.

12      Q.    How long have you held this position?

13      A.    Two months.

14      Q.    Prior to that what was your responsibility?

15      A.    I was senior program manager and the responsibilities

16  were the same except at that time there was no Challenger

17  program manager.  There was a Challenger program

18  representative.

19      Q.    So, right now there's a manager for each of the

20  aircraft that you have described?

21      A.    Uh-huh.

22      Q.    And they restructured a little bit the titles two

23  months ago?

24      A.    For myself and the Challenger program managers just

25  this week.

1      Q.    Okay.  How long were you in that position?

2      A.    Approximately two years.

3      Q.    Prior to that what was your role?

4      A.    Challenger program manager.

5      Q.    And how long was that?

6      A.    Approximately five years.

7      Q.    What exactly does Midcoast Aviation do?

8      A.    We work on corporate jets, we service, repair,

9    refurbish, upgrade, corporate aircraft.

10      Q.    The makes and types of aircraft that you just

11    described as having the different programs?

12      A.    That's the majority of our work.  We do take in other

13    aircraft, but that's the main concentration of our business.

14      Q.    What's your educational background?  Do you have a

15    high school diploma?

16      A.    Yes.

17      Q.    And do you have any college degrees?

18      A.    No.

19      Q.    How about technical degrees?

20      A.    I am a certified A and P, F.A.A. maintenance

21    technician.

22      Q.    And so, you hold F.A.A. licenses?

23      A.    Yes.

24      Q.    What licenses?

25      A.    Air Frame and Power Plant.

```
 1          Q.    Are you a pilot?

 2          A.    No.

 3          Q.    How long have you held that F.A.A. Air Frame and

 4    Power Plant license?

 5          A.    Since 1976.

 6          Q.    Do you hold any professional licenses issued by the

 7    State of Missouri?

 8          A.    No.

 9          Q.    Do you hold any professional licenses issued by any

10    other state or public agency other than the F.A.A.?

11          A.    No.

12          Q.    Do you hold more than one license issued by the

13    F.A.A. just the Air Frame and Power Plant?

14          A.    Power Plant, no.  Well, it's on one certificate.  I

15    would say that's one license.

16          Q.    Okay.

17          A.    I guess it could be deemed as two but it's on the

18    same certificate.

19          Q.    What's your training background with respect to

20    aircraft?  I asked you about technical school degrees, what

21    type of training did you have with respect to aircraft?

22          A.    I attended the Special School District's Air Frame

23    and Power Plant school my junior and senior year of high

24    school.  We went eleven months of the year to get our required

25    2000 and whatever hours by the F.A.A. for training to be able
```

```
 1   to take our tests to get licensed.  I took those tests, got my
 2   license I believe it was in June, and in August of '76 I went
 3   to work for Midcoast and have been with them as a technician
 4   and on up and been trained, you know, sent to school on
 5   different aircraft.
 6        Q.   So, you have been with Midcoast since high school?
 7        A.   Since I graduated high school.
 8        Q.   Graduated high school.
 9        A.   Right.  Yes, since August of '76.
10        Q.   Okay.  You mentioned before that you still work on
11   the Challenger program?
12        A.   I'm still -- I'm involved in all of them but more
13   heavily in the Challenger.
14        Q.   Historically have you been more involved -- oh, you
15   said you were the Challenger program manager?
16        A.   Uh-huh.
17        Q.   So, did you work with other aircraft in the other
18   programs at different times during your tenure with Midcoast?
19        A.   Not too much, no.
20        Q.   Mostly the Challenger?
21        A.   Mostly, yeah.  The first numerous years were with the
22   Sabreliner aircraft and then the last twelve or so, it has been
23   fifteen I guess, have been with the Challenger.
24        Q.   Do you deal at Midcoast directly with the corporate
25   air departments?
```

1    A.    Generally, yeah.  That's what the program managers

2    do.  We're the contact for the customer and the liaison between

3    the shop.

4    Q.    Do you deal, I guess what I'm trying to get at is

5    that if you have got a corporate air department for a fortune

6    500 company would that air department if it owns multiple

7    aircraft deal with one person at Midcoast or would it deal with

8    a program manager for each of the aircraft?  If it had a Gulf

9    Stream, and a Challenger, and a Falcon would that corporate

10   department deal with the three different managers or would

11   there be one point person?

12   A.    More than likely they would deal with each individual

13   program manager; however, we're not as rigid if they wanted to

14   only deal with one we would let them.  It's whatever makes them

15   feel the most comfortable.

16   Q.    Ms. Shelby when she was testifying before explained

17   that you have, Midcoast has, three locations she thinks; is

18   that correct?

19   A.    Yes.

20   Q.    And she mentioned that two of those at least two of

21   those were air fields.  Are all three air fields or just two?

22   A.    I don't understand air fields.

23   Q.    Well, do you have airplanes at all three locations?

24   A.    Well, Midcoast doesn't own any aircraft.

25   Q.    I understand that.

1          A.    We service and maintain aircraft, yes.

2          Q.    At all three?

3          A.    There are aircraft, other peoples aircraft at all

4     three facilities.

5          Q.    Do you service the different types of aircraft at the

6     different locations?  Is the Hawker program at one location and

7     the Challenger at another?

8          A.    No.

9          Q.    You service Challengers at all three locations?

10         A.    No.

11         Q.    How many locations?

12         A.    One for the most part.  I'm not saying that we

13    wouldn't do minor maintenance on aircraft at other facilities,

14    but as far as inspections and rework repairs, any major thing

15    is done at our facility at Parks because that's where the

16    service center is only at the St. Louis downtown Parks

17    facility.

18         Q.    Is that where you are located?

19         A.    Yes.  And we're recognized by the manufacturer as a

20    service facility to do work on their behalf.

21         Q.    Are there other service facilities around the country

22    for that manufacturer?

23         A.    Yes, there are.

24         Q.    This lawsuit involves a Canadair Challenger 600,

25    serial number 1023.  Are you familiar with that aircraft?

1    A.    Yes.

2    Q.    How are you familiar with that aircraft?

3    A.    It originally came to us when Union Camp owned the

4    aircraft and I believe we did maintenance for them for

5    approximately four to five years if my memory serves me

6    correctly.

7    Q.    Was that following Union Camp purchasing the aircraft

8    or do you know whether they owned it for a period of time and

9    then you just started servicing it at one point?

10    A.    I don't have any history when they purchased the

11    aircraft or who they were going to prior.

12    Q.    All of the work that was done by Union Camp would

13    that have been done through you as the program manager?

14    A.    As far as maintenance, yes.  I mean, if it would have

15    been the interior avionics they may have gone directly to

16    somebody else, but for anything mechanical wise, yes through me

17    and possibly some other things.  But there are different

18    departments in our company that they may have dealt with

19    directly.

20    Q.    So, if they wanted to do interior changes, interior

21    upgrades, that type of thing might go through a different

22    department?

23    A.    Right, that's correct.

24    Q.    Did there come a time to your knowledge that Union

25    Camp became part of International Paper and this aircraft

<div align="center">TAYLOR & ASSOCIATES          14<br>(314) 644.2191 OR (800) 280.DEPO</div>

1    became part of the International Paper flight department?

2        A.    Yeah, I was aware that that happened.

3        Q.    How did you become aware of that?

4        A.    I was contacted by I believe it was Bill Keynton in

5    the Union Camp told me that they had I believe they merged with

6    International Paper and that they were going to close their

7    Union Camp flight department.

8        Q.    What was the name that you just gave?

9        A.    Bill Keynton.

10        Q.    Do you know how to spell that?

11        A.    K-E-Y-N-T-O-N.

12        Q.    Is that who you dealt with at Union Camp with regard

13    to the flight department?

14        A.    For the most part, yes.

15        Q.    Do you know what his role or responsibility was at

16    Union Camp?

17        A.    He was director of maintenance.

18        Q.    When they told you or Mr. Keynton told you that they

19    were going to close their flight department did he indicate

20    what was going to happen to this aircraft?

21        A.    No, not that I recall.

22        Q.    Did there come a time when you learned that this

23    aircraft was for sale?

24        A.    Yes.

25        Q.    And how did you learn that?

1    A.    I was contacted by I believe it was Aero Toy Store, I

2    don't remember who from Aero Toy contacted, and was asking if

3    we could do a technical appraisal on the aircraft prior to

4    their possible purchase of the aircraft.

5    Q.    You say technical appraisal.  I have heard other

6    people use the words pre-purchase inspection; are those

7    synonymous?

8    A.    We no longer use pre-purchase inspection.

9    Q.    Why is that?

10    A.    Because --

11    Q.    Because this is the new politically correct way to

12    say it?

13    A.    I'm assuming so, yeah.  We perform technical surveys

14    I should say.

15    Q.    Technical surveys?

16    A.    Technical surveys.

17    Q.    Is it fair to say historically what is currently

18    called a technical survey is what used to be called a

19    pre-purchase inspection?

20    A.    I would say that's fair, yes.

21    Q.    Okay.  Was that the first time that you heard that

22    the aircraft was for sale when you were contacted by Aero Toy

23    Store?

24    A.    Yeah, I believe so.

25    Q.    Prior to that you had not been contacted by Union

```
 1   Camp, International Paper, or any brokers saying that they were
 2   selling the aircraft?
 3        A.   No, I don't believe so.
 4        Q.   At the time that you were contacted by Aero Toy Store
 5   was the aircraft in your possession?
 6        A.   I don't believe it was, no.
 7        Q.   Did you agree to go ahead and perform the technical
 8   survey?
 9        A.   Yes.
10        Q.   Do you recall when this was in relation to today?
11   Was it a year ago?  Two years ago?
12        A.   I believe it would have been somewhere towards the
13   end of '98 beginning of '99 would be my best guess of an
14   approximate time.
15        Q.   And what happened after you agreed to do the
16   technical survey for Aero Toy Store?  Did they bring the plane
17   to you?  Did you go to them?
18        A.   No.  The airplane was flown into our facility I
19   believe by the Union Camp, at least I believe it was their crew
20   that flew it in.  They flew the airplane into our facility
21   there at St. Louis downtown Parks airport.
22        Q.   At the time that Aero Toy Store requested you perform
23   the technical survey did they indicate to you that they had a
24   contract to purchase the aircraft or was this -- I'm sorry, did
25   they indicate to you that they had a contract to purchase the
```

```
 1 | aircraft?
 2 |       A.    I don't know.  I don't recall if they did or not.  I
 3 | mean, we're normally not involved in the contracts, the
 4 | details, or anything like that.  I mean, we're assuming that
 5 | since they are bringing the aircraft for us to do the technical
 6 | survey that there is interest in buying it.  Now, whether a
 7 | contract has been signed we have no idea.
 8 |       Q.    In that instance, we're talking late 1998 early 1999,
 9 | who was your customer for purposes of this technical survey?
10 | Was it Aero Toy Store?
11 |       A.    Aero Toy Store.
12 |       Q.    Did you sign a contract with Aero Toy Store for the
13 | technical survey before it was conducted?
14 |       A.    We signed a work authorization.  I don't know if that
15 | can be termed as a contract very possibly, I don't know.  But
16 | yes, a work authorization and a tech survey agreement were
17 | signed.
18 |       Q.    Do you recall what the quoted price for those was?
19 |       A.    No, I don't recall.
20 |       Q.    What was the scope of the technical survey to be?
21 |       A.    It was our -- we have a standard tech survey that we
22 | perform.
23 |       Q.    Which includes what, just generally obviously I'm not
24 | an aircraft mechanic but?
25 |       A.    Oh, we look at areas we feel that are prone for
```

1   either defect or corrosion, research, logbooks, ops checks,

2   systems, recommending flying the airplane.  It takes us

3   approximately two weeks.

4        Q.   Did you perform all of those checks?

5        A.   I don't believe we flew the airplane but I believe we

6   completed everything else, yes.

7        Q.   Do you recall why you did not fly the airplane?

8        A.   It would have had to have been Aero Toy Store's

9   decision, but.

10       Q.   During this process who deals with Aero Toy Store,

11  was it you?

12       A.   Yes.

13       Q.   And do you recall any of the names of the individuals

14  that you dealt with at Aero Toy Store?

15       A.   I believe it was John Dussia.  Because we had just

16  completed a tech survey --

17            MR. LAWSON: Just answer the question he asked you.

18  BY MR. REIMER:

19       Q.   You were about to say why you think it was John

20  Dussia; what were you going to say?  Something about a tech

21  survey.

22       A.   We had completed a tech survey on the 600 just the

23  week before this aircraft came in for Aero Toy and I was

24  dealing with John Dussia.

25       Q.   You did a inspection of a 600, Challenger 600 for

1    Aero Toy Store?

2        A.    Uh-huh.

3        Q.    What was the outcome of that inspection?

4        A.    I don't understand as far as outcome.

5        Q.    Did you recommend -- strike that.  At the end of a

6    tech survey do you recommend to a client that you buy it or not

7    buy it?

8        A.    No.

9        Q.    Simply give them your outcome?

10        A.    We give them the factual information and the decision

11    is theirs.

12        Q.    With respect to the Challenger 600 that you inspected

13    or surveyed prior to the Serial Number 1023 aircraft, did you

14    find anything wrong with that aircraft to the best of your

15    recollection?

16        A.    Oh I'm sure we found defects, we always do.

17        Q.    Did you find any material defects that in your mind

18    would make somebody not want to buy it?

19        A.    No, that's impossible for me to answer.  I can't

20    determine what when we find defects whether it would make a

21    person decide to buy it or not buy it.

22        Q.    Do you know whether or not Aero Toy Store purchased

23    that Challenger 600?

24        A.    To my knowledge they did.

25        Q.    Going to Aircraft 1023, did you find any material

1    problems with that aircraft?  I'm not asking you whether it is

2    something that would make somebody buy it or not buy it but

3    anything that you would consider a material issue with respect

4    to the aircraft?

5        A.    I don't understand what you mean by material.

6        Q.    Okay.  Did you find anything that required further

7    maintenance?

8        A.    Yes.

9        Q.    What did you find?

10       A.    Oh, I couldn't tell you.  It has been too long ago,

11   but.

12       Q.    Do you know of anybody else at Aero Toy Store that

13   you may have dealt with?

14       A.    No.

15       Q.    Did you deal with anybody else to your recollection?

16       A.    Not to my knowledge, no.

17       Q.    Okay.  Do you know whether or not Aero Toy Store

18   purchased Aircraft 1023 after your technical survey?

19       A.    Yes, they did.

20       Q.    At what point did they purchase the aircraft?

21       A.    Later in the year.  I would say June, July maybe.

22       Q.    Did you have -- strike that.  You finished your

23   technical survey of the aircraft 1023 in approximately two

24   weeks; is that your recollection?

25       A.    Yes.

1      Q.    So, you would have finished the inspection and

2   reported to Mr. Dussia in late '98, early '99?

3      A.    That's correct.

4      Q.    Between that time and the time that they purchased it

5   in June or July did you have ongoing conversations with Mr.

6   Dussia?

7      A.    No.   I think the last time I spoke to him was

8   probably in January and then not again until later in June or

9   July.

10     Q.    The next time that you spoke to him was it before or

11  after they purchased the aircraft?

12     A.    I believe it was afterwards.

th  13     Q.    So, just so that I understand to make sure that I'm

14  getting the chronology, you did the inspection in late '98

15  maybe the beginning of '99?

16     A.    Uh-huh.

17     Q.    Spoke to Mr. Dussia in January of '99?

18     A.    Uh-huh.

19     Q.    And then the next time you spoke to him was after

20  they purchased the aircraft in June or July of '99?

21     A.    I believe that's correct, yes.

22     Q.    During the period from January of '99 through the

23  time it was sold to Aero Toy Store in June or July was the

24  aircraft physically located at Midcoast?

25     A.    Yes.

1       Q.    During that entire period?

2       A.    For the entire period, yes.

3       Q.    Union Camp did not come and take the plane back for

4    its flight department?

5       A.    No.

6       Q.    Do you know why?

7       A.    They asked if -- pardon me -- they asked if the

8    airplane could stay with us.  We did perform maintenance on it

9    at the end of the technical survey, we corrected all the

10   defects we found, performed some additional maintenance, and

11   which probably took us approximately two, two and a half

12   months, and then they asked if they could leave the airplane

13   with us and we agreed to that.

14      Q.    Were you charging them any kind of a hanger fee or I

15   don't know what it would be called?

16      A.    I don't recall.  If we were it did not go through me.

17   I don't charge hanger storage fees.

18      Q.    The maintenance that you did who did you deal with in

19   terms of having that maintenance authorized on behalf of Union

20   Camp?

21      A.    I believe by then Bill Keynton had left the company

22   and I was dealing with the chief pilot Eric Bossard.

23      Q.    Do you know how to spell that last name?

24      A.    No, I don't.

25      Q.    Have you ever dealt with a gentleman by the name of

```
 1   Bob Cassidy?
 2        A.    I have spoken with Bob before, yes.
 3        Q.    In what context?
 4        A.    Most recently I guess he contacted me that about
 5   whether we had been in contact with his attorneys and I told
 6   him I was unaware because I was not involved in that and it was
 7   turned over to our human resources department.
 8        Q.    How long ago was that?
 9        A.    Within a month I would say.
10        Q.    Within the last month?
11        A.    Within the last month, yeah.
12        Q.    And you mentioned Eric Bossard was a chief pilot; was
13   he the chief pilot for Union Camp or?
14        A.    Yes.
15        Q.    Do you know what Bob Cassidy's employment role is in
16   this whole thing?
17        A.    I believe to the best of my knowledge he's director
18   of maintenance for International Paper, but I guess I'm making
19   the assumption of that.
20        Q.    Have you ever dealt with a gentleman by the name of
21   John Dillon at International Paper or Union Camp?
22        A.    Not that I recall, no.
23              MR. REIMER: Maybe he doesn't really exist.
24              MS. KEITH: He doesn't.  I have been telling you that
25   for months.
```

1    BY MR. REIMER:

2         Q.    *Going back to January of 1999 you have completed your*

3    *technical survey, do you have any knowledge about what happened*

4    *with respect to Aero Toy Store's interest in the aircraft at*

5    *that point in time?*

6         A.    Yes.

7         Q.    And what knowledge do you have?

8         A.    The conversation I had with John Dussia.

9         Q.    And that was what?

10        A.    That they probably were not going to purchase the

11   aircraft at that time.

12        Q.    Did he indicate why?

13        A.    Yes.

14        Q.    And that is what?

15        A.    Because there were I believe he said six to eight

16   Challenger 600's that hit the market at that time and with the

17   prior purchase of the aircraft I mentioned earlier that they

18   had just bought they didn't think it was sound business to

19   purchase the airplane with that many more airplanes coming on

20   the market.   I believe is what his concern was is the price

21   would go down because there would be six to eight airplanes

22   competing for sales.

23        Q.    Aero Toy Store is an aircraft broker or sales

24   company; is that what you know them to be?

25        A.    From my understanding they purchase aircraft, service

1   them, update them, possibly paint them or whatever to resell
2   them.  Yeah, that's my understanding of their business.
3       Q.   So, it was your understanding that they were looking
4   to buy these two or one of these Challengers for their own
5   inventory?
6       A.   It was my understanding that they were looking to buy
7   both of them for inventory and then whatever they wanted to do
8   to them prior to reselling.
9       Q.   Do you know whether or not the outcome of your
10  technical survey had any bearing on Aero Toy Store's decision
11  not to purchase that particular aircraft?
12      A.   Not that I'm aware of that it had.  No, not that I'm
13  aware of.
14      Q.   Who handles the billing for the technical survey once
15  it has been completed?  Do you do that?
16      A.   I review it, yeah, and then it is sent down to our
17  accounting department.  They actually, you know, make the
18  invoice and send it out but yeah, I review.
19      Q.   Do you recall who was billed for the technical survey
20  completed on this aircraft?
21      A.   Aero Toy Store.
22      Q.   Do you know whether Aero Toy Store paid that bill?
23      A.   Yeah, because they have to pay before we begin.
24      Q.   Oh, they prepay for the --
25      A.   Technical surveys are prepaid in case the purchaser

1   decides he doesn't want it we're not stuck with a bill.

2      Q.  Good thinking. But the work that was performed after

3   the technical survey that was billed to Union Camp?

4      A.  International -- I don't know. It would have been

5   Union Camp/International Paper, right. And they had an account

6   with us and yes, that's the correction of the items that we

7   found.

8      Q.  Did you during this period of time or previous to

9   that work on other aircraft for either Union -- well, I'll ask

10   Union Camp first.

11      A.  Yes, Union Camp at one point did have another

12   Challenger 600 which we also performed service on.

13      Q.  Do you know what happened to that aircraft?

14      A.  I believe it was sold approximately a year to

15   eighteen months prior to this aircraft.

16      Q.  What about International Paper; had you done any work

17   for the air/flight department prior to their taking over Union

18   Camp?

19      A.  I don't have any knowledge. I believe International

20   Paper operates Falcon aircraft and I'm not aware of Midcoast

21   doing work for them, but I guess there is some possibility we

22   might have. But to my knowledge I'm not aware of it.

23      Q.  Going back to Bob Cassidy, you mentioned that you had

24   spoken with Mr. Cassidy in the last thirty days approximately;

25   had you dealt with Mr. Cassidy prior to that?

1      A.    I had talked to him I believe a couple times before,
2   yeah.
3      Q.    Did you ever speak with Mr. Cassidy in relation to
4   aircraft 1023?
5      A.    Yes.
6      Q.    And to your recollection what was the context of
7   those conversations?
8      A.    I believe it was that there was a possible lawsuit
9   and that International Paper's attorneys may be contacting me
10  to ask me questions about what I knew about the situation.
11     Q.    Did all of your conversations with Bob Cassidy come
12  after Aero Toy Store purchased the aircraft?
13     A.    I don't know.  I may have spoken to him prior to on
14  some maintenance issue on the airplane, but not that I recall.
15  I believe it was afterwards.
16     Q.    Did you ever speak with Mr. Cassidy in relation to
17  International Paper's sale of the aircraft?  We're going to
18  sell the aircraft, this is the name of our broker, anything of
19  that sort?
20     A.    I don't recall it being Bob Cassidy that told me
21  that.  I believe it was Eric Bossard that informed me that they
22  had a broker to sell the airplane.
23     Q.    Do you remember the name of the broker?
24     A.    Yes, Ed Dahlberg.
25     Q.    Had you ever dealt with Mr. Dahlberg before?

1    A.    No, I don't believe I ever have.

2    Q.    Did you have dealings with Mr. Dahlberg directly?

3    A.    Yes.

4    Q.    Going back to Mr. Bossard, did the conversations that

5    you had with Mr. Bossard as he explained Mr. Dahlberg's role

6    come in December '98 when Aero Toy Store was going to buy the

7    plane or did it come at some point after you completed the

8    technical survey for Aero Toy Store?

9    A.    I believe it was prior to.  Either prior to or at

10   input of the aircraft for the technical survey.  So, it would

11   have been prior to our completion of it I believe I was made

12   aware that Ed Dahlberg would be the selling broker.

13   Q.    At any time during negotiations with Aero Toy Store

14   or any other prospective purchasers did you have direct

15   conversations with Mr. Bossard regarding the sale of the

16   aircraft?

17   A.    I don't understand in what context as far as we're

18   not involved in negotiations, contracting, anything of the

19   sale.

20   Q.    Okay.  Let me put that question off a minute and put

21   it in a better context.  After Mr. Bossard tells you that their

22   broker is Ed Dahlberg did you speak with Mr. Dahlberg?

23   A.    Yes, I did but I don't recall when --

24   Q.    Okay.

25   A.    -- the first conversation was.

1    Q.    Would the first conversation generally have been at
2  or about early '99 when you did the technical survey or would
3  it have been later in the year?
4    A.    I would -- I would believe it would be during the
5  technical survey and towards the end because generally the
6  selling broker wants to know what we found to have, you know,
7  to have an idea.
8    Q.    When you did the repairs on the vehicle did you
9  report to Mr. Dahlberg what repairs had been completed?
10    A.    I believe we did, yes.
11    Q.    Was that in addition to reporting to Mr. Bossard?
12    A.    Yes.
13    Q.    While the vehicle -- while the aircraft was
14  physically located at your facility --
15    A.    Uh-huh.
16    Q.    -- did prospective purchasers come to look at or
17  inspect the aircraft?
18    A.    One did.
19    Q.    Who was that?
20    A.    I believe it was Turnberry Aviation.  They had sent a
21  consultant in and then the following day I believe the
22  gentleman's name was Skip Lainey that showed up.
23    Q.    Prior to that had any other prospective purchasers
24  come to look at or inspect the aircraft?
25    A.    Not that I recall.

1      Q.   When was this visit by the people from Turnberry to

2   your recollection?

3      A.   June-ish of '99 to the best of my recollection.

4      Q.   You believe that the maintenance work on the aircraft

5   was completed in approximately two and a half months which put

6   it somewhere in March?

7      A.   Uh-huh.

8      Q.   Was there any discussions with anybody with regard to

9   this aircraft between the period of March and June when the

10  people from Turnberry came to see the aircraft?

11     A.   Discussions how?  I don't understand.

12     Q.   Well, were you talking?  Was the aircraft basically

13  just parked there or was --

14     A.   Yes.

15     Q.   Did you talk with Mr. Dahlberg during that period of

16  time?

17     A.   I really don't recall.

18     Q.   Best of your recollection it was just parked there?

19     A.   To the best of my recollection I believe it just sat

20  there, yeah.

21     Q.   Were you aware of whether the aircraft was being

22  marketed for sale during that period of time?

23     A.   Not that I was aware of, no.  I mean, I made the

24  assumption but I was not aware.

25     Q.   So, in January of '99, at this point I just want to

1 | kind of make sure I understand the chronology, in January of
2 | '99 you have your last conversation with Mr. Dussia at Aero Toy
3 | Store, he tells you that they are not going to purchase the
4 | aircraft because there's a glut in the market place, you then
5 | do work on the aircraft during that period of time for
6 | approximately two and a half months, you report to Mr. Bossard
7 | at International Paper and to Mr. Dahlberg the broker and then
8 | comes June of 1999 and Turnberry comes to look at the aircraft?
9 | A.    I was contacted prior to them coming in, right.
10 | Q.    Okay.  Is that a fair basic chronology of what went
11 | on?
12 | A.    I believe so.
13 | Q.    So, lets go to your being contacted.  Who contacts
14 | you to let you know that someone was going to come look at the
15 | aircraft?
16 | A.    I believe the first person I was contacted by was Ken
17 | Murray contacted me and said he was coming up as a consultant
18 | for Turnberry to look at the aircraft.
19 | Q.    Before I go down this path let me ask you a question.
20 | The records for your technical survey, how are those maintained
21 | at Midcoast?  Do you keep a copy of all of your inspections and
22 | your notes and everything else?
23 | A.    As far as relating to the technical survey?
24 | Q.    Yes.
25 | A.    Yes.

1      Q.    And are they placed in a file that's kept in your

2    records?

3      A.    Yes.

4      Q.    And who maintains that file?

5      A.    I believe it's the inspection department.

6      Q.    And where are they located, at your same facility?

7      A.    Yes.

8      Q.    And who would be the person in charge of the

9    inspection department for this period of time, meaning who

10   would have those records?

11     A.    I would guess -- I'm not quite sure what you're

12   asking.

13     Q.    Who at Midcoast, if I wanted to contact somebody to

14   obtain a copy of that file or have somebody at Midcoast go to

15   their file cabinet and take that out who would that person be?

16     A.    Probably the first person you would contact would

17   probably be the program manager for the aircraft.

18     Q.    For the Challenger?

19     A.    If that's the type of --

20     Q.    Right.  And who is that right now?

21     A.    Right now that's George Layton.

22     Q.    Who was the program manager at the time of this

23   inspection?  It was you?

24     A.    I was.

25     Q.    But those records that were prepared from that period

1    you don't have those records, George Layton would have those
2    records?
3         A.    No, he does not have them physically.  They were at
4    our facility but you're asking who would you contact to see if
5    you could get a copy.
6         Q.    Okay.
7         A.    That is who you would contact first.
8         Q.    Okay.
9         A.    Then he would probably come to me and ask me could we
10   make those records available.  I would ask do you own the
11   airplane.  If you don't, than you will have to get the owner of
12   the aircraft or a representative to contact me to give us
13   permission to give out information on an airplane that you
14   don't own.
15        Q.    Okay.  Assuming that all of that had happened, Mr.
16   Layton would be the one who then would physically go to the
17   file cabinet and take the file out?  I mean, forgetting a
18   secretary --
19        A.    Not necessarily, no.
20        Q.    Who else could be involved?
21        A.    It could be anybody inside the company.  We could
22   contact the inspection department, a maintenance technician, it
23   could be we say we need the file for a specific date if it was
24   requested.
25        Q.    Are the files for maintenance work maintained

1   separately than the files for technical surveys?

2       A.    I don't believe so.

3       Q.    Would there be one grouping of files or one file for

4   this particular aircraft that would cover everything that you

5   did for this aircraft?

6       A.    I'm really not sure.  I don't know how it would have

7   been filed in the cabinet.  We normally file by date.  We keep

8   records I believe for two or three years.

9       Q.    So, if I wanted to determine all the work, if I'm the

10  owner of an aircraft and I want to determine the history of

11  work that you performed --

12      A.    Uh-huh.

13      Q.    -- I would have to give you the dates that you

14  performed the work?

15      A.    Yeah.  The easiest thing for you to do would be look

16  in the aircraft logbook.

17      Q.    Right.  But skipping past the aircraft logbook I'm

18  just trying to get a feel for your records.  I would have to

19  give you the dates of your performing work.  I guess I would

20  have to go to aircraft logbook, look at the dates, and then ask

21  you for those records for those days?

22      A.    Yes.  I think that would be -- yes.  I don't know of

23  any other way.

24      Q.    Going back now to June of 1999.  You are contacted by

25  Ken Murray; did you know Mr. Murray?

```
 1          A.    Yes, I have known Mr. Murray since early to mid '80s.
 2          Q.    And how do you know Mr. Murray?
 3          A.    He was the service manager for Canadair's repairs
 4     facility in Hartford, Connecticut and back at that time I
 5     maintained an aircraft and took it to him into his facility
 6     five or six times.
 7          Q.    When Mr. Murray contacted you what did he tell you he
 8     was doing?
 9          A.    That he had been hired as a consultant, which was his
10     profession, to come look at this aircraft for Turnberry
11     Aviation.
12          Q.    And what did you tell Mr. Murray?  Did you arrange
13     for that to occur?
14          A.    No, I didn't make any arrangements.  He just told me
15     he was coming and I informed him that I would need to contact
16     Ed Dahlberg to get permission for anybody to look at the
17     aircraft or the records.
18          Q.    Did you then contact Mr. Dahlberg?
19          A.    I contacted him and left a message with him.  I did
20     not get to him originally.
21          Q.    What happened next after you left a message?
22          A.    I believe, I believe Ken actually showed up the
23     following day which would have been Wednesday.  I would say, I
24     believe Ken showed up there approximately 11:00 a.m. and I
25     again called Mr. Dahlberg because I hadn't heard from him.
```

1          Q.    How do you recall that it was a Wednesday that he
2    arrived?
3          A.    How do I know it was a Wednesday?  I guess because I
4    have told the story numerous times to different people over the
5    course since June of '99.
6          Q.    So, you contacted or attempted to contact Mr.
7    Dahlberg on Tuesday, you were unable to contact him, and on
8    Wednesday Mr. Murray arrives at your facility?
9          A.    Yeah, he came to my office.
10         Q.    Okay.  And did you get Mr. Dahlberg at that time?
11         A.    Yes.
12         Q.    And what did you tell Mr. Dahlberg?
13         A.    I informed him that Ken Murray was there to look at
14    the aircraft and the records and I wanted his permission for
15    that to happen.
16         Q.    And what did he say?
17         A.    He said to hold off at this point.  It was to his
18    knowledge that from his previous conversation with Mr. Layton
19    that the deal had fallen through and that they weren't going to
20    purchase the airplane and prior to giving Ken access that he
21    wanted to contact Mr. Lainey and verify that the deal was back
22    on.
23         Q.    Did he indicate to you why the deal had fallen
24    through?
25         A.    No.

1    Q.    Did he indicate to you that the deal had fallen

2    through at Mr. Lainey's doing or any other reason?

3    A.    I have no idea why.

4    Q.    When was the last time that you had spoken to Mr.

5    Dahlberg prior to Mr. Murray's arrival at your facility?

6    A.    I have no recollection.  Somewhere between --

7    Q.    March and June?

8    A.    March and June, yeah.  I have no recollection.

9    Q.    He had not called you within the last couple of days;

10   is that a fair statement?

11   A.    I don't believe he had, no.

12   Q.    What did you tell Mr. Murray?

13   A.    Ken was there in my office and we were on the speaker

14   phone so Ken heard the conversation.  So, I made the

15   recommendation that it was eleven o'clock, Ken and I would walk

16   next door and have lunch, and when we returned we would either

17   see if we had a message or I would call Mr. Dahlberg upon our

18   return.

19   Q.    And did you do that?

20   A.    Yes.

21   Q.    Prior to Mr. Murray's arrival had you been contacted

22   by anybody else with respect to these inspections?  Did Mr.

23   Lainey contact you or anybody from International Paper?

24   A.    I don't recall that happened.

25   Q.    What happens after you return from lunch?

1     A.    There was no message from Mr. Dahlberg so Ken again
2   in my office on the speakerphone we called Mr. Dahlberg.
3     Q.    And what happened during that conversation?
4     A.    He I believe at that time he said yes, it was okay
5   for Ken to go ahead and have access to the airplane and the
6   records, that he had contacted -- gotten in touch with Mr.
7   Lainey and he could have the access.
8     Q.    And what did you do or what did Mr. Murray do from
9   that point forward?  Did you set Mr. Murray up in an office for
10  him to review the records?
11    A.    I walked him down and showed him where the aircraft
12  was and the hanger it was in, I believe I had power put on the
13  aircraft by an external power card for his disposal, and then
14  took him to the inspection department and showed him where the
15  numerous boxes of records and logbooks and things were for the
16  aircraft, and asked him if he had everything he needed and he
17  said as far as he knew he did.
18    Q.    Then you left him alone to do his work?
19    A.    Yeah.
20    Q.    How long was he left alone to work on the books and
21  the aircraft that day?
22    A.    I have no idea.  As late as he wanted but I did not
23  check on him.
24    Q.    Was he still there when you left at the end of the
25  day?

```
 1           A.    I have no idea.  He was two hangers away.  I couldn't
 2     tell you whether he was or not.
 3           Q.    Did you have anymore conversations with him during
 4     that day?
 5           A.    I don't recall.  I don't recall if it was that day or
 6     the following day.
 7           Q.    What was the next conversation or the context of the
 8     next conversation that you recall with Mr. Murray?
 9           A.    I believe it was the following day in the morning and
10     I asked him if there was anything that he hadn't found or
11     needed assistance with or that we could get for him.
12           Q.    And what did he tell you?
13           A.    No.  He said he had everything he needed.
14           Q.    Did he do additional work the following day?
15           A.    Yes.
16           Q.    You set him up in the hanger?
17           A.    I didn't, no.  I didn't do anything.  He just came in
18     and picked up where -- I'm assuming -- picked up where he had
19     left off the day before.
20           Q.    Did you have any other interaction with Mr. Murray
21     during this period?  Did he ask you any questions about the
22     aircraft, about the records?
23           A.    No, I don't believe so.
24           Q.    Do you know whether Mr. Murray was working with
25     anybody else from Midcoast during this period of time, any
```

1 | inspectors, mechanics, asking questions?

2 |     A.   Not to my knowledge.  He could have but not to my

3 | knowledge.

4 |     Q.   So to best of your knowledge he simply just worked by

5 | himself on the records and did a visual inspection of the

6 | aircraft?

7 |     A.   Uh-huh.

8 |     Q.   Do you know whether he physically inspected any

9 | aspects of the aircraft itself?

10 |     A.   I did not witness him doing that.  I mean, we are

11 | fairly spread out.

12 |     Q.   What other conversations did you have with Mr.

13 | Murray?  Did he say things, I'm leaving?

14 |     A.   Yes.  We had a conversation before he left.  It was

15 | approximately at two o'clock.  He informed me he had completed

16 | his -- he had looked at everything he needed to look at as far

17 | as the airplane and the records and he was finished, and that

18 | Mr. Lainey was supposed to be there at noon.  And he had been

19 | trying to get ahold of him and has been unable contact him, and

20 | that he was going to leave at approximately 3:00, and that he

21 | would call me before he left and if Mr. Lainey hadn't shown up

22 | would I please let him know that Ken was there until 3:00 but

23 | had to catch a flight and to call him on his cell phone so he

24 | could update him on his findings from what he did.

25 |     Q.   At that point had you spoken to Mr. Lainey yet?

```
1       A.    I don't believe I had.  No, I don't believe I had.

2       Q.    Did you have any other conversations with Mr.

3   Dahlberg up until that point other than the ones we have

4   discussed?

5       A.    No, I don't believe.  From the time I -- that he and

6   I talked as far as giving Ken permission to go ahead and look

7   at the aircraft, no, I don't believe I did.

8       Q.    Did you have any discussions with Mr. Murray with

9   regards to any further testing of the aircraft, flight tests,

10  or systems checks?

11      A.    No.  As far as I recall Ken told me he was finished,

12  he had seen everything he needed to see.  He was finished and

13  then he was going to wait for Mr. Lainey but if by three

14  o'clock if he had not shown he was going to have to depart to

15  catch his flight.

16      Q.    Did he tell you why he was going to have to depart?

17      A.    I believe he had -- I believe he told me he had

18  another job to do, a consulting job for another customer.

19      Q.    Did he tell you where he was going?

20      A.    No.

21      Q.    And to your knowledge did he leave at that point at

22  approximately three o'clock?

23      A.    Yeah.  I believe I was there when he left, yeah.

24      Q.    Did he leave any records with you, anything with

25  Midcoast for Mr. Lainey to have when he arrived?
```

1        A.    I don't believe so, no.  I believe the way it was was

2   he said if I did hear or see Mr. Lainey to please have him call

3   him and he would give him, you know, his details of what, you

4   know, he found from his -- from his research he did.

5        Q.    Did he give you any indication of what he had found?

6   Did he talk to you about substantive findings?

7        A.    I don't recall.

8        Q.    Did he ask you any substantive questions about the

9   aircraft or its maintenance history at any time before he left

10  town?

11       A.    Oh, yeah.  I mean, he asked, you know, what we had --

12  if what we had found from our technical survey, what

13  corrections we did.  I mean, yeah, he asked us what work we had

14  done on the airplane, yeah.

15       Q.    So, what's the next thing that happens with respect

16  to this aircraft in this sequence of events?  Did you talk to

17  Mr. Dahlberg?  Did you talk to Mr. Lainey?

18       A.    I believe the first person I saw next was Mr. Lainey.

19       Q.    Had you ever met Mr. Lainey before?

20       A.    No.

21       Q.    Did you know who he was?

22       A.    No.

23       Q.    Okay.  And when you saw Mr. Lainey where was that at,

24  at Midcoast?

25       A.    Right.

1    Q.    What did Mr. Lainey tell you?

2    A.    As I recall I was contacted by the receptionist who I

3    don't know at this time, I don't recall who that was, but it

4    was approximately a quarter after five.  I had stayed late

5    waiting because according to Ken Mr. Lainey was going to show

6    up.  I proceeded down to the other hanger where the reception

7    area is and Mr. Lainey was there with his wife and that was

8    about a quarter after five.

9                      He asked where Mr. Murray was.  I explained to

10   him that Ken has been trying to get him since at least 2:00

11   that afternoon, but was unable to contact him and that he had

12   left and that to contact him on his cell phone and he would

13   give him the details of the research that he had performed.

14   Q.    Did Mr. Lainey talk to you about further inspections

15   of the aircraft?

16   A.    No.  He did ask me if he could see the airplane and,

17   you know, if I could go over with him, you know, the things

18   that Ken had looked at and I did do that.  I took him and his

19   wife down to the aircraft, went around it, went inside the

20   aircraft, and then I believe we went back down and sat in the

21   inspection department at the table and were discussing things

22   that we had performed on the airplane in January to the end of

23   March or whatever it was, the items that we had done.

24   Q.    And did Mr. Lainey talk to you about performing any

25   systems check on the aircraft during the next couple of days?

1        A.   I believe he asked me if we had pilots to fly it and
2   I said no, Midcoast does not have any pilots.
3        Q.   Did he talk to you about performing any flight tests?
4        A.   I don't recall.  It may have been part of the
5   conversation.  The only part I remember is he asked me if we
6   had pilots.
7        Q.   Did Mr. Lainey indicate to you generally what the
8   purpose of his visit was?
9        A.   I mean, the only thing he told me is he wanted to see
10  the airplane and I was assuming that he was also there to meet
11  Ken Murray.
12       Q.   Did you speak with Mr. Dahlberg that day?  This is
13  Thursday.
14       A.   I believe I did.
15       Q.   Do you recall what the context of that conversation
16  was?
17       A.   No.  I mean, it would have been I think whether the
18  consultant had completed his task and, you know, similar
19  conversations like that.
20       Q.   Do you recall whether Mr. Lainey spoke with Mr.
21  Dahlberg at your facility?
22       A.   Yes, that did happen in the inspection department at
23  the table.
24       Q.   Was that on a speakerphone also?
25       A.   No, it was not.

1      Q.    From hearing Mr. Lainey's side of the conversation do

2    you know what the context of that conversation was?

3      A.    I'm assuming they were discussing the details of the

4    purchase.

5      Q.    Do you know whether there was any further discussions

6    about whether the deal was falling through at that point?

7      A.    I don't believe I heard that mentioned at that point,

8    no.

9      Q.    Mr. Lainey says that the context of that conversation

10   was that Mr. Dahlberg was telling him, we're not selling you

11   the aircraft, or that we are sending you a new contract.  And

12   Mr. Lainey said that you and he waited at that point for some

13   time for a new contract to be faxed; does any of that --

14           MS. KEITH: Objection to form.

15   BY MR. REIMER:

16     Q.    Does any of that recollect with your remembering of

17   the events of that?

18           MS. KEITH: Same objection.

19     A.    I don't recall that at all.

20   BY MR. REIMER:

21     Q.    Okay.  Your conversation with Mr. Dahlberg was before

22   or after Mr. Lainey had the conversation with Mr. Dahlberg?

23     A.    I believe it was before and it was prior to Mr.

24   Lainey showing up.

25     Q.    Did you ever have any conversations with Mr. Dahlberg

1   after the conversation with Mr. Lainey that day?

2       A.    No, not that I recall.

3       Q.    What time did you break from your meeting with Mr.

4   Lainey at Midcoast?

5       A.    I believe he departed Midcoast somewhere 6:45 to

6   seven o'clock that evening.

7       Q.    And what was going to happen next, anything to your

8   knowledge?  Was he coming back the next day or?

9       A.    I was not aware of what his schedule was.  I really

10  don't know what his plans were.

11      Q.    Do you know was he staying in town?  Do you know?

12      A.    Yes, he did.

13      Q.    Do you know where?

14      A.    No, I don't recall where he was staying but I do

15  believe he and his wife were staying in downtown St. Louis at

16  one of the hotels.

17      Q.    Do you know how many times Mr. Lainey spoke with Mr.

18  Dahlberg during this period that he was there at your office?

19  Was this all one conversation?  Were there multiple

20  conversations with Mr. Lainey, do you know?

21      A.    I believe there was only -- the only one I was

22  witness to was the one phone conversation in the inspection

23  department that evening.

24      Q.    Was Mr. Lainey there by himself at any other times?

25  Was he looking at records or was he waiting in the reception

```
 1   area at any period that you were not with him?
 2        A.   Possibly.  Well, I know he waited in the reception
 3   area when he first got there because I had to walk down there
 4   from the other hanger and possibly while he was in the
 5   inspection office I may have left for a few minutes.
 6             MS. GODDARD:  If you don't know you can just answer, I
 7   don't know.
 8        A.   Not that I recall, no.
 9   BY MR. REIMER:
10        Q.   Did you have any conversation with Mr. Lainey the
11   next day?
12        A.   Yes, I believe he did call me the following day
13   Friday.
14        Q.   Did you see Mr. Lainey on Friday?
15        A.   No.
16        Q.   Do you know what the context of that telephone
17   conversation was on Friday?  Do you remember what you talked
18   about?
19        A.   I believe he informed me that he and Mr. Dahlberg had
20   been unable to come to an agreement over the purchase of the
21   airplane.
22        Q.   Had you had any conversations with Mr. Dahlberg to
23   that effect?
24        A.   Prior to, yes.
25        Q.   And when was that?
```

```
1         A.    That morning.  Mr. Dahlberg called me and basically
2    informed me the same thing, that negotiations had broken down
3    last night and that the deal did not come to.
4         Q.    Come to?
5         A.    They had not reached an agreement.  They couldn't
6    reach an agreement.
7         Q.    Do you know what any of the issues were with respect
8    to their inability to reaching an agreement?
9         A.    No, I have -- I am not involved or aware of any of
10   it, disputes.
11        Q.    Did Mr. Dahlberg tell you whether or not Mr. Lainey
12   could come and see the aircraft on Friday?
13        A.    He -- yeah, he did say that Mr. Lainey was not
14   allowed to see the airplane on Friday.
15        Q.    He told you that Friday morning?
16        A.    I believe so, yes, sometime Friday morning.
17                   (A SHORT BREAK WAS TAKEN.)
18   (AT WHICH TIME THE COURT REPORTER READ BACK THE LAST QUESTION
19                         AND ANSWER.)
20   BY MR. REIMER:
21        Q.    So, you had a conversation with Mr. Dahlberg Friday
22   morning prior to your telephone conversation with Mr. Lainey?
23        A.    Yes.
24        Q.    And that during that conversation Mr. Dahlberg told
25   you that the deal had fallen through and that Mr. Lainey would
```

TAYLOR & ASSOCIATES          49
(314) 644.2191 OR (800) 280.DEPO

1   not to be given access to the aircraft?

2       A.    On Friday, that's correct.

3       Q.    Okay.  Did you have any other conversations with Mr.

4   Dahlberg after Mr. Lainey left Friday -- I'm sorry -- Thursday

5   evening?

6       A.    No.

7       Q.    At any time during these conversations with Mr.

8   Dahlberg did he indicate to you that the plane was being sold

9   to another party?

10      A.    I don't believe he mentioned that to me, no.

11      Q.    In relation to these conversations when was the first

12  time that you learned that Aero Toy Store was purchasing the

13  aircraft?

14      A.    To the best of my knowledge it was about a week or so

15  after that that John Dussia called me from Aero Toy and said

16  that they would be up to pick up the aircraft.

17      Q.    During this period of time did you have

18  communications with anybody at International Paper directly?

19      A.    I don't believe so.  No, not that I recall.

20      Q.    You were speaking only with Ed Dahlberg?

21      A.    Yes.

22      Q.    Had Ed Dahlberg ever come out to the hanger to see

23  the aircraft at any time between the time you first learned of

24  his involvement and this period of time?

25      A.    Not to my knowledge.

1      Q.   Had you ever met him personally or just talked to him
2 on the telephone?

3      A.   I have only talked to him on the telephone.

4      Q.   Did he ever come out at any time thereafter?

5      A.   Not that I recall.

6      Q.   How and when did the aircraft get turned over to Aero
7 Toy Store?

8      A.   I believe John Dussia is the one who called me from
9 Aero Toy told me that they would be coming up to pick the
10 aircraft up, could we get it pre-flighted and make sure it was
11 ready for flight, and I told him that I would start making
12 those arrangements but that I would also contact Ed Dahlberg
13 and International Paper to get permission from both of them to
14 release the aircraft and the records.

15      Q.   And who did you speak to after that?

16      A.   Ed Dahlberg and I believe it was Bob Cassidy.

17      Q.   And did both of them give you permission to go ahead
18 and do that?

19      A.   Yes, they gave me permission to release the airplane
20 to Aero Toy Store.

21      Q.   And when was that accomplished?

22      A.   I believe within the next few days after that.

23      Q.   They came and picked it up, they being Aero Toy
24 Store?

25      A.   They came up with two pilots.

1     Q.   Other than the two technical surveys that you

2   completed for Aero Toy Store on these two Challengers have you

3   had any other involvement with Aero Toy Store either before or

4   after?

5     A.   Yes.

6     Q.   What type of involvement?  What type of work?

7     A.   We have done tech surveys for them on other aircraft,

8   we have corrected defects on airplanes they owned, we've

9   performed air inspections for them.

10    Q.   Have you done work for them since they have picked up

11  the Challenger 600?

12    A.   Yes.

13    Q.   When was the last time that you did work for them?

14    A.   I believe it was in the spring of this year.

15    Q.   On what type of aircraft?

16    A.   Challenger 604.

17    Q.   Have you had any conversations with anybody from Aero

18  Toy Store regarding this particular aircraft since they have

19  picked it up?

20    A.   John Dussia called me after they picked up the

21  aircraft, yeah.

22    Q.   To discuss what?

23    A.   I believe the conversation was that the airplane had

24  gone into Bombardier, a service facility in Fort Lauderdale for

25  a technical survey for somebody buying the airplane and that

1  they had found some discrepancies and John was informing me
2  what they had found.  But his main, main reason for calling was
3  he needed an engine inlet and asked if we had one that we could
4  make available to them.
5      Q.    What is that, an engine inlet?
6      A.    It's a piece of structure.  It's the metal circle
7  that sits on the front of the engine.
8      Q.    Why did they need that?
9      A.    I believe that they had found a crack in the one on
10 the aircraft in Fort Lauderdale.
11     Q.    Did you have any conversations with him other than
12 those conversations involving the discrepancies?
13     A.    No, I don't believe so.  I believe I checked with one
14 of our operators who was down for a couple months and he would
15 allow John to use the engine inlet, but other than that that's
16 the only thing I recall talking to John about.
17     Q.    Were you ever made aware of who the ultimate
18 purchaser or who Aero Toy Store sold the aircraft to?
19     A.    Eventually but not at that time.
20     Q.    Eventually how?
21     A.    I was contacted by Turnberry.  They had a problem
22 with the landing gear and I flew down to their facility and
23 then made arrangements to have it corrected.
24     Q.    And it was corrected by Midcoast?
25     A.    Yes.

1      Q.   Any other conversations with anybody at Turnberry

2  other than the landing gear?

3      A.   Not that didn't relate to the landing gear problem.

4  No, I don't believe I have.

5      Q.   Do you recall ever speaking with an attorney at

6  Turnberry by the name of Marci Gettleman and an individual by

7  the name of Don Sopher regarding their purchase of the aircraft

8  in general?

9      A.   Not that I -- I don't recall those names, no.

10     Q.   Do you recall speaking with anybody at Turnberry

11  about the things that we have talked about today, that is the

12  events on Wednesday through Friday when Ken Murray and Dennis

13  Lainey were there?

14     A.   I don't believe I have ever discussed that with

15  anybody from Turnberry, no.

16     Q.   Do you recall speaking with me before approximately

17  eight, nine months ago?

18     A.   I do recall that you contacted me, yes.

19     Q.   When you and I spoke you indicated to me that on

20  Friday morning Ed Dahlberg told you that the plane was being

21  sold to someone else, that the deal had fallen through with

22  Turnberry, and that the plane was being sold to someone else.

23  If that's my recollection of the conversation, your

24  recollection right now is that that's not what Dahlberg said?

25          MS. KEITH: Objection to form.  Do you have a

1  statement that you took from him that you can use or are you
2  just going to tell him what you think he said?
3          MR. REIMER: I'm just asking him that question just as
4  I have stated it.
5          MS. KEITH: Object to the form of the question.
6  BY MR. REIMER:
7      Q.   I'm just ask you whether, you know, that that's what
8  I recall that you told me and that's why I'm just asking you
9  the question.
10     A.   I don't recall saying that.  I don't remember.
11     Q.   Okay.  You don't remember saying it or you don't
12 remember whether or not Mr. Dahlberg told you that?
13         MS. KEITH: Objection to form.
14         MS. GODDARD: Or you don't remember either.
15     A.   I don't remember either to be honest.
16 BY MR. REIMER:
17     Q.   So, you don't remember telling me that or having that
18 conversation with me and you don't remember whether or not Mr.
19 Dahlberg told you that the plane was being sold to someone
20 else?
21     A.   I don't recall that, no.
22     Q.   Did Mr. Lainey ever contact you after the telephone
23 conversation he had with you on Friday?
24     A.   No, not that I remember.  No, not at all.
25     Q.   Did Mr. Dahlberg ever have any further conversations

1   with you other than your contact with him asking whether you
2   could release the plane to Aero Toy Store?
3        A.    I believe that was the last time I talked to Mr.
4   Dahlberg --
5        Q.    Do you --
6        A.    -- concerning this matter.
7        Q.    Have you spoken with Mr. Dahlberg since then with
8   regard to this lawsuit or the fact that there's a dispute?
9        A.    No.
10       Q.    Did you talk with anybody at International Paper
11  other than the conversation with Mr. Cassidy approximately
12  within the last thirty days about the lawsuit and the facts?
13       A.    I was asked prior to, and I don't remember who asked
14  me, what I recalled of the events that happened that Wednesday
15  through Friday.
16       Q.    Someone at International Paper asked you that?
17       A.    Yes, I believe so.
18       Q.    When was that?
19       A.    I don't recall.
20       Q.    Was it recently?
21       A.    No, I would say it was back around the time that you
22  contacted me.
23       Q.    Oh.  Do you obtain written authorizations from the
24  client when you're going to release an aircraft?  When you
25  contacted Dahlberg and Cassidy about whether or not you can

1    release the aircraft to Aero Toy Store do you obtain anything

2    from them before Aero Toy Store, anything in writing, before

3    Aero Toy Store comes and takes the keys to use a layman's --

4        A.    I did not in this instance, no.

5        Q.    Did you ever see a copy of their contract for the

6    purchase?

7        A.    We're never made privilege of that.  We never know

8    what the airplane sells for or what the agreement says.  We're

9    not interested.  We don't want to be involved.

10       Q.    And this is not an accusation or anything but just so

11   that I understand, in this particular instance you were

12   contacted by Mr. Dussia, he says we purchased the aircraft, you

13   call up Ed Dahlberg and Bob Cassidy and they say yes, that's

14   correct, and Mr. Dussia and two pilots come and take the

15   aircraft?

16       A.    That's as I recall it, yeah.

17       Q.    And then the next involvement that you have is when

18   Turnberry calls you to say that they are having a -- I'm

19   sorry -- you said a landing gear or a brake problem?

20       A.    They had a landing gear problem.

21       Q.    And you went down and you took care of it?

22       A.    I flew down and investigated the problem and then

23   called back to our facility, got the appropriate parts and

24   personnel on the way and they came down and repaired the

25   aircraft.

1    Q.    Do you remember who you dealt with at Turnberry for
2  that?

3    A.    I don't recall his name at this point.  No, I don't
4  remember what his name is.  I know I had couple conversations
5  with him.

6    Q.    Larry Atkins?

7    A.    I believe that's correct.

8    Q.    Did anybody from Aero Toy Store or on Aero Toy
9  Store's behalf -- strike that.  What did you do between the
10  time that Mr. Dussia contacted you to inform you that they were
11  picking up the aircraft and the time that the aircraft was
12  actually picked up in relation to the aircraft itself, what did
13  you have to do to get the aircraft ready to go?

14    A.    We did what we call a preflight which is basically
15  checking servicing items, air in the tires, oxygen service,
16  accumulator service, hydraulic service, oil in the engines, we
17  started it, ran it, operated some of the systems just to make
18  sure to the best of our ability that the aircraft was safe to
19  fly.

20    Q.    How long did all of that take?

21    A.    I believe I asked John to give us two days to get the
22  airplane ready for as long as it had sat.

23    Q.    Did anybody ask you to do a preflight prior to Mr.
24  Murray and Mr. Lainey being there at the facility?

25    A.    Not that I recall, no.

1      Q.    Did Mr. Lainey or Mr. Murray to the best of your
2    recollection ask you to perform a preflight?

3      A.    No.

4      Q.    At the time that Mr. Lainey was there you would have
5    needed two days in order to get the aircraft ready to be test
6    flown; is that a fair statement?

7      A.    I believe that's a fair statement, yeah.

8      Q.    What is a gear swing?

9      A.    You jack the aircraft up and retract the gear, watch
10   it go into the wheel wells, make sure all the doors are closed
11   and extended back out.

12     Q.    Do you do that during a preflight?

13     A.    Normally not, but I believe we did do this in this
14   case because of the extended downtime of the aircraft, it sat.

15     Q.    That was for my own edification.

16     A.    It makes passengers feel better.

17     Q.    During the time that Mr. Lainey and his wife and I
18   think I asked this already and I just want to get a
19   clarification, during the time that Mr. Lainey and his wife
20   were there on Thursday afternoon/evening, you were with them
21   the entire time?  Other than their waiting for you to arrive at
22   the reception area, you were with them the entire time?

23     A.    I believe -- I believe I was other than maybe a
24   possible few minutes here or there.  Yes, that's what I recall.

25     Q.    And when Mr. Murray left to the best of your

1    recollection he indicated to you that he was on his way to
2    another job?
3        A.    I believe that's what he told me, yes.
4        Q.    Just excuse me one moment.  I think I'm done I just
5    want to make sure.
6                    (A SHORT BREAK WAS TAKEN.)
7    BY MR. REIMER:
8        Q.    When you had that telephone conversation with Mr.
9    Lainey on Friday morning where was he calling you from to your
10   knowledge?
11       A.    I don't know where he was.
12       Q.    Was he still here in St. Louis?
13       A.    I believe he said that, yes.
14       Q.    Did he indicate to you whether or not he was coming
15   back to your facility that morning?
16       A.    I believe he told me he was not.
17       Q.    That he was not coming back to your facility?
18       A.    I believe that's what he told me, yes.
19       Q.    Did he tell you where he was heading?
20       A.    I don't think he did.
21       Q.    Did Mr. Lainey receive any, to your knowledge,
22   receive any facsimiles through your office during his stay at
23   your facility on Thursday afternoon/evening?
24       A.    Not that I recall.
25       Q.    Did Mr. Murray receive any facsimiles while he was

1   there for two days?

2        A.   Not that I was made aware of.  I mean, we have

3   numerous fax machines at our facility but not that I'm aware

4   of.

5        Q.   And you weren't with Mr. Murray while he was there?

6        A.   No.

7        Q.   But Mr. Lainey you were with him so you would

8   presumably know whether he was given any faxes?

9             MS. KEITH: Object to form.

10            MR. REIMER: What's the objection?

11            MS. KEITH: Was that a question or was it a statement?

12   I mean I don't know, are you asking him a question?  I don't

13   know.

14            MR. REIMER: Yeah, there was a question.

15        A.   I don't recall Mr. Lainey receiving any faxes.

16   BY MR. REIMER:

17        Q.   The conversation that Mr. Lainey and Mr. Dahlberg

18   were having while you were in the room -- and if I asked you

19   this I apologize -- what was that conversation about to your

20   knowledge?  Do you know what they were talking about hearing

21   one end of the conversation?

22        A.   The one thing that I could get from the conversation

23   is they were discussing the airplane, but as far as what they

24   were talking about, no.  I only heard part of it.

25        Q.   Do you know whether they were talking about the

1   inspection that was going on or the fact that he was there
2   looking at the aircraft?
3          MS. GODDARD: If you know.
4      A.   I don't recall what was specifically said.  No, I
5   don't remember.
6   BY MR. REIMER:
7      Q.   Did you have any conversations with Mr. Lainey's wife
8   during this afternoon?  While he was on the phone with Mr.
9   Dahlberg were you talking with Mrs. Lainey at all?
10     A.   Not that I recall.  I mean, not discussing the
11  airplane.
12     Q.   No, about anything.  I didn't even know that she was
13  there so I'm just curious whether you had any conversations
14  with her.  You're saying you had none about the aircraft?
15     A.   I don't believe while he was on the phone, no.  I
16  believe I was respecting his that he was on the phone and was
17  staying quiet as I recall.
18     Q.   Did you leave the room?
19     A.   No, I don't believe I did.
20     Q.   And as best you recall there was only one
21  conversation between Mr. Dahlberg and Mr. Lainey that afternoon
22  or that evening?
23     A.   At our facility, yeah.  To the best of my
24  recollection, yes.
25          MR. REIMER: Okay.  I have nothing further.

1                        CROSS-EXAMINATION

2    BY MS. KEITH:

3        Q.    Hi, Mr. Bates.  My name is Heather Keith and I'm

4    counsel for International Paper in connection with a lawsuit

5    pending in South Florida.  I do have some questions to ask you.

6    Some may seem repetitive and if so I apologize.  If I talk too

7    quickly, which I tend to do, just ask me to slow down, repeat

8    the question.  If you want to take a break any time just let me

9    know and we'll take a break, okay?

10       A.    Okay.

11       Q.    I would like to start with going over some of your

12   testimony regarding the people that you were dealing with at

13   Union Camp and then I.P. when you first had the plane at

14   Midcoast.  Actually, let me first start out, you were referring

15   to Plaintiff's Plane Number 1023; is that like a serial number

16   of a plane?

17       A.    Yes.

18       Q.    I have in my notes that the plane was a 1981 Canadair

19   Challenger and I believe Mr. Reimer said it was a 1980; do you

20   know what year the plane was?

21       A.    No, I don't know.

22             MR. REIMER:  It's an '81, I'm sorry.

23   BY MS. KEITH:

24       Q.    But you know we're talking about the same plane when

25   we're talking about Number 1023?

1          A.    1023, yes.

2          Q.    Okay.  When you first had the plane at Midcoast in

3    December of '98 or January of '99 and it was owned at this time

4    to your knowledge by Union Camp --

5          A.    Correct.

6          Q.    -- did I understand your testimony to be that you

7    were dealing with Bill Keynton at that time?

8          A.    I believe I was, yes.

9          Q.    And during the time of your technical survey were you

10   dealing with Bill Keynton throughout that?

11         A.    I believe it was a combination of Bill Keynton and

12   Eric Bossard.

13         Q.    So, at some point there was a transition then from

14   Bill Keynton to Eric Bossard?

15         A.    Yes.

16         Q.    Do you know if Mr. Keynton left employment with Union

17   Camp before or after the merger with International Paper?

18         A.    I don't recall when Bill left.  I believe I still had

19   conversations with Bill even after he left though but I

20   don't -- I have no idea when he left.

21         Q.    And Eric Bossard I believe you had said that he was

22   the chief pilot for Union Camp?

23         A.    Uh-huh.

24         Q.    Do you know did he stay on with Union Camp once it

25   became International Paper?

1     A.   I know for a period of time he did.  I don't know --

2    I believe that ended in the first half of '99 I believe within

3    the first six months.  I don't know exactly when but that's my

4    recollection.

5     Q.   You mentioned about doing some service, maintenance,

6    and some repairs on the plane for the first approximate two and

7    a half months of 1999.

8     A.   Uh-huh.

9     Q.   During the time of that work was that Union Camp that

10   you were invoicing for the work or was that International

11   Paper?

12     A.   I believe initially the invoice was open to Union

13   Camp but I believe we changed it to International Paper.  But I

14   was still dealing with Eric Bossard over getting approval and

15   authorization for the price of the repairs.

16     Q.   Okay.  Was Eric Bossard still a contact person for

17   you at the time that this plane, this aircraft, was sold?

18     A.   I don't believe so.  I don't believe so.  I believe

19   at that time I talked to Bob Cassidy.

20     Q.   So, at some point you were originally dealing with

21   Bill Keynton and then you switched over to Eric Bossard, then

22   it was Bob Cassidy for maintenance or Ed Dahlberg in regards to

23   the sale of the aircraft?

24     A.   Correct.

25     Q.   And then the change between Union Camp and I.P.

1   occurred sometime in the spring of 1999?

2       A.   That I don't really -- I don't have any knowledge.

3       Q.   I mean, as far as your invoicing, your billing

4   purposes?

5       A.   As far as our billing purposes, yes, I believe that's

6   when we switched.

7       Q.   Okay.  Do you know on the day that Mr. Murray came

8   and you believe you referred to it as a Wednesday, do you

9   happen to know what date that was?

10      A.   No, I don't recall what date it was.

11      Q.   I'm looking at a calender for Wednesday in June of

12  '99 and there's a Wednesday June 23rd of 1999; does that date

13  at all sound familiar to you?

14      A.   No, I just don't recall.

15      Q.   That's fine.  I just didn't know if that seemed like

16  the date that you recalled.  Do you know whether Mr. Murray

17  signed into the sign-in book at Midcoast on that day?

18      A.   I have no knowledge of that.  That is two hangers

19  away from my office.

20      Q.   Have you ever dealt with a Jerry Carter from

21  International Paper?

22      A.   I don't recall that name, no.

23      Q.   You mentioned earlier that you have told the story

24  numerous times and that's why you remembered it was a

25  Wednesday.

1          A.    Yes.

2          Q.    Who other than your attorneys have you told the story

3    to numerous times that you can recall?

4          A.    I believe I told the story to Mr. Cassidy, an

5    attorney for International Paper and I don't recall who that

6    was, and I believe I also talked to Ken Murray.

7          Q.    And you mentioned that you also spoke with Mr.

8    Reimer?

9          A.    Yes.  I'm sorry, yes.  And Mr. Reimer.

10         Q.    Did you ever recant the story to anyone at Aero Toy

11   Store?

12         A.    Not that I remember.

13         Q.    The attorney for International Paper, that was not

14   myself, was it?

15         A.    I don't believe it was.

16         Q.    Okay.  Do you ever recall speaking to any Heather

17   Keith before?

18         A.    I don't think I ever spoke to you.  I believe I got a

19   phone message from you and that I turned it over to Jack Dunne

20   in our Human Resources and I don't know who contacted you after

21   that.

22         Q.    That's correct.  I'm not trying to trick you I just

23   wanted to, you know, hear what your information was what you

24   recall.  What about anyone else from -- well, let me ask you

25   this:  Do you know of Turnberry as Turnberry Charters or

1   Turnberry Aviation, or are they one of the same to you?

2        A.    As far as I know it is one in the same.  I don't --

3   all I know is the name Turnberry, whether it's Aviation or

4   Charter I don't know if there's any difference or not.

5        Q.    The only reason I'm asking is because when I ask you

6   Turnberry Charters or Turnberry Aviation if you don't think

7   they are one in the same I don't want to confuse you, so if I

8   refer to Turnberry you know the entity I'm talking about?

9        A.    Yeah.  I believe that's the company there in South

10  Florida, yeah.

11       Q.    Okay.  And in particular I'm talking about the

12  company you went down and did the repair work for.

13       A.    Right.

14       Q.    And you dealt with a Mr. Larry Atkins?

15       A.    Yeah, and I do believe that's who I dealt with Mr.

16  Atkins.

17       Q.    So, for purposes of the deposition when I refer to

18  Turnberry Charters or Turnberry Aviation that is the company

19  that I'm referring to.  I just want you to understand we're

20  talking about the same entity.

21       A.    Okay.  Right.

22       Q.    When you went down to do some further work on this

23  same aircraft -- it was this same aircraft, right, 1023?

24       A.    Right.

25       Q.    -- for Turnberry did you recant the story to anyone

1  there?

2      A.    I don't believe I did.  I believe our discussions

3  only pertained to the gear issues and the how we were going to

4  try and get them corrected as expeditiously as possible.

5      Q.    Did Mr. Atkins tell you that there was currently a

6  suit pending between Turnberry and International Paper over

7  this plane?

8      A.    I don't recall him mentioning that.

9      Q.    You were asked earlier whether you recalled ever

10  speaking with a Marci Gettleman.  I don't have here whether you

11  did or you didn't with Turnberry; do you recall ever talking to

12  her?

13      A.    Not that I recall.  I mean, the name does not -- I

14  mean I don't recognize the name.  I don't remember.

15      Q.    The numerous times that you have told the story has

16  it always been verbal?

17      A.    Yes.

18      Q.    Have you ever provided a written statement to anyone

19  regarding this whole scenario with the Plane 1023?

20      A.    No, I don't believe so.  No.

21      Q.    Has anyone take a recorded statement of you

22  explaining what happened with Plane 1023 at Midcoast?

23      A.    Not before today, no.

24      Q.    Your files that are kept, you indicated that they are

25  kept by date for service files; do you ever have any files kept

1    by aircraft or by client?

2         A.    Well, I guess to give you a better detail it's kept

3    by aircraft serial number and then it's broken down by date.

4         Q.    So, if someone wanted to request your entire service

5    file on aircraft 1023 everything you have ever done on that

6    aircraft should be in that file maintenance wise?

7         A.    No, that may not be true.  We're only required to

8    keep records by the F.A.A.  I believe it is for two or three

9    years, so it is possible that we may if we have been

10   maintaining the airplane for five to ten years that we may not

11   go back that full time.

12        Q.    Understood.  But if someone tomorrow asked you to

13   look at your file for 1023 it would have everything through

14   December of '98 for that aircraft?

15        A.    I believe it should, yes.

16        Q.    At least as far as I think you said that you're

17   responsible for mechanical issues?

18        A.    Yes.

19        Q.    So, would that same file contain anything done to

20   that aircraft regarding interior, upgrade, paint?

21        A.    Yes.

22        Q.    That would all been have in the same serial file?

23        A.    Yes.

24        Q.    The technical survey that you completed for Aero Toy

25   Store would that be in that file as well?

```
 1        A.    I believe a copy of the report should be, yes.

 2        Q.    What about the back-up documentation?

 3        A.    That should also.  The guide we use should be there,

 4   yes.

 5        Q.    Would Aero Toy have been provided a copy of the

 6   technical survey of the final report?

 7        A.    Yes.  It was their property.

 8        Q.    Because they were your client?

 9        A.    Yes.  And I asked and was given permission to give a

10   copy to Union Camp/International Paper.

11        Q.    The owner of the aircraft?

12        A.    Yes.

13        Q.    At the time?

14        A.    But at that time we do ask the Aero Toy who is the

15   purchaser of that information that it is okay for us to give it

16   to the seller because they have paid for that information.

17        Q.    Do you yourself work at all with upgrades or

18   refinishing of the interior of Challengers?

19        A.    No.  I'm not -- I have no responsibility with that.

20        Q.    Have you ever worked in that area?

21        A.    No.

22        Q.    Have you ever worked in regards to painting the

23   exterior of aircraft such as the Challenger?

24        A.    No.

25        Q.    So, you would have no knowledge or experience in
```

1   dealing with interior upgrade or painting?

2       A.   As far as I'm not quite sure I understand the

3   question.  I mean --

4       Q.   In your work at Midcoast you haven't dealt with that?

5   You're not responsible for interior upgrade or?

6       A.   No, I'm not responsible for it.

7       Q.   So, any knowledge that you have would be what you

8   have picked up in the industry over the years working at

9   Midcoast?

10      A.   Yes.

11      Q.   Did Ken Murray have the technical survey as part of

12  his records that he was given permission to review?

13      A.   Yes, I do believe -- yes, he did have a copy of the

14  report.

15      Q.   You indicated that when Mr. Murray got there about

16  11:00 a.m. and you went to lunch, and then you returned from

17  lunch, called Mr. Dahlberg, and obtained permission for Mr.

18  Murray to go forth with his inspection, can you approximate for

19  me how long the delay was that Mr. Murray was delayed to start

20  conducting his inspection?

21      A.   I would say approximately an hour and a half to two

22  hours.

23      Q.   Did Mr. Murray ever tell you on Thursday or indicate

24  to you in any way when he was leaving on Thursday that that

25  delay in any way prevented or precluded him from completing

1    what he needed to do?

2         A.    No.    In fact his words to me was that he had

3    completed his task.

4         Q.    Does Midcoast have any pilots or flight crew employed

5    by Midcoast that are authorized to fly an aircraft such as the

6    1023?

7         A.    Not to my knowledge, no.

8         Q.    Did you in June of 1999?

9         A.    No, not to my knowledge.

10        Q.    To your knowledge is Ken Murray authorized to fly an

11   aircraft such as the 1023?

12        A.    Not to my knowledge, no.

13        Q.    To your knowledge does Mr. Lainey carry the necessary

14   certification to fly a aircraft such as the 1023?

15        A.    No, not to my knowledge.

16        Q.    Did Mr. Lainey ever ask you if he could fly the

17   aircraft 1023?

18        A.    No, I don't recall him asking me that.

19        Q.    You indicated that when you first called Mr. Dahlberg

20   on Wednesday at approximately 11:00 a.m -- and if I misstate

21   anything that you previously said please correct me, I'm just

22   trying to do that for quickness and ease of questioning -- that

23   you called Mr. Dahlberg at approximately 11:00 a.m. and he was

24   going to have to confirm whether the deal was on or not and

25   whether the inspection could go forward?

1      A.    That's the way I recall it.  It was I believe his
2    words to me is that he thought the deal had fallen through and
3    that he would have to make a couple phone calls, and that if we
4    could wait until he could make those phone calls then he would
5    get back to us.
6      Q.    And it was your understanding that his phone calls
7    were going to be made to Mr. Lainey?
8      A.    I believe that's who he told me he was calling, yes.
9      Q.    Did Mr. Lainey ever tell you or explain to you why he
10   arrived at approximately 5:15 on Thursday?
11     A.    No, I don't believe he ever told me why.
12     Q.    Did he acknowledge that he was late?
13     A.    I don't remember him saying -- I don't if -- no, I
14   don't recall that.
15     Q.    But you did explain to him that Mr. Murray had been
16   waiting for him and trying to reach him all afternoon?
17     A.    Yes, I did.  I did tell him that Ken had expected him
18   at noon and that he could only stay until 3:00 and that, you
19   know, to get in touch with him by his cell phone so he could
20   give him the details of his investigation.
21     Q.    From your recollection did Mr. Lainey seem concerned
22   or upset in any way that Mr. Murray was no longer there when he
23   arrived?
24     A.    Not that I recall.
25     Q.    What are your normal hours of operation at Midcoast?

```
1        A.    Our facility runs from 7:00 a.m. until 11:30 at
2   night.
3        Q.    And what about your office operations?
4        A.    Normal office hours are from 8:00 to 5:00.
5        Q.    So, when you were there at 5:15 that night what would
6   be your normal time to get off of work?
7        A.    I generally try to leave at five o'clock.
8        Q.    And I think you mentioned that you stayed late
9   because you were expecting Mr. Lainey?
10       A.    Yes.  I was informed he was coming.
11       Q.    Prior to his arrival at 5:15 to your knowledge did he
12   call and tell you or anyone else at Midcoast that he was on his
13   way?
14       A.    Not that I recall.
15       Q.    And once he did arrive and I believe you said he
16   stayed until -- I'm sorry I don't recall how long was he there
17   until?
18       A.    I believe it was approximately 6:45 to 7:00 p.m.
19       Q.    If he wanted to stay there until 11:30 that evening
20   is there any reason he could not have?
21       A.    No.  I would have made arrangements with the night
22   shift supervisor.
23       Q.    So, no one at that point from International Paper or
24   Ed Dahlberg had told you that he had to leave at 7:30 that
25   night?
```

1        A.    No.

2        Q.    And Mr. Lainey chose to leave on his own accord at

3    that point?

4        A.    As I recall, yeah.  I mean, nobody from Midcoast

5    asked him to leave, no.

6        Q.    On Wednesday when Mr. Murray was there you indicated

7    that you had hooked up electric to the plane?

8        A.    I believe, yes, we did.  We put a power card on the

9    aircraft for him.

10       Q.    And Mr. Murray conducted a visual inspection of the

11   plane?

12       A.    I did not witness that.  I -- I can't say whether he

13   did or not.  All I can say is I took him to the airplane, put

14   power on for him, took him to the inspection office, showed him

15   the numerous boxes of records, and asked him if he needed

16   anything else and he said no, he could more than handle it on

17   his own.

18       Q.    But I mean he saw the aircraft?

19       A.    He did physically see the aircraft.  I did take him

20   to the airplane, yes.

21       Q.    And you did the same thing with Mr. Lainey?

22       A.    Yes.

23       Q.    And did both Mr. Murray and Mr. Lainey go inside the

24   plane?

25       A.    Yes.

1      Q.    At the time that Mr. Lainey visually saw the plane
2    was the electric hooked up to the plane as well?

3      A.    I believe it was, yes.

4      Q.    And bear with me here because I'm not educated on
5    planes, that's where you come in. On a systems check is that
6    something that can be done on the ground or is that something
7    that's done in flight in the air?

8      A.    Yes to both.  It depends what systems.  Most systems
9    we can operationally test on the ground.  There are a few that
10   may require flight.

11     Q.    Do you know whether Mr. Murray conducted a systems
12   check of the aircraft at all while it was on the ground?

13     A.    I don't have knowledge of whether he -- I don't have
14   the knowledge of what he investigated.  No, I don't know.

15     Q.    With the electrical hook up to the plane that you
16   provided could he have conducted a systems check on the ground?

17     A.    Yes.

18     Q.    If he chose to do so?

19     A.    Yes.

20     Q.    Did anyone at Midcoast in any way tell him he was not
21   authorized to conduct a systems check on the ground?

22     A.    Not to my knowledge, no.

23     Q.    Did Mr. Lainey's wife go in the plane do you know?

24     A.    Yes.

25     Q.    How do you know it was his wife that was with him?

1     A.   I believe that's the way she was introduced to me.
2   That's what I recall.

3     Q.   Other than the hour and a half to two-hour delay for
4   Mr. Murray to gain access to the plane and to the records did
5   Midcoast Aviation at any other time deny access to anyone from
6   Turnberry to look at this plane or inspect records?

7     A.   I would say no other than what happened on Friday,
8   but nobody was asked to see it and nobody was denied, no.

9     Q.   And that's exactly where I wanted to go next.  Did
10   Mr. Lainey ever ask you on Friday to see the plane?

11     A.   No, not that I recall.

12     Q.   Did he ever ask you to see any records on Friday?

13     A.   No, he didn't.  Not that I recall.

14     Q.   And when he called you Friday what was the purpose of
15   his call to you?  I mean, he called you, right?  You didn't
16   call him?

17     A.   No, he called me and I believe if I recall correctly
18   he called to thank me for staying the night before and I
19   believe the rest of the conversation was that he and Mr.
20   Dahlberg did not come to any agreement that night and.

21     Q.   And the deal was off?

22     A.   That's, yeah.  That was my understanding.

23     Q.   So, as you recall the conversation Mr. Lainey was
24   indicating to you the deal was off and he was not requesting to
25   do  anything further with the plane on Friday?

1     A.     I don't recall him -- I don't know if he actually
2  said the deal was off, but I know he did not request any
3  additional access to the airplane.  I believe I'm the one that
4  said that Mr. Dahlberg had called me earlier, but and I think
5  he said that yeah, they did not come to an agreement that prior
6  night.  I believe he said they had a phone conversation that
7  night later after he had left Midcoast.

8     Q.     Did Mr. Lainey ask you any questions about if he
9  wanted to do a flight test of the plane how would he coordinate
10 that or how long it would take?  Did you have any discussions
11 like that on Friday?

12    A.     Not that I recall, no.

13    Q.     If a flight check had to be arranged in June of '99 I
14 believe you indicated it would take possibly up to two days to
15 arrange that; is that correct?

16    A.     Well, to verify that the aircraft would be ready for
17 flight, yeah.  I would have probably asked for a day and a half
18 to two days advance notice just -- yeah.

19    Q.     If on Wednesday when Ken Murray arrived if anyone had
20 indicated to you that they needed to fly the plane that week,
21 if Mr. Murray had said Lainey's coming up this afternoon we
22 want to fly this plane, what would have been the soonest in
23 June of '99 that you could have had that plane ready for a
24 flight check?

25    A.     I would say it could have been ready Friday morning

1    to Friday afternoon depending, you know, what if anything we
2    found.
3        Q.    But no one asked you to prepare the plane for a
4    flight check; is that correct?
5        A.    No, not that I recall.  No, no one ever asked me to
6    do that.
7        Q.    And you would have to do that through using whose
8    pilots would you use to do that?
9        A.    We would not make pilots available.  Either I would
10   assume the buyer or the seller would provide the crew.
11       Q.    Do you know in June of '99 whether International
12   Paper had any pilots that were authorized to fly the 1023?
13       A.    Not to my knowledge.
14       Q.    In fact, as you sit here today can you recall any
15   pilots that were employed by International Paper in June of '99
16   that could have flown that plane?
17       A.    I didn't know any of International Paper's pilots,
18   no.
19       Q.    What about Eric Bossard for Union Camp?
20       A.    I don't believe I was dealing with Eric at that
21   point.
22       Q.    And when Aero Toy Store actually bought the plane who
23   was it your understanding that provided the pilots to fly that
24   plane?
25       A.    I was told when I was introduced to them by John

1   Dussia that they were Aero Toy's pilots, the pilots that worked

2   for Aero Toy Store.

3       Q.   Were there any records that were in the possession of

4   Midcoast that would not have been provided to Ken Murray at his

5   inspection in June of '99?

6       A.   None that I'm aware of, no.  I showed him where all

7   the records were for the aircraft.

8       Q.   So, to your knowledge sometime after lunch on a

9   Wednesday in June of '99 Ken Murray was getting full access to

10  the aircraft 1023 and all records at Midcoast regarding that

11  aircraft?

12      A.   That's correct.

13      Q.   Was he also given access to the logs with the

14  aircraft?

15      A.   Yeah, and we consider logbooks part of the records.

16  Yes, he was.

17      Q.   So, those records would go back even further than

18  Midcoast's records, correct?

19      A.   Yes, that is correct.

20      Q.   In regards to the Aircraft 1023 how many different

21  days was Ken Murray at Midcoast regarding that aircraft, 1023?

22      A.   Two days, Wednesday and Thursday.

23      Q.   And no other times before that in June or after that

24  in June?

25      A.   Not that I recall, no.

1    Q.    How many days did Mr. Lainey actually come on the

2    premises at Midcoast regarding Aircraft 1023?

3    A.    The one Thursday late afternoon, early evening.

4    Q.    The time at 5:15?

5    A.    Yes.

6    Q.    P.m.?

7    A.    Yes.  And Thursday, yeah.

8    Q.    To your knowledge during that time period in

9    approximately June of '99 did anyone else on behalf of

10   Turnberry other than Ken Murray or Mr. Lainey come to Midcoast

11   to inquire, inspect, or fly Aircraft Number 1023?

12   A.    Not to my knowledge, no.

13   Q.    And it is your understanding that Ken Murray was

14   working for Turnberry in regards to this aircraft?

15   A.    That was my understanding.  That's what I was told.

16   Q.    Is there any way Mr. Lainey could come back to

17   Midcoast and have inspection or involvement of Aircraft Number

18   1023 in June of '99 without you knowing about it?

19   A.    I don't believe that's possible.

20   Q.    Because you were the -- I'm sorry -- called project

21   manager; is that what it's called?

22   A.    Program manager.

23   Q.    Program manager for Challengers at that time, right?

24   A.    Yes, that's correct.

25   Q.    And what about anyone else; if anyone else wanted to

```
 1   come and inspect the Aircraft 1023 in June of '99 would you
 2   have known about it?
 3        A.    I believe I would have.  I believe I would have.
 4        Q.    As far as the way Midcoast operates you would be the
 5   person that would be contacted to set up that inspection?
 6        A.    Yes.
 7        Q.    Did anyone from International Paper or Mr. Dahlberg
 8   ever tell you to deny anyone from Turnberry a flight check?
 9              MR. REIMER: Object to the form.
10   BY MS. KEITH:
11        Q.    Do you understand what I mean by flight check?   In
12   other words, to fly the plane?
13        A.    No, not that I recall.
14        Q.    Do you know who currently owns this aircraft if you
15   know?
16        A.    To the last of my knowledge it's Turnberry Aviation.
17        Q.    And that would be when you went down there to do --
18   was it landing gear work; is that what you were down there for?
19        A.    Yes.
20        Q.    Was that also warranty work?
21        A.    Yes.
22        Q.    Did anyone else from Midcoast go down with you to
23   Turnberry for that work?
24        A.    Not with me.  I went down I believe Saturday,
25   inspected the airplane, determined what directive action needed
```

```
 1   to happen, and the parts used, and then I called back to the
 2   St. Louis facility and made arrangements for the parts and the
 3   technicians to come down on Sunday, and then I left Saturday
 4   night.  So, I was never down there at the same time.
 5       Q.   Okay.  So, it was Midcoast's technicians that came
 6   down and actually performed the work?
 7       A.   The repairs, yes.
 8       Q.   Was that done at Bombardier?
 9       A.   No, it was done in Turnberry's hanger.  The only
10   involvement that Bombardier had was I believe they did some
11   N.D.T. work for us which is non-destructive testing on one of
12   the components.  We felt it was more efficient to use them for
13   the hour or two technique that we needed done and to fly one of
14   our technicians down.
15       Q.   Other than that time that you went down to Turnberry
16   on this aircraft were there any other times that you have been
17   involved with this aircraft after the sale to Aero Toy Store in
18   June of '99?
19       A.   In further conversations with Mr. Atkins after that,
20   after the repair of the gear.
21       Q.   Regarding what?
22       A.   Lost revenue for the airplane when it couldn't fly
23   for those three or four days.
24       Q.   Any other further conversations beyond that?
25       A.   No.
```

```
 1        Q.    In the documents that Mr. Murray would have had
 2   access to at Midcoast it would have included the pre-purchased
 3   inspection which from Aero Toy Store which is now called the
 4   technical surveys that we talked about; is that correct?
 5        A.    The report, yes.
 6        Q.    And would it have included documents on the landing
 7   gear overhaul?
 8        A.    Not in the technical survey report, no.  That would
 9   have been in the logbook.
10        Q.    What I'm asking is would he have had access to
11   records regarding that?
12        A.    Yes.
13        Q.    During his review?
14        A.    Yes.
15        Q.    Would he have had access to records regarding the
16   120-month inspection?
17        A.    On the landing gear, yes.
18        Q.    And how about the 36-month inspection?
19        A.    He should have had access.  That should have been in
20   the logbooks so, yes, he would have had access to that.
21        Q.    Okay.  So, as you sit here today you don't know
22   whether a systems check was done on the ground by anyone from
23   Turnberry on Aircraft 1023?
24        A.    Not that I witnessed, no.  I don't know if that
25   happened or not.
```

1      Q.   Okay.  But to your knowledge the document review was

2   completed by Ken Murray?

3      A.   Yeah.

4      Q.   And in fact he told you that he was done?

5      A.   He told me that he had completed whatever he had come

6   there for and that he was finished and that he, you know, he

7   needed to go within the hour.

8      Q.   But to your knowledge a flight check, actually flying

9   the plane, was not done in regards to Aircraft 1023 for

10  Turnberry Charters or Turnberry Aviation; is that correct?

11     A.   No.

12     Q.   Okay.  But again, it was never requested by anyone

13  from Turnberry to you?

14     A.   Not to me, no.

15     Q.   I wrote down here earlier in quotes that you said

16  that Ken Murray could stay as late as he wanted; was that

17  accurate?

18     A.   Yeah.  No one asked Ken to leave.  I don't know how

19  late he stayed, but.

20     Q.   You don't know how late he stayed on Wednesday night?

21     A.   On Wednesday night, right.  But nobody would have

22  asked him to leave.

23     Q.   Is it fair to say he could have stayed there until --

24  well, what's the latest he could have stayed, until 11:30 when

25  your operation --

```
1           A.    I would say probably 11:30 when the facility would
2    shut down.
3           Q.    And that's 11:30 p.m.?
4           A.    P.m.
5           Q.    And then what's the earliest he could come back in
6    there on Thursday morning?
7           A.    7:00 a.m.
8           Q.    As you sit here today can you recall Ken Murray
9    asking you for anything in regards to Aircraft 1023 that you
10   could not give him or provide him access to?
11          A.    No, not that I'm aware of.
12                MS. KEITH: That's all I have.  Thank you.
13                        REDIRECT-EXAMINATION
14                MR. REIMER: Just a few follow-up questions.
15   BY MR. REIMER:
16          Q.    When you did perform the flight check or preflight
17   check -- I'm sorry, the preflight check for Aero Toy Stores
18   picking up the aircraft?  Did you actually complete it in the
19   two days?  You had said you needed two days and then later you
20   mentioned that's assuming it would take me a day and a half,
21   two days assuming I didn't find anything.  I was curious did
22   you find anything?
23          A.    No, I don't believe we did.  In fact, I believe the
24   aircraft was ready in approximately a day and a half, a little
25   bit less.
```

1    Q.    The conversation that you had with Mr. Dahlberg when
2    Ken Murray arrived prior to your going to lunch to wait for Mr.
3    Dahlberg to get back, you what did Mr. Dahlberg tell you the
4    reason was that he needed some additional time?
5    A.    He believed that the deal had fallen apart I thought
6    he said the day before or that day, you know, it was something
7    like that.    That he believed that the deal was not going
8    through, that it was over.
9    Q.    But didn't tell you why?
10   A.    No, he did not tell me why.
11   Q.    An then lastly on Friday morning you indicated to Ms.
12   Keith, when I spoke to Mr. Lainey I told him that I had already
13   spoken to Mr. Dahlberg, right?
14   A.    That's correct.
15   Q.    What did you tell Mr. Lainey Mr. Dahlberg had said?
16   A.    I said he informed me last night that the deal fell
17   through again.
18   Q.    And that's when Mr. Lainey said yes, that's what
19   happened?
20   A.    I don't know if those were his exact words, but I
21   believe that's what he was indicating to me that he and Mr.
22   Dahlberg did not reach an agreement.    I don't recall his exact
23   words, but.
24   Q.    Did you relay to Mr. Lainey that Mr. Dahlberg had
25   instructed you that he was not to be shown the aircraft that

```
 1   day?
 2        A.   Yes.
 3             MR. REIMER: Okay.  I have nothing further.
 4                      RECROSS-EXAMINATION
 5             MS. KEITH: I do have a couple follow-up.
 6   BY MS. KEITH:
 7        Q.   When you relaid to Mr. Lainey that he was not to be
 8   shown the aircraft did he seem concerned about that or
 9   frustrated with that or did he indicate that he didn't want to
10   see it anyway at that point?
11        A.   I don't know how to answer that.  He did not indicate
12   to me that he was.  He wanted to see it.
13        Q.   To your knowledge did he have plans to come see it
14   that day?
15        A.   Not to my knowledge.
16        Q.   And based upon your impression and your recollection
17   from the call with Mr. Lainey was he confirming or not
18   disputing your statement that Mr. Dahlberg said that the deal
19   had fallen through?
20             MR. REIMER: Object to the form.
21   BY MS. KEITH:
22        Q.   Do you understand what I'm asking?  What I'm asking
23   you is was he surprised that you told him that Mr. Dahlberg was
24   saying that the deal was off or they hadn't come to terms or
25   was he acknowledging that that was in fact the case?
```

1    A.    I believe that what he said was that they could
2    not -- they did not come to an agreement that night that, you
3    know, what I told him was I had already spoken with Ed earlier
4    then when he called and that Ed had told me the deal had fallen
5    through.  And when Mr. Lainey called to thank me for staying
6    and I informed him of that then his words were, yeah, we could
7    not come to an agreement last night.

8    Q.    I just want to make sure I'm clear.  Mr. Lainey
9    called you and based on your discussion I just want to make
10   sure that it doesn't come up later that Mr. Lainey was calling
11   you to set up an inspection to come look at the plane, to fly
12   the plane.  Am I correct in saying that your testimony was that
13   he was calling you just for thanking you for being there the
14   night before?

15   A.    That's what he first said and I told him that I had
16   spoken to Mr. Dahlberg earlier and that I was informed that the
17   deal had fallen through and that he was, you know, that I was
18   told that he was not to have access to the airplane or the
19   records anymore and as I stated I believe his response was,
20   yeah, we could not come to an agreement last night.

21   Q.    When Mr. Lainey left on Wednesday evening did he give
22   you any indication --

23   A.    Thursday.

24   Q.    I'm sorry.  Thursday evening, your right.  Did he
25   give you any indication that he was done with his review of the

1    records and the aircraft at that point? Like Mr. Murray you
2    said indicated he was done?

3        A.    No.   He did not specifically say like Ken did, I have
4    completed.  I mean, I had shown him the airplane, we had sat in
5    the inspection office around the records, and he had gotten on
6    the phone with Mr. Dahlberg, that conversation ended, I walked
7    them back to the receptionist area because by then the doors
8    were locked, I let them out of the facility, and there was no
9    mention that he was finished or that he was coming back, I
10   mean.

11            MS. KEITH: Okay.   That's all I have.   Thank you.

12            MR. REIMER: That's it.   Mr. Bates, thank you very
13   much.

14            MR. LAWSON: Steve, you have the right to read over
15   your deposition testimony once it is printed out and ensure
16   that everything has been taken down accurately or you can trust
17   that court reporter did that and you can waive that process and
18   won't have to be involved any further.

19                    (SIGNATURE WAS RESERVED.)

20

21

22

23

24

25

```
 1                      NOTARIAL CERTIFICATE

 2   STATE OF MISSOURI        )
                             )  SS
 3   COUNTY OF ST. LOUIS      )

 4        I, CHERI A. RAIFFIE, a Certified Shorthand.
     Reporter and Notary Public within and for the
 5   State of Missouri, do hereby certify that there came
     before me at the law offices of McMahon, Berger, Hanna,
 6   Linihan, Cody & McCarthy, 2730 North Ballas Road, Suite 200,
     St. Louis, Missouri,
 7
                        STEPHEN EATES,
 8
          Who was by me first duly sworn to testify to the
 9   truth and nothing but the truth of all knowledge touching
     and concerning the matters in controversy in this cause; that
10   the witness was thereupon carefully examined under oath and
     said examination was reduced to writing by me; and that this
11   deposition is a true and correct record of the testimony given
     by the witness.
12
          I further certify that I am neither attorney
13   nor counsel for nor related nor employed by any of the
     parties to the action in which this deposition was taken;
14   further that I am not a relative or employee of any
     attorney or counsel employed by the parties hereto or
15   financially interested in this action.

16        IN WITNESS WHEREOF, I have hereunto set my hand and
     seal this 2nd day of November, 2000.
17

18

19                             Cheri A. Raiffie, CSR

20

21                                   (Notary Public)

22

23

24

25
```

CHERI A. RAIFFIE
Notary Public – Notary Seal
STATE OF MISSOURI
St. Louis County
My Commission Expires: Dec. 17, 2000

```
 1              I, STEPHEN BATES, do hereby state that I have read

 2    the foregoing questions and answers appearing in this

 3    transcript of my deposition: That this is a true and accurate

 4    report of said answers given in response to the questions

 5    appearing herein.

 6              IT IS FURTHER STIPULATED AND AGREED, between Counsel,

 7    that this deposition may be signed before any Notary.

 8                        _____

 9                          STEPHEN BATES

10              (Reported by:  Cheri A. Raiffie)

11

12                      C E R T I F I C A T E

13    STATE OF MISSOURI  )
                         )  SS
14    COUNTY OF ST. LOUIS)

15         Before me personally appeared STEPHEN BATES, known to me
      to be the person described in and who executed the foregoing
16    instrument and acknowledged to and before me that he executed
      the said instrument in the capacity and for the purpose therein
17    expressed.
      WITNESS my hand and official seal this_____day of_____
18    2000.

19

20                        _____
                              NOTARY PUBLIC
21                           State of Missouri

22
                          My Commission expires:
23

24

25
```

```
 1

 2

 3

 4
    November 1, 2000
 5

 6   McMahon, Berger, Hanna, Linihan, Cody & McCarthy
     Ms. Courtney E. Goddard
 7   2730 New Ballas Road, Suite 200
     St. Louis,  Missouri 63131
 8

 9   In re:   Turnberry Charters, Inc. v. International Paper Company
              Case No: 00-6111-CIV-DIMITROULEAS
10            Deposition of Stephen Bates, 10/20/00.

11

12   Dear Ms. Goddard:

13   This letter is notice to you that the transcript has now been
     prepared and is ready for  reading and signature.
14
     At your earliest convenience please allow Mr. Bates to review
15   and sign the transcript before a notary public.  After this has
     been completed, please forward the original signature page and
16   correction sheet to all attorneys of record.

17
     Thank you,
18

19
     Cheri A. Raiffie
20   Certified Shorthand Reporter

21

22

23

24

25
```

```
 1                UNITED STATES DISTRICT COURT

 2                SOUTHERN DISTRICT OF FLORIDA

 3    - - - - - - - - - - - - - - - -x
      TURNBERRY CHARTERS, INC.,          :
 4
                     Plaintiff,          :
 5
                 v.                      :Case No.:00-6111
 6                                        Civ-Dimitrouleas
      INTERNATIONAL PAPER COMPANY,       :Magistrate: Johnson
 7
                     Defendant.          :
 8    - - - - - - - - - - - - - - - -x

 9                           Fairfax, Virginia

10                           Thursday, November 30, 2000

11            Deposition of EDWARD C. DAHLBERG,

12    called for examination by counsel for the plaintiff,

13    at the offices of Marc Dycio, Esquire, 10615 Judicial

14    Drive, Suite 101, Fairfax, Virginia 22030, before

15    Sharon K. Arnoult, a stenographic reporter and Notary

16    Public in and for the Commonwealth of Virginia at

17    Large, commencing at 12:35 p.m., when were present on

18    behalf of the respective parties:

19

20

21

22

23
                  ANITA B. GLOVER & ASSOCIATES, LTD.
             10521 West Drive, Fairfax, Virginia  22030
                           (703) 591-3004
```

```
 1              FOR THE PLAINTIFF TURNBERRY CHARTERS, INC.:
 2
                     DAVID H. REIMER, Esquire
 3                        Reimer & Rosenthal LLP
                          3801 Hollywood Boulevard
 4                        Suite 350
                          Hollywood, Florida  33021
 5
 6              FOR THE DEFENDANT INTERNATIONAL PAPER COMPANY:
 7                   RICHARD C. HUTCHISON, Esquire
                          Holland & Knight LLP
 8                        P. O. Box 14070
                          One East Broward Boulevard
 9                        Suite 1300
                          Ft. Lauderdale, Florida  33301
10
11              FOR THE WITNESS EDWARD C. DAHLBERG:
12                   MARC DYCIO, Esquire
                          10615 Judicial Drive
13                        Suite 101
                          Fairfax, Virginia  22030
14
15
16
17
18
19
20
21
22
23
```

```
 1                          I N D E X

 2                    EXAMINATION BY COUNSEL FOR:

 3                       PLAINTIFF,          DEFENDANT,
 4    WITNESS          MR. REIMER          MR. HUTCHISON

 5    Edward C. Dahlberg     4, 119        112, 120

 6

 7

 8                         EXHIBITS
 9                     (None attached.)

10

11    No. 39      FAX                          34

12    No. 40      Letter                       44

13    No. 41      FAX                          51

14    No. 42      Stapled document             67

15    No. 43      Agreement                    71

16    No. 44      Draft                        81

17    No. 45      Spare parts list            101

18    No. 46      Cover sheet                 102

19    No. 47      Letter                      114

20

21

22

23
```

ANITA B. GLOVER & ASSOCIATES, LTD.
10521 West Drive, Fairfax, Virginia  22030
(703) 591-3004

1                    P R O C E E D I N G S

2            Whereupon,

3                    EDWARD C. DAHLBERG,

4    was called for examination by counsel for the

5    plaintiff, and having been first duly sworn, was

6    examined and testified upon his oath as follows:

7                    EXAMINATION BY COUNSEL FOR TURNBERRY

8    BY MR. REIMER:

9        Q.    Would you state your full name for the

10   record and spell your last name?

11       A.    Edward Dahlberg, D-A-H-L-B-E-R-G.

12       Q.    Before I get started, let's talk about

13   basics.  My name is David Reimer, and I represent

14   Turnberry Charters.

15            You may be familiar with them from the

16   transaction that you were involved with.  Turnberry

17   is currently involved in a lawsuit in the Southern

18   District of Florida against International Paper.

19            We're here to take your deposition to find

20   out what information you have relating to the

21   transaction that forms the basis of that lawsuit.

22            Have you ever had your deposition taken

23   before?

                  ANITA B. GLOVER & ASSOCIATES, LTD.
              10521 West Drive, Fairfax, Virginia  22030
                           (703) 591-3004

```
1        A.   No.

2        Q.   I'm going to ask you a series of questions

3   as quick as possible and show you some documents and

4   ask you questions about the documents, which are

5   mostly related to the general background and

6   involvement that you had with the transaction.

7        A.   Uh-huh (affirmative).

8        Q.   If you don't understand any question that I

9   ask you, please ask me to rephrase the question.  If

10  you don't ask me to clarify the question, I will

11  assume that you understood the question and your

12  answer is directly responsive to the question.

13       A.   Okay.

14       Q.   There may be some objections interposed by

15  the other attorneys here.  On some of those

16  objections you still have to answer the question and

17  I ask you to answer the question unless directed by

18  your attorney not to answer the question.

19       A.   Okay.

20       Q.   Do you have any questions about the

21  deposition before we get started?

22            MR. DYCIO:  It is my understanding that

23  Mr. Dahlberg is here as a representative of Emerald
```

1  Aviation and not in his personal capacity; is that

2  correct?

3          MR. REIMER:  That's correct.

4  BY MR. REIMER:

5      Q.   Please tell me what your date of birth is?

6      A.   January 19, 1961.

7      Q.   And your Social Security number?

8          MR. DYCIO:  Objection as to relevancy.  You

9  can go ahead and answer it.

10         THE WITNESS:  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.

11 BY MR. REIMER:

12     Q.   You are currently employed by Emerald

13 Aviation; is that correct?

14     A.   Yes.

15     Q.   What is the business address of Emerald

16 Aviation?

17     A.   9998 Wakeman Drive, Manassas, Virginia

18 20110.

19     Q.   What is your residential address?

20         MR. DYCIO:  Objection as to relevancy.  He

21 is here in a corporate capacity.

22         THE WITNESS:  7008 Dalemar Drive, Clifton,

23 Virginia 20110.

                ANITA B. GLOVER & ASSOCIATES, LTD.
             10521 West Drive, Fairfax, Virginia  22030
                           (703) 591-3004

```
 1   BY MR. REIMER:

 2        Q.   Do you hold any professional license issued

 3   by the State of Virginia or any other state or local

 4   Government entities?

 5        A.   An aircraft dealer's license in the State

 6   of Virginia and FAA dealer certificate.

 7        Q.   How long have you held the State of

 8   Virginia aircraft broker's license?

 9        A.   I don't know.

10        Q.   Approximately?

11        A.   Since I started the company.

12        Q.   Which is how long ago?

13        A.   1995.

14        Q.   How about your FAA license?

15        A.   The same.

16        Q.   Do you hold any other professional

17   licenses?

18        A.   Commercial pilot certificate.

19        Q.   How long have you held that?

20        A.   I'd say, since the early '80s.

21        Q.   What's your educational background?  Did

22   you go to college?

23        A.   I have a four-year degree in marketing from
```

ANITA B. GLOVER & ASSOCIATES, LTD.
10521 West Drive, Fairfax, Virginia  22030
(703) 591-3004

1   the University of South Florida and graduated in

2   1982.  Can I get some more water?

3        Q.   Sure.

4             (Whereupon, a discussion off the record

5   was held.)

6   BY MR. REIMER:

7        Q.   I think that the last thing that you said

8   was that you graduated from the University of South

9   Florida in 1982, with a degree in marketing, correct?

10       A.   Uh-huh (affirmative).

11       Q.   Any postgraduate work?

12       A.   No.

13       Q.   What did you do after you graduated from

14  the University of South Florida in 1982?

15       A.   I worked in a sales job for an insurance

16  company and then I worked for Federal Express

17  Corporation.

18            Shortly thereafter, I worked for an

19  aircraft broker at Dulles Airport Aerodyne.  After

20  that another broker in Reston called Jettech and

21  started my own company in 1995, Emerald Aviation.

22       Q.   What's the name of the insurance company?

23       A.   Madden Insurance.

                ANITA B. GLOVER & ASSOCIATES, LTD.
            10521 West Drive, Fairfax, Virginia  22030
                        (703) 591-3004

1          Q.    What did you do for them?

2          A.    Sales.

3          Q.    Did you at that time have any licensing for

4     an insurance agent?

5          A.    Uh-huh (affirmative).

6          Q.    What license?

7          A.    Life and health.

8          Q.    Do you still maintain those licenses?

9          A.    No.

10         Q.    Where was Madden Insurance located?

11         A.    New Jersey.

12         Q.    How long did you work for them?

13         A.    I'd say a year, maybe two years.

14         Q.    What did you do for Federal Express?

15         A.    I was a driver and worked in sales a little

16    bit as a sales assistant.

17         Q.    Where did you work there?

18         A.    In Virginia.

19         Q.    How long did you hold that position?

20         A.    I would say six years.  That's when I got

21    my pilot's license.  I was working full-time at

22    Federal Express and training part-time.

23         Q.    How were you undertaking training?  Did you

                    ANITA B. GLOVER & ASSOCIATES, LTD.
              10521 West Drive, Fairfax, Virginia  22030
                            (703) 591-3004

```
 1   have a part-time job or anything?
 2        A.   I worked full-time at Federal Express.  I
 3   went to flight school out at the Woodbridge airport.
 4        Q.   When did you attend flight school?  During
 5   what period of time?
 6        A.   During that whole period of time.
 7        Q.   During the six years --
 8        A.   I started there in college and kept flying
 9   through Federal Express days and continue to fly
10   today.
11        Q.   Have you ever had held any jobs as a pilot?
12        A.   I'd say, no.  I have flown for various --
13   when I worked for Jettech, I would have to fly
14   occasionally.  Right after I went to work for
15   Jettech, I was in the United Airlines training
16   program, but I never -- I don't know if you can
17   classify that as an employee.  I was with them a
18   couple of months.  I guess you could say that I was
19   an employee, but I quit to go to work for Jettech.
20        Q.   How do you spell that?
21        A.   A-E-R-O-D-Y-N-E.
22        Q.   They were located where?
23        A.   Dulles Airport.
```

1        Q.    And what period of time did you work for
2    them?
3        A.    I would say from 1988, in and around that
4    period.
5        Q.    For how long?
6        A.    I would estimate a year.
7        Q.    What did you do for them?  You said
8    aircraft broker?
9        A.    Sales.
10       Q.    You went to United Airlines after that and
11   you were in the training program?
12       A.    Technically, it wasn't United.  It was --
13   at the time they were United Express Commuter and I
14   went through their training program.  In the middle
15   of it, I was offered a job with Jettech.
16       Q.    Where was Jettech located?
17       A.    Reston, R-E-S-T-O-N.
18       Q.    Is that here in Virginia, also?
19       A.    Yes.
20       Q.    How long did you work for them?
21       A.    Six to seven years.
22       Q.    You were in aircraft sales?
23       A.    Yes.

                ANITA B. GLOVER & ASSOCIATES, LTD.
           10521 West Drive, Fairfax, Virginia  22030
                        (703) 591-3004

```
 1          Q.   At the time did you hold any licenses for
 2     selling aircraft?
 3          A.   No.
 4          Q.   You worked for Jettech up through 1995 or
 5     about the time that you started Emerald Aviation?
 6          A.   Right up until that time.  There are no
 7     licenses issued for aircraft brokers by the way.
 8          Q.   So, in 1995 you started Emerald Aviation.
 9     Where is that located?
10          A.   Manassas Airport.
11          Q.   Are you the only principal of Emerald
12     Aviation?
13          A.   Yes.
14          Q.   Are you an officer of Emerald Aviation?
15          A.   Yes.
16          Q.   What office do you hold?
17          A.   President.
18          Q.   Are there any other officers?
19          A.   No.
20          Q.   Are there any other directors, other than
21     yourself?
22          A.   No.
23          Q.   What is the business of Emerald Aviation?
```

1         A.    Aircraft brokerage.

2         Q.    Does Emerald Aviation own any aircraft that

3    it sells or only sells other owners' aircraft?

4         A.    Primarily, we sell other aircraft.

5         Q.    Time-to-time do you own aircraft that you

6    purchase for resale?

7         A.    Yes.

8         Q.    Does Emerald Aviation currently have

9    employees, other than yourself?

10        A.    No.

11        Q.    At any time during the last six years has

12   it had any other employees, other than yourself?

13        A.    No.

14        Q.    Does Emerald Aviation have any regular

15   means of advertising its aircraft?  In other words do

16   you have like a monthly advertisement?

17             Do you take out ads in a particular

18   aircraft industry magazine or anything like that?

19        A.    No.

20        Q.    Do you publish any fliers?

21        A.    No.

22        Q.    On average for the last five years how many

23   aircraft does Emerald Aviation broker in terms of

1    completed transactions?

2        A.    I'd say, and I'm just guessing around 30 a

3    year, maybe 40.

4        Q.    Any particular types of aircraft that

5    Emerald Aviation particularly brokers?

6        A.    Not one that we specialize in.   No.   It is

7    a number of different types, all of them pre-owned.

8        Q.    Not any particular brand or any particular

9    classification?   Do you deal mostly with

10   corporation-type planes or commercial planes?

11       A.    I would say the majority are corporate and

12   private individual owned airplanes.

13       Q.    What's located at the Manassas airport?   Is

14   there an office or a hangar?

15       A.    It is an office.

16       Q.    Does Emerald Aviation have any other

17   locations?

18       A.    No.

19       Q.    The lawsuit that we're here taking this

20   deposition with regards to involves a Canadair

21   Challenger, serial No. 1023.   Are you familiar with

22   that aircraft?

23       A.    Uh-huh (affirmative).

1      Q.   Could you respond to the questions by
2    saying yes or no?  She may not know if that was a
3    yes.  How are you familiar with that aircraft?
4      A.   It is an aircraft that I broker.
5      Q.   When did you first become familiar with
6    that aircraft?
7      A.   I don't recall specifically.
8      Q.   Do you recall how you first became familiar
9    with the aircraft?
10     A.   I listed the aircraft for Union Camp
11   Corporation.
12     Q.   When was that?
13     A.   I would say, probably October of 1997.
14     Q.   How did it come about that you were the
15   listing broker for Union Camp?
16     A.   I solicited their business and I was
17   successful getting the listing.
18     Q.   How did you know that they were interested
19   in selling their aircraft?
20     A.   Through calling efforts to the flight
21   department and later on one of the executives at the
22   corporation.
23     Q.   Explain what you mean calling by efforts to

ANITA B. GLOVER & ASSOCIATES, LTD.
10521 West Drive, Fairfax, Virginia  22030
(703) 591-3004

1    the flight department?

2         A.    I called from the owner's lists the

3    different corporations that own airplanes and asked

4    if they were going to be buying or selling aircraft

5    in the near future.  When they indicated that they

6    were, we submit a proposal to get their business.

7         Q.    You weren't aware when you made a cold call

8    that they were interested in selling that aircraft?

9         A.    I don't believe so.

10        Q.    That was about October of 1998?

11        A.    Let's see.  What we're talking about is in

12   the June, 1998 time frame.

13        Q.    June, 1999?

14        A.    It would have been October of 1998.  Yes.

15        Q.    Did Union Camp have any other aircraft that

16   they were interested in selling at that time?

17        A.    No.

18        Q.    Did they own any other aircraft to your

19   knowledge?

20        A.    No.

21        Q.    Do you recall who you spoke with at Union

22   Camp initially setting up this relationship?

23        A.    The chief pilot and later the executive

                ANITA B. GLOVER & ASSOCIATES, LTD.
            10521 West Drive, Fairfax, Virginia  22030
                          (703) 591-3004

1   that I spoke with, which was Bob Cassidy.  I'm sorry.

2   Bob was IP.  Bill Stewart was the vice-president at

3   Union Camp Corporation.

4       Q.   When you were retained to broker this deal

5   was there any form of written arrangement with Union

6   Camp for your brokering the sale of the aircraft?

7       A.   Yes.

8       Q.   And who entered into that written

9   agreement?

10      A.   Emerald Aviation and Union Camp

11  Corporation.

12      Q.   Do you have a copy of that agreement?

13      A.   Not with me.

14      Q.   Do you have a copy in your possession

15  somewhere?

16      A.   Yes.

17          MR. DYCIO:  What was that agreement,

18  counselor?

19          MR. REIMER:  The brokerage agreement

20  between Union Camp and Emerald Aviation.

21  BY MR. REIMER:

22      Q.   Where is that agreement located?

23      A.   In my office.

ANITA B. GLOVER & ASSOCIATES, LTD.
10521 West Drive, Fairfax, Virginia  22030
(703) 591-3004

1          Q.   What were your responsibilities pursuant to

2     that agreement?  What were you going to do for Union

3     Camp?

4          A.   Market the aircraft.

5          Q.   Were you to be paid a fee for your

6     services?

7          A.   Yes.

8          Q.   How was the fee calculated?

9          A.   I believe that it was a percentage.  I'd

10    have to look at the agreement.

11         Q.   How do you typically arrange your fee for

12    purposes of brokering an aircraft?  Is it percentage

13    based?

14         A.   Either a percentage or flat rate, I have

15    done both.

16         Q.   A flat rate contingent on a completed sale?

17         A.   Yes.

18         Q.   In this particular instance you believe

19    that it was a percentage based fee?

20         A.   I believe so.

21         Q.   When you first became involved in the

22    transaction by becoming the broker for Union Camp did

23    you go and see the aircraft or was the aircraft

```
 1   brought to you for viewing?

 2        A.   I went to see it.

 3        Q.   Where did you go to see it?

 4        A.   First at maintenance in Delaware.  I flew

 5   to Delaware to examine it.

 6        Q.   What does your examination of the aircraft

 7   consist of when it comes to this airplane in

 8   particular when you undertake to sell it?  Is it just

 9   a visual inspection or do you have any expertise in

10   reviewing log books or anything else?

11        A.   In this case, they have a very accomplished

12   flight department that put together the equipment and

13   I verified that was correct and began a visual

14   examination of the aircraft and photographs of the

15   aircraft for advertising copy.

16        Q.   From there, how did you undertake to

17   advertise that this aircraft was for sale?

18        A.   In the various trade publications and

19   through my database, FAXES and direct mail.

20        Q.   What trade publications?

21        A.   I don't recall specifically, Controller, AC

22   Flier, Executive Controller, Trade Plane.

23        Q.   Controller, AC Flier, Executive Controller
```

ANITA B. GLOVER & ASSOCIATES, LTD.
10521 West Drive, Fairfax, Virginia  22030
(703) 591-3004

```
1    and Trader Plane are four trade publications?
2         A.    Uh-huh (affirmative).
3         Q.    In each of these four trade publications
4    would these be advertisements with photographs or in
5    a classified section?
6         A.    Both.
7         Q.    Do you recall any specifics about any
8    advertisements that you may have placed for this
9    aircraft in any of these four publications?
10        A.    Specifically, I had a full page color ad in
11   Controller.
12        Q.    Do you recall how long that ad ran?
13        A.    No.
14        Q.    Do you recall for what period of time that
15   you first placed the ad?
16        A.    No.
17        Q.    Would it have been in late 1998, when you
18   first received the --
19        A.    Probably.
20             MR. DYCIO:    For purposes of the record, I
21   ask you to let him finish the question before you
22   answer.
23   BY MR. REIMER:
```

```
1        Q.   You said additionally that you utilize your
2    own database for purposes of advertising the
3    aircraft.  What would that have undertaken?
4        A.   It is not my own database.  I subscribe to
5    amstast multiple listing service.
6        Q.   What is that?
7        A.   Multiple listing service.
8        Q.   Is that similar to a real estate multiple
9    listing service that you place aircrafts in the
10   service, so that everybody can see what is for sale?
11       A.   Yes.
12       Q.   So, you placed the Canadair Challenger 600
13   that Union Camp was attempting to sell in the amstast
14   database?
15       A.   Yes.
16       Q.   Were there any other efforts that you
17   undertook to advertise and solicit people to purchase
18   the aircraft?
19       A.   I'm sure that there were many.
20       Q.   Can you think of any one that you generally
21   used, but are not sure?
22       A.   Direct mail, FAXES, telephone solicitation,
23       Q.   Tell me about if there was interest in
```

ANITA B. GLOVER & ASSOCIATES, LTD.
10521 West Drive, Fairfax, Virginia  22030
(703) 591-3004

```
 1   purchasing the aircraft in late 1998?  Was there any?
 2        A.   Yes.
 3        Q.   By whom?
 4        A.   A company called Aero Toy Store.
 5        Q.   Were they the only ones who expressed
 6   interest, other than maybe some telephone
 7   conversation, but any serious interest?
 8        A.   Quite a few.
 9        Q.   Expressed serious interest in the aircraft?
10        A.   Uh-huh (affirmative).
11        Q.   Where was the aircraft located at that
12   time -- at this time in late 1998?
13        A.   I don't recall.
14        Q.   You saw it in Delaware?
15        A.   Yes.
16        Q.   Do you know whether it left Delaware to go
17   to some other location?
18        A.   It went to New Jersey to the hanger that it
19   was based at.
20        Q.   How did you first get contacted by someone
21   from Aero Toy Store?
22        A.   Telephone.
23        Q.   Do you recall whether they contacted you or
```

ANITA B. GLOVER & ASSOCIATES, LTD.
10521 West Drive, Fairfax, Virginia  22030
(703) 591-3004

1    you contacted them as part of the telephone

2    solicitation?

3         A.    They contacted me.

4         Q.    Do you know who contacted you initially?

5    We are talking in late 1998?

6         A.    I don't recall offhand; one of their

7    salesman.

8         Q.    Do you know when that first contact

9    occurred?

10        A.    I don't.

11        Q.    Was it soon after the aircraft was placed

12   on the market for sale?

13        A.    Yes.

14        Q.    Did the salesman from Aero Toy Store

15   indicate how he learned of the availability of the

16   aircraft?

17        A.    No.

18        Q.    Did you ever come to learn?

19        A.    No.

20        Q.    What happened next after the salesman from

21   Aero Toy Store contacted you with an interest?

22        A.    I sent him information on the aircraft.

23        Q.    What information would you have sent him?

ANITA B. GLOVER & ASSOCIATES, LTD.
10521 West Drive, Fairfax, Virginia   22030
(703) 591-3004

1          A.    Specifications.

2          Q.    Would you have FAXED that to him?

3          A.    Yes.

4          Q.    Would you have maintained a record of your

5     having FAXED that to him?  Like a FAX cover sheet or

6     cover letter that you sent to him?

7          A.    I don't think so, but I may have something

8     like that.

9          Q.    What type of files do you keep on aircraft

10    that you are selling?  How do you maintain physical

11    files?  Do you have a file marked Challenger

12    600/Union Camp or is it in some other fashion?

13         A.    They are listed for sale.  I keep a file

14    for each aircraft.  After they are no longer for

15    sale, I usually file by companies.

16         Q.    By seller or buyer?

17         A.    Both.

18         Q.    What would you do with a file selling on

19    behalf of one company bought by another company?

20    Where would that file go?

21         A.    The reason I don't have the Union Camp

22    file -- it is the Union Camp file.  So, Union Camp

23    would be in a seller file.  I imagine most of that

1    information is in the Union Camp file.

2        Q.    So, with respect to using this particular

3    aircraft, as we sit here today in 2000, how are all

4    records to this aircraft currently kept?  Do you have

5    a file in your office labeled Union Camp?

6        A.    You are aware that Union Camp was purchased

7    by IP.  When IP became the owner of the aircraft, I

8    then kept records in the IP file.

9        Q.    Okay.  So, would all the documents relating

10   to the sale of this aircraft -- let me ask it this

11   way.

12          Would all the documents relating to the

13   sale of the aircraft from the time that Union Camp

14   contacted you until it was sold to Aero Toy Store in

15   mid-99 -- would all those records be in one file or

16   in multiple files?

17       A.    I don't recall.

18       Q.    At the end of a transaction what would you

19   do -- typically do with the documents?  Where would

20   they be?  That's what I'm trying to get it.  You keep

21   them in a seller file and split them up to a seller

22   file and buyer's file?

23       A.    Sometimes I keep both files.  I don't

                ANITA B. GLOVER & ASSOCIATES, LTD.
            10521 West Drive, Fairfax, Virginia  22030
                         (703) 591-3004

1   generally keep correspondence from the file.  I just

2   keep the pertinent information, contracts, dec sheet.

3        Q.   At the conclusion of a deal you remove from

4   the file kind of what you would say would be

5   anything --

6        A.   No longer necessary.

7        Q.   You discard it and keep just the pertinent

8   information, contracts --

9        A.   Right.

10       Q.   During the transaction would you keep the

11  correspondence and the FAX cover sheets, etc.?

12       A.   Yes.

13       Q.   How long after the conclusion of a

14  transaction do you typically thin out the file?

15            MR. HUTCHISON:  Objection to the form.

16            THE WITNESS:  I don't have a system for

17  that.

18  BY MR. REIMER:

19       Q.   Have you done that?  Have you removed

20  documents from your original file and discarded

21  them --

22       A.   Not that I recall.

23       Q.   You don't recall discarding any documents

                ANITA B. GLOVER & ASSOCIATES, LTD.
          10521 West Drive, Fairfax, Virginia   22030
                        (703) 591-3004

1    with respect to this transaction?

2         A.    No.

3         Q.    Going back to the point in time that you

4    FAXED to Aero Toy Store initially the specifics on

5    the aircraft, and at that time would you have kept

6    any letters to Aero Toy Store or information relating

7    to that FAX to Aero Toy Store?

8              MR. HUTCHISON:  Objection.  Asked and

9    answered.

10             MR. DYCIO:  Asked and answered.  You can go

11   ahead and answer.

12             THE WITNESS:  I don't recall honestly.

13   BY MR. REIMER:

14        Q.    So, what happened after you FAXED the

15   specifics to Aero Toy Store?

16        A.    Eventually, they became interested in the

17   aircraft.  I'm not as familiar with that far back,

18   not the history of this case.  That has been a year

19   and a half now.

20        Q.    It is fair to say if you don't recall.  I

21   just wanted to go chronologically from the time that

22   you started brokering the aircraft.  If you don't

23   recall, I understand.

                 ANITA B. GLOVER & ASSOCIATES, LTD.
             10521 West Drive, Fairfax, Virginia  22030
                          (703) 591-3004

1            How did they indicate Aero Toy Store, that

2     they were now interested in pursuing possible

3     purchase of the aircraft?

4          A.   I don't recall.

5          Q.   Do you recall whether or not there came a

6     time when they issued any correspondence to you

7     making any kind of offer on the aircraft?

8          A.   I'm sure that happened.  Yes.

9          Q.   You don't recall that it happened, but you

10    think that it may have happened at that time?

11         A.   I know that they made an offer on the

12    aircraft at one point in time.  How they originally

13    expressed interest, I don't recall.

14         Q.   At the time that Aero Toy Store initially

15    made an offer on the aircraft was Union Camp still

16    involved -- was that before IP took over?

17         A.   Yes.

18         Q.   How much was Union Camp asking for the

19    aircraft?

20         A.   At that time, I believe that it was $8

21    million or more.

22         Q.   Do you recall what the Aero Toy Store offer

23    on the aircraft was in late 1998?

ANITA B. GLOVER & ASSOCIATES, LTD.
10521 West Drive, Fairfax, Virginia  22030
(703) 591-3004

1       A.    I want to say that I think it was seven or
2    eight.
3            MR. DYCIO:   Mr. Dahlberg, I instruct you to
4    answer with your knowledge.   If you are guessing, I
5    instruct you not to respond.
6    BY MR. REIMER:
7       Q.    Do you recall when you received the offer
8    from Aero Toy Store who you reported the offer to at
9    Union Camp?
10      A.    Bill Stewart.
11      Q.    Did Aero Toy Store and Union Camp enter
12   into an formal contract for the purchase of the
13   aircraft at that time?
14      A.    What do you mean by contract?
15      Q.    Well, did they enter into any agreement
16   whether it is a letter of intent or a contract?  Was
17   there any agreement or paper that both parties signed
18   and said that the parties are interested in buying or
19   selling the aircraft?
20      A.    As best I can recall, yes.
21      Q.    Is it fair to say that you are not sure
22   what the form of that document was?
23      A.    Yes.

                ANITA B. GLOVER & ASSOCIATES, LTD.
             10521 West Drive, Fairfax, Virginia  22030
                          (703) 591-3004

```
 1              MR. HUTCHISON:  Between Union Camp and Aero
 2   Toy Store?
 3              MR. REIMER:  Yes.
 4   BY MR. REIMER:
 5         Q.   Do you recall who you were dealing with at
 6   Aero Toy Store during that period?
 7         A.   I don't know.
 8         Q.   Were you dealing with one person or more
 9   than one person during that period of time?
10         A.   I believe at that time it was more than
11   one.
12         Q.   But you do not recall any names?
13         A.   Gary Anzalon (phonetic).
14              MR. DYCIO:  For the purpose of
15   clarification, you are asking if he recalls the names
16   from Aero Toy Store and not the names of who he was
17   dealing with vis-a-vie this airplane.  He doesn't
18   recall.
19   BY MR. REIMER:
20         Q.   Gary Anzalon is someone who works for Aero
21   Toy Store?
22         A.   Yes.
23         Q.   What is his position?
```

1          A.    Sales.

2          Q.    Do you recall anybody else?

3          A.    No.

4          Q.    Had you ever dealt with Aero Toy Store

5     before on anything?  Any other transactions in your

6     experience as an aircraft salesman or broker?

7          A.    No.

8          Q.    Had you dealt with any the employees of

9     Aero Toy Store in terms of their sales people?  Do

10    you know their salespeople through other

11    associations?  Maybe they used to work for a

12    different broker?

13         A.    No.

14         Q.    You didn't know Mr. Anzalon from before

15    this?

16         A.    No.

17         Q.    How about Morris Zarosi (phonetic) the

18    owner of Aero Toy Store?  Had you ever dealt with him

19    before?

20         A.    No.

21         Q.    Do you know whether you ever dealt with him

22    in late 1998, with respect to the problems respective

23    of the purchase of the aircraft?

```
1            MR. DYCIO:  Mr. Zarosi for purposes of the
2     record.
3            THE WITNESS:  I don't recall whether I
4     became involved or not.
5     BY MR. REIMER:
6        Q.    At any time?
7        A.    Later.
8        Q.    When did he become involved?
9        A.    In June of the following year.
10       Q.    So, after Aero Toy Store and Union Camp
11    agreed on the terms or at least agree in theory that
12    there might be a sale of the aircraft, what happened
13    next?
14       A.    I haven't studied that part in so long.  I
15    would be guessing.  I'd need to look over that whole
16    period of time in order to talk about it.
17       Q.    It is my understanding that at some point
18    during this process the aircraft was taken out to
19    Midcoast Aviation in St. Louis, Missouri for a
20    pre-purchase inspection.  Do you recall that?
21       A.    Yes.
22       Q.    You produced here this morning --
23            MR. DYCIO:  Mr. Dahlberg or Emerald
```

ANITA B. GLOVER & ASSOCIATES, LTD.
10521 West Drive, Fairfax, Virginia  22030
(703) 591-3004

```
 1   Aviation did not produce anything from any
 2   corporation to you.  We didn't recognize your
 3   subpoena.  Whatever is here is on a voluntary basis
 4   for purposes of this deposition.
 5           We do not recognize what you purport to be
 6   the binding nature of the subpoena.
 7   BY MR. REIMER:
 8       Q.  You voluntarily provided this morning a
 9   document from Midcoast Aviation, which is dated
10   February 3, 1999.  Could you tell me what that
11   document is?
12           MR. HUTCHISON:  I want to make a
13   clarification.  Do you mind if we put a deposition
14   exhibit label on the original?
15           MR. DYCIO:  I think what we can do is
16   reference it and make copies now.  That way -- why
17   don't I make copies for purposes of the deposition?
18           MR. HUTCHISON:  Take a look, and we'll make
19   copies of what you want.  We might take a break and
20   do it now.
21           Sharon, we are continuing our marking of
22   the exhibits from the last deposition.  I would like
23   you to start with Exhibit No. 39, please.  Just put
```

ANITA B. GLOVER & ASSOCIATES, LTD.
10521 West Drive, Fairfax, Virginia  22030
(703) 591-3004

1    the date on the bottom and Dahlberg and just put 39,

2    40, please.

3            (Whereupon, a discussion off the record

4    was held.)

5                        (A document was marked as

6                        Deposition Exhibit No.

7                        39   identification.)

8    BY MR. REIMER:

9        Q.    Let me show you Exhibit No. 39, which is a

10   FAX from Midcoast Aviation.  Can you identify that?

11       A.    It is a FAX from Midcoast Aviation on

12   squawks on an inspection.

13       Q.    What are squawks?

14       A.    Discrepancies.

15       Q.    Do you recall whether or not that was the

16   result of the inspection that Midcoast sent out at

17   the time that Aero Toy Store was interested in

18   purchasing the aircraft?

19       A.    I believe that was what it was from to the

20   best of my knowledge.

21       Q.    Do you recall who paid for that inspection

22   whether it be Union Camp or Aero Toy Store?

23       A.    I believe that it was a combination.

                ANITA B. GLOVER & ASSOCIATES, LTD.
          10521 West Drive, Fairfax, Virginia  22030
                        (703) 591-3004

1          Q.    This report was issued in February or early

2    February, 1999.  Do you know whether this report was

3    issued at a time when Aero Toy Store was still

4    interested in purchasing the aircraft?

5          A.    Yes.  I believe that it was at the time

6    that they were still interested in purchasing the

7    aircraft.

8          Q.    Did anybody from Aero Toy Store go up to

9    New Jersey to see the aircraft before it went to

10   Midcoast?  Do you know?

11         A.    I don't recall.

12         Q.    Do you know whether anybody from Aero Toy

13   Store went out from Midcoast to see the aircraft?

14         A.    I believe that they did.

15         Q.    Do you know who that might be?

16         A.    No.

17         Q.    What happened to the transaction between

18   Union Camp and Aero Toy Store?  The first

19   transaction?

20         A.    It didn't come to fruition.

21         Q.    Do you know why?

22         A.    I don't know specifically.  It's been such

23   a lengthy time.  I'd have to get re-familiar with it.

                    ANITA B. GLOVER & ASSOCIATES, LTD.
                10521 West Drive, Fairfax, Virginia  22030
                              (703) 591-3004

```
 1        Q.    Were you the person that was dealing with
 2   Aero Toy Store for purposes of completing that
 3   transaction?
 4        A.    Yes.
 5        Q.    Would Aero Toy Store have been dealing with
 6   anybody directly at Union Camp?
 7        A.    No.
 8        Q.    Do you recall who you were dealing with at
 9   Aero Toy Store?
10        A.    I don't.
11        Q.    Do you know how the deal died, so to speak?
12   Is there an event or series of events that you recall
13   that put this deal to bed in early 1999?
14        A.    I don't recall.  I recall bits and pieces,
15   and I would rather not speculate on what little I
16   remember without reviewing it first.
17        Q.    What would it be that you would review that
18   would refresh your recollection as to what occurred?
19        A.    The file, the Union Camp file.
20        Q.    What documents could be contained in the
21   Union Camp file, that would refresh your
22   recollection?
23              MR. HUTCHISON:  Objection to form, and
```

ANITA B. GLOVER & ASSOCIATES, LTD.
10521 West Drive, Fairfax, Virginia  22030
(703) 591-3004

1    asked and answered.

2    BY MR. REIMER:

3         Q.    You can answer.

4         A.    I would look for correspondence between

5    myself and Union Camp and Emerald Aviation and Aero

6    Toy Store to see what might have been going on at

7    that time.

8         Q.    After the deal was terminated or at least

9    ended with Aero Toy Store at that time, what happens

10   next in the sale of this aircraft or prospective sale

11   of this aircraft?

12        A.    The airplane stayed at the Midcoast

13   facility because the flight department at Union Camp

14   was closing down because of the takeover -- the

15   impending takeover of IP.  They left it at Midcoast.

16   I continued to market the aircraft.

17        Q.    Did you go out to Midcoast in St. Louis

18   where the aircraft was?

19        A.    No.

20        Q.    Have you ever been out there?

21        A.    Ever in my life?  I believe so.

22        Q.    Do you know who Steven Bates is at

23   Midcoast?

                ANITA B. GLOVER & ASSOCIATES, LTD.
            10521 West Drive, Fairfax, Virginia  22030
                         (703) 591-3004

1        A.   Yes.

2        Q.   Did you have dealings with Steven Bates at

3    Midcoast before this Canadair Challenger went out to

4    Midcoast?

5        A.   I don't believe so.  No.

6        Q.   Was there any interest in the aircraft that

7    you are marketing after Aero Toy Store is no longer

8    interested in purchasing the aircraft?

9        A.   Yes.

10       Q.   Let me go back a second.  Do you recall who

11   terminated the deal between Union Camp and Aero Toy

12   Store?  Was it a decision of Aero Toy Store or the

13   decision of Union Camp to your recollection?

14       A.   Aero Toy Store.

15       Q.   Through you don't recall why?

16       A.   No.

17       Q.   At what point does your involvement with

18   International Paper begin?  Do you recall a date?  An

19   approximate date?  I'm not looking for a specific

20   date as much as a month, time of year?

21       A.   I don't know.  I would guesstimate in the

22   Spring of 1999.

23       Q.   Would it be after the deal --

                ANITA B. GLOVER & ASSOCIATES, LTD.
             10521 West Drive, Fairfax, Virginia  22030
                           (703) 591-3004

```
1                MR. HUTCHISON:  1999.
2                THE WITNESS:  May of 1999.
3     BY MR. REIMER:
4          Q.   Would it be after the deal with Aero Toy
5     Store ended?  The initial transaction?
6          A.   I'm estimating that.  Yes.
7          Q.   What type of interest was being generated
8     in the aircraft after the transaction concluded?
9     Telephone calls or --
10         A.   Telephone calls, response to advertising.
11         Q.   Any offers come in?
12         A.   I don't recall.  As I remember the market
13    was declining at that time.  There was becoming less
14    interest in the airplane.
15         Q.   Was it the market for aircraft in general
16    of this type or the market for Canadair Challengers
17    declining -- for the Canadair Challenger 600?
18         A.   I don't recall.
19         Q.   Just seems that there was a market decline?
20         A.   We dropped the price.
21         Q.   Who did?  Did International Paper or Union
22    Camp drop the price?
23         A.   Both, I believe.
```

ANITA B. GLOVER & ASSOCIATES, LTD.
10521 West Drive, Fairfax, Virginia  22030
(703) 591-3004

1        Q.   Do you recall -- you said that the initial

2   asking price was $8 million.  Do you recall what the

3   next asking price was?

4        A.   I don't.  I can only tell you that the $8

5   million is an absolute guess.  I'm assuming it was

6   somewhere around there.

7        Q.   So, you don't recall whether any offers

8   came in on the aircraft, but at some time somebody on

9   behalf of Turnberry Charters becomes interested in

10  the aircraft?

11       A.   Yes.

12       Q.   Were you negotiating to the best of your

13  recollection with anybody for the purchase of the

14  aircraft between the time that Aero Toy Store ceased

15  its interest and the time that Turnberry Charters

16  began negotiating for the purchase of the aircraft?

17       A.   Many, I'm sure.  More than one or two.

18       Q.   But you are -- you are not sure whether any

19  offers came in?  I'm trying to get a clarification to

20  the extent --

21            MR. DYCIO:  Asked and answered.

22            MR. HUTCHISON:  I object to the form.

23            THE WITNESS:  From a party in California --

            ANITA B. GLOVER & ASSOCIATES, LTD.
         10521 West Drive, Fairfax, Virginia  22030
                    (703) 591-3004

```
 1   I don't think of their names right now.
 2   BY MR. REIMER:
 3        Q.   What happened to that offer?
 4        A.   I don't recall.
 5        Q.   How did you first get contacted by somebody
 6   on behalf of Turnberry or did you contact them?
 7        A.   They contacted me, Dennis Lainey.
 8        Q.   Did you know Mr. Lainey before that initial
 9   contact?
10        A.   No.
11        Q.   Did you know of Mr. Lainey?
12        A.   I had heard of him.
13        Q.   And to the best of your recollection how
14   did that initial contact take place?
15        A.   I seem to recall that he called the owner
16   of the aircraft directly and they had instructed --
17   let me know that he had made an attempt to call them.
18   I called him and said, I understand that you are
19   interested in the aircraft.  You called the owner
20   directly.  I'm the broker who is handling it.
21        Q.   Do you recall who contacted you?  When you
22   say the owner you mean International Paper at that
23   time?
```

```
 1          A.    I believe International Paper at that time.

 2          Q.    Do you recall who contacted you and told

 3    you that he had called?

 4          A.    I believe it was Bob Cassidy.

 5          Q.    Who is Mr. Cassidy?

 6          A.    The chief pilot at the time.

 7          Q.    At the time that International Paper took

 8    over Union Camp who at International Paper were you

 9    dealing with?

10          A.    Bob Cassidy.

11          Q.    Was he the only one that you were dealing

12    with?

13          A.    Pretty much.  Yes.

14          Q.    Did International Paper enter into a new or

15    separate written agreement for your brokering this

16    aircraft when they became involved in the deal?

17          A.    Yes.

18          Q.    Do you recall any changes that were made to

19    the agreement between the agreement by and between

20    Union Camp and Emerald Aviation?  Were there any

21    changes in the terms of the agreement?

22          A.    I don't recall.

23          Q.    Was there a change in the asking price at
```

1   that time?

2       A.   More than likely, yes.

3       Q.   So, go back to the time when you contacted

4   Dennis Lainey and tell me what happens in your

5   initial contact in terms of discussions about the

6   aircraft?

7       A.   I'm sure that he had some questions about

8   the airplane that I answered and I probably FAXED him

9   a spec sheet on the aircraft.

10      Q.   Do you recall a date or anything like that

11  or a time when any of this occurred with respect to

12  contacting Dennis Lainey?

13      A.   I would say the mid-June, 1999, time frame.

14      Q.   Did you begin negotiating over the

15  telephone with Mr. Lainey for the purchase of the

16  aircraft?

17          MR. HUTCHISON:   Objection as to the form.

18          THE WITNESS:   What do you mean negotiating?

19  BY MR. REIMER:

20      Q.   Did you have discussions about terms upon

21  which International Paper would sell the aircraft to

22  Turnberry?

23      A.   Yes.

ANITA B. GLOVER & ASSOCIATES, LTD.
10521 West Drive, Fairfax, Virginia  22030
(703) 591-3004

1       Q.    Did there come a time when Mr. Lainey on

2    behalf of Turnberry made a verbal offer to purchase

3    the aircraft for a given price?

4       A.    I don't recall a verbal offer.

5       Q.    What's the first offer that you do recall

6    being made to you on behalf of Turnberry?

7             MR. DYCIO:    Assumes facts not in evidence.

8    I will object, but go ahead and answer.

9             THE WITNESS:    I recall him making a $7

10   million offer.

11   BY MR. REIMER:

12      Q.    In writing?

13      A.    Yes.

14      Q.    Had you heard that $7 million number before

15   in any written documents or verbal conversations with

16   Mr. Lainey?

17      A.    I don't recall.

18            MR. REIMER:    Let me mark this.

19                          (A document was marked as

20                          Deposition Exhibit No.

21                          40 for identification.)

22            (Whereupon, a discussion off the record

23   was held.)

                 ANITA B. GLOVER & ASSOCIATES, LTD.
              10521 West Drive, Fairfax, Virginia  22030
                          (703) 591-3004

1   BY MR. REIMER:

2       Q.   Let me show you a document that is marked

3   as Exhibit No. 40, which you brought with you today

4   and ask you if can identify that document?

5       A.   This is a letter from Dennis Lainey of

6   Turnberry Charters relative to their interest in the

7   Challenger.

8       Q.   That document refers to that purchase price

9   of $7 million.  Is that the document that you were

10  referring to a few moments ago when you said that you

11  received an offer?

12      A.   Yes.

13           MR. DYCIO:  The document speaks for itself.

14  BY MR. REIMER:

15      Q.   Did you receive any written correspondence

16  from Turnberry prior to that correspondence dated

17  June 19th, which I think has FAX information of June

18  20th?

19           MR. DYCIO:  The document speaks for itself,

20  but you can go ahead and answer the question.

21           THE WITNESS:  I don't recall.  I doubt it.

22  BY MR. REIMER:

23      Q.   You did not bring with you -- strike that.

                ANITA B. GLOVER & ASSOCIATES, LTD.
            10521 West Drive, Fairfax, Virginia  22030
                         (703) 591-3004

```
 1              This document that we have marked as
 2    Exhibit No. 40, where did that document come from in
 3    terms of your office?  Is that the Union Camp file
 4    that we talked about?
 5         A.    It would be the Turnberry/International
 6    Paper file.
 7         Q.    That would be a separate file than the
 8    Union Camp International Paper file that you
 9    referenced earlier?
10         A.    Yes.
11         Q.    The documents that your attorney
12    volunteered to us this morning that we have in front
13    of me, that we'll mark through this deposition, is
14    that the entire contents of the
15    Turnberry/International Paper file that you
16    described?
17              MR. DYCIO:  I object to the form and nature
18    of the question.  Let me state for the record that
19    there is a privileged document that we withheld,
20    which was prepared in anticipation of this deposition
21    to inform me the basis of this litigation.
22              MR. REIMER:  With the exception -- strike
23    that.  A document that was prepared by whom?
```

ANITA B. GLOVER & ASSOCIATES, LTD.
10521 West Drive, Fairfax, Virginia  22030
(703) 591-3004

```
 1              MR. DYCIO:  By Mr. Dahlberg at my request.
 2              MR. REIMER:  I'm trying to get
 3     clarification.
 4     BY MR. REIMER:
 5         Q.   With the exception of the document that you
 6     prepared and forwarded to your attorney Mr. Dycio is
 7     this the entire contents of that file that you
 8     described as the International Paper/Turnberry file?
 9         A.   I don't know.
10         Q.   What else is contained in that file?
11         A.   I believe the listing agreement between
12     Emerald and IP.
13         Q.   Anything else?
14         A.   I don't believe so.
15         Q.   Why would the listing agreement between
16     Emerald and International Paper be in that file,
17     rather the Union Camp/International Paper file that
18     you described before?
19         A.   It may be in the Union Camp file.  I think
20     that's where I put it after I was getting it.  I put
21     it in with the old Union Camp listing agreement to
22     keep them together.  It was odd to have the client
23     change midstream.
```

1        Q.   Going back to your records.  In terms of
2   the files that we have identified, there are two
3   files the Union Camp/International Paper file, which
4   contain documents relating to the original
5   prospective deal between Aero Toy Store and Union
6   Camp.  We have identified the file which contains the
7   prospective deal between Turnberry and International
8   Paper.
9             Are there any other files that you maintain
10  in your office, other than those two, that have
11  anything to do with your involvement with this
12  particular Canadair Challenger 600?
13       A.   I don't believe so.
14       Q.   Jumping ahead for a moment.  The document
15  which relates to the ultimate purchase of the
16  aircraft by Aero Toy Store are those in the same file
17  as the document that we talked about earlier dated
18  late 1998, early 1999?
19       A.   I don't recall.
20       Q.   Do you know where the documents relating to
21  the ultimate sale of the aircraft to Aero Toy Store
22  are?
23       A.   Either in the Aero Toy Store file or in the

                  ANITA B. GLOVER & ASSOCIATES, LTD.
              10521 West Drive, Fairfax, Virginia  22030
                           (703) 591-3004

1    Union Camp file, I'd have to look.

2         Q.   It is possible there is a third file

3    dealing with that?  We'll call it the third

4    transaction or attempted transaction on the sale, but

5    you are not sure?

6         A.   Right.

7         Q.   Lastly, would there be any other files,

8    other than those three if they were three, that would

9    have anything to do with this aircraft that you would

10   maintain in your office?

11        A.   I honestly don't recall.  There could be

12   another company that I received an interest on the

13   aircraft that I started a file on.

14        Q.   How would you reference that if you were

15   required -- and you weren't required to do it

16   today -- if you were required to locate any other

17   document that you had that had anything to do with a

18   Canadair Challenger 600, serial 1023?  How would you

19   reference those documents?

20        A.   I'd just go through my files, which are all

21   in alphabetical order and open them up.  A lot that I

22   have are from people like -- I would have to see what

23   was in the file and what we are talking about and

ANITA B. GLOVER & ASSOCIATES, LTD.
10521 West Drive, Fairfax, Virginia  22030
(703) 591-3004

1   when.

2        Q.   Now, getting back to Exhibit No. 40 --

3   strike that.

4            What did you do with that letter when you

5   received it from Dennis Lainey?

6            MR. HUTCHISON:  Exhibit No. 40, is a

7   three-page exhibit.  A two-page letter with a cover

8   page, as well.

9            THE WITNESS:  I believe that I forwarded it

10  to International Paper.

11  BY MR. REIMER:

12       Q.   Do you know who at International Paper you

13  would forward it to?

14       A.   I want to say Bill Stewart -- I mean

15  Cassidy.

16       Q.   Bob Cassidy?

17       A.   Yes.

18       Q.   Did you have a conversation with

19  Mr. Cassidy regarding that offer?  A telephone

20  conversation?

21       A.   I'm sure that we did, but I don't recall

22  the substance.

23       Q.   What happened after you sent the letter to

                ANITA B. GLOVER & ASSOCIATES, LTD.
         10521 West Drive, Fairfax, Virginia  22030
                         (703) 591-3004

1  Mr. Cassidy?

2      A.    I believe that he forwarded it to his

3  internal people to look it over.

4      Q.    Did you have any telephone conversation

5  with anybody else at International Paper at the time

6  that this letter was received by you and sent to

7  International Paper for review?

8      A.    No, not that I recall.

9      Q.    Let's mark that as Exhibit 41, please.

10                        (A document was marked as

11                        Deposition Exhibit No.

12                        41 identification.)

13          MR. HUTCHISON:  Is that an executed copy of

14  that exhibit?

15          MR. REIMER:  Yes.

16  BY MR. REIMER:

17      Q.    Exhibit No. 41, is another document from

18  your files.  Is that the same letter with some FAX

19  header information and another signature on it?  Do

20  you recognize that correspondence?

21      A.    Yes.

22      Q.    That version of the correspondence is one

23  that contains two signatures, correct?

1          A.   Right.

2          Q.   And how did you come in possession of that

3     document in its form right there?

4          A.   I believe that it was FAXED to me from

5     International Paper.

6          Q.   Do you know whether International Paper

7     FAXED a copy to Turnberry or were you the one who

8     FAXED a copy?

9               MR. DYCIO:   I object to the compound nature

10    of the question, only if you have specific

11    information.

12              THE WITNESS:   I don't recall.

13    BY MR. REIMER:

14         Q.   I don't see in this package of materials

15    any FAX confirmation information.   Does your FAX

16    machine when you FAX things at the office print out a

17    FAX confirmation page?

18         A.   No.

19         Q.   Do you print any form of FAX confirmation

20    log for a given day or week?

21         A.   No.

22         Q.   Do you recall having telephone

23    conversations with Mr. Lainey to indicate that

                    ANITA B. GLOVER & ASSOCIATES, LTD.
               10521 West Drive, Fairfax, Virginia  22030
                              (703) 591-3004

1    International Paper had agreed to accept their offer

2    of $7 million?

3        A.    I don't recall.

4        Q.    At the time that you received this letter

5    executed by International Paper did you have any

6    conversation with anybody at International Paper to

7    discuss the fact they agreed to accept the offer?

8            MR. HUTCHISON:  Objection to the form.

9            MR. DYCIO:  Objection.

10           THE WITNESS:  The question that you are

11   asking, no.  I don't remember.

12   BY MR. REIMER:

13       Q.    So, you don't recall any conversation with

14   Mr. Lainey or International Paper with respect to the

15   fact that they agreed on the $7 million purchase

16   price?

17           MR. DYCIO:  I object.  He is not qualified

18   to know, unless it is specifically set forth on the

19   documents.  Go ahead and answer.

20           THE WITNESS:  Would you rephrase the

21   question?

22   BY MR. REIMER:

23       Q.    At the time that International Paper agreed

                ANITA B. GLOVER & ASSOCIATES, LTD.
           10521 West Drive, Fairfax, Virginia  22030
                          (703) 591-3004

1    to accept Turnberry's offer of $7 million -- can we

2    agreed that occurred?  There came a time

3    International Paper agreed to accept Turnberry's

4    offer of $7 million?

5              MR. HUTCHISON:  Form.

6              MR. DYCIO:  I object.  Calls for a legal

7    conclusion and he is not qualified to answer.

8    BY MR. REIMER:

9         Q.   You can answer the question.

10        A.   I don't recall.

11        Q.   What happened after you got that letter

12   back from Turnberry -- I'm sorry -- from

13   International Paper signed by International Paper.

14   What was the next step in the process?

15        A.   There were subsequent conversations with

16   myself and Dennis Lainey to make arrangements to move

17   forward with his getting the airplane inspected.

18        Q.   What was the contents of those

19   conversations?  What were you discussing?

20        A.   Initially.  I guess it was the particulars

21   and timing and then it grew to -- as I recall in a

22   Tuesday evening conversation that I had with him when

23   he had identified a particular person that he was

```
 1   sending out to look at the airplane.
 2            I had reiterated to him as I had in
 3   previous conversations that he was welcome to inspect
 4   the aircraft as many different ways as he wanted to.
 5            This pre-purchase inspection was made
 6   available to him, and may have been made available to
 7   him by FAX.  That IP's position on the sale of the
 8   aircraft especially at the reduced price of $7
 9   million was going to be on an as is, where is basis.
10            At that time he exploded with me on the
11   phone and said that this was not the only type of
12   aircraft available.  That he didn't have to buy this
13   airplane.  There were other Challenger 600s available
14   and began ranting and cursing and hung up on me.
15            At that point I thought that the deal was
16   off.  I called International Paper to let them know
17   that it didn't look like the deal was going to
18   continue.
19       Q.   Well, did Mr. Lainey indicate to you what
20   it was that he wanted different than an as is basis?
21       A.   He wanted to go out and inspect the
22   airplane and everything that he found that he wanted
23   fixed he wanted the seller to pay for before he was
```

1   going to close.

2       Q.   Did he say that he wanted them to fix all

3   what he found?

4       A.   That was the kind of agreement that he

5   wanted to pursue and that was going to be his

6   understanding of the inspection that would ensue.

7       Q.   What did he say specifically that would

8   lead you to believe that?

9       A.   I don't have to buy an airplane in as is,

10  where is, condition.  There are others that I can

11  buy.  I don't have to buy this one.

12      Q.   This was on a Tuesday evening?

13      A.   I have a phone record of it.

14      Q.   Did you review that phone record recently?

15      A.   I did a couple of weeks ago.  I remembered

16  it was on my cell phone, and I looked through the

17  cell phone records to see if it was an incoming or

18  outgoing call.

19      Q.   So, a couple of weeks ago you looked at

20  your phone bill?

21      A.   Many months ago.

22      Q.   Many months ago you looked at your phone

23  bill to identify when that conversation took place?

```
 1          A.    Right.

 2          Q.    Do you still have that phone bill?

 3          A.    I believe that I do.

 4          Q.    That is for your cell phone?

 5          A.    Uh-huh (affirmative).

 6          Q.    How about your office phone?  Do you have

 7    your bills for your office phone for June of 1999?

 8          A.    Yes.

 9          Q.    When you received Exhibit No. 40, from Mr.

10    Lainey did you review this letter?

11          A.    I'm sure that I did.

12          Q.    In that conversation on Tuesday evening,

13    Mr. Lainey indicated that he was sending a

14    representative out to Midcoast to review the records;

15    is that correct?

16          A.    Yes.

17          Q.    Was that Ken Murray?

18          A.    Yes.

19          Q.    Had you heard Murray's name before in any

20    conversation with Mr. Lainey?

21          A.    I knew who Ken Murray was, but not from Mr.

22    Lainey.

23          Q.    How?
```

1      A.    He is a known maintenance expert on the

2    Challengers.

3      Q.    Had you ever had dealings with Mr. Murray

4    before?

5      A.    Not directly, but indirectly.

6      Q.    What kind of indirectly?

7      A.    He was involved in doing some work for a

8    client that I had some business dealings with.  I

9    knew what he did.

10     Q.    Had you ever spoken with him before?

11     A.    Yes.

12     Q.    Did you speak to him at any time in

13   relation to this particular aircraft?

14     A.    Yes.

15     Q.    When did you speak to him?

16     A.    Before and after he completed his

17   inspection.

18     Q.    While he was out at Midcoast you spoke to

19   him?

20     A.    I'm not sure if it was while or after.  It

21   might have been both.

22     Q.    What was the purpose of those

23   conversations, if there was more than one?

ANITA B. GLOVER & ASSOCIATES, LTD.
10521 West Drive, Fairfax, Virginia  22030
(703) 591-3004

```
 1          A.    Initially, it was because I was confused
 2    that he was even there.  The night before that he
 3    arrived, Mr. Lainey called the whole deal off.  I was
 4    under the impression because that happened so late in
 5    the day, maybe 6:00, 7:00 or 8:00 at night, Mr.
 6    Lainey might not have been able to call him off.
 7          I thought it was a lack of communication
 8    between the two that had him still arriving there.
 9    We had a conversation saying, are you sure that you
10    are supposed to be there?  As far as I know, Mr.
11    Lainey called the whole thing out off last night.
12          Q.    Did Mr. Lainey say to you that he was
13    calling the whole deal off?
14          A.    I think that I explained to you that he
15    made it specific that he wasn't buying the airplane.
16          Q.    You said that he hung up the phone and you
17    assumed the deal was off?
18          MR. DYCIO:  I believe that assumes facts
19    not in evidence.  The record speaks for itself.  Go
20    ahead and reiterate it once again.
21          THE WITNESS:  He made it very obvious that
22    he was not buying the airplane.  I don't have to buy
23    this airplane.  There are other airplanes out there.
```

1   From the tone and words that he used, he wasn't --

2   didn't have an interest at that time in pursuing this

3   deal.

4   BY MR. REIMER:

5        Q.   This letter Exhibit No. 40, that you said

6   that you reviewed, it states in the fourth

7   paragraph -- you have a copy.  In Exhibit No. 41, it

8   states that Turnberry would be conducting a systems

9   check and flight check at Midcoast Aviation.

10       Do you understand that they intended to

11  conduct a systems check and flight check when they

12  first made this offer?

13       A.   I understood that he could have done that,

14  but he understood that that was his responsibility.

15  There were no pilots made available.  International

16  Paper didn't have pilots to fly the airplane because

17  the Union Camp guys had long since gone.

18       Q.   You understood that he intended to do that;

19  is that right?

20       A.   At that point I understood that was his

21  plan.

22       Q.   What happened?  You said this conversation

23  happened on Tuesday night, which by my calculations

ANITA B. GLOVER & ASSOCIATES, LTD.
10521 West Drive, Fairfax, Virginia  22030
(703) 591-3004

1    was June 22nd.  Does that sound right or do you know?

2         A.    Sounds --

3              MR. HUTCHISON:  I have a 1999 calendar

4    here.  Do you want to use it to help him out?  Mark

5    it as an exhibit or whatever you want to do.

6              THE WITNESS:  I thought Tuesday was the

7    21st.  It might have been the 22nd.

8    BY MR. REIMER:

9         Q.    Here is a calendar.  It indicates Tuesday

10   night is June 22nd?

11        A.    Okay.

12             MR. REIMER:  I don't think we need to mark

13   it as an exhibit.  I would hope that Mr. Hutchison's

14   calendar is the same as everybody else.

15   BY MR. REIMER:

16        Q.    The document that we marked as Exhibit No.

17   41, has several FAX headers of June 21st.

18             Do you recall whether or not you had

19   conducted the back and forth FAXES of that

20   correspondence on Monday, June 21st?

21             MR. HUTCHISON:  Objection as to form.

22             THE WITNESS:  I don't recall.

23   BY MR. REIMER:

                    ANITA B. GLOVER & ASSOCIATES, LTD.
                 10521 West Drive, Fairfax, Virginia  22030
                              (703) 591-3004

1     Q.   Do you recall generally whether or not this

2    conversation with Mr. Lainey that we are talking

3    about on Tuesday evening occurred before or after the

4    point in time when both parties signed Exhibit No.

5    41?

6     A.   I want to say it was after to the best of

7    my knowledge.

8     Q.   Just so that I'm clear.  If I understand

9    it, you had a series of conversations with Mr. Lainey

10    I guess over the weekend where you talked about the

11    logistics of reviewing the records?  Is that what you

12    said?

13          MR. HUTCHISON:  Objection to the form.

14          THE WITNESS:  I'm sure prior to executing

15    this and him sending it, we had many conversations

16    about the aircraft.  I know that I had made it known

17    previous to him making this agreement that they could

18    inspect the aircraft.  We weren't going to object,

19    but weren't going to sell the air --

20          MR. HUTCHISON:  You are referring to

21    Exhibit No. 41?

22          THE WITNESS:  This letter, yes.

23    BY MR. REIMER:

ANITA B. GLOVER & ASSOCIATES, LTD.
10521 West Drive, Fairfax, Virginia  22030
(703) 591-3004

63

1       Q.    Then you are basically saying, if I

2   understand you, that all of that seemed to change on

3   Tuesday evening when Mr. Lainey indicated that he

4   wanted International Paper to fix any discrepancies

5   found on the aircraft?  Is that a fair description of

6   what you are telling me happened?

7       A.    Yes.

8       Q.    Was there any conversation before Tuesday

9   evening where Mr. Lainey gave you any indication that

10  he wanted International Paper to fix discrepancies?

11      A.    No.

12      Q.    So, after the conversation on Tuesday

13  evening you learned that and Ken Murray arrived at

14  Midcoast Aviation, correct?  That is what you said?

15      A.    Wednesday morning, I believe was when I was

16  made aware of that.

17      Q.    What did you do when you were made aware

18  Mr. Murray was out at Midcoast?

19      A.    I believe that I tried to get in touch with

20  Dennis Lainey to see if there was a miscommunication

21  between him and this mechanic to make sure that they

22  had talked and he was indeed out there on this deal.

23  That it wasn't a mistake that he was there.  I didn't

```
 1   want him tearing into the airplane for nothing.
 2        Q.   Had you already spoken to Mr. Cassidy at
 3   International Paper to report the conversation with
 4   Dennis Lainey?
 5        A.   Yes.
 6        Q.   Did you call Mr. Cassidy that Tuesday
 7   evening that you spoke to Mr. Lainey?
 8        A.   I don't know.  It might have been or the
 9   next day, but I'm sure that it was soon after.
10        Q.   Did you get ahold of Mr. Lainey after you
11   learned Mr. Murray was out at Midcoast?
12        A.   Not right away.
13        Q.   At what point?
14        A.   I left word for him at a number of
15   different places and he got back to me.
16        Q.   When was that?  At what point?  Was it
17   still on Wednesday?
18        A.   It was still the same day or a couple of
19   hours later.
20        Q.   What happened during that telephone
21   conversation?
22        A.   He began backpedaling and withdrawing what
23   he said the night previously and in a much nicer tone
```

1   said, you know, hey.  Let's start all over again.  We

2   still want to pursue the inspection of this aircraft.

3       Q.    At that time I agreed to let Mr. Murray

4   continue the inspection of the aircraft.  I also at

5   that time made it clear that IP's position was

6   inspect away, but don't ask that they pay for any of

7   the discrepancies that you find.  At the $7 million

8   price it was an as is, where is deal.

9             MR. DYCIO:  I have to make a 2:00 call to

10  the Judge's chambers.  Let's take five minutes, if

11  that is okay.

12             (Whereupon, a discussion off the record

13  was held.)

14  BY MR. REIMER:

15      Q.    Mr. Dahlberg, I think where we left off was

16  the events leading up to the conversation on Tuesday

17  night and you then described what was happening on

18  Wednesday with respect to Ken Murray arriving

19  Midcoast.

20            Let me ask you this question relating to

21  the period of time before Wednesday when Mr. Murray

22  arrived at Midcoast.

23            At that point in time had you dealt with

                ANITA B. GLOVER & ASSOCIATES, LTD.
        10521 West Drive, Fairfax, Virginia  22030
                      (703) 591-3004

1  anybody else at International Paper, other than Bob
2  Cassidy?
3     A.   Not that I recall specifically.  I'm sure
4  there were other people that I had phone
5  conversations with, but he was the guy that I dealt
6  with.
7     Q.   Did there come a time when a proposal or
8  contract for the sale was created or produced by
9  either side?  A formal, you know, agreement?  I use
10  the word formal agreement to better describe it.
11        MR. HUTCHISON:  Objection as to the form.
12        THE WITNESS:  Yes.  There came a time when
13  the parties wanted to draft an aircraft purchase
14  agreement.
15  BY MR. REIMER:
16     Q.   Who prepared an initial draft of the
17  aircraft purchase agreement?
18     A.   I produced the boiler plate agreement and
19  FAXED it to both parties for their changes.
20     Q.   So, you produced a document that you sent
21  to International Paper and to Turnberry at the same
22  time?
23     A.   Yes.

ANITA B. GLOVER & ASSOCIATES, LTD.
10521 West Drive, Fairfax, Virginia  22030
(703) 591-3004

```
1              MR. DYCIO:  Off the record.
2                   (Whereupon, a discussion off the record
3     was held.)
4     BY MR. REIMER:
5          Q.   To whom did you send it to at International
6     Paper?
7          A.   If I didn't send it to Bob Cassidy, I sent
8     it to whoever he told me to send it to, which may
9     have been his contract people.  I don't recall the
10    person's name.
11         Q.   But do you recall him giving you a name of
12    somebody?  You seem to be suggesting that there was
13    somebody that he gave you the name of?
14         A.   I know that he wasn't handling it.  He was
15    delegating it to someone else, but I wasn't talked to
16    directly except maybe by FAX.
17              MR. REIMER:  Let me show you a document
18    that we'll mark as Exhibit No. 42.  That was a
19    document, although now stapled I don't know if it was
20    stapled originally.
21                             (A document was marked as
22                              Deposition Exhibit No.
23                              42 for identification.)
```

ANITA B. GLOVER & ASSOCIATES, LTD.
10521 West Drive, Fairfax, Virginia  22030
(703) 591-3004

```
1              MR. DYCIO:  It was paper clipped as one.  I
2    stapled it when I made a copy.
3    BY MR. REIMER:
4         Q.   It does appear to contain several different
5    documents, including an aircraft sales agreement,
6    which has a handwritten draft and then looks like a
7    correspondence from Dennis Lainey to you?
8         A.   Uh-huh (affirmative).
9         Q.   Do you recognize all those documents?  All
10   the contents of that exhibit?
11        A.   Yes.
12        Q.   Tell me what is contained in Exhibit No.
13   42?  What is that Exhibit No. 42?
14        A.   It is a draft of an aircraft purchase
15   agreement.
16        Q.   Is that the draft that you referred to a
17   moment ago?
18        A.   Yes.
19        Q.   Whose handwriting is on the front page that
20   says, draft?
21        A.   Mine.
22        Q.   Was that on there when you sent it to Mr.
23   Lainey?
```

```
 1          A.    I believe so.
 2          Q.    Was that on there when you sent it to --
 3    I'm sorry -- to International Paper?
 4          A.    I believe so.
 5          Q.    I notice that in that package there is a
 6    FAX cover sheet to Dennis Lainey indicating you are
 7    sending him a draft of a sales aircraft agreement,
 8    but I don't see to FAX cover sheet to International
 9    Paper.  Is there a reason for that?
10          A.    I don't know why it wouldn't be here.
11          Q.    But you produced that document on your
12    computer?
13          A.    Yes.
14                MR. HUTCHISON:  Objection to the form.
15    That document being the contract?  Is that what you
16    are referring to?
17    BY MR. REIMER:
18          Q.    The portion of the exhibit entitled
19    aircraft sales agreement?
20          A.    Yes.
21          Q.    Did that come from a form that you had on
22    the computer from a prior transaction?
23          A.    Yes.
```

1       Q.   Did you indicate to Mr. Lainey at any time
2    either verbally or in writing, that you were sending
3    that agreement to International Paper for them to
4    review at the same time?
5       A.   I don't recall.  I most likely did.
6       Q.   Did you have any telephone conversations
7    with Mr. Lainey with regard to that regarding that
8    document?  Discussions about changes or provisions in
9    the document?  Telephone conversations?  I'm asking
10    about --
11       A.   I don't believe so.  I believe it was all
12    done by FAX.
13       Q.   I think your FAX cover sheet is dated June
14    21st?
15       A.   Right.
16       Q.   Do you believe that to be the day that you
17    sent the agreement?  That would be Monday.  We agreed
18    that would be Monday, June 21st.  Do you believe that
19    to be the day that you sent it to Mr. Lainey?
20       A.   Yes.
21       Q.   Do you think that you sent it to
22    International Paper that same day?
23       A.   Most likely.

```
 1              MR. REIMER:  Let me show you a document
 2    that we'll mark as Exhibit No. 43.
 3                            (A document was marked as
 4                            Deposition Exhibit No.
 5                            43 for identification.)
 6    BY MR. REIMER:
 7         Q.   Let me ask you if you can tell me what that
 8    document is?  Again, this is another document given
 9    to me by your attorney this morning as a document
10    from your files?
11         A.   It looks like the exact agreement with
12    maybe one or both parties' proposed changes.
13         Q.   Can I see that for a moment?  This appears
14    to be a 16-page FAX or copy of on a 16-page FAX
15    received on June 23, 1999.
16              Do you know or recognize this FAX header at
17    the top that is the highest of the three FAX headers?
18         A.   I don't.
19         Q.   Underneath it would appear that it was on
20    June 23rd, that it was sent by the IP legal
21    department?
22         A.   That I recognize.
23              MR. HUTCHISON:  Objection as to the form,
```

1   where it was sent from.

2          MR. DYCIO:  The document speaks for itself.

3   BY MR. REIMER:

4      Q.   Do you recall whether or not this came to

5   you from the IP legal department?

6      A.   I don't recall.

7      Q.   Is any of this handwriting on this document

8   with the exception of the draft at the top left

9   corner your handwriting?  Would please look through

10  all 16 pages?

11          (Witness reviews document.)

12     A.   To the best of my knowledge, I don't

13  recognize any of it as my writing, except for the

14  draft.

15     Q.   Do you know whose handwriting it is?  Was

16  it put there by somebody from International Paper?

17     A.   I don't know.  I assume so.

18          MR. DYCIO:  Don't assume.  Answer the

19  question yes or no.

20          THE WITNESS:  I don't know.

21  BY MR. REIMER:

22     Q.   Was there anybody else reviewing this

23  proposed aircraft sales agreement, other than

                ANITA B. GLOVER & ASSOCIATES, LTD.
            10521 West Drive, Fairfax, Virginia  22030
                        (703) 591-3004

1    International Paper and Turnberry and by that I mean

2    did you give a copy of this draft to any law firms,

3    escrow agents or anybody else?

4        A.    No.

5        Q.    So, it is fair to say that you sent out

6    this aircraft sales agreement to Mr. Lainey and to

7    somebody at International Paper and that was all?

8        A.    I believe that's the only people that I

9    would have sent it to.  Yes.

10       Q.    In Exhibit No. 42, I notice that the letter

11   from Mr. Lainey, which is dated June 23rd and while

12   backwards appears to be four pages, says that it was

13   sent by FAX, but there are no facsimile headers on

14   that copy.

15            Does your FAX printout FAX headers when it

16   is received by other senders?

17       A.    It does, but if that is a copy the copy may

18   have cut off the header.

19       Q.    Did you receive a hard copy of this letter?

20   Do you recall?

21       A.    I don't think -- I think it was done by

22   FAX.

23       Q.    What happened with the agreement next after

            ANITA B. GLOVER & ASSOCIATES, LTD.
       10521 West Drive, Fairfax, Virginia  22030
                    (703) 591-3004

1    you received the comments from International Paper

2    and from Mr. Lainey?

3         A.    I believe that the next conversation that I

4    had with Mr. Lainey was back again to the subject of

5    as is, where is.  He consistently expressed himself

6    in that he was not going to be purchasing the

7    airplane in an as is, where is condition.  This was

8    something that I told him was the only way that IP

9    was going to sell the airplane.

10        Q.    And when did this next conversation take

11   place?

12        A.    I would say on Wednesday or Thursday.

13        Q.    Did Mr. Lainey inform you that he was

14   traveling to Midcoast to view the aircraft?

15        A.    I don't recall.

16        Q.    Did there come a time that you learned that

17   Mr. Lainey was traveling to or was at Midcoast?

18        A.    Yes.

19        Q.    When did you learn that?

20        A.    I think the day that he arrived.

21        Q.    Mr. Murray -- you said that you spoke to

22   Mr. Murray.  You believe when he first got out there,

23   there was some confusion as to whether or not he was

1    supposed to be there?

2         A.    Right.

3         Q.    Did you speak to Mr. Murray again while he

4    was out at Midcoast?

5         A.    Yes.

6         Q.    What was the content of that conversation?

7         A.    Just he had let me know that he had

8    finished the inspection and that he was getting his

9    report together for Mr. Lainey.  That he had to

10   leave.  He wasn't going to be able to wait for Mr.

11   Lainey.

12        Q.    Did he tell you why he had to leave?

13        A.    He didn't say specifically.  Something just

14   came up.

15        Q.    Do you recall when that was?  Was it the

16   same day that he got there or was it the next day?

17        A.    It was either the same day or the next day.

18   I don't recall specifically.

19        Q.    Did he give you any indication as to his

20   findings?

21        A.    He said that overall the airplane looked

22   good, but that there were some items that he was

23   going to recommend be addressed prior to closing.  He

1    said addressed to be fixed by the seller.

2        Q.    Did you have any conversation with him with

3    regard to the fact that the seller was not intending

4    to fix anything?

5        A.    No.  That wasn't his concern.

6        Q.    He gave you an indication that there were

7    things that needed to be fixed by the seller?  Is

8    what you said?

9        A.    He assumed that he was -- what he was out

10   there to do was to find discrepancies to get the

11   seller to pay for before the deal closed.

12       Q.    Did he tell -- did he use the words things

13   needed to be fixed by the seller?

14       A.    To best of my recollection or something

15   similar to that.

16       Q.    You didn't tell him that the seller wasn't

17   going to fix anything?

18       A.    No.  I didn't get into that with him.

19       Q.    Did he indicate to you there were things

20   that needed to be inspected beyond his initial

21   inspection?

22       A.    No.

23       Q.    Did he indicate to you anything with

ANITA B. GLOVER & ASSOCIATES, LTD.
10521 West Drive, Fairfax, Virginia  22030
(703) 591-3004

1 | respect to -- strike that.

2 | Did he tell you what the things were that

3 | he felt needed to be fixed by the seller?

4 | A.  No.

5 | Q.  Did he indicate to you whether Mr. Lainey

6 | was going to be there when he said that he couldn't

7 | wait for Mr. Lainey?

8 | A.  He had said that from what I can recall.

9 | He thought that he was already to have been there,

10 | but that he couldn't wait longer for him, Mr. Murray.

11 | Q.  The conversation that you had with Mr.

12 | Lainey the second time that he brought up the fact

13 | that he wasn't going to buy the plane as is, where

14 | is?  Was that after he had gone out to Midcoast?

15 | A.  Yes.

16 | Q.  Did Mr. Lainey ever put anything in writing

17 | to you indicating that he wasn't going to buy the

18 | plane, as is, where is?

19 | A.  No.  I don't believe so.

20 | Q.  Did anything in the letter that Mr. Lainey

21 | sent on June 23, 1999, which has been incorporated

22 | into Exhibit No. 42, indicate that Turnberry wanted

23 | the draft contract changed to anything, other than an

ANITA B. GLOVER & ASSOCIATES, LTD.
10521 West Drive, Fairfax, Virginia  22030
(703) 591-3004

```
 1   as is contract?

 2             MR. DYCIO:  I object.  The document speaks

 3   for itself.

 4             THE WITNESS:  I don't understand the

 5   question.

 6   BY MR. REIMER:

 7        Q.   Did Mr. Lainey's letter of June 23rd say

 8   that it contains changes to the proposed contract?

 9        A.   Prior to his arrival at Midcoast, right?

10        Q.   Well, June 23rd would be -- we agreed

11   Wednesday of that week?

12        A.   Okay.  So, prior to Ken Murray's

13   inspection?

14        Q.   That's correct, but subsequent to the

15   Tuesday night telephone conversation?

16        A.   Okay.

17        Q.   My question is.  Is there anything in this

18   letter that you are aware of which requested that the

19   contract be changed to anything, but an as is

20   contract?

21             MR. DYCIO:  I renew my objection.

22             MR. HUTCHISON:  I object to the form and to

23   foundation.
```

ANITA B. GLOVER & ASSOCIATES, LTD.
10521 West Drive, Fairfax, Virginia  22030
(703) 591-3004

```
 1   BY MR. REIMER:

 2        Q.   You can answer.

 3        A.   I don't recall.

 4        Q.   Did Mr. Lainey give you any specifics of

 5   what he was requesting in terms of what he wanted

 6   International Paper to fix?

 7        A.   Not specifically, no.  I mean, there was a

 8   number of items -- a very broad list of items, but

 9   none that were discussed specifically.

10        Q.   The broad list of items was given to you

11   how?  Did he indicate during a telephone conversation

12   problems that he wanted International Paper to fix?

13        A.   To best of my recollection, yes.  Some

14   outstanding service bulletins possibly and things

15   that from the previous inspection that weren't taken

16   care of yet.

17             There were some things that Ken Murray

18   found that he didn't share with me, but Ken Murray

19   said he was going to compile his report and give it

20   to Mr. Lainey.  I wasn't made privy to his report of

21   squawks, but I think there were a number of them.

22        Q.   Mr. Lainey told you that he expected

23   International Paper would fix those squawks?
```

                ANITA B. GLOVER & ASSOCIATES, LTD.
            10521 West Drive, Fairfax, Virginia  22030
                         (703) 591-3004

1          A.    He expected that's how he wanted to proceed

2     with the deal.

3          Q.    How did he express that?

4          A.    He expressed it that when I asked, are you

5     prepared to accept the aircraft in an as is, where is

6     condition now that you have completed your

7     inspection?  He clearly said, no.  I am not.

8          Q.    Did he indicate to you that he needed to

9     conduct further inspections?

10         A.    No.

11         Q.    Did he tell you that the reason that he was

12    not prepared to accept the aircraft was that there

13    were deficiencies or squawks?

14         A.    Yes.

15         Q.    But he didn't identify what those are?

16         A.    He may have, but I don't recall

17    specifically what they were.

18         Q.    Did he follow-up with, I would accept it if

19    International Paper corrected the problems?

20         A.    He knew that -- at that point I had made

21    that point so many times that that wasn't going to be

22    a possibility.

23         Q.    Did there come a time that Mr. Lainey said

```
 1   the deal was off?
 2        A.   Yes.
 3        Q.   When was that?
 4        A.   Twice Tuesday night when he hung up on me
 5   and Thursday when I asked him specifically, are you
 6   in a position to accept the aircraft in an as is,
 7   where is condition, now that you have done your
 8   inspection?  He clearly said, no.
 9        Q.   He never indicated that he would conduct an
10   additional inspection?
11             MR. DYCIO:  Asked and answered.
12             THE WITNESS:  No.  If we couldn't get
13   together on the inspection so far, why would he want
14   to go further?
15             MR. DYCIO:  Just answer the questions that
16   are asked, Mr. Dahlberg.
17             MR. REIMER:  Let me show you what we'll
18   mark as Exhibit No. 44.
19                            (A document was marked as
20                             Deposition Exhibit No.
21                             44 for identification.)
22   BY MR. REIMER:
23        Q.   This is a document from your files and ask
```

ANITA B. GLOVER & ASSOCIATES, LTD.
10521 West Drive, Fairfax, Virginia  22030
(703) 591-3004

```
 1   you if can identify that document -- ask you if can
 2   identify that?  That is a document given to me by
 3   your attorney this morning as being from your files?
 4        A.   Right.
 5        Q.   Right.  That's a document from your file?
 6        A.   Yes.  It looks like the same document that
 7   we looked at earlier without the handwriting on it.
 8        Q.   It appears there is some language changes
 9   and I will give you Exhibits No. 42 and 43, and just
10   so just visually the front page doesn't look like --
11   it even sets up the same.
12             I haven't looked at them side-by-side, but
13   line by line their appears to be changes in it.  Look
14   at it more carefully, so that we can identify where
15   this document came from.
16        A.   Okay.  It would appear to me that it is the
17   same document with the handwritten changes
18   incorporated and typed.
19        Q.   It is the document with the changes
20   incorporated into it?
21        A.   Right.
22        Q.   Who prepared that document to your
23   knowledge?
```

```
 1         A.    I did.
 2         Q.    What did you do with it?
 3         A.    I'm assuming that I did.  I can't be for
 4    certain.  It looks like my computer printer.  I don't
 5    know that I did anything with this at this point
 6    because as we got to the end of the deal it was not
 7    going further.  I don't know if I FAXED this to the
 8    parties, but I was prepared to.  That's why I got it
 9    together.
10         Q.    Did you have any conversations with
11    International Paper with respect to proposed changes
12    to the agreement?
13         A.    I'm sure that I did.
14         Q.    But you don't have any recollection of
15    those conversations?
16         A.    No.
17         Q.    Do you have recollection who those
18    conversations would have been with?
19         A.    Probably, Bob Cassidy.
20               MR. DYCIO:  Off the record.
21                    (Whereupon, a discussion off the record
22    was held.)
23    BY MR. REIMER:
```

```
1        Q.   Did you have any conversation with Steven
2    Bates of Midcoast while this was going on while Ken
3    Murray was out there?
4        A.   Yes.
5        Q.   What conversation did you have with him?
6        A.   The first conversation was when he called
7    me to tell me that Ken Murray was there.  He was here
8    to see the Challenger.  I had expressed surprise,
9    like I indicated earlier, that he was there because
10   Dennis had called the deal off the night before.  I
11   was surprised that he was there.
12            He was asking me, should I let him have
13   access to the airplane?  I said, hold off until I
14   find out what was going on.
15       Q.   You had already contacted International
16   Paper to tell them about your conversation with
17   Dennis Lainey on Tuesday night?
18       A.   Yes.
19       Q.   Did you contact International Paper again
20   that day to say that Mr. Lainey is now interested
21   again?
22            MR. HUTCHISON:  Objection.  Asked and
23   answered.
```

ANITA B. GLOVER & ASSOCIATES, LTD.
10521 West Drive, Fairfax, Virginia  22030
(703) 591-3004

1          THE WITNESS:  I don't believe that I did.

2     BY MR. REIMER:

3          Q.   Did you have authority from International

4     Paper to grant access to the records and to the

5     aircraft?

6          A.   Not really, but I think that Steven Bates

7     assumed that I did.  I didn't think that was

8     overstepping anything when I did so.

9          Q.   When you say, not really.  What do you

10    mean?

11         A.   No one told me specifically you can grant

12    access to the airplane.  I assumed there wouldn't be

13    a problem, if I did.

14         Q.   What other conversations did you have with

15    Mr. Bates, other than the first conversation that you

16    just described?

17         A.   I don't believe that I have talked to him

18    since that regarding this deal.

19         Q.   It was just that first conversation when he

20    called to say Ken Murray was out there?

21         A.   I believe that was it.

22         Q.   Who did you contact to indicate that it was

23    okay for Mr. Murray to review records and see the

```
1    aircraft?

2         A.    Steve Bates.

3         Q.    Did you have another conversation with him

4    that day?

5         A.    Either one or the other, maybe.  It was

6    either one of them, just to let the person --

7    probably I talked to Mr. Murray or Mr. Bates.

8         Q.    On Thursday, you have a telephone

9    conversation with Dennis Lainey wherein he indicated,

10   okay.  We have seen the aircraft.  We have some

11   problems that International Paper has to fix?

12        A.    Uh-huh (affirmative).

13        Q.    Can you say yes or no?

14        A.    Yes.

15        Q.    Did you conclude at the end of that

16   conversation at that point the deal is off?

17        A.    Yes.

18        Q.    Did you have any conversations with Mr.

19   Bates at that point to let him know that the deal is

20   off?

21             MR. HUTCHISON:  Objection.  Still on

22   Thursday night?

23             MR. REIMER:  Yes, or at any time.  Let me
```

1  ask it more specifically.

2  BY MR. REIMER:

3      Q.   At any time after you had a conversation

4  with Mr. Lainey on Thursday night -- let me back up.

5          Was it Thursday night when you had the

6  conversation with Mr. Lainey or was it Thursday night

7  that you had a conversation where he indicated that

8  he expected International Paper to make corrections?

9      A.   I think it was probably afternoon or night.

10 I don't think that it was in the morning.  I guess

11 that I did have a subsequent conversation again with

12 Mr. Bates to let him know the deal was off.

13     Q.   Did you tell Mr. Bates that Mr. Murray and

14 Mr. Lainey were not to be given access to the plane?

15     A.   Murray had already left.

16     Q.   Not to give Mr. Lainey access?

17     A.   Yes.

18     Q.   Did you have a conversation with

19 International Paper subsequent to the Thursday

20 conversation to inform them that the deal was off

21 again?

22     A.   Yes.

23     Q.   Who did you talk to?

ANITA B. GLOVER & ASSOCIATES, LTD.
10521 West Drive, Fairfax, Virginia  22030
(703) 591-3004

```
 1        A.    Probably, Mr. Cassidy.

 2        Q.    Do you recall?

 3        A.    I don't recall exactly.

 4        Q.    Did you ever give Mr. Lainey an ultimatum

 5   in terms of a deadline to accept the aircraft as it

 6   is in order to proceed with the deal?

 7        A.    I believe that I did.

 8        Q.    How was that communicated?

 9        A.    Well, he kept insisting that he wanted to

10   buy the airplane, but kept denying that he would

11   accept the aircraft as is, where is.

12              I let him know that was our position.  The

13   conversation was really futile, but there was a time

14   that I said if he wanted the aircraft as is, where

15   is, you have to close by Friday.

16        Q.    Okay.  How did you communicate that to him?

17   Was that in a telephone conversation?

18        A.    Yes.

19        Q.    And when did that conversation take place?

20   The same conversation on Thursday?

21        A.    I would say Thursday, maybe Friday.  I

22   can't remember exactly.

23        Q.    And with respect to Exhibit No. 44, you
```

ANITA B. GLOVER & ASSOCIATES, LTD.
10521 West Drive, Fairfax, Virginia  22030
(703) 591-3004

1    don't think that you ever sent this to Mr. Lainey?

2    The modified agreement incorporating the changes in

3    Exhibit No. 43?

4         A.    I very well may have.  I don't recall.

5         Q.    In Exhibit No. 43, on page 14, there is

6    some handwritten language at the end of paragraph

7    five that indicates a deadline of 5:00 p.m., June

8    25th.

9              Do you recall anything with regard to that

10   handwritten language?

11        A.    That's -- I'm sure that's where I got

12   giving him a 5:00 p.m. deadline from.

13        Q.    Do you know who was -- is that somebody

14   indicating to you that's a deadline that they want

15   imposed?

16        A.    I believe that was a proposed change to the

17   draft of the agreement to put finality in the

18   agreement, so that this wouldn't go on infinitum.

19        Q.    A proposed change by International Paper?

20        A.    Yes.

21        Q.    Was International Paper willing to allow

22   Turnberry to conduct a flight check?

23        A.    Absolutely.

                ANITA B. GLOVER & ASSOCIATES, LTD.
            10521 West Drive, Fairfax, Virginia  22030
                          (703) 591-3004

```
1          Q.    Did you ever have conversations with
2     Mr. Bates to determine how soon a flight test could
3     be conducted on the aircraft?
4          A.    No.   Not that I recall.
5          Q.    Did you have any conversation with Bob
6     Cassidy about Turnberry conducting a flight test?
7          A.    No.
8          Q.    Did you ever have a conversation with Mr.
9     Bates about how soon a systems check could be
10    conducted on the aircraft?
11         A.    Not that I recall.   It never got that far.
12         Q.    Well, did you ever check to see whether or
13    not it was possible for Turnberry to conduct a flight
14    check before the 5:00 p.m., June 25th deadline?
15         A.    I don't believe so.   I don't see where it
16    couldn't have been.
17         Q.    Did you speak to Mr. Lainey again after the
18    conversation on Thursday June 24th?
19         A.    I don't recall.   I know that I spoke to him
20    on Thursday and probably Friday.
21         Q.    Do you recall what you would have spoken to
22    him about on Friday?
23         A.    More of the same, I'm sure.   The whole deal
```

1   and his intention of wanting to buy the airplane with

2   things fixed and IP's intention of selling as is,

3   where is.

4        Q.   So, you think those conversations continued

5   on to Friday?

6        A.   I think so.  I can't be certain.

7        Q.   Did there ever come a time after the 5:00

8   p.m. deadline on Friday that you had a conversation

9   or wrote to Mr. Lainey to indicate the deadline had

10  passed and that he had not accepted the plane?

11       A.   I don't recall sending anything in writing.

12  I do recall a conversation letting him know that the

13  deal was off.

14       Q.   At what point does -- how does Aero Toy

15  Store get back in the deal?

16       A.   They had never been out of the deal.  They

17  had continually expressed an interest in the

18  aircraft.

19       Q.   When was the last time that you spoke to

20  somebody at Aero Toy Store before June 21st of 1999?

21       A.   I don't recall.

22       Q.   Was it a week after?  Was it six months

23  after?

                ANITA B. GLOVER & ASSOCIATES, LTD.
            10521 West Drive, Fairfax, Virginia  22030
                         (703) 591-3004

```
 1              MR. HUTCHISON:  Objection.  Asked and
 2   answered.
 3              THE WITNESS:  I don't recall.
 4   BY MR. REIMER:
 5        Q.   How does their interest go from just that?
 6   An interest in the aircraft to something more with
 7   respect to completing a sale?
 8        A.   They made another offer that was accepted.
 9        Q.   How did they make an offer?  Orally or in
10   writing?
11        A.   In writing.
12        Q.   Did you have a telephone conversation with
13   anybody at Aero Toy Store before that offer was made
14   in writing?
15              Was it just before or within a day or hours
16   of that to indicate that it was coming or did it just
17   come out of the blue?
18        A.   I talked to them on an ongoing basis while
19   the airplane was for sale.
20        Q.   Did you have a conversation at some point
21   on Thursday or Friday where they said, we are going
22   to make an offer on the airplane and then an offer
23   came through?
```

```
1            A.    I don't recall.

2            Q.    Do you recall when the offer came from Aero

3    Toy Store to purchase the aircraft?

4            MR. HUTCHISON:  Objection as to foundation.

5            THE WITNESS:  I don't know.  It was very

6    soon thereafter with the deal falling apart with

7    Turnberry.

8    BY MR. REIMER:

9            Q.    It was after the deal fell apart?

10           A.    I believe so.

11           Q.    And how much was their offer for?

12           A.    $7 million.

13           Q.    What did you do with that offer?

14           A.    Accepted it.

15           Q.    Did you have to contact International

16   Paper?

17           A.    International Paper looked it over and

18   accepted it.

19           Q.    Did you send it to Mr. Cassidy?

20           A.    Yes.

21           Q.    Let me ask you a question.  Just looking at

22   Exhibit No. 43, with the handwritten notes that we

23   talked a moment ago.  On page 14, there is
```

```
 1   handwriting that indicates there should be a June
 2   25th deadline.
 3           Just looking on Exhibit No. 44, which was
 4   your modification and the agreement, look at
 5   paragraph B at the top.  It says that they have to
 6   accept the aircraft by 5:00 p.m., Thursday, June
 7   24th.
 8           Do you know why there is a discrepancy
 9   between the handwritten change and the change in your
10   document?
11       A.   I don't.
12       Q.   How soon after the deal with Turnberry is
13   concluded was the actual sale to Aero Toy Store
14   concluded?  How soon after did they actually transfer
15   title to Aero Toy Store?
16       A.   Within days and they were very quick with
17   it.  They had a complete knowledge of the aircraft.
18   They had done a pre-buy on it.
19       Q.   And Aero Toy Store then contacted you,
20   correct?
21       A.   Uh-huh (affirmative).
22       Q.   You didn't solicit?
23       A.   The deal had fallen through --
```

ANITA B. GLOVER & ASSOCIATES, LTD.
10521 West Drive, Fairfax, Virginia   22030
(703) 591-3004

```
1                MR. HUTCHISON:  Form.

2                THE WITNESS:  -- I don't believe so.

3      BY MR. REIMER:

4           Q.   In the deal with Turnberry a deposit was

5      placed with an escrow agent.  Do you recall that?

6           A.   Yes.

7           Q.   Did Aero Toy Store similarly place a

8      deposit with an escrow agent for the purchase of the

9      aircraft?

10          A.   I believe so.

11          Q.   Do you recall who that agent was?

12          A.   No.

13          Q.   Would you have those documents in your

14     file?

15          A.   Yes.

16          Q.   How was the contract between Aero Toy Store

17     and International Paper created?  Did you use the

18     same aircraft sale agreement?

19          A.   No.  They had a very simple one-page

20     agreement that they FAXED.  Aero Toy Store FAXED.

21          Q.   Was that the only agreement between the

22     parties?

23          A.   Yes.  I believe so.
```

```
1         Q.    Was that the same agreement as the offer?
2    Was there one document that constituted the offer and
3    the only written agreement between the parties?
4              MR. HUTCHISON:  Foundation.
5              THE WITNESS:  I believe so.
6    BY MR. REIMER:
7         Q.    That agreement was sent off to
8    International Paper for them to review, correct?
9         A.    Yes.  But it was more than just a letter
10   agreement, it was a contract.  It was a very
11   definitive sales agreement.
12        Q.    One page?
13        A.    One page.
14        Q.    And what makes you say that it was a very
15   definitive agreement and that it was more than a
16   letter agreement?  What was in it that makes you say
17   that?
18        A.    It wasn't an agreement to agree.  It was a
19   sales agreement that didn't have a paragraph about
20   subject to something later on.  I mean, we have done
21   a pre-purchase inspection.  We are going to buy the
22   airplane through you for a number of dollars and
23   close on a certain day.
```

1        Q.    Did there ever come a time that you

2    indicated to Mr. Lainey that you had that offer in

3    hand from Aero Toy Store?

4        A.    I don't believe that I ever made Aero Toy

5    Store's name known to Mr. Lainey.

6        Q.    Not in name, did you indicate that you had

7    an offer from somebody else to purchase?

8        A.    I think that I did at one point let Mr.

9    Lainey know that other parties were interested, not

10   just Aero Toy Store.  At the time that was entered

11   there were a number of parties.

12       Q.    Any other parties whose names you had

13   passed onto Bob Cassidy to let Cassidy know that they

14   were interested?

15       A.    Possibly, I think the outfit in California

16   at that point was still interested.  I may have in

17   correspondence let him know that was a potential

18   client for the airplane, prospect.

19       Q.    You mentioned that before that some time

20   ago you went and looked at your phone records and it

21   identified the telephone conversation on Tuesday

22   night.

23            Were you able to pinpoint any other

                ANITA B. GLOVER & ASSOCIATES, LTD.
            10521 West Drive, Fairfax, Virginia  22030
                        (703) 591-3004

1    conversations that you had with Mr. Lainey or anyone

2    else regarding this transaction, as a result of your

3    review of those records?

4        A.    No.

5        Q.    Were you specifically looking for that

6    phone conversation?

7        A.    Yes.

8        Q.    Why?

9        A.    I just thought that was critical to this

10   whole situation because I remember it being a call

11   that was made from him to me and I remember where I

12   was and what time of day.  It helped me in putting

13   together the time frame.

14       Q.    When Aero Toy Store contacted you to say

15   that they wanted to make an offer on the aircraft who

16   did you speak with?

17       A.    It is probably still Gary Anzalon.

18       Q.    You indicated earlier in the deposition in

19   June, you, Mr. Zarosi, the owner of the company

20   became involved in the transaction.  Is this a point

21   in time that you are referring to?

22           MR. DYCIO:  It misconstrues his testimony.

23   His testimony was --

```
1            MR. REIMER:  I'm going to ask you to stop
2     giving these long verbal objections.  His testimony
3     was what his testimony was.
4            MR. DYCIO:  You are here at my courtesy.
5     You are misconstruing his statements.
6            MR. REIMER:  Mr. Dahlberg can correct it.
7            MR. DYCIO:  You are to be courteous or the
8     deposition is over.
9            MR. REIMER:  I'm trying to be courteous.
10    Mr. Dahlberg can correct himself.  I'm trying to
11    conclude this in the next fifteen minutes.
12           MR. DYCIO:  Fifteen minutes, it is.
13    BY MR. REIMER:
14       Q.  Is this the point in time Mr. Zarosi
15    becomes involved in the transaction?
16       A.  I don't recall.
17       Q.  Do you recall having any conversation with
18    Mr. Zarosi?
19       A.  Yes.
20       Q.  Were they telephone conversations?
21       A.  Yes.
22       Q.  Do you know whether this was before or
23    after you received a letter offer from Aero Toy
```

```
 1   Store?

 2        A.   I don't recall if it was before or after or

 3   during, but one of those times.

 4        Q.   How long did the process last with Mr --

 5   I'm sorry -- with Aero Toy Store between the time

 6   they made an offer and the time they ultimately

 7   closed on the aircraft?

 8        A.   Days, not weeks.

 9        Q.   The escrow agent who handled the deposit?

10   Did you use that escrow agent for purposes of

11   exchanging all the necessary transfer documents?

12        A.   That wasn't an escrow agent that we

13   selected.  It was an escrow agent Turnberry selected.

14        Q.   The escrow agent that Aero Toy Store

15   deposited their deposit with?

16        A.   Uh-huh (affirmative).

17        Q.   Did that escrow agent handle the exchange

18   of the necessary transfer documents?  Did

19   International Paper give over its documents to the

20   escrow agent or simply to Aero Toy Store?

21        A.   I'm assuming that's what happened.  They

22   wouldn't necessarily have to use an escrow company.

23   I'm assuming that they did.  I'd have to look at the
```

```
 1   file.  They could do it directly with the FAA, if
 2   they wanted.
 3        Q.   You don't recall who that was?
 4        A.   I don't.
 5             MR. REIMER:  Let me show you a document
 6   that again that you produced and we'll mark that as
 7   Exhibit No. 45.
 8                         (A document was marked as
 9                          Deposition Exhibit No.
10                          45 for identification.)
11   BY MR. REIMER:
12        Q.   Is that a document that you provided here
13   today from your files?
14        A.   Looks like it.  Yes.
15        Q.   What is that document represent?
16        A.   It is a spare parts list from October, 1998
17   for the Challenger aircraft.
18        Q.   These spare parts to the extent they
19   existed in June of 1999, were they given to Aero Toy
20   Store as part of its transaction?
21        A.   I believe so, but I'm not certain.
22             MR. REIMER:  Let me mark this as Exhibit
23   No. 46.
```

```
 1                            (A document was marked as

 2                            Deposition Exhibit No.

 3                            46 for identification.)

 4    BY MR. REIMER:

 5         Q.   I am showing you an Emerald Aviation FAX

 6    cover sheet with an aircraft sales agreement and ask

 7    you whether that appears to be a copy of your FAX to

 8    Mr. Lainey forwarding the proposed aircraft sales

 9    agreement?

10              MR. HUTCHISON:  Did you just hand him two

11    exhibits?

12              THE WITNESS:  It shows here the spare parts

13    list.  It is part of the spec sheet.

14              MR. HUTCHISON:  Forty-six was a prior

15    exhibit, was it not?  Exhibit No. 23.

16              MR. REIMER:  I'm not sure that it was.

17              MR. HUTCHISON:  This is the one provided to

18    International paper by the plaintiff.  Now if you are

19    showing him another document that --

20              MR. REIMER:  That's the same one.  It is 23

21    then.

22              THE WITNESS:  Without having to go through

23    it, it looks like the same agreement in Exhibit No.
```

1    42.

2    BY MR. REIMER:

3        Q.    Is that your FAX No. 703-361-3170?

4        A.    Yes.

5            MR. REIMER:  So that I don't duplicate this

6    exhibit, let me show you what I proposed is next and

7    ask you whether or not that exhibit is one of your

8    exhibits?

9            MR. HUTCHISON:  I think it was 18.  Hang on

10    a second.  I'm testing my memory -- 19 or 17.

11    Something like that.  This is Exhibit No. 17.  If you

12    want to mark it again, that's fine.  I'm more

13    concerned about the contract.

14            I may not have gotten a copy of -- I'm

15    sorry.  This is the same thing without the changes

16    that are in 42.  This doesn't look like that is any

17    of the proposed changes that were handwritten in

18    Exhibit No. 41 -- I'm sorry -- Exhibit No. 44.

19    BY MR. REIMER:

20        Q.    That's your FAX to Mr. Lainey indicating

21    this is the draft proposal?

22        A.    Right.  This is the draft proposal without

23    the changes.

                    ANITA B. GLOVER & ASSOCIATES, LTD.
                10521 West Drive, Fairfax, Virginia  22030
                            (703) 591-3004

1      Q.   Let me show you what's previously been

2   marked as Exhibit No. 17, and ask if can identify

3   that document?

4      A.   Yes.  It is spec sheet on the aircraft.

5      Q.   Did you say earlier that you indicated that

6   you sent a spec sheet to Mr. Lainey?  Would that have

7   been the spec sheet that you would have sent him?

8      A.   Looks like it.  Could you go through it --

9           MR. HUTCHISON:  Remark it.  I don't know

10   care.

11          MR. REIMER:  I don't have a cover sheet.

12   BY MR. REIMER:

13      Q.   Let me show you page 4.  Is this your

14   handwriting on this page?

15      A.   Yes.

16      Q.   What is this document?

17      A.   That shows interior configuration of the

18   layout of the aircraft.  It is not to scale.  It is a

19   sketch.

20      Q.   Did you draw this for purposes of Mr.

21   Lainey or did you have that?

22      A.   I already had it.

23      Q.   This is the list of parts that we just

ANITA B. GLOVER & ASSOCIATES, LTD.
10521 West Drive, Fairfax, Virginia  22030
(703) 591-3004

1    mentioned a while ago in Exhibit No. 45?

2        A.    Right.

3        Q.    The last page, which in everybody's copy is

4    upside down, seems to be a memo from you, although it

5    doesn't indicate to whom it is addressed --

6        A.    That was from another client that was

7    interested in the airplane, only if it had a

8    refurbished interior.  I got a quote from Capital

9    Aviation and those are the numbers they came back

10   with for interior refurbished.

11            I guess Mr. Lainey was interested in what

12   it might cost to redo the interior.  That's all I can

13   assume.

14       Q.    Who had inquired?

15       A.    Another client.

16       Q.    You don't recall who?

17       A.    Not right off the top of my head, a

18   gentleman in Maryland.

19       Q.    For this particular aircraft he was

20   interested?

21       A.    Yes.

22       Q.    Did you ever talk to Mr. Lainey about

23   changes that he would do to the aircraft?

                ANITA B. GLOVER & ASSOCIATES, LTD.
          10521 West Drive, Fairfax, Virginia  22030
                        (703) 591-3004

```
 1        A.   No.

 2        Q.   You just added this to the list of things

 3   because you had it?

 4        A.   Yes.  We were aware, as the seller of the

 5   plane, that it wasn't a new interior.  That anybody

 6   would want to do the interior.

 7        Q.   Did you ever send any correspondence to Mr.

 8   Lainey officially notifying him or let me -- strike

 9   the word officially -- notify him as far as

10   International Paper was concerned that the deal was

11   off?

12        A.   I don't believe that I ever sent him

13   anything written, but the conversation that we had on

14   the phone I let him be aware that it was.  He let me

15   be aware that they were no longer interested in the

16   airplane.

17        Q.   Did there come a time that you told Mr.

18   Lainey that as far as International Paper was

19   concerned the deal was done?

20        A.   Yes.

21        Q.   When was that?

22        A.   Thursday and Friday; I'm just assuming

23   those were the days.  I think those were the days
```

1    that we had the conversation about are you in a
2    position to take the airplane?  No, and the deals
3    off.

4        Q.   Were you reporting back to Mr. Cassidy
5    these conversations before you told Mr. Lainey that
6    the deal was off?

7        A.   I'm sure that I was.  I wouldn't speak it
8    without their say so.  They probably had given me
9    marching orders to the extent that we are interested
10   dealing as is, where is.  Anything less than that, we
11   are not interested.

12       Q.   Did there come a time on Thursday or Friday
13   when International Paper told you, well, if they
14   doesn't want to buy as is, tell them the deal is off?

15       A.   I would assume there was a conversation
16   like that on one of those two days.

17       Q.   Did you have any conversation with Mr.
18   Lainey, except after this deal fell through on
19   Friday?

20       A.   Weeks after probably.

21       Q.   What was the content of those
22   conversations?

23       A.   What we're doing right now.

ANITA B. GLOVER & ASSOCIATES, LTD.
10521 West Drive, Fairfax, Virginia  22030
(703) 591-3004

```
1          Q.    What do you mean?

2          A.    I think that was the point where IP

3     received a letter from your office threatening a

4     lawsuit.

5          Q.    And you placed the telephone call to Mr.

6     Lainey or Mr. Lainey called you?

7          A.    I don't recall.

8          Q.    What was the topic of conversation?

9          A.    I just recall discussing, you know, what is

10    going on and him saying something to extent there was

11    something completely out of his hands and not

12    anything that he instituted.  He had people to answer

13    to.  That it was entirely out of his hands.

14         Q.    Did you have any conversation with

15    Mr. Murray at any time after he left Midcoast and

16    this week period?

17         A.    I don't recall.  There is a good chance

18    that we called since.

19         Q.    There is a good chance that you talked

20    since then?  About this or another transaction?

21         A.    I don't recall.

22         Q.    Do you know whether Mr. Murray's been

23    involved in any other transactions on planes that you
```

1    brokered, other than the one that you mentioned that

2    predated this one?

3        A.    Previously to this one?

4        Q.    You mentioned there was one that predated

5    this?    That was previous to this one?    Any others

6    since then?

7        A.    No.

8        Q.    Have you done other transactions involving

9    Aero Toy Store since this one?

10       A.    No.

11       Q.    Did you ever speak with anybody on behalf

12   of Turnberry Charters, other than Dennis Lainey?

13       A.    No.

14       Q.    Have you spoken to anybody else, other than

15   your attorney Mr. Dycio and Mr. Hutchison who

16   represents International Paper about this set of

17   events since it occurred?

18       A.    Not that I can recall.

19       Q.    Ever spoken to Mr. Bates about it since

20   then?

21       A.    No.

22       Q.    Ever spoken to Mr. Cassidy about it since

23   then?

1        A.    Yes.

2        Q.    When did you speak to Mr. Cassidy about it?

3        A.    I would say just a few weeks ago.  A month

4    or two ago, maybe.

5        Q.    What was the reason for that conversation?

6        A.    I guess just that he no longer worked for

7    International Paper and probably just staying in

8    touch with him and he had mentioned about this

9    deposition.  I don't know if he was deposed, as well.

10   Just to let him know that there was going to be a

11   deposition.  Basically, just chitchat.

12       Q.    Did you talk about the fact that it

13   happened?

14       A.    No.  Not specifically.

15       Q.    Did you talk to anybody else at

16   International Paper?

17       A.    No.

18       Q.    Have you represented International Paper or

19   been a broker for International Paper for any other

20   aircraft that they have sold or been interested in

21   selling since then?

22       A.    No.

23       Q.    Do they currently have aircraft for sale?

1      A.    Not that I'm aware of.

2      Q.    Have you contacted International Paper

3  since these events to see if they were interested in

4  purchasing any aircraft that you were brokering?

5      A.    No.

6      Q.    Were any changes made to the aircraft?

7  Anything fixed or anything modified or in any other

8  way altered from the time that Ken Murray saw the

9  aircraft at Midcoast and the time that Aero Toy Store

10  purchased the aircraft?

11     A.    I don't believe so.  No.

12     Q.    To the best of your recollection were there

13  any other correspondence from Dennis Lainey or to

14  Dennis Lainey and you during this period of time,

15  other than what we have seen here today either in the

16  exhibits that you brought with you or maybe the ones

17  that I have shown to you?

18          MR. HUTCHISON:  Objection.  Asked and

19  answered.

20          THE WITNESS:  No.

21          MR. HUTCHISON:  I had those in order for a

22  reason.  Go ahead.  Keep them in that order, if you

23  don't mind.

                ANITA B. GLOVER & ASSOCIATES, LTD.
            10521 West Drive, Fairfax, Virginia  22030
                        (703) 591-3004

1   BY MR. REIMER:

2       Q.    Lastly, Exhibit No. 44, the agreement to

3   incorporate the changes.  You don't recall whether

4   you ever actually sent that to Mr. Lainey?

5           Did you have a conversation with Mr. Lainey

6   to indicate that you had prepared that document

7   incorporating both side's changes and that it was

8   available or going to be FAXED in the future?

9       A.    I don't recall.

10          MR. REIMER:  Then I have nothing further.

11       EXAMINATION BY COUNSEL FOR INTERNATIONAL PAPER

12  BY MR. HUTCHISON:

13      Q.    If you please look, Mr. Dahlberg -- where

14  are those two letters -- in Exhibit No. 40 and 41

15  which is the June 19, 1999 letter or copies of the

16  same document.  Did you draft that agreement?

17      A.    No.

18      Q.    Was that document strictly drafted by Mr.

19  Lainey?

20      A.    Yes.

21      Q.    Did you have input into the wording of that

22  letter in those two exhibits?

23      A.    Absolutely not.

                ANITA B. GLOVER & ASSOCIATES, LTD.
           10521 West Drive, Fairfax, Virginia  22030
                         (703) 591-3004

1          Q.    Is there anything in the two exhibits which

2     prevent you from talking to other prospects of the

3     sale of an aircraft?

4          A.    No.

5          Q.    While Turnberry was inspecting the plane or

6     interested in purchasing the plane did you speak with

7     other prospective purchasers of the aircraft?

8          A.    Yes.

9          Q.    During the week of Monday, June 21st, did

10    you also speak to Aero Toy Store regarding purchase

11    of the subject aircraft?

12         A.    Yes.

13         Q.    Let me show you Exhibit No. 23, previously

14    marked in another deposition.  There is a June 21,

15    1999 FAX date cover page to Mr. Lainey from you.  Do

16    you recognize that?

17         A.    Yes.

18         Q.    Is that the draft agreement that you had on

19    your computer that you sent to Mr. Lainey?

20         A.    It appears that it is.  Yes.

21         Q.    Did you send a copy of that same draft to

22    International Paper?

23         A.    Yes.

1          Q.   Let me show you what was previously marked

2     as Exhibit No. 29.  It is the June 23, 1999 cover

3     letter from Mr. Lainey with attachment of proposed

4     changes to the previous Exhibit No. 23.  Do you

5     recognize Exhibit No. 29?

6          A.   Yes.

7          Q.   Did you receive that letter?

8          A.   Yes.

9          Q.   Do you recognize the attachments to the

10    cover page of Exhibit No. 29, the proposed changes

11    from Turnberry?

12         A.   Yes.

13         Q.   When you received Exhibit A, copy of

14    Exhibit No. 29, did you pass it onto International

15    Paper?

16         A.   I believe that I did.  Yes.

17              MR. HUTCHISON:  What is the next exhibit

18    number?

19              MR. REIMER:  Forty-seven.

20                        (A document was marked as

21                         Deposition Exhibit No.

22                         47 for identification.)

23    BY MR. HUTCHISON:

                    ANITA B. GLOVER & ASSOCIATES, LTD.
                 10521 West Drive, Fairfax, Virginia  22030
                              (703) 591-3004

```
 1          Q.    Here is a -- let me show you Exhibit No.
 2    47, which is a four-page document.  Take a look at
 3    it.
 4               The typewritten portion is the proposed
 5    changes Mr. Turnberry, correct?
 6          A.    Yes.
 7          Q.    The handwritten comments are from
 8    International Paper?
 9          A.    Yes.  I believe so.
10          Q.    International Paper would have FAXED that
11    exhibit back to you?
12          A.    Correct.
13          Q.    That was 47?
14               MR. REIMER:  Correct.
15    BY MR. HUTCHISON:
16          Q.    You testified during the course of your
17    deposition that Mr. Lainey called off what you call
18    the deal between Turnberry and International Paper
19    two times?
20          A.    Right.
21          Q.    The first time was Tuesday night?
22          A.    Yes.
23          Q.    The second time was Thursday afternoon
```

ANITA B. GLOVER & ASSOCIATES, LTD.
10521 West Drive, Fairfax, Virginia  22030
(703) 591-3004

1   slash evening?

2       A.   Right.

3       Q.   When you spoke with Mr. Murray or Mr. Bates

4   Wednesday morning when Mr. Murray arrived at Midcoast

5   when did you call back and tell Mr. Bates and Mr.

6   Murray that it was okay for Mr. Murray to inspect the

7   plane?

8       A.   As soon as I talked with Mr. Lainey and

9   made sure that he was indeed there at his instruction

10  and it was not a mistake.

11      Q.   How long did that take you?

12      A.   I called Mr. Lainey -- I'm sure at the

13  numbers that he left which were a cell phone and

14  office phone.  As soon as he called back and said

15  that he knew that they were there and that he wanted

16  them there.  I called Mr. Bates back immediately.

17      Q.   Thursday June 24th, 1999 in the afternoon

18  slash evening when Mr. Lainey called off the deal for

19  the second time during the course of your

20  conversation with Mr. Lainey on that day did he

21  mention that he or Turnberry wanted to conduct a

22  flight test of the subject aircraft?

23      A.   Absolutely not.

```
1          Q.    Was a flight test ever mentioned?

2          A.    Never.

3          Q.    What was the reason that Mr. Lainey called

4    off the deal that Thursday evening?

5                MR. REIMER:  Objection to the form.

6                THE WITNESS:  He was not interested in

7    buying the airplane in an as is, where is condition.

8    BY MR. HUTCHISON:

9          Q.    Was a flight test ever mentioned?

10         A.    Never.

11         Q.    Did you ever -- after the plane was sold to

12   Aero Toy Store did you ever call up Mr. Lainey and

13   threaten him in any way?

14         A.    Absolutely not.

15         Q.    Did you call tell him his reputation would

16   be destroyed in the industry if he allowed the

17   lawsuit to continue?

18         A.    No.

19         Q.    Did you threaten him that his reputation

20   would you destroyed if he allowed the dispute to

21   continue?

22         A.    Absolutely not.

23         Q.    Did you ever call -- after the sale of the
```

1    subject aircraft to Aero Toy Store did you call Ken

2    Murray and tell him that his reputation in the

3    industry would be ruined?

4         A.    Absolutely not.

5         Q.    Did you call Ken Murray after the sale of

6    the subject aircraft to Aero Toy Store from

7    International Paper and threaten Mr. Murray in any

8    way?

9         A.    Absolutely not.

10        Q.    I want to go back to the Tuesday and the

11   conversation on June 22, 1999.  Did you ever tell Mr.

12   Lainey during the course of that conversation that if

13   he didn't buy the plane as is, that you were going to

14   sell it to anyone else?

15        A.    I don't recall specifically, but Tuesday

16   night I don't think that I had a chance to get a word

17   in edgewise that night.

18        Q.    What happened?

19        A.    He was going off on me about not wanting to

20   buy the airplane as is, where is.  There were other

21   airplanes to buy.  He was cursing and upset.

22        Q.    Is it your position today that the

23   agreement as you understood it to be -- strike that.

                    ANITA B. GLOVER & ASSOCIATES, LTD.
              10521 West Drive, Fairfax, Virginia  22030
                            (703) 591-3004

1           Is it your testimony as you sit here today,

2     Mr. Dahlberg, that Mr. Lainey unequivocally told you

3     that Turnberry was not going to buy the plane as of

4     Thursday evening June 24, 1999?

5           A.   Yes.

6           Q.   Is it after that conversation with Mr.

7     Lainey either that evening or Friday morning that you

8     told Mr. Bates that the Turnberry was no longer

9     purchasing the plane and that Turnberry was not

10    allowed access to the plane anymore?

11          A.   Yes.

12               MR. HUTCHISON:   I have no further

13    questions.

14          EXAMINATION BY COUNSEL FOR TURNBERRY

15    BY MR. REIMER:

16          Q.   In the handwritten notes that we looked at

17    from International Paper commenting on the contract

18    it says that there is supposed to be a deadline of

19    Friday, June 25th at 5:00 p.m. for Turnberry to

20    accept or reject the aircraft.

21               In your typewritten version there is a

22    Thursday, June 24th at 5:00 p.m. deadline.   You

23    indicated in your testimony that you did verbally

                    ANITA B. GLOVER & ASSOCIATES, LTD.
                  10521 West Drive, Fairfax, Virginia  22030
                               (703) 591-3004

1    give Mr. Lainey a deadline.

2            Can you tell me what deadline it was?  Was

3    it a Thursday or Friday deadline?

4            A.    I believe that it was Friday.

5            MR. REIMER:  I have nothing further.

6        EXAMINATION BY COUNSEL FOR INTERNATIONAL PAPER

7    BY MR. HUTCHISON:

8            Q.    That comment, the paragraph that Mr. Reimer

9    just mentioned in Exhibit No. 44?  Did you ever send

10   a copy of Exhibit No. 44 to Mr. Lainey?

11           A.    I don't believe that it was sent to him

12   with the corrections that the two parties made.  I

13   don't recall specifically.  He very well may have

14   received it or he might not have received it.

15           MR. HUTCHISON:  I have no further

16   questions.

17           MR. REIMER:  We are concluded.

18                (Whereupon, at 3:30 p.m., the taking of

19                the deposition was concluded.)

20

21

22

23

                ANITA B. GLOVER & ASSOCIATES, LTD.
            10521 West Drive, Fairfax, Virginia  22030
                        (703) 591-3004

```
 1              C E R T I F I C A T E

 2   COMMONWEALTH OF VIRGINIA:

 3   AT LARGE:

 4              I, SHARON K. ARNOULT, a stenographic

 5   reporter and Notary Public in and for the

 6   Commonwealth of Virginia at Large, do hereby certify

 7   that the foregoing was reported by stenographic means

 8   by me, the witness being duly sworn by me, which

 9   matter was held on the date and at the time and place

10   set forth on the title page hereof, and that the

11   foregoing constitutes a true and accurate transcript

12   of same to the best of my ability.

13              I further certify that I am not related

14   to any of the parties, nor am I an employee of or

15   related to any of the attorneys representing the

16   parties, and I have no financial interest in the

17   outcome of this matter.

18              GIVEN under my hand and seal this

19   2nd day of December, 2000.

20   My commission expires:
     May 31, 2001              ,SHARON K. ARNOULT CSR

21

22

23

              ANITA B. GLOVER & ASSOCIATES, LTD.
         10521 West Drive, Fairfax, Virginia  22030
                      (703) 591-3004
```

**✈ MIDCOAST**

# FACSIMILE COVER PAGE

DATE:                FEBRUARY 3, 1999                TOTAL PAGES: ___18___

ATTENTION:          ED DAHLBERG                                    Excluding Cover

COMPANY:

FAX NUMBER:         703-361-3170

FROM:               STEVE BATES

Midcoast Aviation, Inc.
#14 Archview Drive              Phone:    (618) 337-2100
Cahokia, Il 62206               Fax No.:  (618) 332-1457

MESSAGE:

ED,

FOLLOWING ARE THE SQUAWK SHEETS FOR AIRCRAFT N90UC.  ALSO, THE 120
MONTH INSPECTION IS IN WORK FOR THIS AIRCRAFT.

IF YOU NEED ANYTHING ELSE, PLEASE FEEL FREE TO CALL ME AT (618) 337-2100
EXT. 6242.

THANKS!

*-10 YEAR GEAR INSPECTION -*
*12 month + 36 month*

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL TO WHOM OR ENTITY TO
WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED,
CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW.

If the reader of this message is not the intended recipient or the employee or agent responsible for delivering the
message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this
communication is prohibited. If you have received this communication in error, please notify us immediately by
telephone and return the original message to us by mail. Thank you.



EXHIBIT
#39

☑002

**REPAIR ORDER**

...ast Aviation, Inc.
rt-St. Louis International Airport
.10056
ɔt. Louis, Missouri 63145
314-731-7111

| | | |
|---|---|---|
| PAGE | / | OF |

DEPT # ___ /C ___

☐ CHARGE    ☐ CASH

BILLING DATE: _____

Please remit to:

| Lambert-St. Louis International Airport<br>P.O. Box 10056<br>St. Louis, MO 63145<br>FAA Repair Station  R03R822L | St. Louis Downtown-Parks Airport<br>#8 Archview Drive<br>Cahokia, IL 62206<br>FAA Repair Station  R03R822L | MIDCCAST AVIATION, INC.<br>P.O. Box 640972<br>Cincinnati, OH 45264-0972 |
|---|---|---|

| NAME | | | | | | RECEIVED DATE | | TIME |
|---|---|---|---|---|---|---|---|---|
| *UNION CAMP* | | | | | | *12/6/97* | | |

| ADDRESS | | PHONE | PROMISED DATE | | TIME |
|---|---|---|---|---|---|
| | | | | | |

| CITY | STATE | L.H. ENG. NO. | R.H. ENG. NO. |
|---|---|---|---|
| | | | |

| MAKE & MODEL | YEAR | SERIAL NO. | REG. NO. | LANDINGS | PLANE HRS. | |
|---|---|---|---|---|---|---|
| *CHALLENGER CL-601* | | *1073* | *N 9CUC* | | | WO # M005954 |

| NO. | INSTRUCTIONS | SALE AMOUNT |
|---|---|---|
| 1.) | *PRELIMINARY INSP.* | |
| 2.) | *REPAIR R/H THRUST REVERSER* | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | W/O TYPE: | |
| | COMPANY CODE: | |
| | DIST. CODE: | |
| | CUST. CODE: | |
| | EST. HRS.: | |
| | EST. LABOR: | |
| | EST. MATERIAL: | |
| | EST. OUTSIDE SV'S.: | |
| | | |
| | | |

| ABOVE PRICES FOR LABOR ONLY.    PARTS EXTRA. | TOTAL LABOR ONLY | |
|---|---|---|
| | PARTS | |
| IT IS EXPRESSLY AGREED THAT THIS REPAIR ORDER IS SUBJECT<br>TO THE TERMS AND CONDITIONS SET FORTH ON THE REVERSE<br>SIDE HEREOF AND MADE A PART HEREOF AND THAT THE UNDER-<br>SIGNED HAS AUTHORITY TO ORDER SUCH WORK. | OUTSIDE WORK (LABOR) | |
| | SHIPPING & HANDLING | |
| | SURCHARGE | |
| AUTHORIZED BY _____ | | |
| | TAX | |

| PROMISED | COMPLETED | RECEIVED BY | TAX | |
|---|---|---|---|---|
| | | | TOTAL | |

Claims for adjustments must be made immediately upon receipt of ship after test flight.

MIDCOAST

# DISCREPANCY SHEET

N# 90UC          W.O. # M595-1          PAGE 2 OF

| ITEM NO. -1 | DISCREPANCY C/W PRELIMINARY | CORRECTIVE ACTION |
|---|---|---|
| INSP. | | REFER TO W.O. M598-1 |
| | | |
| | | |
| | | |
| | | FUNCTIONAL/LEAK CK — DATE | OK TO CLOSE — DATE |
| OLD P/N | DISCOVERED BY ___ DATE 12/9/98 | CORRECTED BY ___ DATE 12/9/98 | INSPECTED BY ___ DATE 12/9/98 |
| | OLD S/N | NEW P/N | NEW S/N |

| ITEM NO. -2 | DISCREPANCY REPAIR R/H | CORRECTIVE ACTION FOUND inbd (LEFT) ACTUATOR |
|---|---|---|
| THRUST REVERSER | | TANG BROKE. REPLACED ACTUATOR with |
| | | NEW. Rigged Rod ends + RE-RIGGED |
| | | PDU + FLEXSHAFT. Lock. |
| | | |
| | | FUNCTIONAL/LEAK CK ___ DATE 12-23-98 | OK TO CLOSE ___ DATE 1-19-99 |
| OLD P/N 3272534-2 | DISCOVERED BY ___ DATE 12/9/98 | CORRECTED BY ___ DATE 12-23-98 | INSPECTED BY ___ DATE 1-19-99 |
| | OLD S/N P346 | NEW P/N 3272534-2 | NEW S/N 5P961 |

| ITEM NO. -3 | DISCREPANCY RESEARCH AND | CORRECTIVE ACTION C/W RESEARCH OF |
|---|---|---|
| SIGN OFF OUTSTANDING APPLIANCE | | AD APPLIANCE AD |
| A.D. NOTES | | |
| | | |
| | | |
| | | FUNCTIONAL/LEAK CK ___ DATE | OK TO CLOSE ___ DATE |
| OLD P/N | DISCOVERED BY ___ DATE | CORRECTED BY ___ DATE 12-23-98 | INSPECTED BY ___ DATE 12-98 |
| | OLD S/N | NEW P/N | NEW S/N |

| ITEM NO. -4 | DISCREPANCY R/H AFT | CORRECTIVE ACTION cut out crack and |
|---|---|---|
| CORNER OF N.L.G. CUTOUT | | manufactured .063 2024-T3 filler |
| IS CRACKED .13" | | located + installed a doubler P/N |
| | | 601-53-30-21-802 per Canadair REO |
| | | 600-53-30-185 |
| | | |
| | | FUNCTIONAL/LEAK CK ___ DATE | OK TO CLOSE ___ DATE |
| OLD P/N | DISCOVERED BY ___ DATE | CORRECTED BY ___ DATE 1/4/99 | INSPECTED BY Walters DATE 1/4/99 |
| | OLD S/N | NEW P/N | NEW S/N |

**DISCREPANCY SHEET**

N # _90UC_    W.O. # _M5954_    PAGE _3_ OF

| ITEM NO. _5_ DISCREPANCY _PRESSURE_ | CORRECTIVE ACTION |
|---|---|
| BULKHEAD AT F.S. 409.0 CRACKED AT LT. & RT. CORNERS | REPAIRED PER REO. No. |

| | FUNCTIONAL/LEAK CK | DATE | OK TO CLOSE | DATE |
|---|---|---|---|---|
| DISCOVERED BY | DATE | CORRECTED BY | DATE | INSPECTED BY | DATE |
| OLD P/N | OLD S/N | NEW P/N | NEW S/N |

| ITEM NO. _6_ DISCREPANCY _RIGHT ENGINE_ | CORRECTIVE ACTION |
|---|---|
| OVERSPEED SHUT-OFF VALVE SOLENOID STICKS DURING OVER SPEED SHUTDOWN CHECKS | Removed + Replaced overspeed solenoid. Cleaned valve + change filter. |
| Shutoff valve : Packings (added) 12-23-98 WJW | |

| | FUNCTIONAL/LEAK CK | DATE | OK TO CLOSE | DATE |
|---|---|---|---|---|
| DISCOVERED BY | DATE | CORRECTED BY 12/23/98 | INSPECTED BY 12/24/98 |
| OLD P/N 2-302-175 | OLD S/N 137 | NEW P/N 2-303-175 (CB) | NEW S/N 191 |

| ITEM NO. _7_ DISCREPANCY _RIGHT ENGINE_ | CORRECTIVE ACTION _IN WORK AWAITING_ |
|---|---|
| OIL PRESSURE IS LOW AT IDLE, GAUGE AND TRANSMITTER NEED TO BE VERIFIED PRIOR TO ADJUSTMENTS. | POWER A/N |

| | FUNCTIONAL/LEAK CK | DATE | OK TO CLOSE | DATE |
|---|---|---|---|---|
| DISCOVERED BY | DATE | CORRECTED BY | DATE | INSPECTED BY | DATE |
| X.D P/N | OLD S/N | NEW P/N | NEW S/N |

| ITEM NO. _8_ DISCREPANCY _L/H WING FUEL_ | CORRECTIVE ACTION |
|---|---|
| ACCESS HOLES 550 CB, 540 BB, 540 CB AND 140 EL HAVE SEVERAL CHIPPED AREAS (PAINT) ON INNER FLANGE | Cleaned - alodined - primed areas as required |

| | FUNCTIONAL/LEAK CK | DATE | OK TO CLOSE | DATE |
|---|---|---|---|---|
| DISCOVERED BY | DATE | CORRECTED BY SCV. hy 12/24/98 | INSPECTED BY Walters 12/24/98 |
| X.D P/N | OLD S/N | NEW P/N | NEW S/N |

**DISCREPANCY SHEET**

N # 90 UC    W.O. # M5754      PAGE 6 OF

| ITEM NO. ~17 | DISCREPANCY | CORRECTIVE ACTION |
|---|---|---|

**ITEM NO. ~17**   **DISCREPANCY** L/H WING LEADING EDGE RIB (INBOARD) IS CARRODED WHERE WING ANTI-ICE DUCT ENTERS LEADING EDGE

**CORRECTIVE ACTION** REMOVED ANTI-ICE DUCT, CLEANED CORROSION, ALODINED AND PRIMED. REINSTALLED ANTI-ICE duct

FUNCTIONAL/LEAK CK   DATE   OK TO CLOSE   DATE 12-23-98

DISCOVERED BY   DATE    CORRECTED BY   DATE 17-22   INSPECTED BY 12/23/98

OLD P/N   OLD S/N   NEW P/N   NEW S/N

**ITEM NO. ~18**   **DISCREPANCY** L/H AFT FAIRING INSERT IS STRIPPED

**CORRECTIVE ACTION** F/W Replaced insect in wing fairing per CMCCCS&RMSI-61-11

FUNCTIONAL/LEAK CK   DATE   OK TO CLOSE   DATE

DISCOVERED BY   DATE    CORRECTED BY 12/28/98   INSPECTED BY KNEE 12/28/98

OLD P/N   OLD S/N   NEW P/N   NEW S/N

**ITEM NO. ~19**   **DISCREPANCY** BROKEN NUTPLATE on R/H LOWER INBOARD WING WHERE FAIRING ATTACHES

**CORRECTIVE ACTION** RE-ASSEMBLED NUTPLATE AND CHECKED THREADS

FUNCTIONAL/LEAK CK   DATE   OK TO CLOSE   DATE

DISCOVERED BY   DATE    CORRECTED BY 12/28/98   INSPECTED BY 12/23/98

LD P/N   OLD S/N   NEW P/N   NEW S/N

**ITEM NO. ~20**   **DISCREPANCY** RADAR ANTENNA IS CORRODING

**CORRECTIVE ACTION** Removed Radar Ant Cleaned All visible corrosion, Alodized primed and painted Ant Base And Cleaned Base weld Ant mounts And Alodized And REINSTALLED Radar Ant.

FUNCTIONAL/LEAK CK   DATE   OK TO CLOSE   DATE

DISCOVERED BY   DATE    CORRECTED BY 11-23-98   INSPECTED BY 12/23/98

LD P/N   OLD S/N   NEW P/N   NEW S/N

MIDCOAST

**DISCREPANCY SHEET**

N # 90UC    W.O. # M5254    PAGE 8 OF

**ITEM NO. -25** DISCREPANCY R/H FUEL ACCESS
HOLE 140DR HAS CORROSION
AROUND LIP

CORRECTIVE ACTION Blended out - minor corrosion -
roto-peened & clodined as
required per SRM chapter 51-351

FUNCTIONAL/LEAK OK    DATE    OK TO CLOSE    DATE
DISCOVERED BY    DATE    CORRECTED BY  S.E.R.  DATE 2/23/9?    INSPECTED BY  Walter  DATE 12/24/9?
OLD P/N    OLD S/N    NEW P/N    NEW S/N

**ITEM NO. -26** DISCREPANCY FUEL PANEL
640 BB PHENOLIC RING BROKEN

CORRECTIVE ACTION Removed Broken Phenolic
Ring, cleaned Panel and installed
new Fitted Phenolic to Panel and installed
Phenolic to Panel

FUNCTIONAL/LEAK OK    DATE    OK TO CLOSE 12-29-9X DATE
DISCOVERED BY    DATE    CORRECTED BY  12-29-98  DATE    INSPECTED BY    DATE
OLD P/N    OLD S/N    NEW P/N 600-10188-1    NEW S/N

**ITEM NO. -27** DISCREPANCY FUEL PANEL
640 AB MESH GASKET IS TORN

CORRECTIVE ACTION on order
REPLACED

FUNCTIONAL/LEAK OK    DATE    OK TO CLOSE    DATE
DISCOVERED BY    DATE    CORRECTED BY    DATE    INSPECTED BY  DATE 1/29/99
OLD P/N    OLD S/N    NEW P/N    NEW S/N

**ITEM NO. -28** DISCREPANCY R/H T/R
TRANSLATING SLEEVE SEAL IS
ROLLED

CORRECTIVE ACTION on order
Removed & replaced translating
sleeve seal

FUNCTIONAL/LEAK OK    DATE    OK TO CLOSE  Rick Mathis  DATE 1-19-99
DISCOVERED BY    DATE    CORRECTED BY  Williams 01/6/99    INSPECTED BY  Rick Mathis  DATE 1-09-99
OLD P/N    OLD S/N    NEW P/N    NEW S/N

MIDCOAST

**DISCREPANCY SHEET**

N # _90UC_    W.O. # _M5954_    PAGE _13_ OF

| ITEM NO. -45 | DISCREPANCY | OPS. TEST A.D.G. | | CORRECTIVE ACTION | | AWAITING RUNUP OF |
|---|---|---|---|---|---|---|
| CONTROL | | | | | | |
| | | | | FUNCTIONAL/LEAK CK | DATE | OK TO CLOSE | DATE |
| | DISCOVERED BY | DATE | CORRECTED BY | DATE | INSPECTED BY | DATE |
| OLD P/N | OLD S/N | NEW P/N | | NEW S/N | |

| ITEM NO. -46 | DISCREPANCY | CAP. TEST | CORRECTIVE ACTION | I/W |
|---|---|---|---|---|
| MAIN BATTERY | | | | |
| | | | FUNCTIONAL/LEAK CK | DATE | OK TO CLOSE | DATE |
| | DISCOVERED BY | DATE | CORRECTED BY | DATE | INSPECTED BY | DATE |
| OLD P/N  20583 | OLD S/N 078502 | NEW P/N | | NEW S/N | |

| ITEM NO. -47 | DISCREPANCY | WEIGHT CHECK | CORRECTIVE ACTION |
|---|---|---|---|
| MAIN FIRE BOTTLES | | | Removed + weight Checked R/H (18.58 lbs) |
| | | | and Y/H (19.72) Main Fire Bottles |
| | | | FUNCTIONAL/LEAK CK | DATE | OK TO CLOSE | DATE |
| | DISCOVERED BY | DATE | CORRECTED BY  Karl Marting jr  DATE 12-23-98 | INSPECTED BY | DATE |
| LD P/N | OLD S/N | NEW P/N | | NEW S/N | |

| ITEM NO. -48 | DISCREPANCY | WEIGHT CHECK | CORRECTIVE ACTION |
|---|---|---|---|
| PORTABLE FIRE BOTTLES | | | Removed + weight check |
| | | | Portables fire bottles |
| | | | FUNCTIONAL/LEAK CK | DATE | OK TO CLOSE | DATE |
| | DISCOVERED BY | DATE | CORRECTED BY  S. Longes  DATE 12 23-98 | INSPECTED BY | DATE |
| LD P/N | OLD S/N | NEW P/N | | NEW S/N | |

MIDCOAST

DISCREPANCY SHEET

N# 904C    W.O.# M5954    PAGE 15 OF

| ITEM NO. -53 | DISCREPANCY C/W MDHR COWL HINGE INSPECTION | CORRECTIVE ACTION LT. & RIGHT ENGINE Cowl hinge INSP. C/W IAW 71-10-11. No Defects Noted At this time |
|---|---|---|
| | | FUNCTIONAL/LEAK CK        DATE | OK TO CLOSE        DATE |
| OLD P/N | DISCOVERED BY        DATE OLD S/N | CORRECTED BY        DATE WJW NEW P/N | INSPECTED BY        DATE NEW S/N |

| ITEM NO. -54 | DISCREPANCY C/W 50 HR OIL SYSTEM CHECK | CORRECTIVE ACTION OIL SYSTEM check C/W IAW Textron Lycoming H.D. 97-05-11 121. No Defects Noted @ this time |
|---|---|---|
| | | FUNCTIONAL/LEAK CK        DATE | OK TO CLOSE        DATE |
| -LD P/N | DISCOVERED BY        DATE OLD S/N | CORRECTED BY        DATE NEW P/N | INSPECTED BY        DATE NEW S/N |

| ITEM NO. -55 | DISCREPANCY C/W S.B. A600-0024 SPECIAL CHECK FLIGHT SPOILER RIGGING | CORRECTIVE ACTION |
|---|---|---|
| | | FUNCTIONAL/LEAK CK        DATE | OK TO CLOSE        DATE |
| .D P/N | DISCOVERED BY        DATE OLD S/N | CORRECTED BY        DATE NEW P/N | INSPECTED BY        DATE NEW S/N |

| ITEM NO. -56 | DISCREPANCY #1 Hyd. pump SEAL blown | CORRECTIVE ACTION Removed & sent out REINSTALLED — AWAITING POWER |
|---|---|---|
| | | FUNCTIONAL/LEAK CK        DATE | OK TO CLOSE        DATE |
| .D P/N | DISCOVERED BY        DATE OLD S/N | CORRECTED BY        DATE NEW P/N | INSPECTED BY        DATE NEW S/N |

**DISCREPANCY SHEET**

W.O. # m 5954    PAGE 16 OF    GE / 7 OF

| DISCREPANCY | CORRECTIVE ACTION | WORK |
|---|---|---|
| Replace 4/H & R/H. Hinges | Drilled out & replaced 4 each hinge, hole in 4/H & B/H MLG door. P/o 600-31519-9 & -10 P/o 600-31587-1 & -2 —used the old hinge as templates & installed new type fasteners as removed. | |

FUNCTIONAL/LEAK OK    DATE    OK TO CLOSE    DATE    TO CLOSE    DATE
DISCOVERED BY    DATE    CORRECTED BY    DATE    INSPECTED BY    1/11/99    RECTED BY    DATE
OLD S/N    NEW P/N    NEW S/N    S/N

| DISCREPANCY | CORRECTIVE ACTION | WORK |
|---|---|---|
| c/w 36 MONTH REQUIREMENTS | Complied with 36 Month insp. requirements. | RUN UP & TST FTS |

FUNCTIONAL/LEAK OK    DATE    OK TO CLOSE    DATE    TO CLOSE    DATE
DISCOVERED BY    DATE    CORRECTED BY 1-11-99    INSPECTED BY 1-11-99    RECTED BY    DATE
OLD S/N    NEW P/N    NEW S/N    S/N

| DISCREPANCY | CORRECTIVE ACTION | WORK |
|---|---|---|
| Reseal of touch | | Tested all ducts 9 Sealed area Bled all pre. |

FUNCTIONAL/LEAK OK    DATE    OK TO CLOSE    DATE    TO CLOSE    DATE
DISCOVERED BY    DATE    CORRECTED BY    DATE    INSPECTED BY    DATE    RECTED BY 1/4/99
OLD S/N    NEW P/N    NEW S/N    S/N

| DISCREPANCY | CORRECTIVE ACTION | WORK |
|---|---|---|
| DMP #1 Coax d connector | Removed coax from the AIRCRAFT. Removed faulty connector. Replaced with new connector. Re-installed coax in AIRCRAFT. | 2 each hinge & 2 each P/N ice gins P/N |

FUNCTIONAL/LEAK OK    1-28-99    OK TO CLOSE    1-28-99    TO CLOSE    DATE
DISCOVERED BY    DATE    CORRECTED BY 1-28-99    INSPECTED BY 1-28-99    RECTED BY 1/4/99
OLD S/N    NEW P/N    NEW S/N    S/N



# Turnberry Charters Inc.

**Aviation Department**

SENT VIA FAX TO (703) 361-3170
EMERALD AVIATION, Agent

June 19, 1999

INTERNATIONAL PAPER COMPANY
DBA UNION CAMP CORP.
184 Airport Rd , Hgr. D
White Plains, NY 10604

Re:    1981 Canadair Challenger CL600  S/N 1023  N90UC

This will confirm our telephone conversation with your agent, Mr. Ed Dahlberg, on June 18, 1999  TURNBERRY CHARTERS, INC  hereby offers $7,000 000.00 U.S. for the above referenced aircraft, subject to the good faith efforts of both parties to negotiate mutually agreeable terms and conditions of the sale. and the timely execution and delivery of a definitive sales agreement in form and substance mutually acceptable to the parties

It is our understanding that timeliness is a determining factor in the sale of the aircraft, and it is our intention and desire to close within ten (10) business days. We have just sold our Gulfstream GIIB  and are in immediate need of a replacement aircraft. We have pre-arranged funding in place with GECC. and their Manager of Aircraft Leasing and Financing, Mr. Michael C. Flint, can be contacted at (770) 999-4921 to confirm our ability to close upon our demand

To confirm our sincere interest in purchasing your aircraft, we have placed a good faith deposit of $100,000.00 in escrow with AIC Title Service, and you have received or will soon receive faxed confirmation of this from the Escrow Agent. This deposit shall, of course, be fully refundable until such time as a definitive sales agreement shall be executed, and then shall become subject to the terms and conditions of that agreement.

It is our understanding that the records of the recent prepurchase inspection on the aircraft, and the recent landing gear overhaul and the 120-month and 36-month inspections will be made available to us for review at Midcoast Aviation in St. Louis, MO, and it is our intention to send our agent, Mr. Ken Murray, to Midcoast to review these records immediately upon acceptance of this offer  It will also be our intention to visually inspect the aircraft and to conduct systems checks at our expense at Midcoast Aviation, as well as a flight check (not to exceed two (2) hours flight time) to confirm that all systems are operating normally.

15001 N.W. 42nd Avenue, Suite 117, Miami, FL 33054  (305) 685-0881  Fax: (305) 289-9397

**EXHIBIT**

# 40

This offer shall be deemed withdrawn and invalid as of 5:00 pm EDT. Monday. June 21, 1999. unless accepted by execution below and returned prior to that time. This offer. if accepted and executed, shall become null and void as of 5:00 pm EDT, Monday, June 28, 1999. if the parties have not agreed to and executed a definitive sales agreement prior to that time.

This offer is intended for the owner and the owner's agent only. and the terms hereof are not to be divulged to any third party.

For TURNBERRY CHARTERS. INC.          For INTERNATIONAL PAPER COMPANY

_____          _____
Dennis R. Lainey. Director

*Turnberry Charters, Inc.*
AVIATION DEPARTMENT

# FACSIMILE  TRANSMISSION

| | |
|---|---|
| To: | EDD DAHLBERG |
| Company: | |
| Fax number: | +1 (703) 361-3170 |
| Business phone: | (703)361-3330 |
| From: | DENNIS R. LAINEY |
| Date & Time: | 6/20/99 6:17:00 PM |
| Pages: | 3 |
| Re: | CHALLENGER 1023 N90UC |

WOULD YOU SEND ME FULL SPECS ASAP AND A LIST OF ALL SPARES.
                                          REGARDS,
     DENNIS

**If you have any problems with this transmission, please call (305) 685-0881
immediately.**

15001 N.W. 42nd Avenue, Suite 117, Miami, FL 33054  (305) 685-0881  Fax: (305) 289-8397



# Turnberry Charters Inc.

**Aviation Department**

SENT VIA FAX TO (703) 361-3170
EMERALD AVIATION, Agent

June 19, 1999

INTERNATIONAL PAPER COMPANY
DBA UNION CAMP CORP.
184 Airport Rd., Hgr. D
White Plains, NY 10604

Re:  1981 Canadair Challenger CL600 S/N 1023 N90UC

This will confirm our telephone conversation with your agent, Mr. Ed Dahlberg, on June 18, 1999. TURNBERRY CHARTERS, INC. hereby offers $7,000,000.00 U.S. for the above referenced aircraft, subject to the good faith efforts of both parties to negotiate mutually agreeable terms and conditions of the sale, and the timely execution and delivery of a definitive sales agreement; in form and substance mutually acceptable to the parties.

It is our understanding that timeliness is a determining factor in the sale of the aircraft and it is our intention and desire to close within ten (10) business days. We have just sold our Gulfstream GIIB, and are in immediate need of a replacement aircraft. We have pre-arranged funding in place with GECC, and their Manager of Aircraft Leasing and Financing, Mr. Michael C. Flint, can be contacted at (770) 999-4921 to confirm our ability to close upon our demand.

To confirm our sincere interest in purchasing your aircraft, we have placed a good faith deposit of $100,000.00 in escrow with AIC Title Service, and you have received or will soon receive faxed confirmation of this from the Escrow Agent. This deposit shall, of course, be fully refundable until such time as a definitive sales agreement shall be executed, and then shall become subject to the terms and conditions of that agreement.

It is our understanding that the records of the recent prepurchase inspection on the aircraft, and the recent landing gear overhaul and the 120-month and 36-month inspections will be made available to us for review at Midcoast Aviation in St. Louis, MO, and it is our intention to send our agent, Mr. Ken Murray, to Midcoast to review these records immediately upon acceptance of this offer. It will also be our intention to visually inspect the aircraft and to conduct systems checks at our expense at Midcoast Aviation, as well as a flight check (not to exceed two (2) hours flight time) to confirm that all systems are operating normally.

15001 N.W. 42nd Avenue, Suite 117, Miami, FL 33054  (305) 685-0981  Fax: (305) 685-9397

**EXHIBIT**
# 41

INTERNATIONAL PAPER COMPANY        2            June 19, 1999

This offer shall be deemed withdrawn and invalid as of 5 00 pm EDT. Monday June 21, 1999, unless accepted by execution below and returned prior to that time. This offer, if accepted and executed, shall become null and void as of 5:00 pm EDT. Monday, June 28, 1999, if the parties have not agreed to and executed a definitive sales agreement prior to that time.

This offer is intended for the owner and the owner's agent only, and the terms hereof are not to be divulged to any third party

For TURNBERRY CHARTERS, INC.        For INTERNATIONAL PAPER COMPANY

Dennis R. Lainey, Director

6/21/99
Sr. VP

16001 N.W. 42nd Avenue, Suite 117  Miami, FL 33054  (305) 688-6881  Fax: (305) 283-838/

## AIRCRAFT SALE AGREEMENT

AGREEMENT, made this _____ day of June 1999, by and between International Paper Company, with offices at 184 Airport Road, Box 9, White Plains, NY   10604 (hereinafter referred to as "Int'l Paper.") and Turnberry Charters, Inc., with offices at 15001 N.W.. 42nd Avenue, Suite 117, Miami, FL   33054 (hereinafter referred to as "Turnberry").

### WITNESSETH:

WHEREAS, Int'l Paper is the owner of a Challenger 600, Serial Number 1023, Registration Number N90UC, including the engines, avionics equipment, instrumentation and all items of equipment, parts, components and accessories presently installed thereon (hereinafter collectively referred to as the "Aircraft"); and

WHEREAS, the parties are mutually desirous of reducing their understandings and agreements to writing.

NOW, THEREFORE, in consideration of the mutual covenants herein contained, and other good and valuable consideration, the parties hereto agree as follows:

### 1. PERFORMANCE AND PURCHASE PRICE.

Int'l Paper agrees to sell and Turnberry agrees to purchase the Aircraft in its present condition provided the following conditions have been made and representations of Int'l Paper are made, and Turnberry agrees to pay to Int'l Paper therefore the sum of Seven Million ($7,000,000) Dollars, payable in the following manner:

> A.    A deposit in the amount of One Hundred  Thousand Dollars ($100,000) heretofore placed in escrow by Turnberry with AIC Title Service, Oklahoma City, Oklahoma (hereinafter referred to as the "Escrow Agent"), which deposit is refundable until the Aircraft is accepted or rejected upon completion of the pre-purchase inspection to be completed on or about Thursday, June 24, 1999. If the Aircraft is accepted by Turnberry, the deposit will become refundable only in the event that Int'l Paper fails to deliver the Aircraft with a clear title or as provided in Paragraph 4 and Paragraph 9 hereof. Turnberry shall acknowledge acceptance of the pre-purchase inspection in the form attached hereto as Exhibit "A" and by this reference made a part hereof.


EXHIBIT # 42

06111-WPD    Document 34    Entered on FLSD Docket 12/21/2000    Pag

Page Two

> B.    Balance of purchase price plus half of the escrow fees upon delivery of the Aircraft and transfer of title instruments to Turnberry as hereinafter set forth.    Payment shall be made by bank wire transfer.

2.    REPRESENTATIONS.

Int'l Paper agrees that at the time of delivery of the Aircraft to Turnberry:

> A.    The engine service plan (CMSP) for the Lycoming ALF502-L engines shall be transferred by Int'l Paper to Turnberry pursuant to Exhibit "B" attached hereto and made a part hereof.    The cost of transferring the CMSP agreement shall be for the account of Turnberry.

> B.    Any time remaining on the CAMP agreement shall be transferred to Turnberry.    The cost of transferring the CAMP agreement shall be for the account of Turnberry.    Additionally all CAMP, Canadair, Lycoming and vendor information or similar received by Int'l Paper shall be immediately forwarded to Turnberry.

> C.    Int'l Paper will assign, to the extent that Int'l Paper has the right to do so, all of its right, title and interest in any applicable manufacturer's warranties and/or vendor warranties.

3.    CONDITIONS OF SALE.

Turnberry's obligation to purchase the Aircraft shall be subject to the following conditions:

> A.    That the Aircraft will be delivered in its present condition with all systems operating.    Int'l Paper represents and warrants that all applicable FAA airworthiness directives and manufacturer's mandatory service bulletins and modifications have been complied with.

> B.    Pre-purchase inspection and a flight test of up to two hours ("Inspection") to commence on or about Tuesday, June 23, 1999 at Midcoast Aviation Service Center, Cahokia, Illinois (hereinafter referred to as "Airport") to either accept or reject the Aircraft. All costs of the Inspection, flight test and movement of the Aircraft shall be for the account of Turnberry.

Page Three

        C.    In the event Turnberry accepts the Aircraft, Int'l Paper shall have the option but not the obligation to pay for any discrepancies found affecting the airworthy condition or operational systems of the Aircraft.

### 4.    DAMAGE.

Int'l Paper represents that to the best of its knowledge the Aircraft has no damage history. Int'l Paper shall promptly notify Turnberry of any damage, accident or material change occurring to the Aircraft, any part thereof, or engines installed thereon, prior to the date of closing. In the event of destruction or material damage to the Aircraft on or before the transfer of title, either party may elect to cancel this Agreement. If this Agreement is canceled pursuant to the foregoing provisions, the Escrow Agent shall immediately return the deposit of One Hundred Thousand Dollars ($100,000) to Turnberry, and the parties will in such event have no further obligations hereunder.

### 5. DELIVERY.

Int'l Paper and Turnberry agree that the delivery of the Aircraft will take place at the Airport within Three (3) business days of the acceptance of the pre-purchase inspection. The cost of moving the Aircraft to a location other than the Airport for delivery to shall be for the account of Turnberry. Turnberry shall acknowledge receipt and delivery of the Aircraft by executing and delivering to Int'l Paper an Aircraft Sales Final Acceptance and delivery in the form attached hereto as Exhibit "C" and by this reference made a part hereof.

### 6. TRANSFER OF TITLE AND TITLE INSTRUMENTS.

Transfer of title and delivery of the Aircraft shall be made at a location mutually agreeable to the parties.

At the time of closing, Int'l Paper shall deliver to Turnberry:

    A. An executed FAA Bill of Sale in the form required to permit registration of the Aircraft in the United States.

    B. Warranty Bill of Sale in the form annexed hereto and marked Exhibit "D".

Page Four

          C.  All Aircraft and engine logs, manuals, parts, maintenance data and other documentation maintained for the operation of the Aircraft.

## 7.   AIRCRAFT WARRANTY AND DISCLAIMER.

Int'l Paper warrants that the Aircraft is owned by Int'l Paper and shall be delivered to Turnberry free and clear of any mortgages, liens or encumbrances of any nature whatsoever. Turnberry acknowledges that Int'l Paper is selling the Aircraft to Turnberry in an "as-is, where-is" condition. ALL OTHER WARRANTIES OF Int'l Paper WHETHER EXPRESS, IMPLIED OR STATUTORY, INCLUDING BUT NOT LIMITED TO WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, ARE HEREBY EXCLUDED AND WAIVED BY TURNBERRY, ITS SUCCESSORS, ASSIGNS AND TRANSFEREES. IN NO EVENT SHALL INT'L PAPER BE LIABLE FOR COLLATERAL, CONSEQUENTIAL OR INCIDENTAL DAMAGES.

## 8.   TAXES.

Int'l Paper shall bear all taxes, duties or other similar charges assessed by any national, state or local government or any other authority in connection with Int'l Paper's ownership or use of the Aircraft at any time on or prior to the closing date. Turnberry shall bear all subsequent taxes, duties or similar charges that thereafter may be assessed by any national, state or local government or any other authority in connection with Turnberry's purchase, use or ownership of the Aircraft.

## 10.   BROKERAGE REPRESENTATIONS.

Except for Int'l Paper's obligation to Emerald Aviation, Inc., Int'l Paper and Turnberry each represent and warrant to the other that they have taken no action which would give rise to a valid claim for a broker's fee in connection with this transaction and each party agrees to indemnify and forever hold the other harmless from and against any claims for brokers' compensations, fees, or commissions arising out of the indemnifying party's actions.

Page Five

## 11. EXCUSABLE DELAYS.

Int'l Paper shall not be liable for any failure of or delay in delivery of the Aircraft for the period that such failure or delay is due to acts of God or the public enemy; civil war, insurrection or riots; fires, explosions or serious accidents; governmental priorities or allocations; strikes or labor disputes; inability to obtain Aircraft materials, accessories, equipment or parts from the vendors; or any other cause beyond Int'l Paper's control; provided, however, that Turnberry may elect to terminate this Agreement if such failure or delay continues for sixty (60) days or more. In the event that this agreement is cancelled pursuant to the foregoing provisions, the Escrow Agent shall immediately return the deposit in the amount of One Hundred Thousand ($100,000) Dollars to Turnberry and each of the parties shall be released and relieved of any obligations under this agreement.

## 12. NOTICES.

Any notice required or permitted pursuant to this Agreement shall be in writing and shall be delivered either personally, by FAX machine, or by any overnight delivery service such as Airborne, Federal Express or DHL to the parties at their respective addresses as set forth below, and as the same may be changed by serving proper notice to the other party. The date of receipt of said Notice shall be the date on which the party to whom the Notice is directed acknowledges receipt thereof or refuses to receive same or if the Notice is transmitted by FAX machine when the FAX is verified as having been received. Each party shall have the responsibility to notify the other party of any change in address, and each party shall be permitted to rely upon the validity and accuracy of addresses set forth in this agreement, unless otherwise specifically notified of a change of address. All the provisions of this paragraph shall apply to any Notice as referred to in this agreement.

The initial notice addresses of the parties are as follows:

A.          In the case of Int'l Paper, to:

                    Mr. Bob Cassidy
                    Int'l Paper Company
                    184 Airport Road, Box 9
                    White Plains, NY 10604
                    FAX: 914 428 3478

Page Six

B.          In the case of Turnberry, to:

                        Dennis Lainey
                        Turnberry Charters, Inc.
                        15001 N.W. 42nd Avenue, Suite 117
                        FAX: 305 289 9397

### 12.   ENTIRE AGREEMENT.

The parties agree that the foregoing constitutes the entire understanding of the parties, and shall not be modified or amended unless hereinafter made in writing signed by the authorized representatives of the parties.

### 13. RESOLUTION OF DISPUTES.

In the event a dispute or claim arises out of this Agreement, the parties hereto hereby consent to have the dispute resolved by the general district court of New York.

### 14.   APPROVAL.

Int'l Paper and Turnberry each warrant to the other that the execution, delivery, and performance of this Agreement has been authorized and approved by all required corporate action.

### 15. CONFIDENTIALITY.

Int'l Paper and Turnberry each agree that the specific details  regarding this transaction shall be kept confidential except as may be required by law.

### 16.   COUNTERPARTS.

This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and shall be effective when executed by both parties.

This agreement shall be binding upon the heirs, executors, successors and assignees of the parties.

Page Seven

IN WITNESS WHEREOF, the parties hereto have duly signed this Agreement on the day and year first above written.

INTERNATIONAL PAPER COMPANY

By:_____Title_____Date_____

TURNBERRRY CHARTERS, INC.

By:_____Title_____Date_____

EXHIBIT "A"

AIRCRAFT PRE-PURCHASE ACCEPTANCE

Aircraft Make and Model:

Challenger 600

Serial No.:

1023

Registration No.:                                                           N90UC

This is to acknowledge acceptance of the pre-purchase inspection of the above-identified Aircraft in accordance with Aircraft Purchase Agreement dated June _____, 1999, by and between Int'l Paper Company and Turnberry Charters, Inc.
ACCEPTED BY:

TURNBERRY CHARTERS, INC.

BY:_____

DATE OF ACCEPTANCE:_____

EXHIBIT "B"

## ENGINE MAINTENANCE SERVICE PLAN ASSIGNMENT

In consideration of the mutual covenants herein contained, and other good and valuable consideration, Int'l Paper Company, ("Int'l Paper") does hereby assign to Turnberry Charters, Inc. ("Turnberry") all of the right, title and interest of Int'l Paper in a certain Engine Maintenance Service Plan ("CMSP Agreement") which Int'l Paper has executed with Allied Signal for Lycoming ALF502L-2 engines, Serial Number L-F03099S and L-F03052S installed on Challenger 600, Serial No. 1023, Registration No. N90UC.

Int'l Paper represents and warrants to Turnberry that all payments required to be made under the CMSP Agreement are current and covenants and agrees that it will execute any additional instruments and/or documents required by Allied Signal to effectuate the transfer and assignment of the rights of Int'l Paper in the CMSP Agreement to Turnberry.

EXHIBIT "C"

## AIRCRAFT SALES FINAL ACCEPTANCE AND DELIVERY

| | |
|---|---|
| Aircraft Make and Model: | Challenger 600 |
| Serial No.: | 1023 |
| Registration No.: | N90UC |

Delivery of the above-identified Aircraft at Cahokia Airport, Cahokia, Illinois is acknowledged and said Aircraft is accepted in accordance with Aircraft Purchase Agreement dated June ___, 1999, by and between Int'l Paper Company and Turnberry Charters, Inc. acknowledge that all delivery conditions have been satisfied and that Int'l Paper Company has performed all its obligations under the Aircraft Purchase Agreement.

ACCEPTED BY:

TURNBERRRY CHARTERS, INC.

BY:

DATE OF ACCEPTANCE:

EXHIBIT "D"

BILL OF SALE

KNOW ALL MEN BY THESE PRESENTS,

That Int'l Paper Company, a corporation organized and existing under the laws of New York with principal offices at 184 Airport Road Box 9 White Plains, NY 10604, Party of the First Part, for and in consideration of the sum of One Dollar ($1.00) lawful money of the United States, to it in hand paid, at or before delivery of these presents, by Turnberry Charters, Inc. whom can be contacted at at 15001 N.W. 42nd Avenue, Suite 117, Miami, FL 33054, Party of the Second Part, the receipt of which is hereby acknowledged, does hereby grant, bargain, sell, transfer and set over unto the Party of the Second Part, its successors and assigns:

Challenger 600, Serial Number 1023, together with the engines, avionics equipment, instrumentation and all items of equipment, parts, components and accessories presently installed thereon.

TO HAVE AND TO HOLD the same unto the Party of the Second Part, its successors and assignees forever.   And the Party of the First Part does for its successors and assigns warrant that it is the lawful owner of said personal property; that title to said property is free from all prior claims, liens and encumbrances and that the Party of the First Part has good right to sell the same as aforesaid.  The Party of the First Part covenants and agrees to and with the said Party of the Second Part to warrant and defend the sale of the said personal property hereby sold unto the said Party of the Second Part, its successors and assigns, against all and every person and persons whomsoever.

IN WITNESS WHEREOF, the Party of the First Part has
caused these presents to be signed by its duly authorized officer the day and year first above written.

INTERNATIONAL PAPER COMPANY

By:

EXHIBIT "E"

SPARE PARTS INVENTORY

# EMERALD

## Aviation, Incorporated
### Aircraft Acquisitions, Sales and Consulting

## *Fax Transmittal*

**Date**        June 21, 1999

**To**          Dennis Lainey
**Company**     Turnberry Charters, Inc.
**Fax**         305 289 9397

**From**        Ed Dahlberg

**Subject**     Challenger 600, S/N 1023
                Draft of Purchase agreement

Best regards.



# EMERALD

## Aviation. Incorporated
### Aircraft Acquisitions, Sales and Consulting

## CHALLENGER 600
## SERIAL NUMBER 1023

| | |
|---|---|
| Year of Manufacture: | 1981 |
| Airframe: | 6770 Hours |
| | 5761 Landings |

Engines: Avco Lycoming ALF 502L-2C( on CMSP)

| | |
|---|---|
| Left Engine. S/N LF03099S | 6135 Hours |
| | 1088 SHOT |
| | 4631 Cycles |
| Right Engine: S/N LF03052S | 6150 Hours |
| | 1063 SHOT |
| | 5179 Cycles |
| APU  S/N P-162C(on MSP) | 5831 Hours |
| | 254 SHOT |

### *Avionics*

Dual Sperry SPZ-600 Flight
 Directors/SPZ-600 Autopilot
**Delco Carousel VI INS**
Dual Collins VHF-20A Comms
Dual Collins VIR-30A Navs
Dual Collins ADF-60A
Dual Collins TDR-90 Transponders
Two Sperry VG-14 Vertical Gyros
Dual Sperry AZ-242 Air Data
 Computers
**Universal UNS-1K FMS w/ GPS**

Sperry Primus 400SL Radar
Sperry Datanav
**Wulfsberg Flitephone VI**
JET Standby Attitude Ind.
Collins 718-u5 HF
Dual Collins DME-40
Dual Sperry C-14 Compass Systems
**King CAS TCAS II**
Sperry Voice Advisory
Fairchild A100 CVR
**Global AFIS**

Page Two
Challenger 600, S/N 1023

## *Features*

| | |
|---|---|
| Steer-By-Wire S/B 380 | Delco INS Service Contract |
| Winglets | Global AFIS Service Contract |
| ABCD Punch List | Global NDB2 Service Contract |
| Excellent Service Bulletin Status | Engines on CMSP Program |
| CAMP Maintenance Program | Universal UNS-1K Warranty |
| **Extensive Spare Parts Package** | **Fresh Gear Service Bulletin** |
| Fresh Midcoast Pre-Buy | **Fresh SB on FS 409** |

## *Interior*

Executive 12 Place interior in gray, maroon and muted colors in leather and fabrics. Burl Walnut Woodwork throughout. Aft Lavatory, forward galley. Cabin entertainment system includes Sony 19" Color TV, Sony VCR, Sony CD/cassette player and Airshow 100 system. Interior partially refurbished January 1997.

## *Exterior*

Overall Matterhorn White Top with Red Bottom separated by Red and Black Stripes. Repainted January 1997. Always hangared

PROPOSED CHANGES TO
AIRCRAFT SALE AGREEMENT
FROM INTERNATIONAL PAPER COMPANY
CHALLENGER CL600 S/N 1023 N90UC

### Page One

(1)    Buyer's name change from Turnberry Charters, Inc to Turnberry Aviation
       Inc ("Turnberry")

(2)    First paragraph under WITNESSETH: add as follows:

       ...... and accessories presently installed thereon, as more fully described
       on the specifications attached hereto as Exhibit "F" and made a part
       hereof, and spare parts as listed and attached hereto as Exhibit "E" and
       made a part hereof (hereinafter collectively referred to as the "Aircraft").
       and

(3)    Paragraph 1 A.:

       Change Escrow Agent from AIC Title Service to Insured Aircraft Title
       Service, Oklahoma City, OK

       Clarify deposit to be refunded if Aircraft rejected and made non-
       refundable if accepted

       Note: Reference is made to Paragraph 9. - Paragraph 9 is missing.

       A.    A deposit in the amount of One Hundred Thousand Dollars
       ($100,000) heretofore placed in escrow by Turnberry with Insured Aircraft
       Title Service, Oklahoma City, Oklahoma, Kirk L Woford, President
       (hereinafter referred to as the "Escrow Agent"), which deposit is
       refundable until the Aircraft is accepted or rejected upon completion of the
       pre-purchase inspection as provided in Paragraph 3 B. If the Aircraft is
       rejected by Turnberry, the Escrow Agent shall immediately return the
       deposit in the amount of One Hundred Thousand ($100,000) Dollars to
       Turnberry and each of the parties shall be released and relieved of any
       obligations under this agreement. If the Aircraft is accepted by Turnberry,
       the deposit will become non-refundable except in the event that Int'l
       Paper fails to deliver the Aircraft with a clear title or as provided in
       Paragraph 4 and Paragraph 9 hereof. If the Aircraft is accepted,
       Turnberry shall acknowledge acceptance of the pre-purchase inspection
       in the form attached hereto as Exhibit "A" and by this reference made a
       part hereof.

Page Two

(4)    Paragraph 2. A.  Include reference to MSP program on APU:

    A      The engine service plans (CMSP) for the Lycoming ALF502-L and
    (MSP) for the APU shall be transferred by Int'l Paper to Turnberry
    pursuant to Exhibit "B" attached hereto and made a part hereof.  The cost
    of transferring the CMSP and MSP agreements shall be for the account of
    Turnberry.

(5)    Paragraph 3.B.  Clarification:  Commence record review immediately;
    commence aircraft inspection and flight test after execution of contract;
    remove reference to movement of Aircraft as is not applicable here (see
    Paragraph 5. Delivery)

    B      Pre-purchase inspection and a flight test of up to two hours
    ("Inspection") at Midcoast Aviation Service Center, Cahokia, Illinois
    (hereinafter referred to as "Airport") to either accept or reject the Aircraft.
    The Aircraft and engine logs and maintenance records will be available at
    the Airport for review to commence on or about Wednesday, June 23
    1999.  Upon execution of this agreement, the Aircraft will be made
    available for inspection by Turnberry's agent, and Int'l Paper will conduct
    a flight test of up to two hours for a systems check to be observed by
    Turnberry's agent.  The cost of fuel and pilots for this flight test shall be
    paid by Turnberry.

(7)    Paragraph 5.

    ... The fuel and pilot costs of moving the Aircraft to a location other than
    the Airport for delivery shall be for the account of Turnberry.. ..

(8)    Paragraph 6  Bills of Sale to Escrow for closing - logs to Turnberry

    Prior to time of closing, Int'l Paper shall deliver to Escrow Agent.

        A. An executed FAA Bill of Sale in the form required to permit
           Turnberry's registration of the Aircraft in the United States.

        B. Warranty Bill of Sale in the form annexed hereto and marked
           Exhibit "D".

At time of closing, Int'l Paper shall deliver to Turnberry all Aircraft and engine logs, manuals. parts, maintenance data and other documentation maintained for the operation of the Aircraft.

### Page Four

(9)     Paragraph 9. is missing   This paragraph was referenced in Paragraph 1.A.

### Page Six

(10)    Paragraph 12. B : Change the name from Turnberry Charters. Inc. to Turnberry Aviation. Inc.

(11)    Paragraph 15.  Clarification.

.... shall be kept confidential except on a need to know basis or as may be required by law or legal process.

### Page Seven

Change name for signature from TURNBERRY CHARTERS, INC. to TURNBERRY AVIATION, INC.

### All Exhibits

Change name from Turnberry Charters. Inc to Turnberry Aviation, Inc

### EXHIBIT "B"

This Exhibit needs to include appropriate assignment and warrants for payment for the MSP program on the APU along with those for the CMSP on the engines

### EXHIBIT "D"

To include spare parts not installed on the Aircraft (listed on Exhibit "E") add "or appurtenant thereto" to end of property description in second paragraph::

.... presently installed thereon or appurtenant thereto.

# *Turnberry Charters Inc.*

Aviation Department

**VIA FACSIMILE TO (703) 361-3170**

June 23, 1999

Mr. Ed Dahlberg
EMERALD AVIATION INC
9998 Wakeman Drive. Suite 212
Manassas, VA 20110

Re:    Challenger CL600 S/N 1023 N90UC
       Aircraft Sale Agreement

Dear Ed:

Following are the changes we have proposed to the above referenced Aircraft
Sale Agreement  Most of the changes are for clarification in the wording and to change
the name we will be holding this aircraft in to Turnberry Aviation. Inc.

If you have any questions at all, please call me at (305) 685-0881  When ready,
please fax the contract back to me at my direct fax number (305) 289-9397.

As you know, Ed. Ken Murray has already arrived at Midcoast Aviation in St
Louis to begin the records review for the aircraft, and I will be going to St Louis myself
tomorrow. We will, of course. be in touch before I leave.

Regards,

Dennis R. Lainey

**15001 N.W. 42nd Avenue, Suite 117, Miami, FL 33054  Phone: (305) 685-0881  Fax: (305) 289-9397**

## AIRCRAFT SALE AGREEMENT

*AVIATION*

AGREEMENT, made this _____ day of June 1999, by and between International Paper Company, with offices at 184 Airport Road, Box 9, White Plains, NY 10604 (hereinafter referred to as "Int'l Paper,") and Tumberry Charters, Inc., with offices at 15001 N.W. 42nd Avenue, Suite 117, Miami, FL 33054 (hereinafter referred to as "Tumberry").

### WITNESSETH:

WHEREAS, Int'l Paper is the owner of a Challenger 600, Serial Number 1023, Registration Number N9OUC. including the engines, avionics equipment, instrumentation and all items of equipment, parts, components and accessories presently installed thereon (hereinafter collectively referred to as the "Aircraft"), and

WHEREAS, the parties are mutually desirous of reducing their understandings and agreements to writing.

NOW, THEREFORE, in consideration of the mutual covenants herein contained, and other good and valuable consideration, the parties hereto agree as follows:

### 1. PERFORMANCE AND PURCHASE PRICE

Int'l Paper agrees to sell and Tumberry agrees to purchase the Aircraft in its present condition provided the following conditions have been made and representations of Int'l Paper are made, and Tumberry agrees to pay to Int'l Paper therefore the sum of Seven Million ($7,000,000) Dollars, payable in the following manner:

> **A.** A deposit in the amount of One Hundred Thousand Dollars ($100,000) heretofore placed in escrow by Tumberry with AIC Title Service, Oklahoma City, Oklahoma (hereinafter referred to as the "Escrow Agent"), which deposit is refundable until the Aircraft is accepted or rejected upon completion of the pre-purchase inspection to be completed on or about Thursday, June 24, 1999. If the Aircraft is accepted by Tumberry, the deposit will become refundable only in the event that Int'l Paper fails to deliver the Aircraft with a clear title or as provided in Paragraph 4, and Paragraph 9 hereof. Tumberry shall acknowledge acceptance of the pre-purchase inspection in the form attached hereto as Exhibit "A" and by this reference made a part hereof





EXHIBIT
#43

Page Two

B.      Balance of purchase price plus half of the escrow fees upon delivery of the Aircraft and transfer of title instruments to Turnberry as hereinafter set forth. Payment shall be made by bank wire transfer

## 2.    REPRESENTATIONS

Int'l Paper agrees that at the time of delivery of the Aircraft to Turnberry:

> A.      The engine service plan (CMSP) for the Lycoming ALF502-L engines shall be transferred by Int'l Paper to Turnberry pursuant to Exhibit "B" attached hereto and made a part hereof. The cost of transferring the CMSP agreement shall be for the account of Turnberry.
>
> B.      Any time remaining on the CAMP agreement shall be transferred to Turnberry. The cost of transferring the CAMP agreement shall be for the account of Turnberry. Additionally all CAMP, Canadair, Lycoming and vendor information or similar received by Int'l Paper shall be immediately forwarded to Turnberry.
>
> C.      Int'l Paper will assign, to the extent that Int'l Paper has the right to do so, all of its right, title and interest in any applicable manufacturer's warranties and/or vendor warranties.

## 3    CONDITIONS OF SALE

Turnberry's obligation to purchase the Aircraft shall be subject to the following conditions:



> A.      That the Aircraft will be delivered in its present condition, ~~with all systems operating.~~ Int'l Paper represents and warrants that all applicable FAA airworthiness directives and manufacturer's mandatory service bulletins and modifications have been complied with.
>
> B.      Pre-purchase inspection and a flight test of up to two hours ("inspection") to commence on or about Tuesday, June 23, 1999 at Midcoast Aviation Service Center, Cahokia, Illinois (hereinafter referred to as "Airport") to either accept or reject the Aircraft. All costs of the inspection, flight test and movement of the Aircraft shall be for the account of Turnberry.

X ~~C. In the event Turnberry accepts the Aircraft, Int'l Paper shall have the option but not the obligation to pay for any discrepancies found affecting the airworthy condition or operational systems of the Aircraft.~~

4. DAMAGE

Int'l Paper represents that to the best of its knowledge the Aircraft has no damage history. Int'l Paper shall promptly notify Turnberry of any damage, accident or material change occurring to the Aircraft, any part thereof, or engines installed thereon, prior to the date of closing. In the event of destruction or material damage to the Aircraft on or before the transfer of title, either party may elect to cancel this Agreement. If this Agreement is canceled pursuant to the foregoing provisions, the Escrow Agent shall immediately return the deposit of One Hundred Thousand Dollars ($100,000) to Turnberry, and the parties will in such event have no further obligations hereunder.

5. DELIVERY.

Int'l Paper and Turnberry agree that the delivery of the Aircraft will take place at the Airport within Three (3) business days of the acceptance of the pre-purchase inspection. The cost of moving the Aircraft to a location other than the Airport for delivery to shall be for the account of Turnberry. Turnberry shall acknowledge receipt and delivery of the Aircraft by executing and delivering to Int'l Paper an Aircraft Sales Final Acceptance and delivery in the form attached hereto as Exhibit "C" and by this reference made a part hereof.

6. TRANSFER OF TITLE AND TITLE INSTRUMENTS.

Transfer of title and delivery of the Aircraft shall be made at a location mutually agreeable to the parties.

At the time of closing, Int'l Paper shall deliver to Turnberry.

A. An executed FAA Bill of Sale in the form required to permit registration of the Aircraft in the United States.

B. Warranty Bill of Sale in the form annexed hereto and marked Exhibit "D".

Page Four

    C. All Aircraft and engine logs, manuals, parts, maintenance data and other documentation maintained for the operation of the Aircraft.



### 7. AIRCRAFT WARRANTY AND DISCLAIMER

"WITH ALL FAULTS",

Int'l Paper warrants that the Aircraft is owned by Int'l Paper and shall be delivered to Turnberry free and clear of any mortgages, liens or encumbrances of any nature whatsoever. Turnberry acknowledges that Int'l Paper is selling the Aircraft to Turnberry in an "as-is, where-is" condition. ALL OTHER WARRANTIES OF Int'l Paper WHETHER EXPRESS, IMPLIED OR STATUTORY, INCLUDING BUT NOT LIMITED TO WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, ARE HEREBY EXCLUDED AND WAIVED BY TURNBERRY, ITS SUCCESSORS, ASSIGNS AND TRANSFEREES. IN NO EVENT SHALL INT'L PAPER BE LIABLE FOR COLLATERAL, CONSEQUENTIAL OR INCIDENTAL DAMAGES.

^ SPECIAL

### 8. TAXES.

Int'l Paper shall bear all taxes, duties or other similar charges assessed by any national, state or local government or any other authority in connection with Int'l Paper's ownership or use of the Aircraft at any time on or prior to the closing date. Turnberry shall bear all subsequent taxes, duties or similar charges that thereafter may be assessed by any national, state or local government or any other authority in connection with Turnberry's purchase, use of ownership of the Aircraft, AND ANY TAXES ASSESSED IN CONNECTION WITH THE SALE AND TRANSFER OF THE AIRCRAFT.

### 9. ~~10.~~ BROKERAGE REPRESENTATIONS.

Except for Int'l Paper's obligation to Emerald Aviation, Inc., Int'l Paper and Turnberry each represent and warrant to the other that they have taken no action which would give rise to a valid claim for a broker's fee in connection with this transaction and each party agrees to indemnify and forever hold the other harmless from and against any claims for brokers' compensations, fees, or commissions arising out of the indemnifying party's actions.

Page Five

## 11. EXCUSABLE DELAYS

Int'l Paper shall not be liable for any failure of or delay in delivery of the Aircraft for the period that such failure or delay is due to acts of God or the public enemy; civil war, insurrection or riots; fires, explosions or serious accidents; governmental priorities or allocations; strikes or labor disputes; inability to obtain Aircraft materials, accessories, equipment or parts from the vendors; or any other cause beyond Int'l Paper's control; provided, however, that Turnberry may elect to terminate this Agreement if such failure or delay continues for sixty (60) days or more. In the event that this agreement is cancelled pursuant to the foregoing provisions, the Escrow Agent shall immediately return the deposit in the amount of One Hundred Thousand ($100,000) Dollars to Turnberry and each of the parties shall be released and relieved of any obligations under this agreement.

## 12. NOTICES

Any notice required or permitted pursuant to this Agreement shall be in writing and shall be delivered either personally, by FAX machine, or by any overnight delivery service such as Airborne, Federal Express or DHL to the parties at their respective addresses as set forth below, and as the same may be changed by serving proper notice to the other party. The date of receipt of said Notice shall be the date on which the party to whom the Notice is directed acknowledges receipt thereof or refuses to receive same or if the Notice is transmitted by FAX machine when the FAX is verified as having been received. Each party shall have the responsibility to notify the other party of any change in address, and each party shall be permitted to rely upon the validity and accuracy of addresses set forth in this agreement, unless otherwise specifically notified of a change of address. All the provisions of this paragraph shall apply to any Notice as referred to in this agreement.

The initial notice addresses of the parties are as follows:

A.    In the case of Int'l Paper, to:

Mr. Bob Cassidy
Int'l Paper Company
184 Airport Road, Box 9
White Plains, NY 10604
FAX: 914 428 3478

Page Six

B.        In the case of Turnberry, to:

Dennis Lainey  *Aviation*
Turnberry Charters, Inc.
15001 N.W. 42nd Avenue, Suite 117
FAX. 305 289 9397

### 12    ENTIRE AGREEMENT.

The parties agree that the foregoing constitutes the entire understanding of the parties, and shall not be modified or amended unless hereinafter made in writing signed by the authorized representatives of the parties.

### 13. RESOLUTION OF DISPUTES

In the event a dispute or claim arises out of this Agreement, the parties hereto hereby consent to have the dispute resolved by the general district court of New York.

### 14    APPROVAL

Int'l Paper and Turnberry each warrant to the other that the execution, delivery, and performance of this Agreement has been authorized and approved by all required corporate action.

### 15. CONFIDENTIALITY

Int'l Paper and Turnberry each agree that the specific details regarding this transaction shall be kept confidential except as may be required by law.

### 16.    COUNTERPARTS

This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and shall be effective when executed by both parties.

This agreement shall be binding upon the heirs, executors, successors and assignees of the parties.

Page Seven

   IN WITNESS WHEREOF, the parties hereto have duly signed this Agreement on
the day and year first above written

INTERNATIONAL PAPER COMPANY

By:_____Title_____Date_____

           AVIATION
TURNBERRRY CHARTERS, INC.

By:_____Title_____   ___Date_____

EXHIBIT "A"

AIRCRAFT PRE-PURCHASE ACCEPTANCE

Aircraft Make and Model:

Challenger 600

Senal No.:

1023

Registration No.:

N90UC

This is to acknowledge acceptance of the pre-purchase-inspection-of-the above-identified Aircraft in accordance with Aircraft Purchase Agreement dated June ___.
1999, by and between Int'l Paper Company and Turnberry Charters, Inc
ACCEPTED BY.       FOLLOWING THE PRE-PURCHASE AVIATION
              AVIATION     IN SPECTRY
TURNBERRY CHARTERS. INC.

BY _____

DATE OF ACCEPTANCE._____

EXHIBIT "B"

## ENGINE MAINTENANCE SERVICE PLAN ASSIGNMENT

In consideration of the mutual covenants herein contained, and other good and valuable consideration Int'l Paper Company, ("Int'l Paper") does hereby assign to Turnberry Charters, Inc. ("Turnberry") all of the right, title and interest of Int'l Paper in a certain Engine Maintenance Service Plan ("CMSP Agreement") which Int'l Paper has executed with Allied Signal for Lycoming ALF502L-2 engines, Serial Number L-F030099S and L-F03052S installed on Challenger 600, Serial No. 1023, Registration No. N90UC.

oK

Int'l Paper represents and warrants to Turnberry that all payments required to be made under the CMSP Agreement are current and covenants and agrees that it will execute any additional instruments and/or documents required by Allied Signal to effectuate the transfer and assignment of the rights of Int'l Paper in the CMSP Agreement to Turnberry

INTERNATIONAL Paper Company

By: _____

Its: _____

EXHIBIT "C"

AIRCRAFT SALES FINAL ACCEPTANCE AND DELIVERY

| Aircraft Make and Model | Challenger 600 |
|---|---|
| Serial No : | 1023 |
| Registration No.: | N90UC |

Delivery of the above-identified Aircraft at Cahokia Airport, Cahokia, Illinois is acknowledged and said Aircraft is accepted in accordance with Aircraft Purchase Agreement dated June ____ 1999, by and between Int'l Paper Company and Turnberry Charters, Inc. acknowledge that all delivery conditions have been satisfied and that Int'l Paper Company has performed all its obligations under the Aircraft Purchase Agreement.

TURNBERRY AVIATION. INC.

ACCEPTED BY.

TURNBERRRY CHARTERS, INC.

BY:

DATE OF ACCEPTANCE:

EXHIBIT "D"

**BILL OF SALE**

KNOW ALL MEN BY THESE PRESENTS,

That Int'l Paper Company, a corporation organized and existing under the laws of New York with principal offices at 184 Airport Road Box 9 White Plains, NY 10604. Party of the First Part, for and in consideration of the sum of One Dollar ($1.00) lawful money of the United States, to it in hand paid, at or before delivery of these presents, by Turnberry Charters, Inc. whom can be contacted at at 15001 N.W. 42nd Avenue, Suite 117, Miami, FL 33054, Party of the Second Part, the receipt of which is hereby acknowledged, does hereby grant, bargain, sell, transfer and set over unto the Party of the Second Part, its successors and assigns.

Challenger 600, Serial Number 1023, together with the engines, avionics equipment, instrumentation and all items of equipment, parts, components and accessories presently installed thereon

TO HAVE AND TO HOLD the same unto the Party of the Second Part, its successors and assignees forever. And the Party of the First Part does for its successors and assigns warrant that it is the lawful owner of said personal property: that title to said property is free from all prior claims, liens and encumbrances and that the Party of the First Part has good right to sell the same as aforesaid. The Party of the First Part covenants and agrees to and with the said Party of the Second Part to warrant and defend the sale of the said personal property hereby sold unto the said Party of the Second Part, its successors and assigns, against all and every person and persons whomsoever

IN WITNESS WHEREOF, the Party of the First Part has caused these presents to be signed by its duly authorized officer the day and year first above written.

INTERNATIONAL PAPER COMPANY

By

EXHIBIT "E"

SPARE PARTS INVENTORY

PROPOSED CHANGES TO
AIRCRAFT SALE AGREEMENT
FROM INTERNATIONAL PAPER COMPANY
CHALLENGER CL600 S/N 1023 N9CUC

### Page One

(1)   Buyer's name change from Turnberry Charters, Inc to Turnberry Aviation      OK
      Inc. ("Turnberry")

(2)   First paragraph under WITNESSETH: add as follows:

      . . . and accessories presently installed thereon, as more fully described
      on the specifications attached hereto as Exhibit "F" and made a part          OK
      hereof  and spare parts as listed and attached hereto as Exhibit "E" and
      made a part hereof (hereinafter collectively referred to as the "Aircraft"):
      and

(3)   Paragraph 1.A.:

      Change Escrow Agent from AIC Title Service to Insured Aircraft Title          OK
      Service, Oklahoma City  OK

      Clarify deposit to be refunded if Aircraft rejected and made non-
      refundable if accepted

      Note: Reference is made to Paragraph 9.  - Paragraph 9 is missing.

      A     A deposit in the amount of One Hundred Thousand Dollars
      ($100,000) heretofore placed in escrow by Turnberry with Insured Aircraft
      Title Service, Oklahoma City, Oklahoma, Kirk L. Woford, President
      (hereinafter referred to as the "Escrow Agent") which deposit is
      refundable until the Aircraft is accepted or rejected upon completion of the
      pre-purchase inspection as provided in Paragraph 3.B.  If the Aircraft is
      rejected by Turnberry, the Escrow Agent shall immediately return the
      deposit in the amount of One Hundred Thousand ($100,000) Dollars to
      Turnberry and each of the parties shall be released and relieved of any
      obligations under this agreement.  If the Aircraft is accepted by Turnberry,
      the deposit will become non-refundable except in the event that Int'l
      Paper fails to deliver the Aircraft with a clear title or as provided in
      Paragraph 4 and Paragraph 9 hereof.  If the Aircraft is accepted,
      Turnberry shall acknowledge acceptance of the pre-purchase inspection
      in the form attached hereto as Exhibit "A" and by this reference made a
      part hereof.

Page Two

(4) Paragraph 2. A. Include reference to MSP program on APU:

A. The engine service plans (CMSP) for the Lycoming ALF502-L and (MSP) for the APU shall be transferred by Int'l Paper to Turnberry pursuant to Exhibit "B" attached hereto and made a part hereof. The cost of transferring the CMSP and MSP agreements shall be for the account of Turnberry

*OK*

(5) Paragraph 3 B. Clarification: Commence record review immediately; commence aircraft inspection and flight test after execution of contract; remove reference to movement of Aircraft as is not applicable here (see Paragraph 5 Delivery)

B. Pre-purchase inspection and a flight test of up to two hours ("Inspection") at Midcoast Aviation Service Center, Cahokia, Illinois (hereinafter referred to as "Airport") to either accept or reject the Aircraft. The Aircraft and engine logs and maintenance records will be available at the Airport for review to commence on or about Wednesday, June 23, 1999. Upon execution of this agreement, the Aircraft will be made available for inspection by Turnberry's agent, and Int'l Paper will conduct a flight test of up to two hours for a systems check to be observed by Turnberry's agent. The cost of fuel and pilots for this flight test shall be paid by Turnberry. *TURNBERRY SHALL HAVE UNTIL 5:00 p.m., EDT, FRIDAY, JUNE 25 TO ACCEPT OR REJECT THE AIRCRAFT. A*

*OK WITH ADDITION*

(7) Paragraph 5. *FAILURE TO ADVISE INT'L PAPER OF SUCH DECISION SHALL BE DEEMED A REJECTION.*
... The fuel and pilot costs of moving the Aircraft to a location other than the Airport for delivery shall be for the account of Turnberry.....   *OK*

(8) Paragraph 8 Bills of Sale to Escrow for closing - logs to Turnberry

Prior to time of closing, Int'l Paper shall deliver to Escrow Agent

A. An executed FAA Bill of Sale in the form required to permit   *OK*
Turnberry's registration of the Aircraft in the United States.

B. Warranty Bill of Sale in the form annexed hereto and marked   *OK*
Exhibit "D".

At time of closing, Int'l Paper shall deliver to Turnberry all Aircraft and    *OK*
engine logs, manuals, parts, maintenance data and other documentation
maintained for the operation of the Aircraft

### Page Four

(9)    Paragraph 9 is missing. This paragraph was referenced in Paragraph
       1.A

### Page Six

(10)   *Paragraph 12 B:  Change the name from Turnberry Charters, Inc to*    *OK*
       Turnberry Aviation, Inc.

(11)   Paragraph 15.  Clarification

       ..... shall be kept confidential except on a need to know basis or as may    *OK*
       be required by law or legal process.

### Page Seven

       Change name for signature from TURNBERRY CHARTERS, INC. to    *OK*
       TURNBERRY AVIATION, INC.

### All Exhibits

       Change name from Turnberry Charters, Inc. to Turnberry Aviation, Inc.

### EXHIBIT "B"

       This Exhibit needs to include appropriate assignment and warranty for    *OK*
       payment for the MSP program on the APU along with those for the CMSP
       on the engines.

### EXHIBIT "D"

       To include spare parts not installed on the Aircraft (listed on Exhibit "E")    *OK*
       add "or appurtenant thereto" to end of property description in second
       paragraph

       ... presently installed thereon or appurtenant thereto.

## AIRCRAFT SALE AGREEMENT

AGREEMENT, made this _____ day of June 1999, by and between International Paper Company, with offices at 184 Airport Road, Box 9, White Plains, NY  10604 (hereinafter referred to as "Int'l Paper.") and Turnberry Aviation, Inc., with offices at 15001 N.W.. 42nd Avenue, Suite 117, Miami, FL  33054 (hereinafter referred to as "Turnberry").

### WITNESSETH:

WHEREAS, Int'l Paper is the owner of a Challenger 600, Serial Number 1023, Registration Number N90UC, including the engines, avionics equipment, instrumentation and all items of equipment, parts, components and accessories presently installed thereon (hereinafter collectively referred to as the "Aircraft"); and

WHEREAS, the parties are mutually desirous of reducing their understandings and agreements to writing.

NOW, THEREFORE, in consideration of the mutual covenants herein contained, and other good and valuable consideration, the parties hereto agree as follows:

### 1. PERFORMANCE AND PURCHASE PRICE.

Int'l Paper agrees to sell and Turnberry agrees to purchase the Aircraft in its present condition provided the following conditions have been made and representations of Int'l Paper are made, and Turnberry agrees to pay to Int'l Paper therefore the sum of Seven Million ($7,000,000) Dollars, payable in the following manner:

> A.    A deposit in the amount of One Hundred  Thousand Dollars ($100,000) heretofore placed in escrow by Turnberry with Insured Aircraft Title Service, Oklahoma City, Oklahoma (hereinafter referred to as the "Escrow Agent"), which deposit is refundable until the Aircraft is accepted or rejected upon completion of the pre-purchase inspection to be completed on or about Thursday, June 24, 1999. If the Aircraft is accepted by Turnberry, the deposit will become refundable only in the event that Int'l Paper fails to deliver the Aircraft with a clear title or as provided in Paragraph 4. Turnberry shall acknowledge acceptance of the pre-purchase inspection in the form attached hereto as Exhibit "A" and by this reference made a part hereof.



EXHIBIT
# 44

06111-WPD    Document 34    Entered on FLSD Docket 12/21/2000    Pag

Page Two

B.     Balance of purchase price plus half of the escrow fees upon delivery of the Aircraft and transfer of title instruments to Turnberry as hereinafter set forth.   Payment shall be made by bank wire transfer.

2.    REPRESENTATIONS.

Int'l Paper agrees that at the time of delivery of the Aircraft to Turnberry:

A.     The engine service plan (CMSP) for the Lycoming ALF502-L engines and (MSP) for the APU shall be transferred by Int'l Paper to Turnberry pursuant to Exhibit "B" attached hereto and made a part hereof.    The cost of transferring the CMSP and MSP agreements shall be for the account of Turnberry.

B.     Any time remaining on the CAMP agreement shall be transferred to Turnberry.    The cost of transferring the CAMP agreement shall be for the account of Turnberry.   Additionally all CAMP, Canadair, Lycoming and vendor information or similar received by Int'l Paper shall be immediately forwarded to Turnberry.

C.     Int'l Paper will assign, to the extent that Int'l Paper has the right to do so, all of its right, title and interest in any applicable manufacturer's warranties and/or vendor warranties.

3.    CONDITIONS OF SALE.

Turnberry's obligation to purchase the Aircraft shall be subject to the following conditions:

A.     That the Aircraft will be delivered in its present condition. Int'l Paper represents that all applicable FAA airworthiness directives and manufacturer's mandatory service bulletins and modifications have been complied with.

Page Three

B. Pre-purchase inspection ("Inspection") to commence on or about Tuesday, June 23, 1999 at Midcoast Aviation Service Center, Cahokia, Illinois (hereinafter referred to as "Airport") to either accept or reject the Aircraft. All costs of the Inspection shall be for the account of Turnberry. Turnberry shall have until 5:00 PM EDT Thursday June 24, 1999 to accept or reject the Aircraft. A failure to advise Int'l Paper of such decision shall be deemed a rejection. If the Aircraft is accepted the deposit shall become non-refundable. If the aircraft is rejected the deposit shall immediately be refunded to Turnberry less any unpaid expenses at Midcoast as a result of Turnberry's inspection.

### 4. DAMAGE.

Int'l Paper represents that to the best of its knowledge the Aircraft has no damage history. Int'l Paper shall promptly notify Turnberry of any damage, accident or material change occurring to the Aircraft, any part thereof, or engines installed thereon, prior to the date of closing. In the event of destruction or material damage to the Aircraft on or before the transfer of title, either party may elect to cancel this Agreement. If this Agreement is canceled pursuant to the foregoing provisions, the Escrow Agent shall immediately return the deposit of One Hundred Thousand Dollars ($100,000) to Turnberry, and the parties will in such event have no further obligations hereunder.

### 5. DELIVERY.

Int'l Paper and Turnberry agree that the delivery of the Aircraft will take place at the Airport within Three (3) business days of the acceptance of the pre-purchase inspection. The cost of moving the Aircraft to a location other than the Airport for delivery to shall be for the account of Turnberry. Turnberry shall acknowledge receipt and delivery of the Aircraft by executing and delivering to Int'l Paper an Aircraft Sales Final Acceptance and delivery in the form attached hereto as Exhibit "C" and by this reference made a part hereof.

### 6. TRANSFER OF TITLE AND TITLE INSTRUMENTS.

Transfer of title and delivery of the Aircraft shall be made at a location mutually agreeable to the parties.

At the time of closing, Int'l Paper shall deliver to Turnberry:

A. An executed FAA Bill of Sale in the form required to permit registration of the Aircraft in the United States.

Page Four

      B. Warranty Bill of Sale in the form annexed hereto and marked Exhibit "D".

      C. All Aircraft and engine logs, manuals, parts, maintenance data and other documentation maintained for the operation of the Aircraft.

### 7.    AIRCRAFT WARRANTY AND DISCLAIMER.

Int'l Paper warrants that the Aircraft is owned by Int'l Paper and shall be delivered to Turnberry free and clear of any mortgages, liens or encumbrances of any nature whatsoever. Turnberry acknowledges that Int'l Paper is selling the Aircraft to Turnberry in an "as-is, where-is", with all faults condition. ALL OTHER WARRANTIES OF Int'l Paper WHETHER EXPRESS, IMPLIED OR STATUTORY, INCLUDING BUT NOT LIMITED TO WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, ARE HEREBY EXCLUDED AND WAIVED BY TURNBERRY, ITS SUCCESSORS, ASSIGNS AND TRANSFEREES. IN NO EVENT SHALL INT'L PAPER BE LIABLE FOR COLLATERAL, CONSEQUENTIAL, SPECIAL OR INCIDENTAL DAMAGES.

### 8.    TAXES.

Int'l Paper shall bear all taxes, duties or other similar charges assessed by any national, state or local government or any other authority in connection with Int'l Paper's ownership or use of the Aircraft at any time on or prior to the closing date. Turnberry shall bear all subsequent taxes, duties or similar charges that thereafter may be assessed by any national, state or local government or any other authority in connection with Turnberry's purchase, use or ownership of the Aircraft, and any taxes assessed in connection with the sale and transfer of the Aircraft

### 9.    BROKERAGE REPRESENTATIONS.

Except for Int'l Paper's obligation to Emerald Aviation, Inc., Int'l Paper and Turnberry each represent and warrant to the other that they have taken no action which would give rise to a valid claim for a broker's fee in connection with this transaction and each party agrees to indemnify and forever hold the other harmless from and against any claims for brokers' compensations, fees, or commissions arising out of the indemnifying party's actions.

Page Five

## 11.  EXCUSABLE DELAYS.

Int'l Paper shall not be liable for any failure of or delay in delivery of the Aircraft for the period that such failure or delay is due to acts of God or the public enemy; civil war, insurrection or riots; fires, explosions or serious accidents; governmental priorities or allocations; strikes or labor disputes; inability to obtain Aircraft materials, accessories, equipment or parts from the vendors; or any other cause beyond Int'l Paper's control; provided, however, that Turnberry may elect to terminate this Agreement if such failure or delay continues for sixty (60) days or more. In the event that this agreement is canceled pursuant to the foregoing provisions, the Escrow Agent shall immediately return the deposit in the amount of One Hundred Thousand ($100,000) Dollars to Turnberry and each of the parties shall be released and relieved of any obligations under this agreement.

## 12.    NOTICES.

Any notice required or permitted pursuant to this Agreement shall be in writing and shall be delivered either personally, by FAX machine, or by any overnight delivery service such as Airborne, Federal Express or DHL to the parties at their respective addresses as set forth below, and as the same may be changed by serving proper notice to the other party. The date of receipt of said Notice shall be the date on which the party to whom the Notice is directed acknowledges receipt thereof or refuses to receive same or if the Notice is transmitted by FAX machine when the FAX is verified as having been received. Each party shall have the responsibility to notify the other party of any change in address, and each party shall be permitted to rely upon the validity and accuracy of addresses set forth in this agreement, unless otherwise specifically notified of a change of address. All the provisions of this paragraph shall apply to any Notice as referred to in this agreement.

The initial notice addresses of the parties are as follows:

A.          In the case of Int'l Paper, to:

Mr. Bob Cassidy
Int'l Paper Company
184 Airport Road, Box 9
White Plains, NY 10604
FAX: 914 428 3478

Page Six


B.          In the case of Turnberry, to:

                         Dennis Lainey
                         Turnberry Aviation, Inc.
                         15001 N.W. 42nd Avenue, Suite 117
                         FAX:  305 289 9397

   12.    ENTIRE AGREEMENT.

   The parties agree that the foregoing constitutes the entire understanding of the parties, and shall not be modified or amended unless hereinafter made in writing signed by the authorized representatives of the parties.

   13.  RESOLUTION OF DISPUTES.

   In the event a dispute or claim arises out of this Agreement, the parties hereto hereby consent to have the dispute resolved by the general district court of New York.

   14.    APPROVAL.

   Int'l Paper and Turnberry each warrant to the other that the execution, delivery, and performance of this Agreement has been authorized and approved by all required corporate action.

   15. CONFIDENTIALITY.

            Int'l Paper and Turnberry each agree that the specific details  regarding this transaction shall be kept confidential except as may be required by law.

   16.    COUNTERPARTS.

   This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and shall be effective when executed by both parties.

   This agreement shall be binding upon the heirs, executors, successors and assignees of the parties.

Page Seven

IN WITNESS WHEREOF, the parties hereto have duly signed this Agreement on the day and year first above written.

INTERNATIONAL PAPER COMPANY

By:_____Title_____Date_____

TURNBERRY AVIATION, INC.

By:_____Title_____Date_____

EXHIBIT "A"

AIRCRAFT PRE-PURCHASE ACCEPTANCE

Aircraft Make and Model:

Challenger 600

Serial No.:

1023

Registration No.:                                            N90UC

This is to acknowledge acceptance of the above-identified Aircraft following the pre-purchase inspection in accordance with Aircraft Purchase Agreement dated June ____, 1999, by and between Int'l Paper Company and Turnberry Aviation, Inc.

ACCEPTED BY:

TURNBERRY AVIATION, INC.

BY:_____

DATE OF ACCEPTANCE:_____

EXHIBIT "B"

## ENGINE MAINTENANCE SERVICE PLAN ASSIGNMENT

In consideration of the mutual covenants herein contained, and other good and valuable consideration, Int'l Paper Company, ("Int'l Paper") does hereby assign to Turnberry Aviation, Inc. ("Turnberry") all of the right, title and interest of Int'l Paper in a certain Engine Maintenance Service Plan ("CMSP Agreement") which Int'l Paper has executed with Allied Signal  for Lycoming ALF502L-2 engines, Serial Number L-F03099S and L-F03052S and ("MSP") on the APU Serial Number P-162C installed on Challenger 600, Serial No. 1023, Registration No. N90UC.

Int'l Paper represents to Turnberry that all payments required to be made under the CMSP Agreement are current and covenants and agrees that it will execute any additional instruments and/or documents required by Allied Signal to effectuate the transfer and assignment of the rights of Int'l Paper in the CMSP Agreement to Turnberry.

INTERNATIONAL PAPER COMPANY

By:_____

Its:_____

EXHIBIT "C"

AIRCRAFT SALES FINAL ACCEPTANCE AND DELIVERY

Aircraft Make and Model:                                   Challenger 600

Serial No.:                                                1023

Registration No.:                                          N90UC

Delivery of the above-identified Aircraft at Cahokia Airport, Cahokia, Illinois is acknowledged and said Aircraft is accepted in accordance with Aircraft Purchase Agreement dated June ___, 1999, by and between Int'l Paper Company and Turnberry Aviation, Inc. acknowledge that all delivery conditions have been satisfied and that Int'l Paper Company has performed all its obligations under the Aircraft Purchase Agreement.

ACCEPTED BY:

TURNBERRY AVIATION, INC.

BY:

DATE OF ACCEPTANCE:

EXHIBIT "D"

## BILL OF SALE

KNOW ALL MEN BY THESE PRESENTS,

That Int'l Paper Company, a corporation organized and existing under the laws of New York with offices at 184 Airport Road Box 9 White Plains, NY 10604, Party of the First Part, for and in consideration of the sum of One Dollar ($1.00) lawful money of the United States, to it in hand paid, at or before delivery of these presents, by Turnberry Aviation, Inc. whom can be contacted at 15001 N.W. 42nd Avenue, Suite 117, Miami, FL 33054, Party of the Second Part, the receipt of which is hereby acknowledged, does hereby grant, bargain, sell, transfer and set over unto the Party of the Second Part, its successors and assigns:

Challenger 600, Serial Number 1023, together with the engines, avionics equipment, instrumentation and all items of equipment, parts, components and accessories presently installed thereon.

TO HAVE AND TO HOLD the same unto the Party of the Second Part, its successors and assignees forever. And the Party of the First Part does for its successors and assigns warrant that it is the lawful owner of said personal property; that title to said property is free from all prior claims, liens and encumbrances and that the Party of the First Part has good right to sell the same as aforesaid. The Party of the First Part covenants and agrees to and with the said Party of the Second Part to warrant and defend the sale of the said personal property hereby sold unto the said Party of the Second Part, its successors and assigns, against all and every person and persons whomsoever.

IN WITNESS WHEREOF, the Party of the First Part has caused these presents to be signed by its duly authorized officer the day and year first above written.

INTERNATIONAL PAPER COMPANY

By:

# UNION CAMP AVIATION PARTS INVENTORY
## SORTED BY LOCATION
### DATE: OCT 02, 1998

| LOC | PART NO. | DESCRIPTION | QTY |
|---|---|---|---|
| 21-01 | 180849-28 | COALESCER BAG | 2 |
| 21-02 | AN-123907 | PACKING, COALESCER | 2 |
| 21-03 | 627962-2 | SENSOR, DUCT TEMPERATURE | 0 |
| 21-04 | 642000-1 | SWITCH, PRESSURE | 1 |
| 21-05 | 841119-1 | SWITCH, THERMAL | 1 |
| 21-06 | 58752 | CARTRIDGE, AIR FILTER | 1 |
| 21-08 | 586110-9 | TURBINE, COOLING | 1 |
| 21-09 | 228545-5 | VALVE, FOOTWARM DEMIST + S.O. | 1 |
| 21-11 | 171856-22 | COUPLING, RUBBER | 1 |
| 21-11 | 171856-35 | COUPLING, RUBBER | 4 |
| 21-11 | 171856-36 | COUPLING, RUBBER | 6 |
| 21-11 | 2201859-3 | COUPLING, RUBBER | 2 |
| 21-11 | 600-95009-33 | COUPLING, RUBBER | 1 |
| 21-11 | 600-95009-41 | COUPLING, RUBBER | 1 |
| 21-11 | 600-95009-31 | COUPLING, RUBBER | 1 |
| 21-11 | 600-95009-15 | COUPLING, RUBBER | 1 |
| 21-11 | 600-95337-1 | COUPLING, RUBBER | 3 |
| 21-12 | 979580-4 | VALVE, LOW LIMIT | 1 |
| 21-13 | 600-97106-1 | GASKET, DUCT ADAPTOR | 2 |
| 21-13 | 600-95053-3 | GASKET | 6 |
| 21-14 | 600-95009-27 | COUPLING, RUBBER | 2 |
| 21-14 | 600-95009-45 | COUPLING, RUBBER | 2 |
| 23-01 | 792-6657-004 | TRANSCEIVER, COMM | 1 |
| 23-03 | AIRMAN 750 | HEADSET, TELEX | 3 |
| 23-04 | 488 T | MICROPHONE | 3 |
| 24-01 | 7578137 [ALT# 55956] | ELEMENT, IDG OIL FILTER | 3 |
| 24-02 | 7579077 | ELEMENT, IDG OIL SCAVENGE | 2 |
| 24-04 | MS-17978-2 | UNIT, TRANSFORMER RECT. [TRU] | 1 |
| 24-05 | 720846 B | UNIT, GENERATOR CONTROL [GCU] | 1 |
| 24-07 | ZCD-B9A-023 | CONTACTOR, GENERATOR | 1 |
| 24-08 | Z-A9A-038 | CONTACTOR, EXTERNAL D.C. | 1 |
| 24-09 | 600-59142-3 | MONITOR, EXTERNAL POWER | 1 |
| 24-10 | MS-90362-4 | RECEPTACLE, EXTERNAL POWER | 1 |
| 24-11 | MS-251822 | CONNECTOR, BATTERY | 1 |
| 24-15 | 59649 [ALT# AE-2123G0156-000] | HOSE, ADG | 1 |
| 25-01-3 | SLO2300-21 | HYDROLOK | 7 |
| 25-01-4 | SLO2300-23 | HYDROLOK | 4 |
| 25-01-5 | CA00259-00 | CONTROL, HYDROLOK | 2 |
| 25-02-2 | 32366 8828 L175F | SENSOR, THERMO | 1 |
| 25-02-2 | 8R-3-115C | HOT CUP | 1 |
| 25-02-3 | B5377 | GASKET, COFFEE POT | 4 |
| 25-02-4 | 2130-1 | ASH TRAY | 1 |
| 25-02-5 | 2510-01 | READING LAMP ASSY | 3 |
| 25-03-1 | MC10-13-03 | MASK, EROS OXYGEN | 1 |
| 25-03-1 | MXP-135-1 | BOX, OXYGEN MASK STOWAGE | 1 |
| 25-03-2 | 500-0063-4\5 | SEAT PLACARDS | |
| 25-05-2 | 1400J-16A | CAP, LAV SERVICE FILL | 1 |
| 26-01 | 897776   (shelf life exp: 8/2007) | SQUIBB, FIREX | 1 |



EXHIBIT
46

*DATE: November 6, 1998   LOCATION  Page 2*

| LOC | PART NO. | DESCRIPTION | QTY |
|---|---|---|---|
| 26-02 | 244-11426 | ELEMENT, HOT SECTION FIRE SENSING | 3 |
| 26-03 | 70017-M00000 | CONNECTOR, FIRE LOOP | 1 |
| 26-04 | 244-03615 | ELEMENT, MLG O/H | 1 |
| 26-04 | 244-07186 | ELEMENT, ACCY SECTION FIRE SENSING | 1 |
| 26-04 | 244-21086 | ELEMENT, APU FIRE SENSING | 1 |
| 26-05 | 244-12086 [ALT# 600-55000-1] | ELEMENT, PYLON FIRE SENSING | 1 |
| 26-06 | 377-02836 | UNIT, FIRE DETECTION | 1 |
| | | | |
| 27-01 | 8-405-04 | SWITCH, PROXIMITY | 1 |
| 27-02 | 8-405-34 | SWITCH, PROXIMITY | 4 |
| 27-03 | 8-060-16 | BOARD, SERVO MONITOR | 1 |
| 27-04 | 600-93000-103 | UNIT, ASYMMETRY DECT& BRAKE | 1 |
| 27-09 | 600-91100-3 [ALT AL00102] | ACTUATOR, AIL + RDR TRIM | 1 |
| 27-14 | 600-75123-65 | HOSE, ELEVATOR PCU | 1 |
| 27-15 | 600-59147-5 | UNIT, SPOILER CONTROL | 1 |
| 27-16 | 600-93000-69 | CABLE ASSY | 1 |
| | | | |
| 28-01 | 798080 | PACKING, GASK-O-SEAL | 2 |
| 28-02 | 600-59180-1 | SWITCH, PRESSURE | 1 |
| 28-03 | 600-62966-21 | PUMP, FUEL BOOST | 1 |
| 28-04 | AV-16B2082-1 | VALVE, FUEL CROSS FLOW | 1 |
| 28-05 | 600-62734-1 | GASKET, BOOST PUMP | 2 |
| 28-06 | 600-62684-3 | GASKET, FUEL DRAIN | 1 |
| 28-06 | 2774194-101 | BODY, FUEL DRAIN | 1 |
| 28-07 | 2652559 | CHAIN ASSY, FUEL CAP | 1 |
| | | | |
| 29-01 | AC-3258F1297J | ELEMENT, HYD RETURN FILTER | 6 |
| 29-02 | AC-9607F10Y3 | ELEMENT, HYD PRESS FILTER | 6 |
| 29-03 | AC-7031F8 | ELEMENT, HYD CASE DRAIN FILTER | 6 |
| 29-04 | 600-59174-17 | TRANSDUCER, HYD PRESSURE | 1 |
| 29-06 | 600-75226-44 | TUBE, HYDRAULIC | 1 |
| 29-07 | 171235D206C | LINE, #3 HYDRAULIC PUMP PRESS. | 1 |
| 29-BOTTOM | 600-75113-5 [ALT 622738] | PUMP, ENGINE DRIVEN HYD | 1 |
| 29-BOTTOM | 63108-03 | PUMP, ELECTRIC DRIVEN HYD | 1 |
| | | | |
| 30-01 | 729944D | VALVE, WING ANTI-ICE | 1 |
| 30-04 | 871-BN3-2 | DETECTOR, ICE | 1 |
| | | | |
| 32-01 | 600-87000-27 | UNIT, SKID CONTROL | 1 |
| 32-02 | 600-50969-9 | UNIT, LANDING GEAR  CONTROL | 1 |
| 32-04 | 600-75136-3 | ACTUATOR, NOSE GEAR DOOR | 1 |
| 32-06 | 600-87000-3 | VALVE, ANTI SKID | 1 |
| 32-07 | 601-57788-29 | HARNESS, STEER-BY-WIRE | 1 |
| 32-11 | 600-87000-5 | TRANSDUCER, ANTI SKID | 1 |
| 32-12 | 5004675 | SEAL, MAIN WHEEL GREASE | 0 |
| 32-13 | 5004682 | RETAINER | 2 |
| 32-14 | 5004678 | RING, RETAINER | 2 |
| 32-15 | 5004683 | RING, RETAINER | 2 |
| 32-16 | L-610510 | CUP, BEARING | 2 |
| 32-17 | L-610549 | CONE, BEARING | 2 |
| 32-18 | L-305610 | CUP, MAIN WHEEL BEARING | 2 |
| 32-19 | L-305549 | CONE, MAIN WHEEL BEARING | 2 |
| 32-20 | 13621 | CUP, NOSE WHEEL BEARING | 2 |
| 32-21 | MS/28775/269 [AN-6230-47] | PACKING, NOSE WHEEL | 14 |
| 32-22 | 9522643 | PACKING, MAIN WHEEL | 5 |
| 32-23 | 600-85002-11 [ALT 150446002] | VALVE\NLG STEERING SELECTOR | 1 |
| 32-25 | 6190 | FUSE, BRAKE HYDRAULIC | 1 |
| 32-26 | 13685 | CONE, NOSE WHEEL BEARING | 2 |

DATE: November 6, 1998   LOCATION  Page 3

| LOC | PART NO. | DESCRIPTION | QTY |
|---|---|---|---|
| 32-28 | 5011084 | SEAL, NOSE WHEEL BEARING | 2 |
| 32-28 | 600-85076-17 | CABLE ASSY | 1 |
| 32-29 | 622EN1-6 | SWITCH | 1 |
| 32-30 | 600-75130-31 | LINE ASSY, MLG BRAKE (inbd L/H,outbd R/H) | 1 |
| 32-31 | 600-75130-35 | LINE ASSY, MLG BRAKE (inbd R/H,outbd L/H) | 1 |
| 32-32 | 6002627 | FILTER, ANTI-SKID VALVE | 4 |
| 32-33 | CSK 6287 | KIT, STRUT REPACK | 4 |
| 32-33 | MS28775-137 | O-RING | 3 |
| 32-34 | CSK 6279 | KIT, NOSE GEAR SEAL | 1 |
| 34-01 | 400-6 | SPEED BUGS | 10 |
| 34-03 | 4020571-903 | COMPUTER, V-NAV | 1 |
| 34-06 | 21105-1-02 | UNIT, DATA INTERFACE | 1 |
| 34-08 | 5212-700000 | CARTRIDGE, WAVEGUIDE DESICCATOR | 0 |
| 34-08 | L84185-100 | KIT, WAVEGUIDE DESICCATOR | 1 |
| 34-09 | 622-1233-001 | TRANSCEIVER, DME | 1 |
| 34-10 | AC7883748 | PANEL, INS CONTROL | 1 |
| 36-01 | 979626-3-1 | VALVE, BLEED AIR ISOLATION | 1 |
| 49-01 | 3888000-2 | UNIT, IGNITION | 1 |
| 49-02 | 519892-6-1 | STARTER | 1 |
| 49-03 | 3888001-4 | IGNITION LEAD | 1 |
| 49-04 | 2117406-7 | ECU | 1 |
| 49-05 | 831125-1 | KIT, INSPECTION | 4 |
| 49-06 | AC-9913F1 | ELEMENT, FILTER | 4 |
| 49-07 | AC-B040F1240 | ELEMENT, FILTER | 1 |
| 49-08 | 3882440-1 | FILTER, FUEL | 1 |
| 49-08 | S-9412-138 | PACKING | 1 |
| 49-08 | S-9412-212 | PACKING | 1 |
| 49-09 | 109776-4-2 | VALVE, LOAD CONTROL | 1 |
| 49-10 | AV-23B1149-1 | VALVE, 3-WAY APU FUEL | 1 |
| 49-13 | 600-97042-15 | INSULATOR, APU EXHAUST | 1 |
| 49-14 | 399-535-9003 | HOSE | 2 |
| 50-01 | 600-31707-1 | ACTUATOR, PASSENGER DOOR | 1 |
| 50-02 | 600-12109-26 | LENS, LANDING LIGHT | 1 |
| 50-02 | 600-12109-25 | LENS, LANDING LIGHT | 1 |
| 50-02 | 600-12113-1 | GASKET, LANDING LIGHT LENS | 1 |
| 50-03 | 600-62670-31 | ASSEMBLY, TUBE | 1 |
| 50-04 | 600-10906-21 | SEAL | 8 |
| 50-05 | 600-10185-7 | SEAL, FUEL PANEL | 2 |
| 50-05 | 600-10185-3 | SEAL, FUEL PANEL | 3 |
| 50-06 | 600-10051-43 | STRIP, PHENOLIC | 2 |
| 50-06 | 600-62733-3 | GASKET | 2 |
| 50-06 | 600-10188-1 | GASKET | 1 |
| 50-06 | 600-01089-1 | GASKET | 1 |
| 50-07 | S-4506 | SEAL | 30ft |
| 50-08 | S-4551 | SEAL | 16ft |
| 50-09 | 600-31038-127 | SEAL | 1 |
| 50-09 | 600-31867-126 | SEAL | 1 |
| 50-09 | 600-37174-3 | SEAL | 2 |
| 50-22 | M61934-2-10A016 | BEARING SLEEVE | 2 |
| 50-TOP | 600-10073-3 | SEAL | 2 |
| 50-TOP | 600-10360-7 | SEAL | 1 |
| 50-TOP | 600-10360-8 | SEAL | 1 |
| 50-TOP | 600-14016-17 | SEAL | 1 |
| 50-TOP | 600-14533-7 | SEAL | 0 |

**DATE: November 6, 1998    LOCATION  Page 4**

| LOC | PART NO. | DESCRIPTION | QTY |
|---|---|---|---|
| 50-TOP | 600-15433-8 | SEAL | 1 |
| 50-TOP | 600-33043-41 | SEAL, NG DOOR | 1 |
| | | | |
| 70-01 | 600-59131-5 | CONDITIONER, VIBE SIGNAL | 1 |
| 70-02 | 3505354-1-2 | STARTER | SCRAP |
| 70-03 | 600-59131-1 | ACCELEROMETER | 1 |
| 70-03 | 600-59131-3 (6917M35-133) | CABLE ASSY, ENG VIBE | 1 |
| 70-04 | 2-303-026-01 ( on board A/C) | EXCITER, IGNITION | 1 |
| 70-05 | 2-303-052-04 | CONTROLLER, OVERSPEED | 1 |
| 70-06 | 2-303-253-01 | VALVE | 1 |
| 70-07 | 2-303-251-01 | STRUT | 1 |
| 70-08 | 2-303-469-01 | COVER | 2 |
| 70-11 | 2-303-175-02 | VALVE | 1 |
| 70-12 | 2-303-150-01 | KIT, ENGINE INLINE FUEL FILTER | 4 |
| 70-13 | 2-303-893-01 | SEAL, INTERSHAFT | 1 |
| 70-14 | 2-300-387-05 | PLATE | 1 |
| 70-15 | 2-303-546-01 | DETECTOR, CHIP | 1 |
| 70-16 | 2-193-420-01 | ASSEMBLY, ADAPTOR | 1 |
| 70-17 | 2-173-560-01 | ASSEMBLY, BRACKET | 1 |
| 70-18 | 2-303-170-03 | KIT, FUEL FILTER | 4 |
| 70-19 | 898930-7-2 | VALVE, ENGINE START | 1 |
| 70-22 | 2-303-033-03\05 | SPEED PU | 1 |
| 70-23 | 2-300-688-02 | TUBE | 2 |
| 70-24 | 2-303-567-01 | LEAD | 2 |
| 70-25 | 2-300-385-01 | GASKET | 1 |
| 70-26 | 2-160-431-01 | GASKET, MOTIVE FLOW | 20 |
| 70-27 | K-600-62043-7 | STRIP, T\R RUB | 1 |
| 70-28 | 215-0200-41 | STRIP, T\R RUB | 2 |
| 70-29 | 600-60901-3 | SEAL, T\R SLEEVE | 2 |
| 70-29 | NAS-1992-2T | SCREW FOR 600-60901-3 | 9 |
| 70-30 | 215-0608-501 | CASCADE, STRAIGHT | 2 |
| 70-31 | 215-0608-503 | CASCADE, ANGLED | 2 |
| 70-32 | 215-0608-504 | CASCADE, ANGLED | 2 |
| 70-33 | MS-9135-01 | GASKET | 8 |
| 70-33 | MS-9136-01 | GASKET | 6 |
| 70-34 | 602EN120-6 | MICRO SWITCH, THRUST REVERSER | 1 |
| 70-35 | 2-160-384-01 | GASKET | 5 |
| 70-38 | 2-303-743-01 | LEAD, IGNITION | 2 |
| 70-37 | 2-303-742-02 | LEAD, IGNITION | 2 |
| 70-39 | 2-303-025-01 | LEAD, EXCITER "A" | 1 |
| 70-40 | 2-303-079-01 | LEAD, EXCITER "B" | 2 |
| 70-41 | 3272534-2 | ACTUATOR, THRUST REVERSER | 1 |
| 70-42 | 2-300-711-01 | FLOW DIVIDER | 1 |
| 70-44 | 2-303-247-02 | ADAPTER, BYPASS VALVE | 1 |
| 70-47 | 600-37145-2 | SEAL | 1 |
| 70-48 | 220-476873-004 | DIGITAL DISPLAY | 1 |
| 70-TOP | 2-310-052-02 | HARNESS | 1 |
| 70-TOP | 215-0888-575 | SUPPORT, FIRE WIRE | 1 |
| 70-TOP | 215-0888-576 | SUPPORT, FIRE WIRE | 1 |
| | | | |
| BLT-03-1 | NAS-6603-1 | BOLT | |
| BLT-03-2 | NAS-6603-4 | BOLT | |
| BLT-1-1 | NAS-6204-3D | BOLT | 6 |
| BLT-1-2 | NAS-6204-6 | BOLT | 16 |
| BLT-1-3 | NAS-6204-9D | BOLT | 10 |
| BLT-1-4 | NAS-6204-10D | BOLT | 23 |
| BLT-1-5 | NAS-6204-11D | BOLT | 12 |
| BLT-1-6 | NAS-6204-12D | BOLT | 13 |

*PARTS INVENTORY SUBJECT TO INSPECTION*
*AND DELETION.*

06/21/99   15:43   FAX 7033813170          EMERALD AVIATION                    ☑01



# Aviation, Incorporated
[Aircraft Acquisitions, Sales and Consulting]

## *Fax Transmittal*

**Date**          June 21, 1999

**To**            Denniis Lainey
**Company**       Turnberry Charters, Inc.
**Fax**           305 2289 9397

**From**          Ed Daahlberg

**Subject**       Challenger 600, S/N 1023
                  Draft of Purchase agreement


Best regards.



EXHIBIT
II 46

*Manassas Regional Airport* • *9998 Wakeman Drive* • *Suite 212* • *Manassas, Virginia 20110-2702*
*703-361-33330* • *Fax: 703-361-3170* • *Email: Planebiz@aol.com*

## AIRCRAFT SALE AGREEMENT

AGREEMENT, made this _____ day of June 1999, by and between International Paper Company, with offices at 184 Airport Road, Box 9, White Plains, NY  10604 (hereinafter referred to as "Int'l Paper.") and Turnberry Charters, Inc.,. with offices at 15001 N.W.. 42nd Avenue, Suite 117, Miami, FL  33054 (hereinafter referred to as "Turnberry").

WITNESSETH.

WHEREAS, Int'l Paper is the owner of a Challenger 600, Serial Number 1023, Registration Number N90UC. including the engines, avionics equipment, instrumentation and all items of equipment, parts, components amd accessories presently installed thereon (hereinafter collectively referred to as the "Aiircraft"); and

WHEREAS, the parties are mutually desirous of reducing their understandings and agreements to writing.

NOW. THEREFORE. in consideration of the mutual covenants herein contained, and other good and valuable consideration, the parties hereto agree as ·follows:

### 1.  PERFORMANCE AND PURCHASE PRICE.

Int'l Paper agrees to sell and Turnberry agrees to purchase the Aircraft in its present condition provided the following conditions have been made and representations of Int'l Paper are made, and Turnberry agrees to pay to Int'l Paper therefore the sum of Seven Million ($7,000,000) Dollars, payable iin the following manner:

> A.    A deposit in the amount of One Hundred Thousand Dollars ($100,000) heretofore placed in escrow by Turnberry with AIC Title Service, Oklahoma City. Oklahoma (hereinafter reiferred to as the "Escrow Agent"), which deposit is refundable untiil the Aircraft is accepted or rejected upon completion of the pre-purchase inspection to be completed on or about Thursday, June 24, 1999. If the Aircraft is accepted by Turnberry, the deposit will become refundable only in the event that Int'l Paper faills to deliver the Aircraft with a clear title or as provided in Paaragraph 4 and Paragraph 9 hereof. Turnberry shall acknowledge acceptance of the pre-purchase inspection in the form attached hereto as Exhibit "A" and by this reference made a part hereof.

Page Two

> B. Balance of purchase price plus half of the escrow fees upon delivery of the Aircraft and transfer of title instruments to Turnberry as hereinafter set forth. Payment shall be made by bank wire transfer.

## 2. REPRESENTATIONS.

Int'l Paper agrees that at the time of delivery of the Aircraft to Turnberry:

> A. The engine service plan (CMSP) for the Lycoming ALF502-L engines shall be transferred by Int'l Paper to Turnberry pursuant to Exhibit "B" attached hereto and made a part hereof. The cost of transferring the CMSP agreement shall be for the account of Turnberry.

> B. Any time remaining on the CAMP agreement shall be transferred to Turnberry. The cost of transferring the CAMP agreement shall be for the account of Turnberry. Additionally all CAMP, Canadair, Lycoming and vendor information or similar received by Int'l Paper shall be immediately forwarded to Turnberry.

> C. Int'l Paper will assign, to the extent that Int'l Paper has the right to do so, all of its right, title and interest in any applicable manufacturer's warranties and/or vendor warranties.

## 3. CONDITIONS OF SALE

Turnberry's obligation to purchase the Aircraft shall be subject to the following conditions:

> A. That the Aircraft will be delivered in its present condition with all systems operating. Int'l Paper represents and warrants that all applicable FAA airworthiness directives and manufacturer's mandatory service bulletins and modifications have been complied with.

> B. Pre-purchase inspection and a flight test of up to two hours ("Inspection") to commence on or about Tuesday, June 23, 1999 at Midcoast Aviation Service Center, Cahokia, Illinois (hereinafter referred to as "Airport") to either accept or reject the Aircraft. All costs of the Inspection, flight test and movement of the Aircraft shall be for the account of Turnberry.

Page Three

> C    In the event Turnberry accepts the Aircraft, Int'l Paper shall
> have the option but not the obligation to pay for any discrepancies
> found affecting the airworthy condition or operational systems of
> the Aircraft.

## 4.    DAMAGE.

Int'l Paper represents that to the best of its knowledge the Aircraft has no damage history. Int'l Paper shall promptly notify Turnberry of any damage, accident or material change occurring to the Aircraft, any part thereof, or engines installed thereon, prior to the date of closing. In the event of destruction or material damage to the Aircraft on or before the transfer of title, either party may elect to cancel this Agreement. If this Agreement is canceled pursuant to the foregoing provisions, the Escrow Agent shall immediately return the deposit of One Hundred Thousand Dollars ($100,000) to Turnberry, and the parties will in such event have no further obligations hereunder.

## 5.  DELIVERY

Int'l Paper and Turnberry agree that the delivery of the Aircraft will take place at the Airport within Three (3) business days of the acceptance of the pre-purchase inspection. The cost of moving the Aircraft to a location other than the Airport for delivery to shall be for the account of Turnberry. Turnberry shall acknowledge receipt and delivery of the Aircraft by executing and delivering to Int'l Paper an Aircraft Sales Final Acceptance and delivery in the form attached hereto as Exhibit "C" and by this reference made a part hereof.

## 6.  TRANSFER OF TITLE AND TITLE INSTRUMENTS.

Transfer of title and delivery of the Aircraft shall be made at a location mutually agreeable to the parties.

At the time of closing, Int'l Paper shall deliver to Turnberry:

> A. An executed FAA Bill of Sale in the form required to permit
> registration of the Aircraft in the United States.
>
> B. Warranty Bill of Sale in the form annexed hereto and marked
> Exhibit "D".

Page Four

C. All Aircraft and engine logs, manuals, parts, maintenance data and other documentation maintained for the operation of the Aircraft.

## 7.    AIRCRAFT WARRANTY AND DISCLAIMER.

Int'l Paper warrants that the Aircraft is owned by Int'l Paper and shall be delivered to Turnberry free and clear of any mortgages, liens or encumbrances of any nature whatsoever. Turnberry acknowledges that Int'l Paper is selling the Aircraft to Turnberry in an "as-is, where-is" condition. ALL OTHER WARRANTIES OF Int'l Paper WHETHER EXPRESS, IMPLIED OR STATUTORY, INCLUDING BUT NOT LIMITED TO WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, ARE HEREBY EXCLUDED AND WAIVED BY TURNBERRY, ITS SUCCESSORS, ASSIGNS AND TRANSFEREES  IN NO EVENT SHALL INT'L PAPER BE LIABLE FOR COLLATERAL, CONSEQUENTIAL OR INCIDENTAL DAMAGES.

## 8.    TAXES.

Int'l Paper shall bear all taxes, duties or other similar charges assessed by any national, state or local government or any other authority in connection with Int'l Paper's ownership or use of the Aircraft at any time on or prior to the closing date. Turnberry shall bear all subsequent taxes, duties or similar charges that thereafter may be assessed by any national, state or local government or any other authority in connection with Turnberry's purchase, use or ownership of the Aircraft.

## 10.    BROKERAGE REPRESENTATIONS.

Except for Int'l Paper's obligation to Emerald Aviation, Inc., Int'l Paper and Turnberry each represent and warrant to the other that they have taken no action which would give rise to a valid claim for a broker's fee in connection with this transaction and each party agrees to indemnify and forever hold the other harmless from and against any claims for brokers' compensations, fees, or commissions arising out of the indemnifying party's actions.

Page Five


### 11. EXCUSABLE DELAY'S

Int'l Paper shall not bee liable for any failure of or delay in deliverry of the Aircraft for the period that such failutre or delay is due to acts of God or the pulublic enemy; civil war, insurrection or riots; fire:s, explosions or serious accidents; govemmmental priorities or allocations; strikes or labor disputes; inability to obtain Airrcraft materials, accessories, equipment or ;parts from the vendors; or any other cauuse beyond Int'l Paper's control; provided, however, that Tumberry may elect to) terminate this Agreement if such failure or· delay continues for sixty (60) days or morre. In the event that this agreement is cancellled pursuant to the foregoing provisions. tthe Escrow Agent shall immediately return tfhe deposit in the amount of One Humdred Thousand ($100,000) Dollars to Turnbeerry and each of the parties shall be releassed and relieved of any obligations under this; agreement.

### 12.    NOTICES.

Any notice required oor permitted pursuant to this Agreement sthall be in writing and shall be delivered eitherr personally, by FAX machine, or by any ovvernight delivery service such as Airbome, FFederal Express or DHL to the parties att their respective addresses as set forth beloow, and as the same may be changed byy serving proper notice to the other party. Trhe date of receipt of said Notice shall be tfhe date on which the party to whom the Notiice is directed acknowledges receipt thereeof or refuses to receive same or if the Notiicoe is transmitted by FAX machine when thtee FAX is verified as having been received. IEach party shall have the responsibility too notify the other party of any change in adddress, and each party shall be permitted · to rely upon the validity and accuracy of æaddresses set forth in this agreement, uunless otherwise specifically notified of a chaange of address. All the provisions of thiss paragraph shall apply to any Notice as referrred to in this agreement.

The initial notice adddresses of the parties are as follows:

A.          In the case off Int'l Paper, to:

                        Mr. Bob Cassidy
                        Int'l Paper Company
                        184 Airport Road, Box 9
                        White Plains, NY  10604
                        FAX:  914 428 3478

Page Six

B.          In the case of Turnberry, to

                          Dennis Lainey
                          Turnberry Charters, Inc.
                          15001 N.W. 42nd Avenue, Suite 117
                          FAX:  305 289 9397

     12.    ENTIRE AGREEMENT

     The parties agree that the foregoing constitutes the entire undersstanding of the parties, and shall not be modified or amended unless hereinafter made in writing signed by the authorized representatives of the parties.

     13.  RESOLUTION OF DISPUTES.

     In the event a dispute or claim arises out of this Agreement, thes parties hereto hereby consent to have the dispute resolved by the general district courtt of New York.

     14.    APPROVAL.

     Int'l Paper and Turnberry each warrant to the other that the exeocution, delivery, and performance of this Agreement has been authorized and approved! by all required corporate action.

     15.  CONFIDENTIALITY.

          Int'l Paper and Turnberry each agree that the specific deztails regarding this transaction shall be kept confidential except as may be required by law.

     16.    COUNTERPARTS.

     This Agreement may be executed in two or more counterparts;, each of which shall be deemed an original and shall be effective when executed by bo3th parties.

     This agreement shall be binding upon the heirs, executors, ssuccessors and assignees of the parties.

Page Seven

IN WITNESS WHEREOF, the parties hereto have duly signed this Agreement on the day and year first above written.

INTERNATIONAL PAPER COMPANY

By:_____Title_____Date_____

TURNBERRRY CHARTERS, INC

By:_____Title_____Date_____

EXHIBIT "A"

AIRCRAFT PRE-PURCHASE ACCEPTANCE

Aircraft Make and Model:

Challenger 600

Serial No.:

1023

Registration No :                                                             N90UC

This is to acknowledge acceptance of the pre-purchase inspection of the above-identified Aircraft in accordance with Aircraft Purchase Agreement dated June _____, 1999, by and between Int'l Paper Company and Turnberry Charters, Inc.
ACCEPTED BY:

TURNBERRY CHARTERS, INC.

BY:_____

DATE OF ACCEPTANCE:_____

EXHIBIT "B"

## ENGINE MAINTENANCE SERVICE PLAN ASSIGNMENT

In consideration of the mutual covenants herein contained, andl other good and valuable consideration, Int'l Paper Company, ("Int'l Paper") does hereby assign to Turnberry Charters, Inc. ("Turnberry") all of the right, title and interest of Int'l Paper in a certain Engine Maintenance Service Plan ("CMSP Agreement") whicIn Int'l Paper has executed with Allied Signal   for Lycoming ALF502L-2 engines. Sterial Number L-F03099S and L-F03052S installed on Challenger 600. Serial No  1023, Registration No. N90UC.

Int'l Paper represents and warrants to Turnberry that all paymenits required to be made under the CMSP Agreement are current and covenants and agrees that it will execute any additional instruments and/or documents required by Allied Signal to effectuate the transfer and assignment of the rights of Int'l Paper in the CMSP Agreement to Turnberry.

EXHIBIT "C"


AIRCRAFT SALES FINAL ACCEPTANCE AND DELIVERY

| | |
|---|---|
| Aircraft Make and Model: | Challenger 600 |
| Serial No.: | 1023 |
| Registration No : | N90UC |

Delivery of the above-identified Aircraft at Cahokia Airport, Cahokia, Illinois is acknowledged and said Aircraft is accepted in accordance with Aircraft Purchase Agreement dated June ___, 1999, by and between Int'l Paper Company and Turnberry Charters, Inc. acknowledge that all delivery conditions have been satisfied and that Int'l Paper Company has performed all its obligations under the Aircraft Purchase Agreement.

ACCEPTED BY:


TURNBERRRY CHARTERS, INC.


BY:



DATE OF ACCEPTANCE:

EXHIBIT "D"

BILL OF SALE

KNOW ALL MEN BY TTHESE PRESENTS,

That Int'l Paper Compæny, a corporation organized and existing urnder the laws of New York with principal officces at 184 Airport Road Box 9 White Plaiins, NY 10604, Party of the First Part, for amd in consideration of the sum of One Dollsar ($1.00) lawful money of the United States, to it in hand paid, at or before delivery of these presents, by Turnberry Charters, Inc. whom can be contacted at at 15001 N.W. 42nd Avenue, Suite 117, Miami, FL 330544, Party of the Second Part, the receipt of which is hereby acknowledged, does hereby grant, bargain, sell, transfer and set over unto the Party of the Second Part, its successcors and assigns:

Challenger 600, Seriial Number 1023, together with the emgines, avionics equipment, instrumentation and all items of equipment, parts, ccomponents and accessories presently installeed thereon.

TO HAVE AND TO HHOLD the same unto the Party of the SSecond Part, its successors and assignees forever. And the Party of the First P/art does for its successors and assigns wanrrant that it is the lawful owner of said peersonal property; that title to said property is ffree from all prior claims, liens and encumtbrances and that the Party of the First Part hais good right to sell the same as aforesaid. The Party of the First Part covenants and aigrees to and with the said Party of the Second Part to warrant and defend the salee of the said personal property hereby soold unto the said Party of the Second Part, its successors and assigns, against all and eivery person and persons whomsoever.

IN WITNESS WHERE(OF, the Party of the First Part has caused these presents to bæ signed by its duly authorized officer the dlay and year first above written

INTERlNATIONAL PAPER COMPANY

By:

EXHIBIT "E"

**SPARE PARTS INVENTORY**

PROPOSED CHANGES TO
AIRCRAFT SALE AGREEMENT
FROM INTERNATIONAL PAPER COMPANY
CHALLENGER CL600 S/N 1023 N9CUC

<u>Page One</u>

(1)   Buyer's name change from Turnberry Charters, Inc to Turnberry Aviation    o K
      Inc. ("Turnberry")

(2)   First paragraph under WITNESSETH: add as follows:

      ...... and accessories presently installed thereon, as more fully described
      on the specifications attached hereto as Exhibit "F" and made a part          o K
      hereof, and spare parts as listed and attached hereto as Exhibit "E" and
      made a part hereof (hereinafter collectively referred to as the "Aircraft");
      and

(3)   Paragraph 1.A.:

      Change Escrow Agent from AIC Title Service to Insured Aircraft Title          o K
      Service, Oklahoma City, OK

      Clarify deposit to be refunded if Aircraft rejected and made non-
      refundable if accepted

      Note: Reference is made to Paragraph 9. - Paragraph 9. is missing.

      A.    A deposit in the amount of One Hundred Thousand Dollars
      ($100,000) heretofore placed in escrow by Turnberry with Insured Aircraft
      Title Service, Oklahoma City, Oklahoma, Kirk L. Woford, President
      (hereinafter referred to as the "Escrow Agent"), which deposit is
      refundable until the Aircraft is accepted or rejected upon completion of the
      pre-purchase inspection as provided in Paragraph 3.B.  If the Aircraft is
      rejected by Turnberry, the Escrow Agent shall immediately return the
      deposit in the amount of One Hundred Thousand ($100,000) Dollars to
      Turnberry and each of the parties shall be released and relieved of any
      obligations under this agreement.  If the Aircraft is accepted by Turnberry,
      the deposit will become non-refundable except in the event that Int'l
      Paper fails to deliver the Aircraft with a clear title or as provided in
      Paragraph 4 and Paragraph 9 hereof  If the Aircraft is accepted,
      Turnberry shall acknowledge acceptance of the pre-purchase inspection
      in the form attached hereto as Exhibit "A" and by this reference made a
      part hereof.



EXHIBIT
#47

### Page Two

(4)   Paragraph 2. A. Include reference to MSP program on APU:

A     The engine service plans (CMSP) for the Lycoming ALF502-L and
(MSP) for the APU shall be transferred by Int'l Paper to Turnberry
pursuant to Exhibit "B" attached hereto and made a part hereof. The cost
of transferring the CMSP and MSP agreements shall be for the account of
Turnberry.                                                                          *OK*

(5)   Paragraph 3.B. Clarification: Commence record review immediately;
commence aircraft inspection and flight test after execution of contract:
remove reference to movement of Aircraft as is not applicable here (see
Paragraph S. Delivery)

B     Pre-purchase inspection and a flight test of up to two hours
("Inspection") at Midcoast Aviation Service Center, Cahokia, Illinois
(hereinafter referred to as "Airport") to either accept or reject the Aircraft.
The Aircraft and engine logs and maintenance records will be available at      *OK*
the Airport for review to commence on or about Wednesday, June 23,             *WITH*
1999. Upon execution of this agreement, the Aircraft will be made              *ADDITION*
available for inspection by Turnberry's agent, and Int'l Paper will conduct
a flight test of up to two hours for a systems check to be observed by
Turnberry's agent. The cost of fuel and pilots for this flight test shall be
paid by Turnberry. *∧TURNBERRY SHALL HAVE UNTIL 5:00 p.m., EDT,*
*FRIDAY, JUNE 25 TO ACCEPT OR REJECT THE AIRCRAFT. A*
(7)   Paragraph 5. *FAILURE TO ADVISE INT'L PAPER OF SUCH DECISION*
*SHALL BE DEEMED A REJECTION.*
.... The fuel and pilot costs of moving the Aircraft to a location other than
the Airport for delivery shall be for the account of Turnberry......    *OK*

(8)   Paragraph 6   Bills of Sale to Escrow for closing.- logs to Turnberry

Prior to time of closing, Int'l Paper shall deliver to Escrow Agent:

   A. An executed FAA Bill of Sale in the form required to permit       *OK*
      Turnberry's registration of the Aircraft in the United States.

   B. Warranty Bill of Sale in the form annexed hereto and marked      *OK*
      Exhibit "D".

At time of closing, Int'l Paper shall deliver to Turnberry all Aircraft and    $OK$
engine logs, manuals, parts, maintenance data and other documentation
maintained for the operation of the Aircraft

## Page Four

(9)   Paragraph 9 is missing. This paragraph was referenced in Paragraph
      1.A.

## Page Six

(10)  Paragraph 12. B.: Change the name from Turnberry Charters, Inc. to    $OK$
      Turnberry Aviation, Inc.

(11)  Paragraph 15. Clarification.

      .... shall be kept confidential except on a need to know basis or as may    $OK$
      be required by law or legal process

## Page Seven

Change name for signature from TURNBERRY CHARTERS, INC. to    $OK$
TURNBERRY AVIATION, INC.

## All Exhibits

Change name from Turnberry Charters, Inc. to Turnberry Aviation, Inc.

## EXHIBIT "B"

This Exhibit needs to include appropriate assignment and warrants for    $OK$
payment for the MSP program on the APU along with those for the CMSP
on the engines.

## EXHIBIT "D"

To include spare parts not installed on the Aircraft (listed on Exhibit "E")    $OK$
add "or appurtenant thereto" to end of property description in second
paragraph

.. presently installed thereon or appurtenant thereto.

EXHIBIT "E"

SPARE PARTS INVENTORY