## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 00-6111-CIV-(DIMITROULEAS/Johnson)

TURNBERRY CHARTERS, INC.

    Plaintiff,

vs.

INTERNATIONAL PAPER COMPANY

    Defendant.

_____ /



### DEFENDANT'S MOTION FOR FINAL SUMMARY JUDGMENT OR, ALTERNATIVELY, FOR PARTIAL SUMMARY JUDGMENT LIMITING DAMAGES AND INCORPORATED MEMORANDUM OF LAW

Defendant, International Paper Company ("IP"), by and through its undersigned counsel and pursuant to Federal Rule of Civil Procedure 56 and Local Rules 7.1 and 7.5 files this Motion for Final Summary Judgment against Plaintiff Turnberry Charters, Inc. ("Turnberry") or, alternatively, for Partial Summary Judgment Limiting Turnberry's Damages.

### *INTRODUCTION*

There is a clear legal distinction between a valid, binding, enforceable contract and an informal agreement to endeavor to enter into a valid, binding, enforceable contract in the future. In this case, IP and Turnberry entered into preliminary negotiations under which Turnberry sought to purchase a used plane from IP. These preliminary negotiations led to the execution of a Turnberry-drafted informal and non-binding letter agreement that unequivocally contemplated the creation and execution of a future definitive sales agreement.

Because both parties could not agree on the essential terms and conditions of the proposed sale, no definitive sales agreement was ever reached and the letter agreement expired on its own terms. Despite the lack of a binding contract, Turnberry has initiated this lawsuit against IP, wrongfully premising all of its claims on the unenforceable letter agreement.

As explained herein, a consideration of the plain language of the letter agreement together with the deposition testimony in this case demonstrates that neither IP nor Turnberry

intended the letter agreement to constitute a binding contract, and therefore, IP is entitled to summary final judgment on all three counts raised in Turnberry's Complaint.

## *BACKGROUND FACTS*[1]

As part of a merger with Union Camp Corporation ("Union Camp"), IP acquired title to a 1981 Canadair Challenger CL600 aircraft, serial number 1023 (the "Plane"). IP then contracted with Emerald Aviation, Inc. ("Emerald") to sell the Plane.[2] *See* Deposition of Edward C. Dahlberg, November 30, 2000 ("Dahlberg Dep."), 42:14-17.[3]

As part of Emerald's services, Ed Dahlberg, Emerald's president, advertised and listed the Plane in many aircraft sales media, including Business Air Today. *See* Ex. A[4]; *see also* Dahlberg Dep., 19:16 to 20:11; 21:1-22.

Subsequently, Turnberry became interested in purchasing a Challenger 600, so it enlisted the services of its agent, Dennis Lainey ("Mr. Lainey").[5] *See* Deposition of Dennis Lainey, November 15, 2000 ("Lainey Dep."), 30:13-22. Lainey eventually contacted Mr. Dahlberg. *See* Lainey Dep., 32:21-23; *see also* Dahlberg Dep., 41:5-7. During their initial conversation, Mr. Lainey expressed that Turnberry was interested in purchasing the Plane. *See* Lainey Dep., 35:20 to 37:7. Mr. Dahlberg discussed the Plane's specifications, and relayed the Plane's selling price of $7,250,000. *See id.* at 37:8-9.

Following their conversation, Mr. Lainey, on Turnberry's behalf, drafted and executed a letter addressed to IP, setting forth a proposal regarding the Plane (the "Letter Offer"). *See* Ex. C; *see also* Lainey Dep., 40:15-18. The Letter Offer was prepared by Mr. Lainey without the assistance or review of counsel--Mr. Lainey was relying upon "the attorneys" to prepare "a more definitive agreement." *See* Lainey Dep., 63:21-23. After Turnberry approved the contents of the

---

[1] In accordance with Local Rule 7.5, IP's Statement of Material Facts is filed and served contemporaneously with this Motion and Memorandum of Law.

[2] Prior to the merger, Union Camp had previously contracted with Emerald to sell the Plane. *See* Dahlberg Dep., 15:8 to 17:11. Because Emerald was familiar with the Plane, it was an obvious candidate to continue brokering the Plane on IP's behalf following the merger.

[3] All deposition transcripts, which have been previously filed with this Court under separate Notice of Filing, will be cited herein by page and line as "(Name) Dep., ___:___."

[4] All Exhibits attached hereto will be cited as "Ex. __."

[5] Mr. Lainey's agency with Turnberry was established pursuant to an Employment Agreement executed by himself and Turnberry, on or about August 28, 1998. *See* Ex. B. This Employment Agreement was still in effect when Mr. Lainey negotiated to purchase the Plane from IP. *See* Lainey Dep., 19:14 to 20:23.

2

Letter Offer, it was sent to Emerald via facsimile on or about June 20, 1999. *See* Lainey Dep., 40:23 to 41:15; 42:6-10. The Letter Offer constituted a confirmation of Mr. Lainey's and Mr. Dahlberg's preliminary negotiations, and an expression of Turnberry's desire to arrive at a future, formal contract with IP for the purchase of the Plane. *See* Ex. C., 1st ¶. In that regard, the Letter Offer stated that Turnberry would pay seven million dollars for the Plane,

> subject to the good faith efforts of both parties to negotiate **mutually agreeable** terms and conditions of the sale **and** the timely execution and delivery of a ***definitive sales agreement*** in **form and substance mutually acceptable** to the parties. *See* Ex. C, 2d ¶ (emphases supplied).

In furtherance of its desire to negotiate a "definitive sales agreement," Turnberry placed a "good faith" deposit in escrow. *See id.* at 3d ¶. This "deposit," was designated by Mr. Lainey as

> fully refundable until such **time as a definitive sales agreement** shall be executed, and then [was to] become subject to the terms and conditions of **that agreement**. *See id.* at 5th ¶ (emphases added).

The Letter Offer further stated that the "offer" would become "null and void" at 5:00 p.m., June 28, 1999, "if the parties have not **agreed to and executed a definitive sales agreement** prior to that time." *See id.* (Emphases supplied).[6]

Upon receipt of the Letter Offer, Mr. Dahlberg forwarded it to IP. *See* Dahlberg Dep., 50:4-22. In furtherance of possibly negotiating and executing a definitive sales agreement at some future date, IP's Senior Vice President, signed the Letter Offer on behalf of IP on June 21, 1999 in the exact same form as drafted by Turnberry. *See* Ex. D. Shortly thereafter, the fully executed Letter Offer was transmitted back to Mr. Lainey. *See* Lainey Dep., 42:20-24; 45:4-12.

That very same day, June 21, 1999, Mr. Lainey faxed a letter to Turnberry's escrow agent, Insured Aircraft Title Service, Inc., ("Escrow Agent") informing them to expect a wire transfer from Turnberry (the "First Escrow Letter"), and requesting that the funds be placed in an escrow account. *See* Ex. E. Mr. Lainey specified that these escrow funds were to "be held fully refundable to Turnberry" at Mr. Lainey's "sole discretion," and acknowledged that there existed "no formal sales agreement for th[e] Plane." *Id.* at 1st ¶. Mr. Lainey added in the First Escrow

---

[6] It should be noted that nothing in the Letter Offer precluded IP or Mr. Dahlberg from continuing to market the Plane to third parties after the execution of the Letter Offer, and nothing prevent IP or Mr. Dahlberg from negotiating for the sale of the Plane with anyone other than Turnberry. *See* Ex. C; *see also* Lainey Dep., 76:4-14.

Letter that further instructions would be sent when "a binding sales agreement [was] entered into." *Id.*

Meanwhile, the same day, June 21, 1999, Mr. Dahlberg transmitted a proposed "form" purchase agreement to both IP and Mr. Lainey, entitled Aircraft Sale Agreement (the "Proposed Contract"). *See* Ex. F; *see also* Lainey Dep., 47:21 to 48:48:2; Dahlberg Dep., 66:7-23; 70:13-23. Among numerous other terms, the Proposed Contract provided that the Plane was being sold to Turnberry in "'as is-where-is' condition." *See* Ex. F at ¶ 7. However, nowhere in the Proposed Contract did it indicate that a binding agreement was already reached by the Parties. *See* Ex. F.

The next day, June 22, 1999, Mr. Lainey arranged for Turnberry's maintenance representative (Ken Murray) to conduct a pre-purchase inspection of the Plane. *See* Lainey Dep., 55:5-11. Additionally, Mr. Lainey contacted Mr. Dahlberg to discuss the Proposed Contract. *See id.* at 55:15 to 56:1. Specifically, Mr. Lainey remarked that Turnberry was not interested in purchasing the Plane "as-is." *See* Dahlberg Dep., 73:23 to 74:9. Mr. Dahlberg responded that since IP was willing to accept $250,000 less than its requested asking price for the Plane ($7,250,000), IP would not sell other than "as-is." *See* Dahlberg Dep., 54:18 to 55:9. Mr. Lainey replied that Turnberry would not buy the plane in an "as-is" condition. *See id.* at 55:10-14; 56:7-11. Because the parties could not mutually agree on terms, and because Mr. Lainey refused to discuss an "as-is" deal, Dahlberg concluded that negotiations for a definitive sales agreement were off. *See id.* at 55:15-18; 59:10 to 60:3.

The next morning, June 23, 1999, to the surprise of Mr. Dahlberg, Turnberry's agent Mr. Murray arrived at the Midcoast Aviation facility in St. Louis, Missouri, where the Plane was being housed. *See* Dahlberg Dep., 59:1 to 11; *see also* Deposition of Stephen Bates[7], October 20, 2000 ("Bates Dep."), 36:22 to 37:9. Since Mr. Lainey ended any further negotiations the previous evening, Mr. Dahlberg had not arranged with Mr. Bates to permit Mr. Murray access for the inspection of the Plane and its records. *See* Dahlberg Dep., 63:17 to 64:19; 84:1-14; *see also* Bates Dep., 36:12-25. Mr. Murray was asked to temporarily wait and hold-off on his inspection until Mr. Dahlberg could reach Mr. Lainey to clarify the situation. *See* Dahlberg Dep., 63:17 to 65:8; *see also* Bates Dep., 37:8-22.

---

[7] At that time, Stephen Bates was the director of programs for Midcoast Aviation. *See* Bates Dep., 7:22 to 8:13.

When Mr. Dahlberg reached Mr. Lainey shortly thereafter, Mr. Lainey stated that Turnberry wished to "start all over again," and requested that Mr. Murray be permitted to continue with the inspections. *See* Dahlberg Dep., 64:20 to 65:2. As a result, Mr. Dahlberg then informed Mr. Bates to allow Mr. Murray to proceed with his inspection of the Plane and its records. *See* Bates Dep., 39:1-23.

Later that same afternoon, on June 23, 1999, Mr. Lainey, on behalf of Turnberry, faxed to Mr. Dahlberg Turnberry's requested changes to the Proposed Contract. *See* Exhibit G; *see also* Lainey Dep., 100:21 to 101:17.

Upon completion of Mr. Murray's inspection on June 24, 1999, Mr. Lainey and Mr. Dahlberg spoke regarding the condition of the Plane and the Proposed Contract. Mr. Lainey made two points: (1) he did not agree with IP's recommended changes to the Proposed Contract; and (2) Turnberry would not accept the Plane "as is." *See* Dahlberg Dep., 80:23 to 81:8.[8] Consequently, no definitive sales agreement was ever reached, let alone executed, by 5:00 p.m. June 28, 1999. *See* Turnberry's complaint ¶¶ 10, 24 (admitting that no definitive sales agreement was reached). Accordingly, by its own terms, the Letter Offer became "null and void." *See* Ex. D.

Following the expiration of the Letter Offer, on June 29, 1999, Mr. Lainey faxed a succeeding letter to the Escrow Agent (the "Second Escrow Letter"). *See* Exhibit H. Therein, Mr. Lainey asked that the previously-wired escrow funds (as referenced in the First Escrow Letter) be held with no further designation until further notice. *See id.* Specifically, Mr. Lainey wrote, "We will **not be *entering* into a purchase contract** on th[e] Plane, so please remove any reference to this aircraft from these funds." *Id.* at 1st ¶ (emphasis added).

Subsequently, the Plane was sold to a third party, Aero Toy Store, Inc., ("Aero Toy") for the exact same price conditionally offered by Turnberry to IP, namely $7,000,000.[9] *See* Ex. I. Moreover, Aero Toy purchased the Plane "as-is." *See id.* Shortly after Aero Toy took possession of the Plane, Turnberry contacted Aero Toy expressing a desire to purchase the *same*

---

[8] In a telephone conversation with Mr. Bates on June 25, 1999 following Mr. Murray's inspection of the Plane, Mr. Lainey expressed that he and Mr. Dahlberg did not reach an agreement regarding the Plane. *See* Bates Dep., 48:10-21. Similarly, Mr. Bates spoke to Mr. Dahlberg, who confirmed the failure to reach an agreement. *See id.* at 48:22 to 49:6.

[9] Mr. Lainey testified at deposition, nothing prevented IP or Mr. Dahlberg from continuing to market the plane to third parties after execution of the Letter Offer. *See* Lainey Dep., 76:4-14.

Plane (the 1981 Canadair Challenger CL600, serial number 1023); however, Turnberry requested renovations to be made to the Plane.[10]

On July 22, 1999, Aero Toy and Turnberry executed a formal contract for the sale of the to-be-refurbished and improved Plane to Turnberry, entitled Aircraft Purchase/Sale Agreement (the "Contract"). *See* Exhibit L. The Contract provided for a sales price of $7,700,000. *See id.* at Article 2. The purchase price **included** the Plane with **all** of the renovations and improvements integrated by Aero Toy.[11] *See id.* at Exhibit B, incorporated by reference into the Contract by Article 1, ¶ 2.

After purchasing the Plane *with* improvements from Aero Toy, Turnberry filed this suit against IP improperly alleging that the Letter Offer constituted a valid contract and that by not selling the Plane to Turnberry, IP breached that contract (count I). Additionally, Turnberry brought counts for breach of a duty of good faith and fair dealing (count II), and breach of duty to negotiate in good faith (count III). Turnberry's damages allegedly consist of: (a) the $700,000 price difference between IP's selling price ($7 million) and Aero Toy's selling price ($7.7

---

[10] Specifically, Turnberry requested that Aero Toy arrange for the following renovations and improvements: (a) a repainting of almost the entire Plane; (b) all visible metals in the Plane to be gold-plated; (c) the bathroom would feature new hardware, new wooden cabinets, a new toilet paper holder, new gold-plated strips, and a new vanity top constructed of stone and containing gold-plated sink and faucets; (d) the galley top to be reconstructed of stone with faux finish; (e) the gaming tables to be resurfaced with veneer, stone and gold inlays and angled corners; (f) replacement of all latches in the Plane with gold-plated ones; (g) new gold-plated controls on the side rails; (h) installation of light bronze mirrors on the aft bulkheads and door; (i) the aft TV to have a plex face flush with the mirror; (j) new sets to be installed similar to those of the 604 model in Aero Toy's hangar; (k) a leather couch to be installed; (l) all lower dado panels to have covered with Thoreau Maine Woods fabric; (m) all headliner and window panels to be Tapis Brisa Creame; (n) the entry floor was to be painted Lincoln beige; (o) installation of placards for Part 135 fireblocking certificates pertaining to the interior; (p) installation of a DVD player in place of the VCR, new speakers and new headphone with headphone connections and volume controls installed at each seat; and (q) change the Airshow 100 to an Airshow 200 Moving Map. *See* Exhibit J.

Subsequently, additional upgrades and renovations were requested by Turnberry, consisting of: (a) an etched LOGO in the bulkhead; (b) all stereo controls to be gold-plated; (c) specially made liquor bottles for the inside galley etched respectively with the words Vodka, Gin, Bourbon, Scotch, and Whiskey; and (d) replacement of the existing coffee machine with a Krups coffee and espresso maker. *See* Exhibit K.

[11] According to Turnberry's corporate representative, Larry Aitkens, Turnberry purchased the Plane with all of the upgrades, except replacement of the Airshow. *See* Deposition of Larry Milo Aitkens, October 5, 2000 ("Aitkens Dep."), 74:4 to 77:5; 84:15 to 85:21. Moreover, Mr. Lainey testified that Aero Toy: (a) installed a new leather interior; (b) recoated the interior metals with gold-plating; (c) recoated 80% of the woodwork; (d) relaminated about 20% of the interior; (e) resurfaced the interior, including the headliners, side panels and carpeting; (f) re-covered the furnishings; (g) installed a new fiber optic phone; and (h) painted the bottom of the Plane and repainted the old stripe. *See* Lainey Dep., 151:11 to 152:25. These upgrades were actually performed by Jet Center Interiors ("Jet Center") for Aero Toy at Aero Toy's facility. *See id.* at 72:24 to 74:1; see also Exhibit M.

million); and (b) over $200,000 in spare plane parts it believes it would have received had it purchased the Plane from IP.[12]

As discussed in detail below, IP is entitled to summary final judgment on all three counts as a matter of law because: (a) the Letter Offer constituted an incomplete, non-final agreement to agree; (b) no definitive sales agreement was reached or executed between the parties; (c) no binding contract was ever entered into by the parties, and therefore, no implied obligation of good faith arose; (d) absent a binding contract, Florida law does not recognize an independent duty of good faith; and (e) Florida law does not create or recognize a duty to negotiate in good faith, absent a binding contract.

Alternatively, should the Court deny summary judgment on any count, then Turnberry's recovery thereon, if any, must be off-set by the value of any and all improvements, additions or renovations to the Plane[13], and Turnberry cannot recover damages for the spare parts, as these items were not included in the Letter Offer.

## *LEGAL ARGUMENT*
### POINT I
### LEGAL STANDARD ON A MOTION FOR SUMMARY JUDGMENT

It is axiomatic that "[s]ummary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458 (11th Cir.), *cert. denied*, 513 U.S. 1062 (1994); *see also Goldsmith v. Jackson Mem. Hosp. Pub. Health Trust*, 33 F. Supp.2d 1336, 1339 (S.D. Fla. 1998) (internal citations omitted). Material facts are defined as those that have the potential to change the outcome of this lawsuit under governing law. *See Zaben v. Air Prods. & Chems., Inc.*, 129 F.3d 1453, 1455 (11th Cir. 1997).

The Supreme Court has held that this standard is met if the moving party demonstrates that there is "an absence of evidence to support the non-moving party's case." *Celotex Corp. v.*

---

[12] Turnberry's exact claim for damages is unknown because Turnberry has failed to produce a corporate representative to testify as to its alleged damages, despite the request for same by IP in its Re-Notice of Taking 30(b)(6) Deposition, served on September 13, 2000. Pursuant to Fed. Rs. Civ. P. 30(b)(6), and 37, IP has since filed a Motion to Preclude Evidence Regarding Plaintiff's Alleged Damages, or Alternatively, to Compel Plaintiff to Re-Designate a Rule 30(b)(6) Witness To Testify As To Damages on December 8, 2000.

[13] Certainly, had Turnberry actually purchased the Plane "as-is" from IP, it would have received an *unimproved, non-refurbished* plane for $7.0 million. *See* Exs. D & F.

*Catrett*, 477 U.S. 317, 325 (1986). Although reasonable inferences to be drawn from the facts must be viewed in the light most favorable to the non-moving party, "'[o]nce a moving party has sufficiently supported its motion for summary judgment, the non-moving party must come forward with significant, probative evidence demonstrating the existence of a triable issue of fact.'" *Irby v. Bittick*, 44 F.3d 949, 953 (11th Cir. 1995) (citation omitted).

The non-moving party cannot rely solely on his pleadings; he "'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Irby*, 44 F.3d at 953 (*quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, (1986))(emphasis omitted). Furthermore, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

As the Supreme Court held in *Celotex Corp.*, the plain language of Rule 56(c) mandates the entry of summary judgment against a party who fails to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. 477 U.S. at 322. That party must demonstrate that there is a "genuine issue for trial." *Matsushita Elec.*, 475 U.S. at 587.

Here, when the irrelevant and unnecessary factual disputes are eliminated from this case, it becomes perfectly clear that no final and binding contract was ever reached between Turnberry and IP, and therefore, IP is entitled to judgment as a matter of law on all claims asserted in Turnberry's complaint. Alternatively, should the Court permit Turnberry to proceed on any of its causes of action, Turnberry's recovery thereon, if any: (a) must be off-set by the value of the improvements made to the Plane; and (b) must not take into account the value of the separate spare plane parts.

## POINT II

### TURNBERRY'S LETTER OFFER DOES NOT CONSTITUTE A BINDING AND ENFORCEABLE CONTRACT FOR THE SALE OF THE PLANE

Whether the Letter Offer, with its reference to "mutually agreeable terms and conditions" actually creates a contract for sale of the Plane is primarily determined by examining Florida Statutes section 672.204.[14] It provides:

---

[14] The proposed sale of the Plane to Turnberry by IP is governed by Florida's Uniform Commercial Code-Sales (Chapter 672) ("UCC"). Specifically, Florida Statutes section 672.102 provides that chapter 672 (UCC) "applies to

8

(1) A contract for sale[15] of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.

(2) An agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined.

(3) Even though one or more terms[16] are left open a contract for sale does not fail for indefiniteness **if the parties have intended to make a contract** and there is a reasonably certain basis for giving an appropriate remedy.

Fla. Stat. § 672.204 (emphasis added).

It is manifest that regardless of whether you analyze the Letter Offer under UCC provisions or under common law contract principles, no contract will exist unless both parties intended to enter into such a relationship. *See* Fla. Stat. § 672.204(3) (requiring that parties have intended to enter into a contract).

When dealing with a written document, the best evidence of the parties' intentions, is the plain meaning of the actual language utilized therein. *See American Home Assurance Co. v. Larkin Gen. Hosp.*, 593 So. 2d 195, 197 (Fla. 1992); *see also Gendzier v. Bielecki*, 97 So. 2d 604, 608 (Fla. 1957); *Burns v. Barfield*, 732 So. 2d 1202, 1205 (Fla. 4th DCA 1999); *Department of Motor Vehicles v. Mercedes-Benz of N. Am., Inc.*, 408 So. 2d 627, 629 (Fla. 2d DCA 1981) (holding that the language used in a contract best evidences the intent of the parties at the time of its execution); *Rylander v. Sears Roebuck & Co.*, 302 So. 2d 478, 479 (Fla. 3d DCA 1974) (holding that the intention of the parties will be ascertained from the specific

---

transactions in goods." "Goods" is defined as "all things . . . which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid . . . ." Fla. Stat. § 672.105(1). Undoubtedly, an aircraft constitutes a good subject to chapter 672. *See McCollum Aviation, Inc. v. CIM Assocs., Inc.*, 446 F. Supp. 511, 513 (S.D. Fla. 1978). Moreover, the fact that the aircraft is used does not change its status as a good, as "goods" applies to **"all things . . . ."** *See* Fla. Stat. § 672.105(1) (emphasis added).

As both the potential sale of the Plane to Turnberry and the eventual sale of the Plane by IP fall within the ambit of Chapter 672, it will *primarily* dictate the rights, responsibilities and obligations, if any, of both IP and Turnberry. However, as the UCC also recognizes, unless they conflict with specific UCC provisions, common law and general law and equity principles will supplement the UCC. *See* Fla. Stat. § 671.103. As such, reliance upon non-UCC cases that deal with general contract law principles is appropriate. *Id.*

[15] A "contract for sale" encompasses both a present sale of goods and a contract to sell goods in the future. *See* Fla. Stat. § 672.106(1). A "present sale" of goods is "a sale which is accomplished by the making of a contract." *Id.* A "contract" is "the total legal obligation which results from the parties' agreement . . . ." Fla. Stat. § 671.201(11). Conversely, an "agreement" is "the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance . . . ." Fla. Stat. § 671.201(3). As will be demonstrated, no contract for sale was ever effectuated between the parties at bar.

[16] A "term" is a part of an agreement that relates to a particular matter. *See* Fla. Stat. § 671.201(42).

language used in the document); *Rose v. M/V "Gulf Stream Falcon"*, 186 F.3d 1345, 1350 (11th Cir. 1999) (interpreting Florida law); *In re Yates Dev.*, 241 B.R. 247 (Bankr. M.D. Fla. 1999); *Fowler v. Weiss*, 546 A.2d 321, 323 (Conn. App. Ct. 1988) (stating whether the parties intend to bind themselves prior to executing a formal contract is to be determined from the language utilized in the prior document).

As shown below, the Letter Offer cannot be deemed a binding contract because the plain and ordinary meaning of the language used therein reveals that neither Turnberry nor IP intended such a result at the time of its execution.

## A.   Parties to a Preliminary Agreement Will Not Be Bound Thereto Unless They Intended Such a Consequence

As Florida law prescribes, no enforceable contract for goods will result from unsettled preliminary negotiations, unless **all** parties intended such a consequence. *See* Fla. Stat. § 672.204. Almost 90 years ago, the Florida Supreme Court established that when one party expresses an intention not to close on a deal until all terms and conditions are confronted and dealt with in a formal written contract, neither party will be bound until such a contract is signed by both parties. *Strong & Trowbridge Co. v. H. Baars & Co.*, 54 So. 92, 95 (Fla. 1911).

It has been since recognized that "[w]here the parties are merely negotiating as to the terms of an agreement *to be entered into* between them, there is no meeting of the minds, and consequently no contract while the agreement is incomplete." *Goff v. Indian Lake Estates, Inc.*, 178 So. 2d 910, 912 (Fla. 2d DCA 1965) (emphasis added); *see also Mid-State Fed. Savings Bank v. Marketing & Management Assocs., Inc.*, 570 So. 2d 1016, 1018 ("When essential matters of a contract are left for further consideration, there is no meeting of the parties' minds and no enforceable contract.").

In *Goff*, a dispute arose between the parties regarding plaintiff's development of defendant's land. 178 So. 2d at 911-12. Following the commencement of a lawsuit, attorneys for both sides met to discuss settlement options. Thereafter, defendant's attorney composed a letter stating that defendant would enter into an agreement with plaintiff "relative to future communications on certain prescribed conditions." *Id.* Subsequently, Defendant refused to sign the proposed formal agreement, and plaintiff moved for a final decree incorporating its terms. *Id.* The trial court entered a final decree in favor of plaintiff. *Id.*

10

Florida's Third District Court of Appeals reversed, finding that a comparison between the letter and the subsequent (unexecuted) formal settlement document disclosed that the agreement outlined in the letter was tentative and incomplete, and still open to negotiation. *Id.* at 912. Indeed, "[w]here the parties are merely negotiating as to the terms of an agreement to be entered into between them, there is no meeting of the minds, and consequently no contract while the agreement is incomplete." *Id.*; *see also Suggs v. DeFranco's, Inc.*, 626 So. 2d 1100, 1101 (1st DCA 1993) (reversing a money judgment in favor of plaintiff because the disputed settlement agreement never became binding; the court found that "a number of essential terms were left open for future negotiation."); *777 Flagler Co. v. Amerifirst Bank*, 559 So. 2d 1210, 1210 (Fla. 4th DCA 1990) (affirming award of summary judgment and finding no enforceable contract where the agreement provided that it would only become "complete, valid and enforceable" if the parties, by a set deadline, could agree to the *form and substance* of the exhibits, because such precondition was not met); *In re SeaEscape Cruises, Ltd.*, 172 B.R. 1002, 1011 n. 10 (Bankr. S.D. Fla. 1994) (noting that the Letter of Intent amounted to an agreement to agree and that neither party intended to be bound thereby because, *inter alia*, negotiations continued thereafter regarding the use and effect of certain language contained in the Letter--in other words, the parties' conduct following execution of the Letter demonstrated an intent not to be bound thereto).

The case of *Club Eden Roc, Inc. v. Tripmasters, Inc.*, further dictates that no binding contract existed *sub judice.* 471 So. 2d 1322, 1323-24 (Fla. 3d DCA), *reh'g denied*, (July 24, 1985). There, plaintiff and defendant entered into negotiations, under which defendant sought to lease plaintiff's hotel for a certain period. *Id.* at 1323. Following these negotiations, plaintiff sent defendant a letter memorandum that quoted room rates "subject to entering into a more formal Agreement *containing mutually satisfactory terms and conditions.*" *Id.* (Emphases added). Subsequently, plaintiff refused to lease the hotel to defendant and suit commenced.

The Florida appellate court reversed the trial court's finding of a binding contract, holding that the "memorandum was clear that no rights or obligations would arise between the parties until the execution of an agreement containing all the terms and conditions." *Id.* at 1323-24. The court reasoned that when parties intend that no binding obligation will arise until a formal writing is executed, no contract exists until that point. *Id.* at 1324; *see also Midtown*

11

*Realty, Inc. v. Hussain*, 712 So. 2d 1249, 1250-52 (Fla. 3d DCA 1998) (affirming trial court's dismissal of plaintiff's breach of contract count, and finding that the Letter of Intent constituted a non-binding "agreement to agree", as a matter of law, where: (a) the "skeletal" Letter required the execution of a "more detailed and formal Purchase Agreement;" (b) both parties believed that no binding contract existed until a formal Agreement was executed; (c) the subsequently-proposed Agreement contained significant terms and conditions not addressed in the Letter, such as (i) evidence of title; (ii) allocation of expenses; (iii) environmental requirements; and (iv) risk of loss; (d) numerous changes were made to the proposed Agreement by the sellers; (e) the purchasers notified the sellers that some of the changes were not acceptable; and (f) the proposed sale was very complex).[17]

---

[17] Factually analogous cases from other jurisdictions substantiate IP's contention that the Letter Offer is not an enforceable agreement. For example, in *Rogers v. Mattucci*, a New York appellate court affirmed the trial court's ruling that the bilaterally-executed letter agreement was an unenforceable "agreement to agree." 230 A.D.2d 725, 726 (N.Y. App. Div. 1996). There, the court reasoned that neither party intended to be bound by the letter (but rather by a contemplated, but not executed, future contract) because (a) the money deposit accompanying the letter was "being paid on good faith *subject to* a written contract between the parties;" and (b) the parties' continued to engage in extensive negotiations on critical terms following the letter's execution. *See id.; see also, e.g. Dumas v. First Fed. Savings & Loan Ass'n*, 654 F.2d 359, 360, 61 (5th Cir. 1981) (viewing the letter agreement between the parties as an agreement to seek to agree in the future and not as a final, binding contract because: (a) the letter agreement provided it *was subject to a mutually acceptable* Purchase and Sale Agreement; and (b) the proposed Purchase and Sale Agreement contained substantial terms and conditions not contained in the scant letter agreement, such as (i) indemnification agreements; (ii) loan repayment terms; (iii) type of warranty deed; (iv) payment of expenses, such as taxes; and (iv) risk of loss--the court declared that "mutually acceptable" connotes that the terms of the agreement are still open to negotiation and not intended to be final; the court realized that "[a]ny other meaning would obfuscate the plain meaning of the language"); *Equimart Ltd., Inc. v. Epperly*, 545 N.E.2d 595, 596, 97, 98 (Ind. Ct. App. 1989) (affirming the trial court's finding that the letter of intent was not a binding contract, but rather an unenforceable agreement to agree, where it contained the following: (a) that the parties would "attempt, in good faith, to negotiate a **definitive purchase agreement** to be entered into providing for the sale . . ."; (b) various provisions that were to be included in a final agreement, such as an employment agreement and a non-competition agreement; and (c) "In addition to the foregoing, consummation of the transaction here contemplated will be subject to the execution and delivery of a Final Agreement in a form reasonably satisfactory to the parties and their respective counsel. . . "); *Fowler v. Weiss*, 546 A.2d 321, 322, 23, 24 (Conn. Ct. App. 1988) (reversing judgment and finding that the disputed "binder of sale" (by its own terms) was not an enforceable contract where, *inter alia*, the binder was prepared by a real estate broker and not an attorney, and the parties expected an attorney to prepare the contract of sale); and *Ripps v. Mueller*, 517 P.2d 512, 512-13 (Ariz. Ct. App. 1973) (refusing to enforce a mutually executed **one-page** real estate agreement, and holding that it was an "agreement to make an agreement" where: (a) it was subject to the execution of a *formal* sales contract within 10 days; and (b) the deposit was fully refundable if no formal sales contract was reached--the court reasoned that if the initial real estate agreement was intended to be the final expression between the parties, there would have been no reason to include a provision for a full refund of the purchasers' deposit).

12

### B.     Turnberry and IP Never Intended to Become Duty-Bound To The Terms of the Letter Offer Drafted by Mr. Lainey

After examining the clear and unequivocal language of Turnberry's skeletal Letter Offer of June 19, 1999, and in light of the authorities presented herein, it is clear that the Letter Offer represents nothing more than an agreement to possibly agree in the future to a definitive sales agreement. Additionally, a comparison between the express language of the Letter Offer and that of the Proposed Contract, and subsequent actions taken by the parties, further indicate that neither Turnberry nor IP considered the Letter Offer a final and binding agreement.

### 1.     The Express and Unambiguous Language of the Letter Offer Demonstrates Nothing More Than An Agreement to Possibly Agree in the Future

Prior to June 19, 1999, Mr. Lainey and Mr. Dahlberg undertook preliminary negotiations for the potential sale of the Plane to Turnberry. Both parties then executed the Letter Offer confirming those preliminary negotiations. *See* Ex. D. It is patently apparent from the Letter Offer's plain language, that it was intended to be nothing more than a memorialization of preliminary discussions between the parties; merely a baseline for continuing negotiations that could possibly lead to a subsequent, complete and formal contract, i.e., a definitive sales agreement.[18]

The Letter Offer provides that the offer contained therein was "**subject to** the good faith efforts of both parties to negotiate **mutually agreeable terms and conditions** of the sale **and** the timely execution and delivery of a **definitive**[19] **sales agreement** in form and substance **mutually acceptable**[20] to the parties." (Emphases added). *See* Ex. D, at 1st ¶.

Pursuant to the authorities provided herein, the plain language of Turnberry's Letter Offer conclusively establishes that: (a) negotiations were still ongoing; (b) neither party intended

---

[18] When, like here, a writing's language is clear and unambiguous, a court must construe the writing as written. *See Hall v. Burger King Corp.*, 912 F. Supp. 1509 (S.D. Fla. 1995); *see also Florida Mun. Power Agency v. Florida Power & Light Co.*, 81 F. Supp.2d 1313 (M.D. Fla. 1999).

[19] Use of the term "definitive sales agreement" (three times in the Letter Offer) evinces that a final, mutually satisfactory agreement had not been, and needed to be, reached. To that end, Webster's New Collegiate Dictionary defines the word "definitive" as (1) "serving to find a **final** solution"; (2) "serving to define or specify precisely"; (3) "fully differentiated or developed." Thus, by utilizing the word "definitive" throughout the Letter Offer, both parties could have only intended that it was not to be deemed the final expression of the understanding between them. Florida law permits a court to refer to a dictionary for the "plain and ordinary" meaning of words used in a written document. *See Beans v. Chohonis*, 740 So. 2d 65, 67 (Fla. 3d DCA 1999).

[20] The term "mutually acceptable" connotes further negotiation and an intent *not* to be bound. *See Dumas v. First Fed. Savings & Loan Ass'n, supra*, p.12, n.17.

the Letter Offer to be a final expression; (c) there was not yet a meeting of the minds between the parties; (d) any agreement reached thus far was incomplete[21]; and (e) any obligation would be established by a document to be negotiated and created in the future. *See Goff v. Indian Lakes Estates, Inc., supra*, pp. 10-11; *see also Mid-State Fed. Savings Bank v. Marketing & Management Assocs., Inc., supra*, pp. 10; *Club Eden Roc, Inc. v. Tripmasters, Inc., supra*, pp. 11-12; *Suggs v. DeFranco's, Inc., supra*, p. 11; *Midtown Realty, Inc. v. Hussain, supra*, pp. 11-12; *Equimart Ltd., Inc. v. Epperly, supra*, p. 12, n. 17; and *Dumas v. First Fed. Savings & Loan Ass'n, supra*, p. 12, n. 17.

Additionally, Turnberry's "good faith deposit" was "**fully refundable** until such time as a **definitive sales agreement** shall be executed" and then was still fully refundable "subject to the terms and conditions of **that agreement**." *See* Ex. D at 3d ¶. By declaring its deposit fully refundable unless and until a future agreement was reached, Turnberry obviously expressed that it did not intend to be bound by the Letter Offer. *See Rogers v. Mattucci, supra*, p. 12, n. 17; *see also Ripps v. Mueller, supra*, p. 12, n. 17. Furthermore, by keeping the deposit fully refundable subject to "that agreement," Turnberry concedes that a future binding contract was contemplated and necessary. Indeed, until "that agreement" was reached and executed, both IP and Turnberry could walk away at any time with impunity. *See Ripps, supra*, p. 12, n. 17.

Moreover, the Letter Offer was written to automatically expire and became null and void if the parties did not agree to and execute a **definitive sales agreement** prior to 5:00 p.m., June 28, 1999. *See* Ex. D at 5th ¶. Accordingly, the Letter Offer unambiguously provided an "out" for either party, and bound the parties to nothing. Simply stated, even though both Turnberry and IP executed the Letter Offer, neither party was actually obligated to do anything if a definitive sales agreement was not reached and executed by a date certain. The fact that a later agreement still had to be negotiated and mutually accepted belies any argument by Turnberry that the Letter Offer was final, binding and enforceable.

IP's position that the Letter Offer merely served as a memorialization is likewise furthered by Turnberry's language "[t]o confirm our sincere interest in purchasing your aircraft, we have place a good faith deposit . . . ." A sincere interest is certainly something different than

---

[21] By Turnberry's own admission, the "deal" reflected in the Letter Offer was *not* complete. *See* Lainey Dep., 62:15-17.

14

a binding agreement to sell and purchase. By its own contents, the letter expresses a desire to reach a final agreement in the near future.

Finally, the Letter Offer was drafted by Mr. Lainey without the assistance or review of counsel--as Mr. Lainey himself testified during deposition, he was relying upon "the attorneys" to prepare "a more definitive agreement." *See* Lainey Dep., 63:21-23. *See Fowler v. Weiss, supra*, p. 12, n. 17 (finding no enforceable contract where, *inter alia*, the parties intended a final agreement to be prepared by their respective counsel).

Undoubtedly, the plain and unequivocal language used in the Turnberry-drafted Letter Offer establishes, as a matter of law, that no binding contract ever arose therefrom.

### 2.    A Simple Comparison Between the Letter Offer and the Proposed Contract Demonstrates that the Letter Offer Was Not Intended as a Final Expression of the Parties' Agreement

As confirmed by *Goff v. Indian Lakes Estates, Inc., supra* at p. __, this Court may compare the contents of the Letter Offer to those of the Proposed Contract, in order to determine whether the parties agreed *vel non* to be bound by the terms of the Letter Offer.

The Proposed Contract addresses many essential terms/conditions not referenced in the Letter Offer, including: (a) the Plane's engine service plan and the transfer thereof to Turnberry; (Ex. F, ¶ 2A); (b) the Plane's CAMP agreement, and the transfer thereof to Turnberry; (*Id.* at ¶ 2B); (c) any existing manufacturer's and/or vendor's warranties applicable to the Plane (*Id.* at ¶ 2C); (d) that IP has complied with "all applicable FAA airworthiness directives and manufacturer's mandatory service bulletins and modifications" (*Id.* at ¶ 3A); (e) what would occur in the event that discrepancies were discovered during the Plane's pre-purchase inspections (*Id.* at ¶ 3C); (f) what would occur in the event the Plane was damaged prior to closing (*Id.* at ¶ 4); (g) the Transfer of Title and requisite Title Instruments (*Id.* at ¶ 6A-C); (h) that the Plane was to be purchased "as-is, where-is" (*Id.* at ¶7); (i) how taxes and other assessments were to be handled (*Id.* at ¶ 8); (j) whether any broker's fees were to be paid (*Id.* at ¶10); (k) what would occur in the event of failure or delay in delivery (*Id.* at ¶ 11); and (l) where disputes, if any, would be addressed and resolved (*Id.* at ¶ 13).

*Nowhere* in the Proposed Contract does it reference, or even allude, that a binding agreement was already reached in the Letter Offer. By containing no indication in the Proposed Contract that the parties were already bound by the Letter Offer, and by addressing more than ten

15

new terms and conditions in the Proposed Contract, it is apparent that the Letter Offer was not final and that both parties considered the Letter Offer an informal and incomplete memorialization of negotiations. *See Goff, supra*, pp. 10-11; *see also Midtown Realty, Inc. v. Hussain, supra*, pp. 11-12; *Dumas v. First Fed. Savings & Loan Ass'n, supra*, p. 12, n. 17.

## POINT III

### BECAUSE NO BINDING CONTRACT EXISTED, TURNBERRY IS PRECLUDED FROM MAINTAINING A COUNT FOR BREACH OF WARRANTY OF GOOD FAITH

In Count II of its complaint, Turnberry alleges that IP breached an implied warranty of good faith, fair dealing and commercial reasonableness. *See* Complaint ¶¶ 27-31. IP does not dispute that Florida law recognizes an implied warranty of good faith and fair dealing when a binding contract exists.[22] *See Khosrow Maleki, P.A. v. M.A. Hajianpour, M.D., P.A.*, No. 4D98-3178, 2000 WL 275847 (Fla. 4th DCA Mar. 15, 2000). The law is well settled in Florida that an implied warranty of good faith: (a) *only* attaches or arises when a **contract exists** and; (b) must relate to the performance of an express term **of the contract**.[23] *See* 2000 WL 275847 at *3; *see also Burger King Corp. v. Weaver*, 169 F.3d 1310, 1315-16 (11th Cir.), *cert. dismissed*, 120 S. Ct. 370 (1999); *Nautica Int'l, Inc. v. Intermarine USA, L.P.*, 5 F. Supp.2d 1333, 1340 (S.D. Fla. 1998) (holding that a claim for breach of an implied covenant of good faith could remain where a contract existed and a breach of an express term thereof was alleged); *First Nationwide Bank v. Florida Software Servs., Inc.*, 770 F. Supp 1537, 1542 (M.D. Fla. 1991) (noting that good faith is an implicit term in every *contract*).

Absent a valid and enforceable contract provision to attach to, no duty of good faith arises and no independent claim can be so asserted. *See Khosrow*, 2000 WL 275847 at *3; *see also Bernstein v. True*, 636 So. 2d 1364, 1366 (Fla. 4th DCA 1994) (refusing to permit a cause of

[22] This duty of good faith, when it actually arises, assures that neither party acts in a manner that destroys any rights or interests of the other party to the contract. *See Allapattah Servs., Inc. v. Exxon Corp.*, 188 F.R.D. 667 (S.D. Fla. 1999).

[23] These two prerequisites remain the same regardless of whether one analyzes good faith under general contract law, or under the UCC sections pertaining to good faith--Florida Statute sections 671.201(19) and/or 672.103(1)(b). *See Allapattah Servs., Inc. v. Exxon Corp.*, 61 F. Supp.2d 1308, 1318-19 (S.D. Fla. 1999) (recognizing that the UCC's requirements of good faith and fair dealing relate to the **performance and enforcement** *of a contract*); *see also Johnson Enters. of Jacksonville, Inc. v. FPL Group, Inc.*, 162 F.3d 1290, 1314 (11th Cir. 1998) (holding that the UCC's good faith provisions require a *contract* for the sale of goods).

16

action for breach of implied duty of good faith where the underlying contract had expired, and was therefore unenforceable).

That being the case, Turnberry cannot, as a matter of law, maintain a claim for a breach of this implied duty because no binding contract ever existed between the parties. Indeed, the Letter Offer's language clearly shows that the intent of the parties in executing the Letter Offer was only to memorialize their agreement to possibly agree in the future. *See* Point IB, *supra*. Accordingly, IP is entitled to a judgment, as a matter of law, in its favor, and against Turnberry, on count II of Turnberry's complaint.

### POINT IV

### ABSENT A BINDING AGREEMENT, FLORIDA DOES NOT RECOGNIZE A DUTY TO NEGOTIATE IN GOOD FAITH

In count III of its complaint, Turnberry asserts that IP breached a purported implicit duty to negotiate in good faith.[24] However, absent a binding contract, wherein the parties expressly undertake an obligation to negotiate in good faith, there otherwise exists no implied or general obligation to do such, outside of the insurance arena. In that regard, no Florida statute or case exists that creates, adopts, illustrates, promulgates or otherwise mentions an implied duty of good faith negotiation in the absence of a binding agreement expressly providing for the same.

Because the parties at bar never executed a binding contract of any sort, neither party undertook an obligation to do anything, let alone negotiate in good faith. Additionally, because Florida does not recognize an implied duty to negotiate in good faith, IP is entitled to a judgment, as a matter of law, in its favor, and against Turnberry, as to count III of Turnberry's complaint.

### POINT V

### TURNBERRY IS NOT ENTITLED TO RECOUP ANY SUMS FOR IMPROVEMENTS, MODIFICATIONS OR ADDITIONS TO THE PLANE

Even assuming, *arguendo*, that Turnberry can move forward on any of its claims against IP, Turnberry is not entitled to recover its entire (yet unknown) claimed loss. As part of its purported damages, Turnberry is apparently seeking recoupment of the $700,000 difference

---

[24] It should be noted that Turnberry's count for breach of duty to negotiate in good faith is nothing more than a reiteration of it counts for breach of contract and breach of duty of good faith and fair dealing. Turnberry makes the bald assertion that by allegedly entering into the alleged contract, IP implicitly undertook a duty to negotiate in good faith, however, Turnberry fails to disclose from where this duty supposedly arises.

between the price it offered to pay IP for the Plane ($7 million), and the price that it paid to Aero Toy ($7.7 million). However, as discussed above, a substantial portion of the $700,000 is attributable to the increased value of the Plane resulting from the litany of improvements made to the Plane. *See* Exs. J-M. In short, Turnberry bought the same, but "improved" Plane from Aero Toy, and therefore had to pay for the value of those improvements. Accordingly, under both the UCC and Florida's general damages law, Turnberry cannot recover the full amount for the difference in the purchase price.

Under the UCC, Turnberry's damage claim most likely resembles one for cover damages pursuant to Florida Statutes sections 672.711 and 672.712. Though, as section 672.712(1) makes clear, cover can only effectuated with or by a "reasonable purchase." Little argument can be made that the purchase of the *same* Plane in its *same* or similar condition (or the same model plane in similar condition) would not be considered a reasonable purchase.

However, the same cannot be said of Turnberry's purchase of the *same* Plane in an *improved and refurbished* condition. As evidenced by the Contract between Aero Toy and Turnberry, the $700,000 "cover" price takes into account and includes costs associated with improving and refurbishing the Plane prior to Turnberry taking possession thereof. *See* Ex. L.

Florida law is also settled that Turnberry cannot be put into a better position than it would have been in had it purchased the Plane from IP. *See Koplowitz v. Girard*, 658 So. 2d 1183, 1184 (Fla. 4th DCA 1995); *see also Allapattah Servs., Inc. v. Exxon Corp.*, 61 F. Supp.2d 1326, 1328 (S.D. Fla. 1999) (recognizing that damages in a breach of contract action are intended to place the non-breaching party in the position it would have been in had no breach occurred).

Here, had Turnberry actually purchased the Plane from IP, it would have received an *unimproved, non-refurbished* plane for $7 million. *See* Exs. D & F. The fact that it bought the Plane from Aero Toy for $700,000 above IP's selling price does not mean Turnberry actually suffered $700,000 in damages, when considering that a portion of the overage went to improvements and additions to the Plane, ordered and approved by Turnberry.

Accordingly, as a matter of law, IP is entitled to a set-off from any potential damages recovered by Turnberry for the value of the improvements made to the Plane.

18

## POINT VI

## TURNBERRY IS NOT ENTITLED TO RECOVER ANY DAMAGES FOR SPARE AIRCRAFT PARTS NOT REFERENCED IN THE LETTER OFFER

Turnberry is also seeking approximately $200,000 in damages for spare aircraft parts it believes it would have received had Turnberry purchased the Plane from IP, rather than from Aero Toy.

Assuming for purposes of this discussion only that the Letter Offer constituted a binding agreement for the sale of the Plane, Turnberry would still have had no right or claim to any spare aircraft parts. Specifically, the Letter Offer is completely devoid of any reference to spare parts. Instead, the Letter Offer plainly provides that Turnberry offered $7 million for a "1981 Canadair Challenger CL600 S/N 1023 N90UC," without any reference to spare parts. *See* Ex. D. Had Turnberry intended its offer to embrace the spare parts, Mr. Lainey could have, and should have, made reference to them, considering that he drafted the Letter Offer. *See* Ex. C.

Accordingly, should this Court deem the Letter Offer a binding contract, Turnberry is not entitled to recover any money for the value of the spare parts, as they were not included in the Letter Offer, and as a matter of law, Turnberry should be precluded from seeking any such damages.

### *CONCLUSION*

In attempting to seek redress against IP, Turnberry disregards the express and unambiguous language of the Letter Offer in the hopes of establishing that a contract existed between the parties. A simple review of the Letter Offer points to the inescapable conclusion that the parties: (a) merely executed a non-binding agreement to agree, casting upon neither party any legal obligations; and (b) contemplated the negotiation, creation and hopeful execution of a future binding definitive sales agreement. These conclusions are further crystallized when one takes into consideration the significant differences between the Letter Offer and the Proposed Contract, and the actions taken by the parties following execution of the Letter Offer.

It is undisputed that the parties never signed a definitive sales agreement; therefore, no binding contract existed. Consequently, Turnberry cannot maintain claims for breach of contract (count I), and breach of the implied duty of good faith and fair dealing (count II). Similarly, there can be no breach of any purported duty to negotiate in good faith (count III). Accordingly,

19

this Court should enter summary final judgment against Turnberry, and in favor of IP, on all three counts raised by Turnberry.

Conversely, if the Court denies summary judgment on any of the counts in Turnberry's complaint, then Turnberry's recovery, if any: (a) should be limited to the additional $700,000 paid to Aero Toy for the Plane *less* the value of the additions and renovations made to the Plane; and (b) should not include damages for spare aircraft parts as they are not contained in the Letter Offer.

WHEREFORE Defendant International Paper Company requests that this Court enter an Order:

(a) granting summary final judgment in favor of IP and against Turnberry on counts I, II, and III of Turnberry's complaint; or alternatively,

(b) granting partial summary judgment in favor of IP and against Turnberry limiting Turnberry's claims for damages, and precluding Turnberry from recovering monies for: (i) the value of improvements and modifications to the Plane; or (ii) the spare aircraft parts not included in the Letter Offer.

Respectfully submitted,

HOLLAND & KNIGHT LLP
Attorneys for International Paper
One East Broward Boulevard, 13th Floor
P.O. Box 14070
Fort Lauderdale, FL 33302-4070
Tel: (954) 525-1000
Fax:(954) 463-2030
Email: rhutch@hklaw.com; hkeith@hklaw.com

By:_____
Richard C. Hutchison
Florida Bar No. 709360
Heather C. Keith
Florida Bar No. 905690

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that on this 21st day of December, 2000, a true and correct copy of the foregoing has been furnished via U.S. Mail to: David H. Reimer, Attorney for Plaintiff, Reimer & Rosenthal, LLP, 3801 Hollywood Blvd., Suite #350, Hollywood, Florida 33021.

HOLLAND & KNIGHT LLP

By: _____

Heather C. Keith
Florida Bar No. 905690

FTL1 #517045 v3



Cassidy 19
11.3.00

# EMERALD
## Aviation, Incorporated
### Aircraft Acquisitions, Sales and Consulting



### 1994 Challenger 601-3R
#### S/N 5149, N63ST

- Only 850 Hours! Lowest Time 3R Available
- Fresh 60 Month and Gear Inspection Completed
- Exclusive Service Center Maintenance
- 12 Channel GPS, FDR, GPWS, TCAS II
- Gorgeous Paint and Interior, Like New!
- KC Completion, Fireblocked Interior
- Must See to Appreciate

### 1981 Challenger 600
#### S/N 1023, N90UC

- 6770 Hours
- Engines on CMSP, CAMP Maintenance
- Fresh Pre-buy and Gear Service Bulletin by Midcoast Aviation
- Excellent Service Bulletin and Inspection Status
- UNS-1K FMS with GPS, TCAS II, Global AFIS
- Fortune 500 Ownership History
- Must Sell! Flight Department Closing

**$7,495,000**





### 1977 Sabreliner 60 EXLM
#### S/N 128, N117JL

- 7898 Hours
- 1854 / 1831 SMOH
- 50 / 50 SHOTS
- Freon Air
- Airshow 400
- Current on 135 Certificate
- On CAMP
- Excellent Paint and Interior

FOR FURTHER INFORMATION CONTACT: ED DAHLBERG
**703-361-3330 • Fax: 703-361-2170 • E-Mail: Planebiz@aol.com**
Manassas Regional Airport • 9___ ___ Suite 212 • Manassas, VA 20110



**Business Air Today**

**Page 83**

## EMPLOYMENT AGREEMENT

THIS AGREEMENT is made this 25th day of August, 1998, by and between TURNBERRY CHARTERS, INC., a Florida corporation whose principal office is located at 19501 Biscayne Blvd., Suite #400, Aventura, FL 33180, (and/or any other Turnberry corporation or identity affiliated with the Turnberry corporations or their principals), hereinafter referred to as the "EMPLOYER", and DENNIS R. LAINEY, an individual whose address is 5800 Overseas Hwy., #35-152, Marathon, FL 33050, hereinafter referred to as the "EMPLOYEE".

INASMUCH AS the EMPLOYER is presently the owner of two aircraft, one Gulfstream GIIB aircraft serial number 073, and Cessna Citation SII aircraft serial number S550-0154, and desires to sell these two aircraft and purchase other aircraft to replace these, and desires to employ the EMPLOYEE to perform these specific services of selling and purchasing these aircraft, as well as any other aircraft the EMPLOYER may designate in the future, on behalf of the EMPLOYER; and inasmuch as the EMPLOYEE desires to perform these specific services for the EMPLOYER,

It is therefore agreed by both parties as follows:

1.  The EMPLOYEE will act on behalf of and at the sole direction of the EMPLOYER, as EMPLOYER's Director of Sales, and will present all terms and conditions of the potential sale or purchase of an aircraft to the EMPLOYER for consideration. The EMPLOYEE will work under the EMPLOYER's sole direction to handle the details and facilitate the closing of the sale or purchase of the aircraft, and the EMPLOYER shall bear sole responsibility for the acceptance of the terms and conditions of the sale or purchase and the completion of the transaction.

2.  The EMPLOYER will bear sole responsibility for and will pay all the costs and expenses of the marketing and sale of aircraft, and for the market search and purchase of aircraft, including payment of the purchase price plus all applicable taxes and fees. It will be the EMPLOYER's own responsibility to determine if any taxes or fees are applicable to its sale or purchase of an aircraft, including sales and use taxes, and the EMPLOYER will bear sole responsibility for any such liabilities.

3.  The EMPLOYER will pay the EMPLOYEE a commission equal to two percent (2%) of the first $7,500,000.00 of the total sale price or purchase price of each applicable transaction, including full trade value in the event of a trade transaction. The sum owed for each transaction will be due and payable in full on closing date of that transaction.

This Employment Agreement shall be in effect from this date until the completion of the sale of the two aircraft and the purchase of the replacement aircraft, as well as any other aircraft the EMPLOYER may designate in the future, or until terminated by either party by written notice to the other party.

Both parties acknowledge that this Employment Agreement has been fully read and understood, and that this is the full and complete agreement between the parties, and that it shall not be modified except in writing and signed by both parties.

TURNBERRY CHARTERS, INC.
(EMPLOYER)
by: Jeffrey M. Soffer

DENNIS R. LAINEY
(EMPLOYEE)

EXHIBIT
4
B

EXHIBIT
20
11-15-00



# *Turnberry Charters Inc.*

**Aviation Department**

SENT VIA FAX TO (703) 361-3170
EMERALD AVIATION, Agent

June 19, 1999

INTERNATIONAL PAPER COMPANY
DBA UNION CAMP CORP.
184 Airport Rd., Hgr. D
White Plains, NY 10604

Re:    1981 Canadair Challengger CL600  S/N 1023  N90UC

This will confirm our teleephone conversation with your agent, Mr. Ed l Dahlberg, on June 18, 1999. TURNBERRY CHARTERS, INC. hereby offers $7,000,000.00 U.:S. for the above referenced aircraft, subject to t the good faith efforts of both parties to negotiate mutually agreeable terms and conditioms of the sale, and the timely execution and deelivery of a definitive sales agreement in fform and substance mutually acceptable to thee parties.

It is our understanding t that timeliness is a determining factor in the seale of the aircraft, and it is our intention and desiiire to close within ten (10) business days. Wee have just sold our Gulfstream GIIB, and are in immmediate need of a replacememt aircrafL. We l have pre-arranged funding in place with GECC, asnd their Manager of Aircraft Leasing and Finaancing, Mr. Michael C. Flint, can be contacted at (7770) 999-4921 to confirm our ability to close wupon our demand.

To confirm our sincere iinterest in purchasing your aircraft, we have pplaced a good faith deposit of $100,000.00 in escrrow with AIC Title Service, and you have receeived or will soon receive faxed confirmation of tthis from the Escrow Agent. This deposit shaall, of course, be fully refundable until such timee as a definitive sales agreement shall be exeecuted, and then shall become subject to the tenrms and conditions of that agreement.

It is our understanding t that the records of the recent prepurchase insspection on the aircraft, and the recent landingg gear overhaul and the 120-month and 36 moonth inspections will be made available to us foor review at Midcoast Aviation in St. Louis, MCO, and it is our intention to send our agent, Mrlr. Ken Murray, to Midcoast to review these reecords immediately upon acceptance of this offer.    It will also be our intention to visually inspecct the aircraft and to conduct systems checks at (our expense at Midcoast Aviation, as well as i a flight check (not to exceed two (2) hours flight t time) to confirm that all systems are operatingg normally.



**EXHIBIT**
*C*

**TB 00228**

INTERNATIONAL PAPER COMPANY          2              June 19, 1999

This offer shall be deemed withdrawn and invalid as of 5:00 pm EDT, Monday, June 21, 1999, unless accepted by execution below and returned prior to that time. This offer, if accepted and executed, shall become null and void as of 5:00 pm EDT, Monday, June 28, 1999, if the parties have not agreed to and executed a definitive sales agreement prior to that time.

This offer is intended for the owner and the owner's agent only, and the terms hereof are not to be divulged to any third party.

For TURNBERRY CHARTERS, INC.          For INTERNATIONAL PAPER COMPANY

_____          _____
Dennis R. Lainey, Director

16061 N.W. 42nd Avenue, Suite 117, Miami, FL 33054  (305) 685-0881 Fax: (305) 289-8397

**TB 00229**



# Turnberry Charters Inc.

### Aviation Department

SENT VIA FAX TO (703) 351-3170
EMERALD AVIATION, Agent

June 18, 1999

INTERNATIONAL PAPER COMPANY
DBA UNION CAMP CORP.
184 Airport Rd., Hgr. 0
White Plains, NY 10504

Re:  1981 Canadair Challenger CL600  S/N 1#023  N90UC

This will confirm our telephone conversation with your agent, Mr. Ed Dahlberg, on June 18, 1999  TURNBERRY CHARTERS, INC  hereby offers $7,000,000.00 U.S. for the above referenced aircraft, subject to the good faith efforts of both parties to negotiate mutually agreeable terms and conditions of the sale, and to the timely execution and delivery of a definitive sales agreement in form and substance mutually acceptable to the parties

It is our understanding that timeliness is a determining factor in the sale of the aircraft, and it is our intention and desire to close within ten (10) business days. We have just sold our Gulfstream GIIB, and are in immediate need of a replacement aircraft. We have pre-arranged funding in place with GECC, and their Manager of Aircraft Leasing and Financing, Mr. Michael C. Flint, can be contacted at (770) 999-4921 to confirm our ability to close upon our demand.

To confirm our sincere interest in purchasing your aircraft, we have placed a good faith deposit of $100,000.00 in escrow with AIC Titles Service, and you have received or will soon receive faxed confirmation of this from the Escrow Agent. This deposit shall, of course, be fully refundable until such time as a definitive sales agreement shall be executed, and then shall become subject to the terms and conditions of that agreement.

It is our understanding that the records of the recent prepurchase inspection on the aircraft, and the recent landing gear overhaul and the 120-month and 36-month inspections will be made available to us for review at Midcoast Aviation in St. Louis, MO, and it is our intention to send our agent, Mr. Ken Murray, to Midcoast to review these records immediately upon acceptance of this offer. It will also be our intention to visually inspect the aircraft and to conduct systems checks at our expense at Midcoast Aviation, as well as a flight check (not to exceed two (2) hours flight time) to confirm that all systems are operating normally.

13001 N.W. 42nd Avenue, Suite 117, Miami, FL, 13054 (305) 685-8981 Fax: (305) 253-5197



EXHIBIT
D

TB 00230

08/21/99  13:21  FAX 7033613170                EMERALD AVIATION                    ☑02
Jun-21-99 13:42                                                                        P.01

INTERNATIONAL PAPER COMPANY          zz              June 19, 1999

This offer shall be deemed withdrawn and invalid as of 3:00 pm EDT. Monday, June 21,
1999, unless accepted by execution below and I returned prior to that time. This offer, if
accepted and executed, shall become null and I void as of 5:00 pm EDT. Monday, June 28,
1999, if the parties have not agreed to and executed a definitive sales agreement prior to that
time.

This offer is intended for the owner and I the owner's agent only, and the terms hereof
are not to be divulged to any third party

For TURNBERRY CHARTERS, INC.          I For INTERNATIONAL PAPER COMPANY

_____               _____ 6/21/99
Dennis R. Lainey, Director                        Sr. VP

19031 N.W. 42nd Avenue, Suite 117, Miami, FFL 33054  (340) 688-8881  Fax. (340) 300-8307



# *Turnberry Charters Inc.*

### Aviation Department

**VIA FACSIMILE TO (405) 681-5356**

June 21, 1999

Mr. Kirk L. Woford
President
INSURED AIRCRAFT TITLE SERVICE, INC.
P. O. Box 19527
Oklahoma City, OK 73144

**EXHIBIT**
**30**

Re:   Canadair Challenger CL600  S/N 1023  N90UC

Dear Kirk:

You should receive today a wire transfer of funds from Turnberry Charters, Inc. in the amount of $150,000.00. Would you please set up an escrow account for us and designate these funds as a good faith deposit for the above referenced aircraft. There is no formal sales agreement for this aircraft at this time and the $150,000.00 is to be held fully refundable to Turnberry Charters, Inc. and at my sole direction until you receive further written instructions from me. At such time as a binding sales agreement is entered into I will send you further instructions

Please call me at (305) 685-0881 if you have any questions at all.

Kindly acknowledge your receipt of these instructions by signing below and faxing back to me at (305) 289-9397.

Regards,

Dennis R. Lainey
Director of Sales

Acknowledged:

_____
Kirk L. Woford
INSURED AIRCRAFT TITLE SERVICE, INC.



**EXHIBIT**
**"E"**

TB 00234

**15001 N.W. 42nd Avenue, Suite 117, Miami, FL 33054  Phone: (305) 685-0881  Fax: (305) 289-9397**



# Aviation, Incorporated
### I Aircraft Acquisitions, Sales and Consulting

## *Fax Transmittal*

**Date**         June 21, 1999

**To**           Denniis Lainey
**Company**      Turnberry Charters, Inc.
**Fax**          305 2289 9397

**From**         Ed Daahlberg

**Subject**      Challenger 600, S/N 1023
                 Draft of Purchase agreement

Best regards.





Manassas Regional Airport • 9998 Wakeman Drive • Suite 212 • Manassas, Virginia 20110-2702
703-361-33130 • Fax: 703-361-3170 • Email: Planebiz@aol.com

TB 00237

## AIRCRAFT SALE AGREEMENT

AGREEMENT, made this _____ day of June 1999, by and between International Paper Company, with offices at 184 Airport Road, Box 9, White Plains, NY 10604 (hereinafter referred to as "Int'l Paper") and Turnberry Charters, Inc.,. with offices at 15001 N.W.. 42nd Avenue, Suite 117, Miami, FL 33054 (hereinafter referred to as "Turnberry").

### WITNESSETH.

WHEREAS, Int'l Paper is the owner of a Challenger 600, Serial Number 1023, Registration Number N90UC, including the engines, avionics equipment, instrumentation and all items of equipment, parts, components and accessories presently installed thereon (hereinafter collectively referred to as the "Aircraft"); and

WHEREAS, the parties are mutually desirous of reducing their understandings and agreements to writing.

NOW, THEREFORE, in consideration of the mutual covenants herein contained, and other good and valuable consideration, the parties hereto agree as follows:

### 1. PERFORMANCE AND PURCHASE PRICE.

Int'l Paper agrees to sell and Turnberry agrees to purchase the Aircraft in its present condition provided the following conditions have been made and representations of Int'l Paper are made, and Turnberry agrees to pay to Int'l Paper therefore the sum of Seven Million ($7,000,000) Dollars, payable in the following manner:

> A. A deposit in the amount of One Hundred Thousand Dollars ($100,000) heretofore placed in escrow by Turnberry with AIC Title Service, Oklahoma City, Oklahoma (hereinafter referred to as the "Escrow Agent"), which deposit is refundable until the Aircraft is accepted or rejected upon completion of the pre-purchase inspection to be completed on or about Thursday, June 24, 1999. If the Aircraft is accepted by Turnberry, the deposit will become refundable only in the event that Int'l Paper fails to deliver the Aircraft with a clear title or as provided in Paragraph 4 and Paragraph 9 hereof. Turnberry shall acknowledge acceptance of the pre-purchase inspection in the form attached hereto as Exhibit "A" and by this reference made a part hereof.

Page Two

B.    Balance of purchase price plus half of the escrow fees upon delivery of the Aircraft and transfer of title instruments to Tumberry as hereinafter set forth.  Payment shall be made by bank wire transfer.

## 2.    REPRESENTATIONS.

Int'l Paper agrees that at the time of delivery of the Aircraft to Tumberry:

A.    The engine service plan (CMSP) for the Lycoming ALF502-L engines shall be transferred by Int'l Paper to Tumberry pursuant to Exhibit "B" attached hereto and made a part hereof.  The cost of transferring the CMSP agreement shall be for the account of Turnberry.

B.    Any time remaining on the CAMP agreement shall be transferred to Tumberry.  The cost of transferring the CAMP agreement shall be for the account of Tumberry   Additionally all CAMP. Canadair, Lycoming and vendor information or similar received by Int'l Paper shall be immediately forwarded to Tumberry.

C    Int'l Paper will assign, to the extent that Int'l Paper has the right to do so, all of its right, title and interest in any applicable manufacturer's warranties and/or vendor warranties.

## 3.    CONDITIONS OF SALE.

Tumberry's obligation to purchase the Aircraft shall be subject to the following conditions:

A.    That the Aircraft will be delivered in its present condition with all systems operating.  Int'l Paper represents and warrants that all applicable FAA airworthiness directives and manufacturer's mandatory service bulletins and modifications have been complied with.

B.    Pre-purchase inspection and a flight test of up to two hours ("Inspection") to commence on or about Tuesday, June 23, 1999 at Midcoast Aviation Service Center, Cahokia, Illinois (hereinafter referred to as "Airport") to either accept or reject the Aircraft. All costs of the Inspection, flight test and movement of the Aircraft shall be for the account of Turnberry.

TB 00239

Page Three

      C   In the event Turnberry accepts the Aircraft, Int'l Paper shall have the option but not the obligation to pay for any discrepancies found affecting the airworthy condition or operational systems of the Aircraft.

### 4. DAMAGE.

Int'l Paper represents that to the best of its knowledge the Aircraft has no damage history. Int'l Paper shall promptly notify Turnberry of any damage, accident or material change occurring to the Aircraft, any part thereof, or engines installed thereon, prior to the date of closing. In the event of destruction or material damage to the Aircraft on or before the transfer of title, either party may elect to cancel this Agreement. If this Agreement is canceled pursuant to the foregoing provisions, the Escrow Agent shall immediately return the deposit of One Hundred Thousand Dollars ($100,000) to Turnberry, and the parties will in such event have no further obligations hereunder.

### 5. DELIVERY

Int'l Paper and Turnberry agree that the delivery of the Aircraft will take place at the Airport within Three (3) business days of the acceptance of the pre-purchase inspection. The cost of moving the Aircraft to a location other than the Airport for delivery to shall be for the account of Turnberry. Turnberry shall acknowledge receipt and delivery of the Aircraft by executing and delivering to Int'l Paper an Aircraft Sales Final Acceptance and delivery in the form attached hereto as Exhibit "C" and by this reference made a part hereof.

### 6 TRANSFER OF TITLE AND TITLE INSTRUMENTS

Transfer of title and delivery of the Aircraft shall be made at a location mutually agreeable to the parties.

At the time of closing, Int'l Paper shall deliver to Turnberry:

      A.  An executed FAA Bill of Sale in the form required to permit registration of the Aircraft in the United States.

      B.  Warranty Bill of Sale in the form annexed hereto and marked Exhibit "D".

Page Four

    C  All Aircraft and engine logs, manuals, parts, maintenance data and other documentation maintained for the operation of the Aircraft.

## 7.   AIRCRAFT WARRANTY AND DISCLAIMER.

Int'l Paper warrants that the Aircraft is owned by Int'l Paper and shall be delivered to Turnberry free and clear of any mortgages, liens or encumbrances of any nature whatsoever. Turnberry acknowledges that Int'l Paper is selling the Aircraft to Turnberry in an "as-is, where-is" condition. ALL OTHER WARRANTIES OF Int'l Paper WHETHER EXPRESS, IMPLIED OR STATUTORY, INCLUDING BUT NOT LIMITED TO WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, ARE HEREBY EXCLUDED AND WAIVED BY TURNBERRY, ITS SUCCESSORS, ASSIGNS AND TRANSFEREES  IN NO EVENT SHALL INT'L PAPER BE LIABLE FOR COLLATERAL, CONSEQUENTIAL OR INCIDENTAL DAMAGES

## 8.   TAXES

Int'l Paper shall bear all taxes, duties or other similar charges assessed by any national, state or local government or any other authority in connection with Int'l Paper's ownership or use of the Aircraft at any time on or prior to the closing date. Turnberry shall bear all subsequent taxes, duties or similar charges that thereafter may be assessed by any national, state or local government or any other authority in connection with Turnberry's purchase, use or ownership of the Aircraft.

## 10.   BROKERAGE REPRESENTATIONS.

Except for Int'l Paper's obligation to Emerald Aviation, Inc , Int'l Paper and Turnberry each represent and warrant to the other that they have taken no action which would give rise to a valid claim for a broker's fee in connection with this transaction and each party agrees to indemnify and forever hold the other harmless from and against any claims for brokers' compensations, fees, or commissions arising out of the indemnifying party's actions.

TB 00241

Page Five

## 11. EXCUSABLE DELAY'S

Int'l Paper shall not bee liable for any failure of or delay in delivenry of the Aircraft for the period that such failunre or delay is due to acts of God or the puibblic enemy; civil war, insurrection or riots; firess, explosions or serious accidents; governmmental priorities or allocations; strikes or labor disputes; inability to obtain Airrcraft materials, accessories. equipment or rparts from the vendors; or any other catuse beyond Int'l Paper's control; provided, however, that Tumberry may elect to terminate this Agreement if such failure or · delay continues for sixty (60) days or mosre. In the event that this agreement is cancellied pursuant to the foregoing provisions. tfhe Escrow Agent shall immediately return tfhe deposit in the amount of One Humdred Thousand ($100,000) Dollars to Turnbeerry and each of the parties shall be releassed and relieved of any obligations under this agreement.

### 12. NOTICES.

Any notice reauired oor permitted pursuant to this Agreement stehall be in writing and shall be delivered eithesr personally, by FAX machine, or by any oivernight delivery service such as Airborne, FFederal Express or DHL to the parties att their respective addresses as set forth belcow, and as the same may be changed byy serving proper notice to the other party. Tfhe date of receipt of said Notice shall be tfhe date on which the party to whom the Notiice is directed acknowledges receipt thereof or refuses to receive same or if the Noticee is transmitted by FAX machine when thie FAX is verified as having been received. fEach party shall have the responsibility too notify the other party of any change in addtress, and each party shall be permitted · to rely upon the validity and accuracy of aaddresses set forth in this agreement, uunless otherwise specifically notified of a chaange of address. _All the provisions of thiss paragraph shall apply to any Notice as referrred to in this agreement.

The initial notice addtresses of the parties are as follows:

A.        In the case oif Int'l Paper, to:

Mr. Bob Cassidy
Int'l Paper Company
184 Airport Road, Box 9
White Plains, NY 10604
FAX: 914 428 3478

TB-00242

Page Six

B.          In the case of Tumberry, to

Dennis Lainey
Turnberry Charters, Inc.
15001 N.W. 42nd Avenue, Suite 117
FAX: 305 289 9397

### 12.   ENTIRE AGREEMENT

The parties agree that the foregoing constitutes the entire undersstanding of the parties, and shall not be modified or amended unless hereinafter made in writing signed by the authorized representatives of the parties.

### 13.  RESOLUTION OF DISPUTES

In the event a dispute or claim arises out of this Agreement, thes parties hereto hereby consent to have the dispute resolved by the general district court of New York.

### 14.   APPROVAL.

Int'l Paper and Tumberry each warrant to the other that the execcution, delivery, and performance of this Agreement has been authorized and approved! by all required corporate action.

### 15. CONFIDENTIALITY.

Int'l Paper and Tumberry each agree that the specific destails regarding this transaction shall be kept confidential except as may be required by law.

### 16.   COUNTERPARTS.

This Agreement may be executed in two or more counterparts,. each of which shall be deemed an original and shall be effective when executed by bo;th parties.

This agreement shall be binding upon the heirs, executors, ssuccessors and assignees of the parties.

Page Seven

IN WITNESS WHEREOF, the parties hereto have duly signed this Agreement on the day and year first above written.

INTERNATIONAL PAPER COMPANY

By_____Title_____Date_____

TURNBERRRY CHARTERS, INC

By_____Title_____Date_____

TB 00244

## EXHIBIT "A"

### AIRCRAFT PRE-PURCHASE ACCEPTANCE

Aircraft Make and Model:

Challenger 600

Serial No.:

1023

Registration No :                                                        N90UC

This is to acknowledge acceptance of the pre-purchase inspection of the above-identified Aircraft in accordance with Aircraft Purchase Agreement dated June _____ 1999, by and between Int'l Paper Company and Turnberry Charters, Inc.
ACCEPTED BY:

TURNBERRY CHARTERS, INC.

BY:_____

DATE OF ACCEPTANCE:_____

TB 00245

EXHIBIT "B"

## ENGINE MAINTENANCE SERVICE PLAN ASSIGNMENT

In consideration of the mutual covenants herein contained, and other good and valuable consideration, Int'l Paper Company, ("Int'l Paper") does hereby assign to Turnberry Charters, Inc. ("Turnberry") all of the right, title and interest of Int'l Paper in a certain Engine Maintenance Service Plan ("CMSP Agreement") which Int'l Paper has executed with Allied Signal for Lycoming ALF502L-2 engines, Serial Number L-F03099S and L-F03052S installed on Challenger 600, Serial No 1023, Registration No. N90UC.

Int'l Paper represents and warrants to Turnberry that all payments required to be made under the CMSP Agreement are current and covenants and agrees that it will execute any additional instruments and/or documents required by Allied Signal to effectuate the transfer and assignment of the rights of Int'l Paper in the CMSP Agreement to Turnberry.

TB 00246

## EXHIBIT "C"

### AIRCRAFT SAILES FINAL ACCEPTANCE AND DELIVERY

| | |
|---|---|
| Aircraft Make and Model: | Challenger 600 |
| Serial No.: | 1023 |
| Registration No.: | N90UC |

Delivery of the above-identified Aircraft at Cahokia Airport, Cahokia, Illinois is acknowledged and said Aircraft is accepted in accordance with Aircraft Purchase Agreement dated June ___, 1999, by and between Int'l Paper Company and Turnberry Charters, Inc. acknowledge that all delivery conditions have been satisfied and that Int'l Paper Company has performed all its obligations under the Aircraft Purchase Agreement

ACCEPTED BY:

TURNBERRRY CHARTERS, INC.

BY:

DATE OF ACCEPTANCE.

EXHIBIT "D"

BILL OF SALE

KNOW ALL MEN BY TTHESE PRESENTS,

That Int'l Paper Compæny, a corporation organized and existing uınder the laws of New York with principal officces at 184 Airport Road Box 9 White Plaiins. NY 10604, Party of the First Part. for anıd in consideration of the sum of One Dollær ($1.00) lawful money of the United States. to it in hand paid, at or before delivery of' these presents. by Tumberry Charters. Inc. ᴠwhiom can be contacted at at 15001 N.W. 42nd Avenue. Suite 117, Miami, FL 330544, Party of the Second Part, the receipt of ᴠwhich is hereby acknowledged, does hereby ᴠgrant, bargain, sell, transfer and set over uınto the Party of the Second Part, its successcors and assigns:

Challenger 600, Seriial Number 1023. together with the emgines, avionics equipment, instrumentation and all items of equipment, parts, ccomponents and accessories presently installled thereon.

TO HAVE AND TO HHOLD the same unto the Party of the SSecond Part, its successors and assignees forever. And the Party of the First Ptart does for its successors and assigns warrant that it is the lawful owner of said perssonal property; that title to said property is ffree from all prior claims, liens and encumtbrances and that the Party of the First Part haıs good right to sell the same as aforesaid. The Party of the First Part covenants and aıgrees to and with the said Party of the Second Part to warrant and defend the salee of the said personal property hereby soıld unto the said Party of the Second Part. its; successors and assigns, against all and eıvery person and persons whomsoever.

IN WITNESS WHERE(OF, the Party of the First Part has
caused these presents to bæ signed by its duly authorized officer the dıay and year first above written.

INTERtNATIONAL PAPER COMPANY

By:                     -                      .

EXHIBIT "E"

SPARE PARTS INVENTORY

TB 00249



# *Turnberry Charters Inc.*

**Aviation Department**

**VIA FACSIMILE TO (703) 361-3170**

June 23, 1999

Mr. Ed Dahlberg
EMERALD AVIATION, INC.
9998 Wakeman Drive, Suite 212
Manassas, VA 20110

EXHIBIT
29

Re:    Challenger CL600 S/N 1023 N90UC
       Aircraft Sale Agreement

Dear Ed:

Following are the changes we have proposed to the above referenced Aircraft Sale Agreement. Most of the changes are for clarification in the wording and to change the name we will be holding this aircraft in to Turnberry Aviation, Inc.

If you have any questions at all, please call me at (305) 685-0881. When ready, please fax the contract back to me at my direct fax number (305) 289-9397.

As you know, Ed, Ken Murray has already arrived at Midcoast Aviation in St. Louis to begin the records review for the aircraft, and I will be going to St. Louis myself tomorrow. We will, of course, be in touch before I leave.

Regards,

Dennis R. Lainey



EXHIBIT
"G"

**TB 00267**

**15001 N.W. 42nd Avenue, Suite 117, Miami, FL 33054  Phone: (305) 685-0881  Fax: (305) 289-9397**

PROPOSED CHANGES TO
AIRCRAFT SALE AGREEMENT
FROM INTERNATIONAL PAPER COMPANY
CHALLENGER CL600 S/N 1023 N90UC

### Page One

(1)    Buyer's name change from Turnberry Charters, Inc. to Turnberry Aviation
       Inc. ("Turnberry").

(2)    First paragraph under WITNESSETH: add as follows:

       ...... and accessories presently installed thereon, as more fully described
       on the specifications attached hereto as Exhibit "F" and made a part
       hereof, and spare parts as listed and attached hereto as Exhibit "E" and
       made a part hereof (hereinafter collectively referred to as the "Aircraft");
       and

(3)    Paragraph 1.A.:

       Change Escrow Agent from AIC Title Service to Insured Aircraft Title
       Service, Oklahoma City, OK

       Clarify deposit to be refunded if Aircraft rejected and made non-
       refundable if accepted

       Note: Reference is made to Paragraph 9. - Paragraph 9. is missing.

       A.    A deposit in the amount of One Hundred Thousand Dollars
       ($100,000) heretofore placed in escrow by Turnberry with Insured Aircraft
       Title Service, Oklahoma City, Oklahoma, Kirk L. Woford, President
       (hereinafter referred to as the "Escrow Agent"), which deposit is
       refundable until the Aircraft is accepted or rejected upon completion of the
       pre-purchase inspection as provided in Paragraph 3.B. If the Aircraft is
       rejected by Turnberry, the Escrow Agent shall immediately return the
       deposit in the amount of One Hundred Thousand ($100,000) Dollars to
       Turnberry and each of the parties shall be released and relieved of any
       obligations under this agreement. If the Aircraft is accepted by Turnberry,
       the deposit will become non-refundable except in the event that Int'l
       Paper fails to deliver the Aircraft with a clear title or as provided in
       Paragraph 4 and Paragraph 9 hereof. If the Aircraft is accepted,
       Turnberry shall acknowledge acceptance of the pre-purchase inspection
       in the form attached hereto as Exhibit "A" and by this reference made a
       part hereof.

Page Two

(4)    Paragraph 2. A.   Include reference to MSP program on APU:

A.      The engine service plans (CMSP) for the Lycoming ALF502-L and
(MSP) for the APU shall be transferred by Int'l Paper to Turnberry
pursuant to Exhibit "B" attached hereto and made a part hereof. The cost
of transferring the CMSP and MSP agreements shall be for the account of
Turnberry.

(5)    Paragraph 3.B.   Clarification:  Commence record review immediately;
commence aircraft inspection and flight test after execution of contract;
remove reference to movement of Aircraft as is not applicable here (see
Paragraph 5. Delivery)

B.      Pre-purchase inspection and a flight test of up to two hours
("Inspection") at Midcoast Aviation Service Center, Cahokia, Illinois
(hereinafter referred to as "Airport") to either accept or reject the Aircraft.
The Aircraft and engine logs and maintenance records will be available at
the Airport for review to commence on or about Wednesday, June 23,
1999. Upon execution of this agreement, the Aircraft will be made
available for inspection by Turnberry's agent, and Int'l Paper will conduct
a flight test of up to two hours for a systems check to be observed by
Turnberry's agent. The cost of fuel and pilots for this flight test shall be
paid by Turnberry.

(7)    Paragraph 5.

..... The fuel and pilot costs of moving the Aircraft to a location other than
the Airport for delivery shall be for the account of Turnberry......

(8)    Paragraph 6.  Bills of Sale to Escrow for closing.- logs to Turnberry

Prior to time of closing, Int'l Paper shall deliver to Escrow Agent:

A. An executed FAA Bill of Sale in the form required to permit
Turnberry's registration of the Aircraft in the United States.

B. Warranty Bill of Sale in the form annexed hereto and marked
Exhibit "D".

**TB 00269**

At time of closing, Int'l Paper shall deliver to Turnberry all Aircraft and engine logs, manuals, parts, maintenance data and other documentation maintained for the operation of the Aircraft.

### Page Four

(9)     Paragraph 9. is missing. This paragraph was referenced in Paragraph 1.A.

### Page Six

(10)     Paragraph 12. B.: Change the name from Turnberry Charters, Inc. to Turnberry Aviation, Inc.

(11)     Paragraph 15. Clarification.

..... shall be kept confidential except on a need to know basis or as may be required by law or legal process.

### Page Seven

Change name for signature from TURNBERRY CHARTERS, INC. to TURNBERRY AVIATION, INC.

### All Exhibits

Change name from Turnberry Charters, Inc. to Turnberry Aviation, Inc.

### EXHIBIT "B"

This Exhibit needs to include appropriate assignment and warrants for payment for the MSP program on the APU along with those for the CMSP on the engines.

### EXHIBIT "D"

To include spare parts not installed on the Aircraft (listed on Exhibit "E") add "or appurtenant thereto" to end of property description in second paragraph::

.... presently installed thereon or appurtenant thereto.

# *Turnberry Aviation, Inc.*

**VIA FACSIMILE TO (405) 681-5356**

June 29, 1999

Mr. Kirk L. Woford
President
INSURED AIRCRAFT TITLE SERVICE, INC.
P. O. Box 19527
Oklahoma City, OK 73144

Re:    Canadair Challenger CL600  S/N 1023  N90UC

Dear Kirk:

You are holding $150,000.00 in Turnberry Aviation, Inc.'s account designated as a refundable deposit for the above referenced aircraft. We will not be entering into a purchase contract on this aircraft, so please remove any reference to this aircraft from these funds.

Please hold this $150,000.00 in Turnberry Aviation Inc.'s account with no reference or designation until you receive further written instructions from me.

Please call me at (305) 685-0881 if you have any questions at all.

Kindly acknowledge your receipt of these instructions by signing below and faxing back to me at (305) 289-9397.

Regards,

Dennis R. Lainey
Director of Sales

Acknowledged:

_____
Kirk L. Woford
INSURED AIRCRAFT TITLE SERVICE, INC.

15001 NW 42nd Ave., Suite 117, Miami, FL 33054 (KOPF) Phone: (305) 685-0881 Fax: (305) 289-9397

EXHIBIT
36

EXHIBIT
" *H* "

TB 00281

# AIRCRAFT PURCHASE/SALE AGREEMENT

THIS AIRCRAFT PURCHASE/SALE AGREEMENT (hereinafter referred to as the "Agreement"), is made and entered into this 29th day of June, 1999, by and between International Paper Company, a corporation, duly organized and existing under the laws of the State of New York, and having its principal office at Two Manhattanville Road, Purchase, New York 10577 (hereinafter referred to as the "Seller") and **AERO TOY STORE, INC.,** a corporation duly organized and existing under the laws of the State of Florida, United States, and having its principal office at 1710 West Cypress Creek Road, Fort Lauderdale, Florida 33309 (hereinafter referred to as the "Buyer").

**WHEREAS,** Seller is willing to sell to Buyer the following described aircraft, to wit: one (1) Canadair Challenger 600 aircraft bearing manufacturer's serial number 1023 and United States Registration Number N90UC (the "Airframe"), together with two (2) Avco Lycoming ALF 502L-2C engines respectively bearing manufacturers serial numbers LF030995 and LF030525 (each of which produces in excess of 750 rated takeoff horsepower) (the "Engines"), together with the radios, navigational devices, instrumentation, appurtenances, fixtures, accessories, log books, flight and component manuals, maintenance records and loose equipment associated with the Airframe as set forth in Exhibit "A" attached hereto (the Airframe, Engines, and aforesaid radios, navigational devices. instrumentation, appurtenances, fixtures, accessories, log books, flight and component manuals, maintenance records and loose equipment are hereinafter collectively referred to as the "Aircraft"); and

**WHEREAS,** the Buyer is willing to purchase this Aircraft on the terms and conditions set forth herein below.

**For valuable consideration,** the receipt and sufficiency of which is mutually acknowledged, the parties stipulate, covenant and agree as follows:

## ARTICLE 1
### Sale and Purchase of Aircraft

1. Subject to the terms hereof, Buyer agrees to buy from Seller, and Seller agrees to sell to the Buyer, the Aircraft.

2. Buyer shall accept delivery of the Aircraft pursuant to this Agreement **"AS IS, WHERE IS,"** except for the warranty contained in Article 3 below.

## ARTICLE 2
### Price

The total price of the Aircraft. including any equipment, documents and attachments (the "Purchase Price") shall be U.S. S7,000,000.00 (the "Purchase Price"), payable as follows:



## ARTICLE 3
### Clear Title

At the time of Closing the Aircraft will have current Certificate of Airworthiness and be free and clear of all liens and encumbrances. Seller will transfer the CAMP maintenance programs (and all other service life policies applicable to the Aircraft) together with all applicable records, to Buyer at Closing which shall be paid current as of the time of Closing. At Closing, Seller shall transfer full legal and beneficial title to the Aircraft to Buyer at the time of the closing free and clear of all liens and encumbrances whatsoever.

## ARTICLE 4
### Payment

1. Immediately upon execution hereof, Buyer shall deliver to the Escrow Agent, in free, clear and immediately available funds, an initial deposit of Two Hundred Fifty Thousand (U.S. $250,000.00) United States Dollars, which sum shall not be subject to refund unless Seller fails to deliver the Aircraft to Buyer at Closing in accordance with the terms of this Agreement.

2. On the day of closing, Buyer shall, by wire transfer of free, clear and immediately available funds, deposit into the escrow account of the Escrow Agent named below, the Balance of the Purchase Price plus one-half (1/2) of the escrow agent's fee.

3. The parties hereto have agreed to appoint as escrow agent pursuant to this Agreement **INSURED AIRCRAFT TITLE SERVICE,** an aircraft title company located at 6449 South Denning Avenue, Oklahoma City, Oklahoma 73159 (the "Escrow Agent"). Fees of the Escrow Agent shall be paid equally by Buyer and Seller ("Escrow Fees"). Buyer has heretofore, or will have prior to closing, filed with the Escrow agent an FAA Registration Application, Form 8050-1, with respect to the Aircraft (the "Application") (the failure of Buyer to have filed the Application with the Escrow Agent shall not delay closing). Seller has heretofore, or will have, prior to closing, filed with the Escrow Agent an FAA Bill of Sale, Form 8050-2, with respect to the Aircraft, from Seller to Buyer (the "Bill of Sale"), as well as any and all other documents necessary in order to achieve registration and clear title for the Aircraft to Buyer ("Title Documents"). Seller will deliver to the Escrow Agent, prior to closing, a warranty bill of sale for the Aircraft substantially in the form of Exhibit "B" Attached hereto.

4. Upon confirmation by Buyer to the Escrow Agent that the transaction has closed the Escrow Agent shall contemporaneously:

   A. Wire transfer the Purchase Price pursuant to the written instructions of Seller.
   B. File the Registration Application and Bill of Sale and the Title Documents with the FAA or as Buyer may other direct.

C. Collectively, the actions of the Escrow Agent described in Article 4, Paragraphs 4(a) and 4(b) above, shall be referred to as the "Closing."

5. Sales, use or related taxes, if any, that may be due in any states, territory, sovereign or jurisdiction resultant from Buyer's purchase of the Aircraft shall be borne by the Buyer.

## ARTICLE 5
### Closing

Closing and delivery of the Aircraft to Buyer shall occur not later than 6:00 P.M. EDT Wednesday, June 30, 1999. The Aircraft shall be delivered to Buyer by Seller at Mid-Coast Aviation, Cahokia.

## ARTICLE 6
### Assumption of Risk: Indemnities

1. Seller shall have custody and operational control of the Aircraft, and Seller shall have all of the responsibility and liability and insurable interest thereof, until Closing and delivery of the Aircraft to Buyer. Upon and after closing Buyer shall accept delivery of the Aircraft and all of the risk of loss, responsibility, liability and insurable interest thereof, at Mid-Coast Aviation, Cahokia.

2. If the Aircraft is damaged or destroyed prior to closing and delivery, the Buyer may terminate this Agreement without liability to the Seller and the Escrow Agent shall return the Deposit to the Buyer.

3. Buyer agrees to indemnify, reimburse and hold Seller and its assignees, advisors, officers, directors, agents and employees (and all affiliates thereof) (each an "indemnitee") harmless from and against any and all claims, damages, losses, liabilities (including, without limitation, any claim or liability for strict liability in tort or otherwise), obligations, demands, suits, judgments, causes of action legal proceedings, whether civil, criminal or administrative, penalties, fines, other sanctions, and all costs and expenses of any nature, whatsoever, including reasonable attorney's fees and expenses any and all of which result from, pertain to or arise out of the ownership or operation of the Aircraft by Buyer (or anyone claiming under or through Buyer) from and after the delivery of the Aircraft to Buyer.

4. Seller agrees to indemnify, reimburse and hold Buyer and its assignees, advisors, officers, directors, agents and employees (and all affiliates thereof) (each an "Indemnitee") harmless from and against any and all claims, damages, losses liabilities (including, without limitation, any claim or liability for strict liability in tort or otherwise), obligations, demands, suits, judgments, causes of action legal proceedings, wither civil, criminal or administrative, penalties, fines, other sanctions, and all costs and expenses of any nature, whatsoever, including reasonable attorney's fees and expenses any and all of which result from, pertain to or arise out of the ownership or operation of the Aircraft by Seller (or anyone claiming under or through Seller) prior to the delivery of the Aircraft to Buyer.

5. The indemnities set forth in this Article 6, Sections 3 and 4 shall survive the closing and delivery of the Aircraft by Seller to Buyer and continue in full force and effect.

## ARTICLE 7
### Notice

Any written notice, demand or request that is required to be made hereunder shall be served in person or by registered or certified mail, return receipt requested, addressed to the party to be served at the address set forth above. The above addresses may be changed as to the applicable party by providing the other party with notice of such address change in the same manner provided above. In the event that written notice, demand or request is made as provided herein, then in the event that such notice is returned to the sender by the U.S. Postal System because of insufficient address or because the party has moved or otherwise, other than for insufficient postage, such writing shall be deemed to have been resolved by the party to whom it was addressed on the date that such writing was initially placed in the U.S. Postal System by the sender.

A copy of any notices sent to Buyer shall be sent to Bruce David Green, P.A., 600 South Andrews Avenue, Suite 400, Fort Lauderdale, Florida 33301, telefax 954-522-8555. The parties hereto agree to consider said facsimile signatures to be the same as original signatures thereto (but excluding those documents described in Article 4, paragraph 3 above, which documents must be signed in the original).

## ARTICLE 8
### Severability/Forum

Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision hereof shall be prohibited or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity only, without invalidating the remainder of such provision(s) or of the remaining provisions of this Agreement. The validity, construction and performance of this Agreement shall be governed by and construed in accordance with the laws of the State of Florida, and any litigation arising hereunder shall only be resolved in a court of competent jurisdiction in Broward County, Florida, and the parties thereto submit themselves to the jurisdiction of such court for such purpose, notwithstanding that the place of delivery may be outside of the State of Florida.

## ARTICLE 9
### Binding Effect

Whenever the context of this Agreement so admits or requires, the terms Buyer and Seller shall include the heir, personal representatives, successors and/or assigns of the respective parties hereto; the use of the singular number shall include the plural, and the plural shall include the singular; the use of any gender shall include all genders.

### ARTICLE 10
#### Headings

The headings of the paragraphs contained in this Agreement are for convenience of reference only and do not form a part hereof and in no way modify, interpret or construe the meaning of the parties hereto.

### ARTICLE 11
#### Modification/Waiver

No modification or waiver of any of the terms of this Agreement shall be valid unless in writing and unless said subsequent instrument is executed with the same formality as this Agreement. The failure or either party to insist upon strict performance of any of the provisions of this Agreement shall not be deemed a waiver of the right thereafter to insist upon performance of that, or any other, provision of this Agreement.

### ARTICLE 12
#### Integration

The parties have incorporated in this Agreement their entire understanding. No oral statement or prior written matter extrinsic to this Agreement concerning the rights, duties or obligations of either party hereto or to the other shall have any force or effect. Neither party relies upon any representations other than those expressly herein set forth, and no representation not herein contained is deemed by either party to be material to the premises.

### ARTICLE 13
#### Escrow Agent

The parties acknowledge that the Escrow Agent is acting as a stakeholder and document holder only, its duties being purely ministerial, at their request and for their convenience, that the Escrow Agent shall not be deemed to be the agent or trustee for either of the parties, and that the Escrow Agent shall not be liable to either of the parties for any act or omission unless it involves willful misconduct or gross negligence on its part.

**IN WITNESS WHEREOF** the parties hereto have signed this Agreement by their fully authorized officers or representatives as of the date first above written.

Buyer:                                  AERO TOY STORE, INC.

By: _____
    Morris Shirazi, President

Seller:                                 INTERNATIONAL PAPER COMPANY

By: _____

    J N CARTER    SR. VP
    (Print Name and Title)

Escrow Agent:                           INSURED AIRCRAFT TITLE COMPANY
(Only as to Escrow Responsibilities)

By: _____
    Kirk Woford, President

DEPOSITION EXHIBIT
9
10/5/200[...]

# *Turnberry Aviation, IInc.*

CHALLENGER CL600  S/N 1023  N90UC

AIRCRAFT TO BOMBARDIER THURSDAY JULY 8, 1999

**PAINT**
Blue = Acry-Glo # HS-10711 Arctic Blue
Gold = Acry-Glo # HS-10688 Cartier Gold
Belly White / Blue Stripe / White Stripe / Gold Stripe a / White Stripe / Blue Stripe
Wing Tips same (Blue / White / Gold / White / Blue)
(Stripes same spacing as existing)

Stairs - White with Aero Floor Sand on steps
Tail number - N920DS - Paint Blue w/Gold shadow - ¿ Slanted
Tape over with N90UC for temporary numbers

**METALS**      All visible metals to be gold plated    (bu)

**LAV**
**CABINET**
New hardware
New wood - On left side make solid on upper portion a and leave lower opening for trash.
Remove double TP holder and intall owner furnished Y TP holder
Install metal strips on edges and trims - gold plated
Lav vanity top stone with gold plated sink and fawcetsts

**GALLEY**      Galley top to be stone with faux finish to match on sinnk *Customer to Supply.*

**GAME**
**TABLES**
Veneer, stone and gold inlays on game tables with anngled corners  ▷C

**LATCHES**      All latches to be new gold plated  ✓

**CONTROLS**      New controls on side rails - gold plated  ✓

**AFT**
**BULKHEADS**
Aft Bulkheads and door to have light bronze mirror

**AFT TV**      Aft TV to have plex face flush with mirror

**SEATS**      Seats to have same design as 604 seen in hanger

1 of 2

15001 NW 42nd Ave., Suite 117. Miami FL 33054 (KOPF) Phone: (305) 685-0681-1 Fax: (305) 289-9397


EXHIBIT
"J"

TB 00212

# *Turnberry Aviation, Inc.*

CHALLENGER CL600 S/N 1023 N90UC

COUCH    Couch to be leather ☜

DADO    Lower dado panels to have Thoreau Maine Woods fabric ☜

HEADLINER & WINDOW PANELS    Headliner and window panels to be Tapis Brisa Creamie ☜

ENTRY    Entry floor to be Loncoin Beige ☜

FIREBLOCK    Must have Part 135 fireblocking certificates for interior including all woodwork and seats. ☜

PLACARDS    Placards for Part 135 ☜

ENTER-TAINMENT SYSTEMS    New DVD instead of VCR - new speakers - new headphnones with headphone connections and volume controls at each seat    ＊ customer supply to

AIRSHOW    Change present Airshow 100 to Airshow 200 Moving Mlap provided by Turnberry    ＊ customer supply to

＊ at customers expense.

2 of 2

15001 NW 42nd Ave., Suite 117, Miami, FL 33054 (KOPF)  Phone  (305) 665-0661 Ffax  (305) 289-9357

TB 00213

FROM :                                    PHONE NO. :                    Jul. 13 1999 01:21PM P1

# *Executive Jet Center*
# AERO TOY STORE

July 14, 1999



DEPOSITION
EXHIBIT
10
10/5/3000 by

Mr. Dennis Lainey

Via fax: 305-685-8606

Thank you for your telephone call this afternoon. Just to reitterate our
conversation regarding the Challenger aircraft we have complied with
the following items.
Etched LOGO in bulkhead
All Stereo controls are to be gold plated
Galley interior in the upper compartment will have mirror surrounding
the glasses
Travatine Avonite to be place in the forward galley and aft lav counter
tops
Gold sinks aft lav with matching gold faucet, forward galley sink faux
finish to match Travatine (due to wear and tear of silverware this will
be much more durable) drain and faucet to be gold plated.
Liquor bottle to be specially made for inside galley, please supply names
of bottles etched - Vodka, Gin, Burbon, Scotch, Whiskey
Inlays in tray tables to have $1/16^{th}$ x ¼ inch gold inlays
Krups coffee and Expresso machine in forward galley to replace
existing coffee maker
Toilet paper holder in gold with overlay cover in gold

I am checking to see about a Microwave oven to be placed in tthe lower
portion of the galley we are taking measurements and I will let you
know the outcome as soon as we have one.

Any questions, please feel free to contact me,

Best regards,
Lana Joy Fish



**EXHIBIT**

"K"

TB 00204

1710 W. Cypress Creek Road • Ft. Lauderdale, Florida 33309 • (954) 771-1795 • Fax (954) 771-3281

## AIRCRAFT PURCHASE/SALE AGREEMENT

**THIS AIRCRAFT PURCHASE/SALE AGREEMENT** (hereinafter referred to as the "Agreement"), is made and entered into this _2 2 ᴺᴰ_ day of July , 1999, by and between **TURNBERRY AVIATION, INC.**, a corporation, duly organized and existing under the laws of the State of Florida, and having its principal office at 15001 N.W. 42ᴺᵈ Avenue, Miami, Florida 33054, (hereinafter referred to as the "Buyer") and **AERO TOY STORE, INC.**, a corporation, duly organized and existing under the laws of the State of Florida, United States, and having its principal office at 1710 West Cypress Creek Road, Fort Lauderdale, Florida 33309 (hereinafter referred to as the "Seller").

**WHEREAS**, Seller is willing to sell to Buyer the following described aircraft, to wit: one (1) Challenger 600 aircraft bearing manufacturers serial number 1023 and United States Registration Number N90UC (the "Airframe"), together with two (2) ALF-502L-2C engines respectively bearing manufacturers serial numbers LF03099S and LF03052S (each of which produces in excess of 750 rated takeoff horsepower) including the transfer to Buyer of the CMSP program applicable to the engines which shall be paid current as of the time of Closing (the "engines"), together with the APU (including the transfer of the MSP program applicable to the APU paid current as of the time of Closing), radios, navigational devices, instrumentation, appurtenances, fixtures, accessories, log books, flight and component manuals, maintenance records and loose equipment (ie. pins, plugs and covers) associated with the Airframe as presently situated at Sellers facilities at Fort Lauderdale Executive Airport, Fort Lauderdale, Broward County, Florida and set forth in Exhibit "A" attached hereto (all specifications are subject to verification by Buyer, there are no spare parts included in the transaction, and items not specifically set forth in Exhibit "A" are excluded) (the Airframe, Engines, and aforesaid radios, navigational devices, instrumentation, appurtenances, fixtures, accessories, log books, flight and component manuals, maintenance records and loose equipment are hereinafter collectively referred to as the "Aircraft"); and,

**WHEREAS**, the Buyer is willing to purchase the Aircraft on the terms and conditions set forth hereinbelow; and,

**For valuable consideration,** the receipt and sufficiency of which is mutually acknowledged, the parties stipulate, covenant and agree as follows:

### ARTICLE I
### Sale and Purchase of Aircraft

1.      Subject to the terms hereof, Buyer agrees to buy from Seller, and Seller agrees to sell to Buyer, the Aircraft.

2.      Buyer may, prior to Closing of the within transaction, have a 7200 hour inspection performed on the Aircraft. The Inspection shall be conducted at Bombardier, at Fort Lauderdale, Florida, at Buyer's sole cost and expense, including the flat rate cost of such inspection as well as the cost to correct any discrepancies or items requiring repair as noted in the aforesaid 7200 hour inspection. Buyer shall not permit any lien to be placed against the Aircraft. The Inspection shall begin not later than _Ν/ A_ (___) business days following the execution of this Agreement and shall be considered complete when the inspection is completed by Bombardier and the Aircraft has been returned to service following resolution of all discrepancies noted in the inspection and appropriate log book endorsements have been prepared. If Buyer accepts the Aircraft (as set forth in sub-section 3 immediately below) Seller will perform the alterations/ modifications to the Aircraft in accordance with Exhibit "B" attached, which shall be considered competed upon entry in the Aircraft Log Books of appropriate endorsements for such items which



require and endorsement.

3.     Not later than 5:00 P.M. EDT three (3) business days following completion of the Inspection, Buyer shall signify to Seller, in writing, Buyer's acceptance or rejection of the Aircraft. In the event Buyer does not give Seller timely notice as immediately aforesaid, it shall be conclusively deemed that Buyer has accepted the Aircraft. Upon acceptance of the Aircraft by Buyer the deposit shall not be subject to refund unless Seller fails to deliver the Aircraft to Buyer at closing as required by this Agreement or Buyer is otherwise entitled to the refund of the Deposit by a specific provision hereof. Buyer understands that Seller will incur substantial damages in the event Buyer fails to accept delivery of the Aircraft and close the within transaction and that the Deposit is intended to compensate Seller for all losses in the event Buyer does not accept delivery of the Aircraft and close the within transaction as provided herein once the deposit has become non-refundable. Accordingly, upon acceptance of the Aircraft by Buyer, the Deposit shall be considered as fully earned and the sole property of Seller and Buyer waives all claims or rights thereto if Buyer fails to pay the Balance of the purchase price and accept delivery of the Aircraft unless Buyer is otherwise entitled to the refund of the Deposit by a specific provision hereof. The transaction shall close as set forth in Article 5 below. If Buyer does not accept the Aircraft, the Aircraft shall be restored to the condition it was in at the time it arrived at the inspection facility. Buyer shall obtain a waiver of lien from the inspection facility for the Aircraft. Buyer shall return the Aircraft to Seller at the inspection facility, and thereupon the Escrow Agent shall return the deposit to Buyer, Seller shall reimburse Buyer for any monies paid by Buyer to Bombardier for the 7200 hour inspection and repairs made pursuant to such inspection at which time this Agreement (and all rights, duties and obligations arising hereunder) shall terminate and be without force or effect.

4.     Buyer shall not permit any lien to be placed against the Aircraft. Buyer shall accept delivery of the Aircraft pursuant to this Agreement "**AS IS, WHEREIS,**" except for the warranty contained in Article 3 below. **SELLER MAKES NO EXPRESS OR IMPLIED WARRANTIES WHATSOEVER THAT WILL SURVIVE THIS CLOSING, INCLUDING THOSE OF CONDITION, OR MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, THE AIRCRAFT BEING SOLD ON AN "AS IS, WHEREIS" BASIS. THE RECORDS AND ENTRIES IN THE LOG BOOKS AND MAINTENANCE RECORDS WHICH PRECEDE SELLER'S OWNERSHIP OF THE AIRCRAFT ARE NOT WARRANTIES OF SELLER AND SELLER MAKES NO REPRESENTATION OR WARRANTY CONCERNING SAME, ALL SUCH WARRANTIES AND REPRESENTATIONS BEING EXPRESSLY EXCLUDED AND BUYER WAIVES SAME.**

5.     It is understood and agreed that sale of the Aircraft by the Seller to the Buyer is subject solely to the terms of this Agreement and that no terms and conditions described in any other document shall be effective with respect to said sale unless otherwise provided herein or unless agreed to in writing by the Seller.

## ARTICLE 2
### Price

The total price of the Aircraft, including any equipment, documents and attachments (the "Purchase Price") shall be U.S. $7,700,000.00 (the "Purchase Price"), payable as follows:

|  |  |  |
|---|---|---|
| U.S. | $150,000.00 | Deposit |
| U.S. $ | 7,550,000.00 | Balance |

## ARTICLE 3
### Clear Title

Seller represents and warrants that the Aircraft will be free and clear of all liens and encumbrances and that Seller shall transfer full legal and beneficial title to the Aircraft and the Aircraft Logs and Equipment to Buyer at the time of the closing free and clear of all liens and encumbrances whatsoever.

-2-

## ARTICLE 4
### Payment

1.    On the day of closing, Buyer shall, by wire transfer of free, clear and immediately available funds, deposit into the escrow account of the Escrow Agent named below, the Balance of the Purchase Price plus one-half (½) of the escrow agents fee.

2.    The parties hereto have agreed to appoint as escrow agent pursuant to this Agreement INSURED AIRCRAFT TITLE SERVICE, an aircraft title company located at 6449 South Denning Avenue, Oklahoma City, Oklahoma 73159 (the "Escrow Agent"). Fees of the Escrow Agent shall be paid equally by Buyer and Seller ("Escrow Fees"). Buyer has heretofore, or will have prior to closing, filed with the Escrow Agent an FAA Registration Application, Form 8050-1, with respect to the Aircraft (the "Application") (the failure of Buyer to have filed the Application with the Escrow Agent shall not delay closing). Seller has heretofore, or will have, prior to closing, filed with the Escrow Agent an FAA Bill of Sale, Form 8050-2, with respect to the Aircraft, from Seller to Buyer (the "Bill of Sale"), as well as any and all other documents necessary in order to achieve registration and clear title for the Aircraft to Buyer ("Title Documents").

3.    At closing, Buyer will execute a delivery receipt acknowledging receipt of the Aircraft. The delivery receipt shall be in the form attached hereto as Exhibit "C."

4.    Upon confirmation by Seller to the Escrow Agent that the transaction has closed and the Buyer has executed documents of acceptance of the Aircraft, provided the full Purchase Price has been received by the Escrow Agent, the Escrow Agent shall contemporaneously:

> A.    Wire transfer the Purchase Price pursuant to the written instructions of Seller.
>
> B.    File the Registration Application and Bill of Sale and the Title Documents with the FAA or as Buyer may otherwise direct.
>
> C.    Collectively, the actions of the Escrow Agent described in Article 4, Paragraphs 4(a) and 4(b) above, shall be referred to as the "Closing."

5.    Any and all taxes or other fees or charges resulting from Buyer's purchase of the Aircraft hereunder shall be borne by Buyer who fully indemnifies and holds Seller completely harmless therefrom excluding such taxes, fees or duties based on Seller's income, gross receipts, any franchises or "doing business" tax imposed upon Seller. Seller shall indemnify and hold Buyer harmless from and against any and all taxes or other fees or charges assessed or levied against Seller pertaining to the Aircraft prior to, but not resulting from, the sale of the Aircraft to Buyer as of the time of Closing. Sales, use or related taxes, if any, that may be due in any state, territory, sovereign or jurisdiction resultant from Buyer's purchase of the Aircraft shall be borne by the Buyer, against which taxes Buyer fully indemnifies Seller, and holds Seller completely harmless from any and all such taxes or related charges whatsoever. This provision shall survive closing. Buyer shall execute an affidavit in the form attached hereto as Exhibit "D."

## ARTICLE 5
### Closing

Closing and delivery of the Aircraft to Buyer shall occur not later than three (3) business days following the later of (i) completion of the 7200 hour inspection by Bombardier referred to in Article 1, Section 2 above and correction of any discrepancies noted in the inspection, or (ii) completion by Seller of the alterations/Modifications set forth in Exhibit "B." At closing Buyer shall execute Seller's standard form of delivery receipt in the form attached hereto as Exhibit "C." If Seller fails or refuses to close and deliver the Aircraft to Buyer as herein provided, and Buyer is at that time ready, willing and able to close, pay the Purchase Price in full and accept delivery of the Aircraft in accordance with the terms hereof, Buyer may either (but not both) (i) accept the return of the Deposit and reimbursement for the cost of the 7200 hour inspection referred to in Article 1 Section 2 above and reimbursement to Buyer for any monies paid by Buyer to Bombardier

-3-

for the 7200 hour inspection aand repairs made pursuant to such inspecttion, without further obligation to Buyer by Seller, tor (ii) initiate an action for specific performaance (the foregoing alternative remedies are Buyer's exclusive remedies).

## ARTICLE 6
### Conttinuity of Agreements & Warranties

Effective as of thee time of Closing, Seller will assign or transfer · to Buyer such rights as Seller may have (if any) in anod to such applicable computerized maintenancce programs, service agreements and manufacturer's warranties which apply to the Aircraft whicch were assigned to Seller when Seller acquired thee Aircraft. Seller makes to warranty or representation concerning same.

## ARTICLE 7
### AAssumption of Risk; Indemnities

1.      Seller shaall have custody and operational control of tthe Aircraft and the Aircraft Logs and Equipment, annd Seller shall have all of the responsibility and liliability and insurable interest thereof, until Closing arnd delivery of the Aircraft to Buyer. Upon andd after closing Buyer shall accept delivery of the Airccraft and all of the risk of loss, responsibility, liiability and insurable interest thereof, at FXE.

2.      If the Airccraft is damaged or destroyed prior to Closingg and delivery of the Aircraft, and such damage or deestruction is not attributable to Buyer or Bombaardier, the Buyer may terminate this Agreement withoout liability to the Seller and the Escrow Agoent shall return the Deposit to the Buyer and the  Seller shall reimburse Buyer for any monioes paid by Buyer to Bombardier for the 7200 hour irnspection and repairs made pursuant to such1 inspection.

3.      Buyer aggrees to indemnify, reimburse and hold Selleer and its assignees, advisors, officers, directors, ageents and employees [and all affiliates thereof](ezach an "Indemnitee") harmless from and against anny and all claims, damages, losses, liabilitiess (including, without limitation, any claim or liability ffor strict liability in tort or otherwise), obligaticons, demands, suits, judgments, causes of action leggal proceedings, whether civil, criminal or admiinistrative, penalties, fines, other sanctions, and all coosts and expenses of any nature, whatsoever, iiincluding reasonable attorney's fees and expenses  any and all of which result from, pertain too or arise out of the ownership or operation of the Akircraft by Buyer (or anyone claiming under or tthrough Buyer) from and after the delivery of the Airccraft to Buver.

4.      Seller aggrees to inoemnify, reimburse and hold Buyeer and its assignees, advisors, officers, directors, ageents and employees [and all affiliates thereof](ezach an "Indemnitee") harmless from and against anny and all claims, damages, losses, liabilitiess (including, without limitation, any claim or liability ffor strict liability in tort or otherwise), obligaticons, demands, suits, judgments, causes of action leggal proceedings, whether civil, criminal or admiinistrative, penalties, fines, other sanctions, and all coosts and expenses of any nature, whatsoever, iiincluding reasonable attorney's fees and expenses  any and all of which result from, pertain too or arise out of the ownership or operation of the Aircraft by Seller (or anyone claiming under or · through Seller) prior to the delivery of the Aircraft to ı Buyer.

5.      The indeemnities set forth in this Article 6, Sections 3 arnd 4 shall survive the closing and delivery of the Aircrraft by Seller to Buyer and continue in full forcce and effect.

## ARTICLE 8
### Notice

Any written noticce, demand or request that is required to be rnade hereunder shall be served in person or by registered or certified mail, return receipt requessted, or by facsimile, addressed to the party to be seerved at its address set forth above. The abovve addresses may be

-4-

changed as to the applicable party by providing the other party with notice of such address change in the same manner provided above. In the event that written notice, demand) or request is made as provided herein, then in the event that such notice is returned to the senderr by the U. S. Postal System because of insufficient address or because the party has moved or ottherwise, other than for insufficient postage, such writing shall be deemed to have been received b)y the party to whom it was addressed on the date that such writing was initially placed in the U. S. Postal System by the sender.

A copy of any notices sent to Seller shall be sent to Bruce David Green, P.A., 600 South Andrews Avenue, Suite 400, Fort Lauderdale, Florida 33301, telefax 954-522-8555. The parties hereto agree to consider said facsimile signatures to be the same as original signatures thereto (but excluding those documents described in Article 4, paragraph 3 above, which documents must be signed in the original).

## ARTICLE 8
### Severability/Forum

Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision hereof shall be prohibited or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity only, without invalidating the remainder of such provision(s) or of the remaining provisions of this Agreement. The validity, construction and performance of this Agreement shall be governed by and construed in accordance with the laws of the State of Florida. and any litigation arising hereunder shall only be resolved in a court of competent jurisdiction in Broward County. Florida, and the parties hereto submit themselves to the jurisdiction of such court for such purpose, notwithstanding that the place of delivery may be outside of the State of Florida.

## ARTICLE 9
### Binding Effect

Whenever the context of this Agreement so admits or requires, the terms Buyer and Seller shall include the heir, personal representatives, successors and/or assigns of the respective parties hereto; the use of the singular number shall include the plural, and the plural shall include the singular; the use of any gender shall include all genders.

## ARTICLE 10
### Headings

The headings of the paragraphs contained in this Agreement are for convenience of reference only and do not form a part hereof and in no way modify, interpret or construe the meaning of the parties hereto.

## ARTICLE 11
### Modification/Waiver

No modification or waiver of any of the terms of this Agreement : shall be valid unless in writing and unless said subsequent instrument is executed with the same formality as this Agreement. The failure of either party to insist upon strict performance of any of the provisions of this Agreement shall not be deemed a waiver of the right thereafter to insist upon performance of that, or any other, provision of this Agreement.

## ARTICLE 12
### Integration

The parties have incorporated in this Agreement their entire understanding. No oral

-5-

statement or prior written matter extrinsic to this Agreement concerning tthe rights, duties or obligations of either party hereto or to the other shall have any force or effect.. Neither party relies upon any representations other than those expressly herein set forth, and nxo representation not herein contained is deemed by either party to be material to the premises.

### ARTICLE 13
#### Escrow Agent

The parties acknowledge that the Escrow Agent is acting ass a stakeholder and document holder only, its duties being purely ministerial, at their request and fcor their convenience, that the Escrow Agent shall not be deemed to be the agent or trustee for eitheer of the parties, and that the Escrow Agent shall not be liable top either if the parties for any act cor omission unless it involves wilful misconduct or gross negligence on its part.

IN WITNESS WHEREOF the parties hereto have signed this; Agreement by their duly authorized officers or representatives as of the date first above written.

Seller:                                          **AERO TOY STORE, INC.**

By: _____
Morris Shirazi, President

Buyer:                                           **TURNBERRY AVIATICON, INC.**

By _____
JEFFREY SOFISI (Print Name & Title)

Escrow Agent:                                    **INSURED AIRCRAFT TITLE COMPANY**
(Only As To Escrow Responsibilities)

By: _____
Kirk Woford, President

-6-



*Executive Jet Center*

# AERO TOY STORE

# CHALLENGER 600
# S/N 1023

**AIRFRAME TOTAL TIME: 6770**          **LANDINGS: 5761**

## ENGINE STATUS

L2C Modified engines are on CMSP with on condition TBO.

| LEFT ENGINE | | RIGHT ENGINE | |
|---|---|---|---|
| ALF502L-2C | | ALF502L-2C | |
| Total Time: | 6135 | Total Time: | 6150 |
| Since HSI: | 1088 | Since HSI: | 1088 |
| Total Cycles: | 4631 | Total Cycles: | 5179 |

APU: P-162C, 5831 Hours Total Time, 254 Since HSI on MSP.

## AVIONICS

Dual Sperry SPZ-600 Flight Directors
Dual Collins VHF-20A Comms
Dual Collins VIR-30A Navs
Dual Collins DME-40
Dual Collins ADF-60A
Dual Collins TDR-90 Transponder
Wulfsberg Flitefone VI
Dual Collins 718U-5 HF

King TCAS II
Dual Sperry AZ-242 Air Data Computers
Sperry SPZ-600 Autopilot
Universal UNS-1K FMS
Dual Delco Carousel Six INS
Global AFIS
Sperry Primus 400SL Radar w/Datanav
Sperry Voice Advisory

## ADDITIONAL EQUIPMENT

Winglets
Standby Attitude, Airspeed and Altimeter

Steer by Wire(SB-380)

TB 00314

*Executive Jet Center*

# AERO TOY STORE

Page no.
Challenger 600/601 1035

# MAINTENANCE

# INTERIOR

y the Sculpted Truffle Carpets, Thoreau Maine Woods Sidepanels and Almond Headliner.
Completing this elegant environment is the entertainment center featuring Airshow 400,
CD, LCD TV,VCR, Graphic Equalizer and Surround Sound.

# EXTERIOR

Overall Matterhorn White with Accents.

Rev. 6/23/99

Specifications/Descriptions are provided as introductory information and do not constitute representations or warranties of
Aero Toy Store, Inc. or Aero Toy Store, Inc. client(s). Accordingly, you should rely on your own inspection of the aircraft.
Any proposed transaction is subject to final execution of a contract acceptable in form and substance to Aero Toy Store,
Inc's client(s), and their counsel.

TB 00315

7-6-99

Received this date from Acme Toy Store the following logs for aircraft CL 600 S/N 1073

Box 1
16 w.o binders
2 boxes eng tags

Box 2
44 w.o. binders

Box 3
4 vol w/dia.
2 eng logs
2 binders a/f logs
1 apu log
1 binder camp
1 flt log

Box 4
2 ops man
1 mel
~~1 flt man~~   rr.~suro rec
6 w.o. packs
1 w/b man.

Received by:                          For:
                                        Lurahery

**TB 00316**

EXHIBIT "6" PAGE 1 OF 2

# *Turnberry Aviation, Inc.*

CHALLENGER CL600 S/N 1023 N90UC

AIRCRAFT TO BOMBARDIER THURSDAY JULY 8, 1999

| | |
|---|---|
| **PAINT** | Blue = Acry-Glo # HS-10711 Arctic Blue |
| | Gold = Acry-Glo # HS-10688 Cartier Gold |
| | Belly White / Blue Stripe / White Stripe / Gold Stripe / White Stripe / Blue Stripe |
| | Wing Tips same (Blue / White / Gold / White / Blue) |
| | (Stripes same spacing as existing) |
| | |
| | Stairs - White with Aero Floor Sand on steps |
| | Tail number - N920DS - Paint Blue w/Gold shadow - Slanted |
| | Tape over with N90UC for temporary numbers |
| **METALS** | All visible metals to be gold plated |
| **LAV CABINET** | New hardware |
| | New wood - On left side make solid on upper portion and leave lower opening for trash. |
| | Remove double TP holder and install owner furnished TP holder. |
| | Install metal strips on edges and trims - gold plated |
| | Lav vanity top stone with gold plated sink and faucets |
| **GALLEY** | Galley top to be stone with faux finish to match on sink Customer to supply. |
| **GAME TABLES** | Veneer, stone and gold inlays on game tables with angled corners |
| **LATCHES** | All latches to be new gold plated |
| **CONTROLS** | New controls on side rails - gold plated |
| **AFT BULKHEADS** | Aft Bulkheads and door to have light bronze mirror |
| **AFT TV** | Aft TV to have plex face flush with mirror |
| **SEATS** | Seats to have same design as 604 seen in hanger |

1 of 2

15001 NW 42nd Ave  Suite 117  Miami, FL 33054 (KOPF)  Phone (305) 685-0881 Fax (3305) 289 9357

TB 00317

EXHIBIT "  " PAGE 2 OF 2

# *Turnberry Aviation, Inc.*

CHALLENGER CL600  S/N 1023  N90UC

| | |
|---|---|
| COUCH | Couch to be leather |
| DADO | Lower dado panels to have Thoreau Maine Woods fabric |
| HEADLINER & WINDOW PANELS | Headliner and window panels to be Tapis Brisa Creame |
| ENTRY | Entry floor to be Loncoin Beige |
| FIREBLOCK | Must have Part 135 fireblocking certificates for interior including all woodwork and seats. |
| PLACARDS | Placards for Part 135 |
| ENTER-TAINMENT SYSTEMS | New DVD instead of VCR - new speakers - new headphones with headphone connections and volume controls at each seat          * customer supply to |
| AIRSHOW | Change present Airshow 100 to Airshow 200 Moving Map provided by Turnberry          * customer supply to. |

\* at customers expense.

15001 NW 42nd Ave  Suite 117, Miami, FL 33054 (KOPF)  Phone (305) 685-0881  Fax (305) 289-9397

**TB 00318**

**AND AUTHORIZATION TO ESCROW AGENT TO RELEASE FUNDS**

**THE UNDERSIGNED** acknowledges and confirms receipt and delivery of the following described aircraft together with two (2) ALF-502L-2C engines respectively bearing manufacturers serial numbers LF03099S and LF03052S and all log books, maintenance records and related documents (collectively the "Aircraft"):

| | |
|---|---|
| Challenger 600 | (A/C Type) |
| N90UC | (Regis. Number) |
| 1023 | (Serial Number) |

The undersigned further confirms that he/it has inspected and examined the Aircraft and associated records and log books, has independently examined same and has had the opportunity to have same inspected by an independent expert of his own selection.

The undersigned confirms that the Aircraft is airworthy and in acceptable and satisfactory condition, is being acquired **AS IS** without any warranties of any kind whatsoever, including any warranties of fitness for a particular use or otherwise, all of which the undersigned acknowledges are and have been expressly disclaimed by the Seller, and is accepted with all faults. The undersigned is not relying upon any statements or representations whatsoever regarding the Aircraft but, rather, solely upon information derived from an independent inspection of same and that the undersigned is a knowledgeable and sophisticated aircraft purchaser.

The undersigned is satisfied with the aircraft and acknowledges that the price paid for same was fairly bargained and represents an arms length transaction and was, in all respects, reasonable.

Any and all sales, use or related taxes, if any, that may be due in any United States jurisdiction resultant from Buyer's purchase of the Aircraft shall be borne by the Buyer, against which taxes Buyer fully indemnifies Seller, and holds Seller completely harmless from any and all such taxes or related charges whatsoever. This provision shall survive closing.

**The Escrow Agent is authorized and directed to deliver the Purchase Price to the Seller pursuant to the Seller's Instructions.**

IN WITNESS WHEREOF, I have hereunto set my hand and seal this _____ day of July, 1999.

**Turnberry Aviation, Inc.**

_____
Witness

_____
Witness

By: _____
Address: _____
_____

**SWORN TO AND SUBSCRIBED** before me this _____ day of July, 1999.

_____
Notary Public
State of Florida at Large

( ) Personally Known

My commission expires:

( ) Photographic I.D.
Type: _____

**TB 00319**

# JET CENTER INTERIORS

7/2/99
2 PAGES

DEPOSITION
EXHIBIT
6
12/15/2000

ATTN: NELLIE

THE NEXT SHEET HAS ALL

THE INFORMATION I WAS GIVEN

SEE IF THERE ARE ANY ITEMS

YOU CAN ADD.

THANKS

JOHN

2050 West Cypress Creek Road Fort Lauderdale, FL 33309
(954) 489-9219 Office (954) 771-3281 Fax



EXHIBIT
"M"

@002

TB 00216

# JET CENTER INTERIORS

- ALL VISIBLE METAL TO BE GOLD PLATED.
- VENEER, STONE AND GOLD INLAYS ON GAME TABLES WITH ANGLED CORNERS.
- LAV VANITY TOP STONE WITH GOLD PLATED SINK AND FAWCETS, REMOVE DBL. TP HOLDER, INSTALL OWNER FURNISHED TP HOLDER.
- ALL LATCHES TO BE GOLD PLATED.
- GALLEY TOP TO BE STONE WITH FAUX FINISH TO MATCH ON SINK.
- AFT BULKHEADS AND DOOR TO HAVE LIGHT BRONZE MIRROR.
- AFT TV TO HAVE PLEX FACE FLUSH WITH MIRROR.
- SEATS TO HAVE SAME DESIGN AS 604.

- COUCH TO BE LEATHER.
- LOWER DADO PANELS TO HAVE THOREAU MAINE WOODS FABRIC.
- HEADLINER AND WINDOW PANELS TO BE TAPIS BRISA CREAME.
- ENTRY FLOOR TO BE LONCOIN BIEGE.
- STEPS WILL BE AERO FLOOR SAND.
- POSSIBLE NEW DVD PLAYER???
- POSSIBLE NEW SPEAKERS???
- AIR SHOW???
- OUTSIDE PAINT COLORS, BELLY NAVY BLUE, WHITE, GOLD LEAF, WHITE, BLUE. COLOR NUMBERS TO BE SUPPLIED. NUMBERS TO BE ON A SLANT, NUMBER BLUE WITH GOLD SHADOW.

TB 00217