**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 00-6111-CIV-(DIMITROULEAS/Johnson)**

TURNBERRY CHARTERS, INC.

    Plaintiff,

vs.

INTERNATIONAL PAPER COMPANY

    Defendant.
_____/

### DEFENDANT'S STATEMENT OF MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR FINAL SUMMARY JUDGMENT, OR ALTERNATIVELY, FOR PARTIAL SUMMARY JUDGMENT LIMITING DAMAGES

Defendant International Paper Company ("IP"), by and through its undersigned counsel and pursuant to Federal Rule of Civil Procedure 56 and Local Rule 7.5 submits its Statement of Material Facts as to which there is no genuine issue to be tried, in support of its Motion and Memorandum of Law for Final Summary Judgment, or Alternatively, for Partial Summary Judgment Limiting Damages.[1]

1.     As part of a merger with Union Camp Corporation ("Union Camp"), IP acquired title to a 1981 Canadair Challenger CL600 aircraft, serial number 1023 (the "Plane"). Prior to the merger, Union Camp had hired Emerald Aviation, Inc. ("Emerald") to sell the Plane. *See* Deposition of Edward C. Dahlberg, November 30, 2000 ("Dahlberg Dep."), 15:8 to 17:11.[2] Following the merger, because the Plane had not yet been sold, IP contracted with Emerald to continue as broker for the Plane on IP's behalf. *See id.* at 42:14-17.

---

[1] In accordance with Local Rules 7.1 and 7.5, IP's Motion and Memorandum of Law has been filed contemporaneously herewith.

[2] All deposition transcripts, which have been previously filed with this Court under separate Notice of Filing, will be cited herein by page and line as "(Name) Dep., ___:___."

2. As part of Emerald's brokering services, Ed Dahlberg, Emerald's president, advertised and listed the Plane in many aircraft sales media, including Business Air Today. *See* Ex. A[3]; *see also* Dahlberg Dep., 19:16 to 20:11; 21:1-22.

3. In mid-1999, Turnberry Charters, Inc. ("Turnberry") became interested in purchasing a Challenger 600, so it enlisted the services of its agent, Dennis Lainey ("Mr. Lainey"). *See* Deposition of Dennis Lainey, November 15, 2000 ("Lainey Dep."), 30:13-22. Mr. Lainey's agency with Turnberry was established pursuant to an Employment Agreement executed by himself and Turnberry, on or about August 28, 1998. *See* Ex. B. This Employment Agreement remained in effect when Mr. Lainey engaged in negotiations to purchase the Plane from IP. *See* Lainey Dep., 19:14 to 20:23.

4. Lainey eventually contacted Mr. Dahlberg on behalf of Turnberry. *See id.* at 32:21-23; *see also* Dahlberg Dep., 41:5-7. During their initial conversation, Mr. Lainey expressed that Turnberry was interested in purchasing the Plane. *See* Lainey Dep., 35:20 to 37:7. Mr. Dahlberg discussed the Plane's specifications, and relayed the Plane's selling price of $7,250,000. *See id.* at 37:8-9.

5. Following their conversation, Mr. Lainey, on Turnberry's behalf, drafted and executed a letter addressed to IP, setting forth a proposal regarding the Plane (the "Letter Offer"). *See* Ex. C; *see also* Lainey Dep., 40:15-18. The Letter Offer was drafted by Mr. Lainey without the assistance or review of counsel--as Mr. Lainey himself testified during deposition, he was relying upon "the attorneys" to prepare "a more definitive agreement." *See* Lainey Dep., 63:21-23. After Turnberry approved the contents of the Letter Offer, it was sent to Emerald via facsimile on or about June 20, 1999. *See* Lainey Dep., 40:23 to 41:15; 42:6-10.

6. The Letter Offer constituted a confirmation of the preliminary negotiations discussed by Mr. Lainey and Mr. Dahlberg. *See* Ex. C, 1st ¶.The Letter Offer also expressed Turnberry's "sincere interest" in seeking to negotiate a future agreement for the Plane. *See id.* The Letter Offer stated that Turnberry would pay seven million dollars for the Plane,

> subject to the good faith efforts of both parties to negotiate **mutually agreeable** terms and conditions of the sale **and** the timely execution and delivery of a ***definitive sales agreement* in**

---

[3] All Exhibits, which are attached to IP's Motion and Memorandum of Law, will be cited herein as "Ex. __."

2

> **form and substance mutually acceptable** to the parties. *See id.* at
> 2d ¶ (emphases supplied).

7.  Turnberry placed a "good faith" deposit in escrow. *See id.* at 3d ¶. This "deposit," was designated by Mr. Lainey as

> fully refundable until such **time as a definitive sales agreement** shall be executed, and then [was to] become subject to the terms and conditions of **that** **agreement**. *See id.* at 5th ¶ (emphases added).

8.  The Letter Offer further stated that the "offer" would become "null and void" at 5:00 p.m., June 28, 1999, "if the parties have not **agreed to and executed a definitive sales agreement** prior to that time." *See id.* (Emphases supplied).

9.  Upon receipt of the Letter Offer, Mr. Dahlberg forwarded it to IP. *See* Dahlberg Dep., 50:4-22. IP's Senior Vice President signed the Letter Offer on behalf of IP on June 21, 1999, in the exact same form as drafted by Turnberry. *See* Ex. D. Shortly thereafter, the fully executed Letter Offer was transmitted back to Mr. Lainey. *See* Lainey Dep., 42:20-24; 45:4-12. Nothing in the Letter Offer precluded IP or Mr. Dahlberg from continuing to market the plane to third parties after execution of the Letter Offer, and nothing prevented IP or Mr. Dahlberg from negotiating for the sale of the Plane with anyone other than Turnberry. *See* Ex. D; *see also* Lainey Dep. at 76:4-14.

10.  That same day, June 21, 1999, Mr. Lainey faxed a letter to Turnberry's escrow agent, Insured Aircraft Title Service, Inc., ("Escrow Agent") informing them to expect a wire transfer from Turnberry (the "First Escrow Letter"), and requesting that the funds be placed in an escrow account. *See* Ex. E. Therein, Mr. Lainey directed that these escrow funds were to "be held fully refundable to Turnberry" at Mr. Lainey's "sole discretion," and acknowledged that there existed "no formal sales agreement for th[e] Plane]." *Id.* at 1st ¶. Mr. Lainey added in the First Escrow Letter that further instructions would be sent when "a binding sales agreement [was] entered into." *Id.*

11.  Additionally on June 21, 1999, Mr. Dahlberg transmitted a proposed "form" purchase agreement to both IP and Mr. Lainey, entitled Aircraft Sale Agreement (the "Proposed Contract"). *See* Ex. F; *see also* Lainey Dep., 47:21 to 48:48:2 (describing the Proposed Contract

3

as "a first draft of a *more complete* aircraft sales agreement") (emphasis added); Dahlberg Dep., 66:7-23; 70:13-23.

12. The Proposed Contract addressed many essential terms/conditions not referenced in the Letter Offer, including: (a) the Plane's engine service plan and the transfer thereof to Turnberry; (Ex. F, ¶ 2A); (b) the Plane's CAMP agreement, and the transfer thereof to Turnberry; (*Id.* at ¶ 2B); (c) any existing manufacturer's and/or vendor's warranties applicable to the Plane (*Id.* at ¶ 2C); (d) that IP has complied with "all applicable FAA airworthiness directives and manufacturer's mandatory service bulletins and modifications" (*Id.* at ¶ 3A); (e) what would occur in the event that discrepancies were discovered during the Plane's pre-purchase inspections (*Id.* at ¶ 3C); (f) what would occur in the event the Plane was damaged prior to closing (*Id.* at ¶ 4); (g) the Transfer of Title and requisite Title Instruments (*Id.* at ¶ 6A-C); (h) that the Plane was to be purchased "as-is, where-is" (*Id.* at ¶7); (i) how taxes and other assessments were to be handled (*Id.* at ¶ 8); (j) whether any broker's fees were to be paid (*Id.* at ¶10); (k) what would occur in the event of failure or delay in delivery (*Id.* at ¶ 11); and (l) where disputes, if any, would be addressed and resolved (*Id.* at ¶ 13).

13. *Nowhere* in the Proposed Contract does it reference or allude to the Letter Offer previously executed by the Parties. *See* Ex. F.

14. The next day, June 22, 1999, Mr. Lainey arranged for Turnberry's maintenance representative (Ken Murray) to conduct a pre-purchase inspection of the Plane. *See* Lainey Dep., 55:5-11.

15. Additionally, Mr. Lainey spoke with Mr. Dahlberg regarding the Proposed Contract. *See id.* at 55:15 to 56:1. Specifically, Mr. Lainey remarked that Turnberry was not interested in purchasing the Plane "as-is." *See* Dahlberg Dep., 73:23 to 74:9. Mr. Dahlberg responded that since IP was willing to accept $250,000 less than its requested asking price for the Plane ($7,250,000), IP would not sell other than "as-is." *See* Dahlberg Dep., 54:18 to 55:9. Mr. Lainey replied that Turnberry would not buy the plane in an "as-is" condition. *See id.* at 55:10-14; 56:7-11.

16. Because the parties could not mutually agree on terms, and because Mr. Lainey refused to discuss an "as-is" deal, Dahlberg concluded that negotiations for a definitive sales agreement were off. *See id.* at 55:15-18; 59:10 to 60:3.

4

17. The next morning, June 23, 1999, Turnberry's agent, Mr. Murray, arrived at the Midcoast Aviation facility in St. Louis, Missouri, where the Plane was being housed. *See* Dahlberg Dep., 59:1 to 11; *see also* Deposition of Stephen Bates, October 20, 2000 ("Bates Dep."), 36:22 to 37:9. Since Mr. Lainey ended any further negotiations the previous evening, Mr. Dahlberg had not arranged with Mr. Bates to permit Mr. Murray access for the inspection of the Plane and its records. *See* Dahlberg Dep., 63:17 to 64:19; 84:1-14; *see also* Bates Dep., 36:12-25. Mr. Murray was asked to temporarily wait and hold-off on his inspection until Mr. Dahlberg could reach Mr. Lainey to clarify the situation. *See* Dahlberg Dep., 63:17 to 65:8; *see also* Bates Dep., 37:8-22.

18. When Mr. Dahlberg reached Mr. Lainey, Mr. Lainey stated that Turnberry wished to "start all over again," and requested that Mr. Murray be permitted to continue with the inspections. *See* Dahlberg Dep., 64:20 to 65:2. Mr. Dahlberg then notified Mr. Bates that Mr. Murray could proceed with his inspection of the Plane and its records. *See* Bates Dep., 39:1-23.

19. Later that same afternoon, on June 23, 1999, Mr. Lainey, on behalf of Turnberry, faxed to Mr. Dahlberg Turnberry's requested changes to the Proposed Contract. *See* Exhibit G; *see also* Lainey Dep., 100:21 to 101:17.

20. Upon completion of Mr. Murray's inspection on June 24, 1999, Mr. Lainey and Mr. Dahlberg spoke regarding the condition of the Plane and the Proposed Contract. Mr. Lainey made two points: (1) he did not agree with IP's recommended changes to the Proposed Contract; and (2) Turnberry would not accept the Plane "as is." *See* Dahlberg Dep., 80:23 to 81:8.

21. The next day, June 25, 2000, during a post-inspection telephone conversation with Mr. Bates, Mr. Lainey expressed to Mr. Bates that he and Mr. Dahlberg did not reach an agreement regarding the Plane. *See* Bates Dep., 48:10-21. Similarly, Mr. Bates spoke to Mr. Dahlberg, who confirmed the failure to reach an agreement. *See id.* at 48:22 to 49:6.

22. No definitive sales agreement was ever executed by 5:00 p.m. June 28, 1999. *See* Turnberry's complaint ¶¶ 10, 24 (admitting that no definitive sales agreement was reached). Accordingly, by its own terms, the Letter Offer became "null and void." *See* Ex. D.

23. A day after the Letter Offer expired, on June 29, 1999, Mr. Lainey faxed a succeeding letter to the Escrow Agent (the "Second Escrow Letter"). *See* Exhibit H. Therein, Mr. Lainey asked that the previously-wired escrow funds (as referenced in the First Escrow

5

Letter) be held with no further designation until further notice. *See id.* Specifically, Mr. Lainey wrote, "We will **not be *entering* into a purchase contract** on th[e] Plane, so please remove any reference to this aircraft from these funds." *Id.* at 1st ¶ (emphasis added).

24.  Subsequently, the Plane was sold to a third party, Aero Toy Store, Inc., ("Aero Toy") for the exact same price conditionally offered by Turnberry to IP, namely $7,000,000. *See* Ex. I.

25.  Aero Toy purchased the Plane "as-is." *See id.*

26.  Shortly after Aero Toy took possession of the Plane, Turnberry contacted Aero Toy expressing a desire to purchase the *same* Plane (the 1981 Canadair Challenger CL600, serial number 1023); however, Turnberry requested that the following renovations and improvements be made to the Plane: (a) a repainting of almost the entire Plane; (b) all visible metals in the Plane to be gold-plated; (c) the bathroom would feature new hardware, new wooden cabinets, a new toilet paper holder, new gold-plated strips, and a new vanity top constructed of stone and containing gold-plated sink and faucets; (d) the galley top to be reconstructed of stone with faux finish; (e) the gaming tables to be resurfaced with veneer, stone and gold inlays and angled corners; (f) replacement of all latches in the Plane with gold-plated ones; (g) new gold-plated controls on the side rails; (h) installation of light bronze mirrors on the aft bulkheads and door; (i) the aft TV to have a plex face flush with the mirror; (j) new sets to be installed similar to those of the 604 model in Aero Toy's hangar; (k) a leather couch to be installed; (l) all lower dado panels to have covered with Thoreau Maine Woods fabric; (m) all headliner and window panels to be Tapis Brisa Creame; (n) the entry floor was to be painted Lincoln beige; (o) installation of placards for Part 135 fireblocking certificates pertaining to the interior; (p) installation of a DVD player in place of the VCR, new speakers and new headphone with headphone connections and volume controls installed at each seat; and (q) change the Airshow 100 to an Airshow 200 Moving Map. *See* Exhibit J.

27.  Subsequent to the request reflected in Exhibit J, additional upgrades and renovations were requested by Turnberry, consisting of: (a) an etched LOGO in the bulkhead; (b) all stereo controls to be gold-plated; (c) specially made liquor bottles for the inside galley etched respectively with the words Vodka, Gin, Bourbon, Scotch, and Whiskey; and (d) replacement of the existing coffee machine with a Krups coffee and espresso maker. *See* Exhibit K.

28. On July 22, 1999, Aero Toy and Turnberry executed a formal contract for the sale of the to-be-refurbished and improved Plane to Turnberry, entitled Aircraft Purchase/Sale Agreement (the "Contract"). *See* Exhibit L. The Contract provided for a sales price of $7,700,000. *See id.* at Article 2. This $7.7 million purchase price **included** the Plane with **all** of the renovations and improvements integrated by Aero Toy. *See id.* at Exhibit B, incorporated by reference into the Contract by Article 1, ¶ 2. According to Turnberry's corporate representative, Larry Aitkens, Turnberry purchased the Plane with all of the upgrades, except replacement of the Airshow.[4] *See* Deposition of Larry Milo Aitkens, October 5, 2000 ("Aitkens Dep."), 74:4 to 77:5; 84:15 to 85:21.

29. Mr. Lainey testified that Aero Toy: (a) installed a new leather interior; (b) recoated the interior metals with gold-plating; (c) recoated 80% of the woodwork; (d) relaminated about 20% of the interior; (e) resurfaced the interior, including the headliners, side panels and carpeting; (f) re-covered the furnishings; (g) installed a new fiber optic phone; and (h) painted the bottom of the Plane and repainted the old stripe. *See* Lainey Dep., 151:11 to 152:25.

30. Had Turnberry actually purchased the Plane "as-is" from IP, it would have received an ***unimproved, non-refurbished*** plane for $7 million.

31. Subsequent to its purchase of the improved Plane, Turnberry instituted suit against IP seeking almost one million dollars in damages.

32. Turnberry's damages allegedly consist of: (a) the $700,000 price difference between IP's selling price ($7 million) and Aero Toy's selling price ($7.7 million); and (b) over $200,000 in plane parts it believes it would have received had it purchased the Plane from IP.[5]

---

[4] These upgrades were actually performed by Jet Center Interiors ("Jet Center") *for Aero Toy* at Aero Toy's facility. *See* Aitkens Dep., 72:24 to 74:1; see also Exhibit M.

[5] Turnberry's exact claim for damages is unknown because Turnberry has failed to produce a corporate representative to testify as to its alleged damages, despite the request for same by IP in its Re-Notice of Taking 30(b)(6) Deposition, served on September 13, 2000.

7

33. The Letter Offer is completely devoid of any reference to spare aircraft parts. *See* Ex. D. The Letter Offer provides that Turnberry offered $7 million for a "1981 Canadair Challenger CL600 S/N 1023 N90UC," without any reference to spare parts. *See id.*

           Respectfully submitted,

           HOLLAND & KNIGHT LLP
           Attorneys for International Paper
           One East Broward Boulevard, 13th Floor
           P.O. Box 14070
           Fort Lauderdale, FL 33302-4070
           Tel: (954) 525-1000
           Fax:(954) 463-2030
           Email: rhutch@hklaw.com; hkeith@hklaw.com

           By: _____
           Richard C. Hutchison
           Florida Bar No. 709360
           Heather C. Keith
           Florida Bar No. 905690

### CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that on this 21st day of December, 2000, a true and correct copy of the foregoing has been furnished via U.S. Mail to: David H. Reimer, Attorney for Plaintiff, Reimer & Rosenthal, LLP, 3801 Hollywood Blvd., Suite #350, Hollywood, Florida 33021.

           HOLLAND & KNIGHT LLP

           By: _____
           Heather C. Keith
           Florida Bar No. 905690

FTL1 #522833 v2